# Ex. A

# Counseled Petition

# *In v. Sup't*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____ :
                               :
John In,                       :
                               :
                  Petitioner,  :                    ____ cv _____
                               :
            v.                 :
                               :
Mark Capozza, Superintendent,  :
State Correctional Institution at :
Fayette,                       :
                               :
                  Respondent.  :
                               :
_____:

**PETITION FOR A WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. § 2254**

Karl Schwartz
Wiseman & Schwartz, LLP
718 Arch Street, Suite 702 North
Philadelphia, PA 19106
215-450-3391
schwartz@wisemanschwartz.com

Counsel for Petitioner
John In

Dated:        February 9, 2021

# Table of Contents

Preliminary Statement ....................................................................... 1

Parties ................................................................................................ 2

Procedural History ............................................................................ 2

The Anti-Terrorism and Effective Death Penalty Act .................................. 3

This Petition is Timely ...................................................................... 4

Statement Regarding Exhaustion and Default ................................. 5

Claims for Relief ............................................................................... 6

## I

Trial Counsel was Ineffective Under the Sixth Amendment for
Failing to Request DNA Testing that Would have Exonerated
Petitioner.  Petitioner is Actually Innocent of the Charges on
Which He was Convicted ................................................................... 6

## II

Trial Counsel Was Ineffective Under the Sixth Amendment, For Failing to
Object to the Prosecutor's Prejudicial Reference to God. It Violated
Pennsylvania Law, Petitioner's Right to Due Process, and the
Establishment and Free Exercise Clauses of the First Amendment ............. 21

## III

Trial Counsel was Ineffective Under the Sixth Amendment, for Allowing
the Commonwealth to Utilize Dyshon Marable's Guilty Plea and
Statement in Any Manner, During the Trial ................................. 25

A.  Knowing Marable Would Refuse to Testify, Trial Counsel was Ineffective Under the Sixth Amendment for Allowing the Commonwealth to Call Him as a Witness. .................................................. 28

B.  Trial Counsel was Ineffective Under the Sixth Amendment for Agreeing to Stipulate that Marable Pled Guilty and For Failing to Request a Cautionary Instruction Regarding the Plea ................................. 31

C.  Trial Counsel was Ineffective Under the Sixth Amendment for Failing to Object to Detectives Hopkins' and Conn's Testimony Regarding Marable's Statement .................................................................... 33

D.  Trial Counsel was Ineffective Under the Sixth Amendment for Failing to Object to the Prosecutor's Reference to Marable's Silence ......... 35

## IV

Petitioner is Entitled to Relief Because of the Cumulative Prejudicial Effect of the Errors in this Case ................................................. 39

Conclusion ................................................................................................ 40

## PRELIMINARY STATEMENT

Petitioner, John In, who is serving a sentence of 25 to 50 years followed by 10 years of probation, resulting from his Pennsylvania conviction for burglary, robbery and related charges, hereby submits his *Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254.*

This is a fact petition. Consistent with the instructions on this Court's Habeas form, except where necessary for identifying bases for a ground for relief, Petitioner does not discuss legal authority at length. Once the Petition is docketed, he will file a *Motion for Permission to File a Brief in Support of Petitioner's Habeas Petition,* in which he will request sixty (60) days to file a brief in advance of any responsive pleading from the Commonwealth.

This petition cites transcripts of the state court proceedings by "NT", followed by the date of the proceeding, followed by the page number.

Most of the cited material in this Petition can be found in the state court record. However, certain cited documents in the record and any cited extra-record documents are included in the accompanying Appendix, and cited as "A", followed by page number.

## PARTIES

Petitioner, John In, is a prisoner in the custody of the Pennsylvania Department of Corrections. He is currently incarcerated at the State Correctional Institution at Fayette, in LaBelle, Pennsylvania, prisoner number HW 6898. Mark Capozza is the Superintendent of the State Correctional Institution at Fayette. As such, he has immediate control over Petitioner's custody.

## PROCEDURAL HISTORY

On September 15, 2008, after a tree-day jury trial, before the Hon. Sandy L.V. Byrd, a Philadelphia Common Pleas jury returned a partial verdict on conspiracy, finding Petitioner guilty of that charge. The jury continued deliberating, and on September 16, 2008, it returned guilty verdicts on burglary, robbery (two counts), PIC, and VUFA.  On December 19, 2008, the trial court sentenced Petitioner to a period of incarceration of 25 to 50 years, followed by 10 years of probation.

On July 23, 2010, the Pennsylvania Superior Court affirmed the judgment of conviction and sentence.  *Commonwealth v. In,* 2010 Pa. Super. LEXIS 3579 (Pa. Super. July 23, 2010) (unpublished). On January 5, 2011, the Pennsylvania Supreme Court denied a petition for allowance of appeal. *Commonwealth v. In,* 12 A.3d 370 (Pa. Jan. 5, 2011).

On July 15, 2011, Petitioner filed a *pro se* PCRA Petition. Subsequent to the *pro se* filing, David Rudenstein, Esq., was appointed to represent Petitioner. On July

2

19, 2013, he filed a Supplemental Amended PCRA Petition. On October 11, 2013, the PCRA court dismissed the PCRA Petition without a hearing. On October 26, 2016, the Pennsylvania Superior Court remanded the case to the PCRA court to conduct an evidentiary hearing on Petitioner's claims of ineffective assistance of counsel. *Commonwealth v. In,* 2016 Pa. Super. Unpub. LEXIS 3920 (Pa. Super. Oct. 26, 2016). Craig M. Cooley, Esq., represented Petitioner on appeal, and for the duration of subsequent PCRA proceedings. Following a July 7, 2017 evidentiary hearing before the PCRA court, that court again dismissed Petitioner's PCRA petition, on August 18, 2017. On April 23, 2019, the Superior Court affirmed. *Commonwealth v. In,* 2019 Pa. Super. Unpub. LEXIS 1522 (Pa. Apr. 23, 2019). On May 27, 2020, the Pennsylvania Supreme Court denied Petitioner's Petition for Allowance of Appeal. *Commonwealth v. In,* 2020 Pa. LEXIS 2954 (Pa. May 27, 2020).

## THE ANTI-TERRORISM AND EFFECTIVE DEATH PENALTY ACT

The Anti-Terrorism and Effective Death Penalty Act (AEDPA) applies to this case. As to some grounds, AEDPA deference under 28 U.S.C. §2254(d)(1) & (2), applies. As to other grounds, *de novo* review is required. Petitioner will address these points in his to-be-filed *Brief in Support*. For now, he asserts that the he is entitled to relief under either *de novo* review, or with the application of AEDPA deference,

because his rights under the United States Constitution were violated and the state court decisions were either contrary to or involved an unreasonable application of United States Supreme Court precedent, and/or were based on an unreasonable determination of the facts in light of the state court record.

## THIS PETITION IS TIMELY

28 U.S.C. § 2244(d)(1) imposes a one-year limitations period for filing a petition. In applicable part, the one-year commences at the conclusion of direct review "or the expiration of the time for seeking such review."

The Pennsylvania Supreme Court denied Petitioner's allocatur petition on direct review, on January 5, 2011. Petitioner did not seek review in the United States Supreme Court. Thus, the "expiration of the time for seeking such review" expired 90 days later, on April 5, 2011.

A properly filed state post-conviction petition tolls the AEDPA limitations period. 28 U.S.C. § 2244(d)(2). Petitioner properly filed just such a petition on July 15, 2011 (which was subsequently amended). By July 15, 2011, Petitioner had used 101 days of the 365 days he is allotted under 28 U.S.C. § 2244(d)(1).

The limitations period remained tolled until May 27, 2020, when the Pennsylvania Supreme Court denied leave to appeal from the denial of Petitioner's PCRA petition. As of May 27, 2020, Petitioner had 264 days remaining on his one-year limitations period. Thus, the AEDPA limitations period expires on February 15,

2021, 264 days from May 27, 2020, and this Petition, filed on February 9, 2021, is timely.

## STATEMENT REGARDING EXHAUSTION & DEFAULT

Each claim for relief contained in this Petition was either fairly presented to the Pennsylvania courts, or else exhaustion is excused or was or remains futile. Three of the claims were never presented to the state courts, and uniformly this was due to the ineffective failure of initial state post-conviction counsel. In those instances, Petitioner can overcome any procedural bar raised by Respondents due to state post-conviction counsel's ineffectiveness. *See Martinez v. Ryan*, 566 U.S. 1 (2012). Petitioner submits that even if a portion of a claim was not presented to the state courts, there is no longer an available remedy to exhaust that aspect of the claim and therefore the claim is arguably procedurally defaulted. In his forthcoming brief, Petitioner will demonstrate why initial PCRA's counsel's ineffectiveness provides cause to overcome any potential asserted default. On the Habeas Form that accompanies this pleading, Petitioner, per the instructions therein, identifies those claims that were not exhausted in state court, and the reasons why.

## CLAIMS FOR RELIEF

### CLAIM I

### TRIAL COUNSEL WAS INEFFECTIVE UNDER THE SIXTH AMENDMENT FOR FAILING TO REQUEST DNA TESTING THAT WOULD HAVE EXONERATED PETITIONER. PETITIONER IS ACTUALLY INNOCENT OF THE CHARGES ON WHICH HE WAS CONVICTED

**Introduction**

On March 7, 2007, three (3) men committed a home invasion robbery at the residence at 720 West Mifflin Street. Two of the men who were charged – Jerry Jean and Dyshon Marable – pled guilty. Petitioner went to trial and was convicted. The main evidence against Petitioner was an in-court identification by a witness who had a brief confrontation with the perpetrator during the incident, and thereafter made a post-incident identification of Petitioner.

The jury never learned of the existence of DNA evidence on the scene that exonerated Petitioner. Trial counsel knew of the DNA evidence; he had been provided notice of it in discovery. Yet he never sought to have the necessary testing and comparison performed that would have conclusively refuted the Commonwealth's theory that Petitioner was the third perpetrator inside the residence at 720 Mifflin. Counsel was ineffective under the Sixth Amendment for failing to do the work that would have established his client's innocence, and his ineffectiveness prejudiced Petitioner. Petitioner, through undersigned counsel, recently performed

the DNA testing and comparison that trial counsel failed to perform. As discussed below, those results exonerate Petitioner.

**Facts Relevant to the Claim**

Mr. Vuthary Yun lived at 720 Mifflin Street, along with his three daughters Christina, Angela and Dina Khem, and one son, Keith Khem. NT 9/10/08 at 74-75. On the morning of March 7, 2007, three men entered his house and accosted him. *Id.,* 101. He was doing the dishes in his kitchen. *Id.,* 101-102. Two of the men (Jerry Jean and Dyshon Marable) went upstairs to a second-floor bedroom occupied by Christina. *Id.* 75-80. Jean, accompanied by Marable, had a gun, and held Christina at gunpoint. *Id.* 80. The third perpetrator, the tallest of the three, took Mr. Yun at gunpoint from the kitchen on the ground floor down to the basement, where he tied him up. *Id.,* 100-104. Mr. Yun's daughter Dina, who had a bedroom in the basement, heard the commotion and phoned the police from inside her bedroom. *Id.,* 124. When Dina Khem later heard the police arrive, she left her bedroom and began walking upstairs toward the ground floor. *Id.,* 124-25. She saw her father and the third perpetrator with a gun. *Id.,* 125-26. She spoke to her father, and the perpetrator pointed a gun at her and told her to "shut the fuck up." *Id.,* 126-27. She then went back into her bedroom. *Id.,* 127. At trial, she identified Petitioner as that third perpetrator. *Id.,* 125.

After the police arrived, Officers Robert Robinson and Felicia Battles went to the rear alley to apprehend one of the two men from upstairs (Jerry Jean), who had jumped out of a second-floor window over that alley. 9/11/08 at 31-35. Jerry Jean was chased for about a block and apprehended by Officer Kevin Cannon, in the vicinity of 6th and Mifflin. *Id.* Jean's DNA was found on a latex glove in the rear alley behind the house, in the 700 block of Mifflin. *Id.,* 146; 170.

While the police were in the rear, the perpetrator from the basement ran upstairs to the ground floor, and then ran through a front vestibule, and out of the house. 9/10/08 at 82-84. Christina Khem, who had come downstairs after the police arrived, was standing by the front door when the man ran right past her. *Id.* at 84. She testified that in order to get out of the house, the man had to run through the vestibule. *Id.* While the man ran past her, she heard him yell "oh shit." NT 9/10/08 at 82-83. A piece of a latex glove was later found in the vestibule. NT 9/11/08 at 23; A1-2. (Commonwealth DNA Report, Item #2).

Defendant Marable was later found by police in an upstairs bedroom closet. *Id.,* 160. Petitioner was arrested a few blocks away, and placed in a police wagon. *Id.,* 91; 130. While in the wagon, Petitioner was displayed by police to Christina Khem. NT 9/10/08 at 92-95. Ms. Khem testified that the man she viewed that night in the police wagon, who she acknowledged was the defendant in the courtroom, was someone who she had never seen before that post-incident confrontation. *Id.,*

93-94. Petitioner was, at the same time, presented to Dina Khem. *Id.,* 130. Dina Khem identified him as the perpetrator from the basement. *Id.* Petitioner was arrested, brought to trial and convicted of burglary, robbery, conspiracy and related offenses, primarily on the basis of Ms. Khem's identification.

DNA samples were taken from Petitioner and Jerry Jean. According to the trial prosecutor, the Commonwealth never took DNA from Marable. NT 9/12/08 at 47. DNA was obtained from five locations at the crime scene. 9/11/08 at 168-176; A1-2. They included three pieces of latex glove found on or near the crime scene, including the one with Jean's DNA on it, found behind the residence, and the one found in the vestibule. DNA was also taken from two guns, one of which was found in a white Nissan Altima, that was chased by police after the incident. *Id.* The other gun was found in an area where Jerry Jean had been observed, behind the residence. *Id.,* 12-13; 32-37. ***Petitioner was excluded from every DNA sample.*** A1-2.

The Commonwealth's expert excluded Petitioner and Jerry Jean as contributors to the DNA found on the glove piece from the vestibule. *Id.,* 172. Thus, for Petitioner to have been the third perpetrator involved in this crime who, according to the Commonwealth's theory, alighted from the basement and escaped through the vestibule, that glove piece had to have been worn by defendant Marable. If it were not, since the Commonwealth had already determined that the glove piece

did not come from Jerry Jean or Petitioner, the third perpetrator was a third, as yet, unknown, individual (and **not** John In).

Marable was caught upstairs in the house. Based on this fact, trial counsel argued to the jury that since Petitioner and Jerry Jean were excluded as contributors to that glove, the glove had to have been worn by the perpetrator who had been in the basement and escaped through the front vestibule. NT 9/12/08 at 24-25.

**Trial Counsel's Deficient Performance**

While it was the defense **theory** that the glove was not worn by Marable, and therefore Petitioner was innocent, trial counsel did nothing to prove that theory. He failed to utilize the readily available evidence – the glove piece and the person of Marable – to do so. This opened the door for the trial prosecutor to assure the jury that there was no unknown third perpetrator, because Marable was, in fact, the man who dropped the glove. *See id.* at 47 (ridiculing the defense argument by restating it as "[John In] is not guilty because **Dyshon [Marable] dropped the glove** . . . ."). Thus, according to the prosecutor, the DNA on the glove was not from an unknown perpetrator, it was from Marable, and therefore the fact that Petitioner's DNA was not on the glove (or anywhere else), was meaningless. This freed the jury to find that Petitioner was the third perpetrator. To obtain a conviction, the prosecutor was forced to make this fallacious argument, in light of her concession – required by the evidence – that only "three guys" were involved in the robbery. NT 9/12/08 at 42.

In attempting to explain the absence of scientific proof to support her suggestion that the DNA was Marble's, the prosecutor told the jury that Marable's DNA was not taken because the date of his plea "predates the day the buccal swabs was [*sic*] taken from Jerry Jean or John In. So, there was no buccal swab from Dyshon Marable." *Id.,* 47. The prosecutor never explained, nor could she have, why Marable's earlier plea precluded the Commonwealth from obtaining a court order for Marable's DNA. In fact, under Pennsylvania law, Marable was required to provide his DNA following his conviction and sentence. Regardless, Marable's admission of guilt, coupled with the relevance of his DNA profile, meant that obtaining his DNA would be a mere formality. The Commonwealth's suggestion – in the absence of supporting scientific evidence that it could have easily obtained – that the DNA on the glove was Marable's, undermined the integrity of this conviction.

During the habeas investigation in this case, Marable agreed to provide Petitioner's habeas counsel with a buccal swab so that a DNA analysis could be obtained. On February 25, 2020, Marable was swabbed and his sample was sent to a DNA Laboratory, DNA Diagnostics Center, of Fairfield, Ohio. A3-5. On February 28, 2020, DNA Diagnostics Center issued its report revealing Marable's profile. A6-7. After undersigned counsel obtained the profile, and alerted the Commonwealth, the Commonwealth made arrangements to obtain its own buccal swab from Marable,

to allow an analysis and comparison. The Commonwealth obtained Marable's buccal swab on July 27, 2020, and now has it in its possession. As of this writing the Commonwealth has not completed its DNA analysis and comparison.

Petitioner, however has. Petitioner's DNA Expert is Arthur W. Young, of Guardian Forensic Sciences in Abington, Pennsylvania. A8-15. Arthur Young compared the Marable profile with the DNA found on the glove piece from the vestibule as reported in the Commonwealth DNA report at A1-2. Arthur Young concludes, contrary to the prosecutor's invitation to the jury to find otherwise, that Marable is excluded as a contributor to the DNA on the glove piece in the vestibule. A17. Arthur Young is prepared to testify to this critical fact at an evidentiary hearing. It is a fact that wholly exonerates Petitioner, since it demonstrates, by sheer process of elimination, that the third individual who alighted from the basement could not have been Petitioner. This is so, because there has never been any question that Jean and Marable (both of whom pled guilty) constituted two of the three perpetrators. Since Petitioner and Jerry Jean were long ago excluded as wearers of the vestibule-glove, and now Marable is excluded, there is no question that the third person involved in the crime could not have been Petitioner. Petitioner respectfully suggests that the Commonwealth has no interest in preserving the conviction of an innocent man, and should concede habeas relief.

In addition to this dispositive evidence of innocence, Young's expert opinion offers even more exculpatory evidence, that further demonstrates that, but for trial counsel's failure to seek Marable's profile, there is a reasonable probability that Petitioner would have been acquitted. Young found a number of common alleles between Item # 2 (the glove piece in the foyer) and Item # 4 (the firearm in the Nissan Altima). A18. As discussed above, the Commonwealth's evidence demonstrated the likelihood that the person who alighted from the basement and ran through the vestibule, and attempted to escape in a Nissan Altima. Young's discovery of commonalities between the alleles in the DNA on Items 2 and 4, means that "it cannot be ruled out [that] there is at least one common contributor," who cannot be Petitioner, to the glove piece from the foyer and the gun in the Altima. A18. It would certainly stand to reason that the person who fled the residence through the vestibule, discarding the glove piece, was the same person who attempted to escape in the car, and was in possession of the gun found in the car. But even if not, this Court now knows for certain – what no court knew before – that the man who discarded the glove piece in the vestibule, after alighting from the basement, was not Marable.

Trial counsel failed to act as the reasonably competent advocate guaranteed by the Sixth Amendment, when he failed to seek to obtain co-defendant Marable's DNA profile. Petitioner repeatedly requested that trial counsel seek testing of

Marable, before trial. A22. Petitioner knew that he was not involved in the crime, let alone present in the vestibule, and related the same to his attorney. *Id.* But trial counsel never honored Petitioner's request. Moreover, even if Petitioner had never made the request, trial counsel should have known that because Petitioner was excluded from being a contributor to the DNA, there was no risk, and an extraordinarily high reward – exoneration – in having the test done.  A23. Trial counsel's failure to request the testing allowed the prosecutor to argue, and the jury to find, that the glove piece in the vestibule was worn by Marable, rendering the vestibule-glove evidence useless to the defense.

### Petitioner Was Prejudiced by Trial Counsel's Deficiency

The prejudice resulting from counsel's blunder was extreme. The Commonwealth's theory was wholly dependent upon Petitioner being one of three active participants in the home invasion; that he entered the house along with Jerry Jean and Dyshon Marable, that he held Mr. Vuy and his daughter Dina at gunpoint, that he tied up Mr. Vuy, and then escaped from the basement, out the front door of the house. The DNA evidence demonstrates that none of that happened. Yet, the Commonwealth repeatedly trumpeted Dina Khem's identification, notwithstanding that it was based on a fleeting observation at 5:00 in the morning in a basement, to assure the jurors that they had enough evidence to confidently convict Petitioner. *See, e.g.,* NT 9/12/08 at 40 ("Every opportunity Dina Khem has been given to

14

identify the man who pointed a gun to her and had her tied up with this orange cord, she has told you it is John In. She told you the police officers that night at the paddy wagon within how many minutes, seven, it was John In. She goes to a preliminary hearing five weeks in front of a Judge, not this one, and tells the Court then, it's John In. She come in here and unequivocally tells all of you it's John In.").

This was not a strong case for the Commonwealth.[1] Evidence that conclusively demonstrated that Petitioner was not the third perpetrator would have surely resulted in an acquittal. Even without this DNA evidence, Dina Khem's identification was undermined by much of the other evidence in the case. First, her sister Christina testified that the perpetrator passed right by her in the house before alighting through the vestibule. NT 9/10/08 at 90. Yet, when Christina viewed Petitioner a short time later, she did not recognize him as anyone she had ever seen before. NT 9/10/08 at 94.

Second, Dina Khem's father testified that the tallest of three men took him into the basement (the man who Christina Khem witnessed). NT 9/10/08 at 112. However, according to Commonwealth witness Officer Thomas Nolan, one of the three perpetrators, Jerry Jean, stood at 6'4". NT 9/11/08 at 54. Petitioner, according

---

[1] Indeed, the trial court's prejudice assessment, cited by the Superior Court (*In,* 2019 Pa. Super. LEXIS at *24), relied on a patently erroneous fact – that Petitioner "dropp[ed a] latex glove" in the residence (Op. at 11) – the glove from which he was ***excluded*** as having been a contributor. Petitioner addresses this clearly erroneous (and hence unreasonable) factual determination in his forthcoming brief.

to the police discovery, stood at 5'9". PCRA Hearing 7/17/17 at 42.  Even Dina Khem, who viewed Petitioner and Jerry Jean at the post-incident confrontation, acknowledged that Petitioner was the shorter of the two. NT 9/10/08 at 143.

Third, Petitioner's DNA was excluded as a source of the DNA found on the glove piece that most likely would have been discarded by the person who fled through the vestibule. NT 9/11/08 at 172.

Fourth, the Commonwealth's theory was that Petitioner, who fled in the white Nissan, left his gun in the car. Yet, while DNA was found on the firearm, Petitioner was excluded as a contributor. NT 9/11/08 at 175.

Fifth, none of the witnesses, including Christina Khem, who described the outer clothing worn by the man who ran from the basement through the vestibule, came close to describing the blue camouflage outerwear with writing on it, that Petitioner was wearing moments after the incident. NT 9/11/08 at 132.

Finally, Dina Khem's post-incident identification took place under highly suggestive circumstances. Petitioner was presented to her in the back of a paddy wagon, standing right next to co-defendant Jerry Jean. NT 9/10/08 at 130. Thus, she viewed two suspects at once, an inherently suggestive procedure. *Id.,* 93. She viewed them in the company of her sister, Christina, also inherently suggestive. *Id.* Police commentary independently suggested to Dina Khem the criminal involvement of the men who were presented to her. That became clear when Christina Khem testified

that during the identification process, police stated that the man standing next to Petitioner had earlier been wearing the green sweatshirt that Christina had seen the perpetrator wearing in her bedroom. *Id.,* 94.

The only other evidence against Petitioner was his alleged flight. That evidence, however, was thin, inconsistent and dubious. Police Officer Roger Birch testified that when he arrived on the scene, he observed Petitioner "kneeled down" behind a white Nissan in the 600 block of Mifflin Street, near the corner of 7th and Mifflin. NT 9/11/08 at 96. According to Birch, Petitioner then jumped through the passenger's side of the car, put it in reverse, and drove eastbound in the 600 block of Mifflin Street. *Id.* The Nissan crashed into a house in the 500 block of Mifflin, and the driver, who Birch identified as Petitioner, took off running. *Id.*

Birch was the only police witness to place Petitioner anywhere near the Nissan. There were many reasons to doubt Birch's testimony, and thus reject his contention that Petitioner was in the Nissan.

First, as noted above, while a gun was found in the car, DNA testing excluded Petitioner, gloveless at arrest, from being a contributor. NT 9/11/08 at 175.

Second, Birch's various accounts over time of the man in the Nissan, were inconsistent in significant ways. On the same day of the incident, March 7, 2007, Birch wrote out a report in longhand. 9/11/08 at 102-104. In it, he stated that when he arrived on the scene "he observed a male [alleged to be Petitioner] sitting inside

(white) Nissan . . . . " *Id.; Id,* 105. There was no hint of his later 2008 trial testimony that the male had been kneeling by the car, or that the male jumped through the passenger side. When Birch gave his 75-483 on March 20, 2007, *id.,* 108-109, he offered a third version of the actions of the man in the Nissan. In his 75-483, Birch states that when he first arrived, the man was not seated in the car as he had written two weeks earlier, nor kneeling down behind the car, as he testified at trial, but rather the man was "running Northbound on 6th St." *Id., Id.,* 109. Additionally, in this (75-483) account – contrary to his trial testimony – the Nissan is at the corner of 6th and Mifflin, not 7th and Mifflin. *Id.; Id.,* 110.

Third, Birch's testimony cannot be squared with his fellow officer Kevin Cannon's testimony. Birch placed Cannon right on the scene with him at 7th and Mifflin. NT 9/11/08 at 99. Indeed, at trial Cannon testified to having approached that corner where the Nissan was located, and seeing a man – Jean, not Petitioner – crouched, moments before the Nissan took off. NT 9/11/08 at 80-81. Yet Cannon never mentioned that he saw the male Birch saw, let alone saw the male engaged in any of the activity Birch described. If Birch's testimony was truthful and accurate, Cannon would have easily seen Petitioner kneeling beside or running toward the Altima. Cannon, though, never reported or testified to seeing Petitioner, or anyone, entering or running toward the Altima.

Fourth, other evidence in the case flatly contradicted Birch's account that he was next to the Nissan in his RPC, when the man fled from inside the Nissan. Birch testified that he pursued the Nissan into the 500 block of Mifflin Street, where it crashed. NT 9/11/08 at 96. He maintained that that was where he put his RPC in park, exited it, and proceeded to chase the man who had jumped out of the Nissan. *Id.* at 96-97. Birch put himself, and his car, midpoint between 5th and 6th Streets, on Mifflin (524 Mifflin). NT 9/11/08 at 100. From this testimony, a juror would naturally infer that Birch was right next to the man, and thus credit his identification of the man as Petitioner.

But after Petitioner was in police custody, Birch put out a call to his fellow officers to retrieve his vehicle, which he described on police radio as "sitting . . . on the ***700 block*** of Mifflin Street." A20.

Officer Peter Seabron also confirmed that Birch did not drive into the 500 block of Mifflin. Birch had testified that when he returned to his vehicle allegedly in the 500 block of Mifflin, Officer Seabron was tending to it. NT 9/11/08 at 101, 111. But Seabron refuted this. He testified that yes, he was in the 500 block of Mifflin with the abandoned Nissan after the driver fled, ***but he did not see Birch's car there.*** NT 9/11/08 at 122. Additionally, Seabron testified that the pursuit that led to the crash was "foot pursuit," not vehicular pursuit. NT 9/11/08 at 116-117.

For all of these reasons, Birch's identification of Petitioner as the driver of the fleeing Nissan, was highly doubtful. So too was his contention that he participated in apprehending Petitioner. 9/11/08 at 100. The police radio transmission indicates otherwise. Sergeant Woods, who arrested Petitioner, and was in RPC 4C, was heard to ask for a wagon at 5th and Hoffman. A21. Birch, who is in RPC 33 (*see id.,* 104), then asks police radio if **he** should go to 5th and Hoffman. *See* A21 ("33, that's where you want me at, 5th and Hoffman?"). Police radio answers affirmatively, and then engages with Sergeant Woods about whether anyone was injured as a result of his apprehension of Petitioner. *Id.*

Indeed, without even having heard the indisputable evidence of innocence presented here, and despite the allegation of flight, the jury struggled with the question of Petitioner's involvement. The jury sent nine questions and requests to the trial court regarding various witnesses and items of evidence. NT 9/12/08 at 90-91; NT 9/15/08 at 1-18. The jury deliberated for three days before returning verdicts on all charges. NT 9/16/08 at 5-7.

The writ should issue.

# CLAIM II

### TRIAL COUNSEL WAS INEFFECTIVE UNDER THE SIXTH AMENDMENT, FOR FAILING TO OBJECT TO THE PROSECUTOR'S PREJUDICIAL REFERENCE TO GOD. IT VIOLATED PENNSYLVANIA LAW, PETITIONER'S RIGHT TO DUE PROCESS, AND THE ESTABLISHMENT AND FREE EXERCISE CLAUSES OF THE FIRST AMENDMENT

In closing, the prosecutor argued the following to the jury:

> For John In to be not guilty, Dina Khem would have to had gotten up here, sworn under oath, *in front of God* and all of you and lied. For John In to be not guilty Officer Birch would have stood in front of all of you, *took an oath to God* and lied. Now, if you believe that, that's the only way that John In is not guilty.

NT 9/12/08 Tr. at 40. Thus, in the starkest possible terms, the prosecutor gave the jury a binary choice. The (only) two witnesses who implicated Petitioner either intentionally broke their oath to the Lord or Petitioner was guilty.

The prosecutor's argument violated Petitioner's right to due process under the Fourteenth Amendment to the United States Constitution, his rights under the establishment and free exercise clauses of the First Amendment to the United States Constitution, 42 Pa.C.S. § 5902, and Article I, Section III of the Pennsylvania Constitution. Trial counsel was constitutionally ineffective for failing to object to the argument.

The prosecutor's reference to God was meant to assure the jurors that, because the witnesses had taken an oath to God, they were more likely to have told the truth. There are several reasons why such an argument runs afoul of both Pennsylvania

21

and federal constitutional law. First, as opposed to emphasizing the legal consequence to not telling the truth, the prosecutor pressed upon the jury the religious consequence. That construct, its implicit promise of retribution, and the implication that religious considerations would influence these witnesses to tell the truth, is improper. Second, the just-as-potent message to the jurors, that they should have confidence that the oath takers' presumed belief in God ensured that they would honor their oath, was equally improper. Third, the argument's presumption of the witnesses' belief in, and fear of, God, was also improper. All of these considerations improperly vouched for the witnesses, and improperly bolstered their credibility, and improperly introduced religion into the jury's assessment of their credibility.

For all of these reasons, the prosecutor's comments violated both the establishment and free exercise clauses by favoring religion, belief in God and belief in divine retribution. The prosecutor's improper argument also so infected the trial as to make it fundamentally unfair and therefore a denial of due process. Trial counsel's failure to recognize these constitutional violations and object to them constituted deficient performance under *Strickland v. Washington,* 466 U.S. 668 (1963).

The arguments also violated Pennsylvania law. 42 Pa.C.S. § 5902(a) & (b) state in relevant part that "[t]he capacity of any person to testify in any judicial proceeding shall not be affected by his opinions on matters of religion[, and that no]

evidence [shall] be heard upon the subject, for the purpose of affecting either his competency or credibility." Under Pennsylvania law, this section has been interpreted to "prohibit[] the use of a witness' religious belief or affiliation to bolster [] his credibility. *Commonwealth v. Myer,* 489 A.2d 900, 905-906 (Pa. Super. 1985). Here, the prosecutor did just what the *Myer* Court held was expressly prohibited: using Ms. Khem's and Officer Birch's presumed belief in the sanctity of their oaths before God, to bolster their credibility. Such commentary also runs counter to the Pennsylvania Constitution. *See Commonwealth v. Eubanks,* 512 A.2d 619, 622-23 (Pa. 1986) (reversing, in part, based on prosecutor's references to witness's religious belief, because Pennsylvania 's Constitution "is neutral regarding religion. It neither encourages nor discourages religious belief. It neither favors or disfavors religious activity. A citizen of this Commonwealth is free, of longstanding right, to practice a religion or not, as he sees fit, and whether he practices a religion is strictly and exclusively a private matter, not a matter for inquiry by the state.").

Trial counsel failed to act as the reasonably competent advocated guaranteed by the Sixth Amendment, when he failed to raise an objection under Pennsylvania statutory and constitutional law, to the prosecutor's references to God for the purpose of bolstering and vouching for the witnesses' credibility.

Petitioner was prejudiced by these references, in the absence of which there was a reasonable probability of a different result. The references to God had nothing

to do with the evidence in the case. Yet the prosecutor's assurance that the oath to God carried with it the imprimatur of veracity resolved for the jury legitimate questions about the compromised, and inconsistent evidence around both the identification of Petitioner as the perpetrator, and the allegation of flight. Petitioner incorporates by reference his prejudice argument focusing on the weakness of the Commonwealth's case, set forth *supra* at 14-20.

The writ should issue.

**CLAIM III**

**TRIAL COUNSEL WAS INEFFECTIVE UNDER THE SIXTH AMENDMENT,
FOR ALLOWING THE COMMONWEALTH TO UTILIZE DYSHON
MARABLE'S GUILTY PLEA AND STATEMENT IN ANY MANNER,
DURING THE TRIAL**

**Facts Related to this Claim**

On direct examination, Detective Robert Conn testified as follows:

**Q.**  Did you have an opportunity to speak with the co-defendant,
Dyshon Marable, after he was taken from the closet?
**A.**  At a later time, that's correct.

**Q.**  Where did you speak with him?
**A.**  South Detectives.

**Q.**  Did you give him his Miranda warnings?
**A.**  That's correct.

**Q.**  Was he cooperative?
**A.**  He was.

**Q.**  Did he provide you a statement with his ***and others***
actions for this incident?
**A.**  He did.

NT 9/11/08 at 13.

The Commonwealth then sought to call co-defendant Dyshon Marable as a
witness against Petitioner. NT 9/11/08 at 58. Marable, who was represented by
counsel, initially testified outside the presence of the jury that he would refuse to
testify in the matter. *Id.,* 61-64. Trial counsel, during PCRA proceedings,
acknowledged that Marable had made it clear that he would not testify. NT 7/7/17

at 14. In light of Marable's refusal to testify, the trial court held him in contempt, and sentenced him to six months less one day and a fine of $499.00. *Id.,* 66-67.

Following Marable's refusal, trial counsel made no motion to strike Detective Conn's testimony regarding Marable's statement.

The trial prosecutor, while acknowledging that Marable would refuse to testify, stated her intention to call him as a witness, inquire of him, and have the trial court sheriff identify him. *Id.,* 69, 73. She also indicated that she would have Commonwealth witness Detective John Hopkins testify that Marable gave a statement after arrest. *Id.,* 73. Inexplicably, trial counsel stated that he did not object to these requests. *Id.* The Commonwealth then called Marable. *Id.,* 75. The trial judge, in the presence of the jury, instructed the court crier to "**[*s*]*wear the witness.*"** *Id.* Trial counsel offered no objection. Marable refused to take the oath. *Id.* The trial judge stated: "Let the record reflect the witness refused to give his name." Trial counsel offered no objection to the questioning or the trial court's comment. Marable was then identified by the trial court's sheriff, as Dyshon Marable. *Id.* The prosecutor then asked that Detective John Hopkins be permitted to enter the courtroom "to look at the witness for purpose of future questioning." *Id.,* 75-76. Trial counsel offered no objection. The trial court granted the request, and Hopkins did so. *Id.* The trial court then granted trial counsel's request to momentarily stand next to the witness. *Id.,* 76-77.

After Marable was excused, the trial prosecutor announced the following stipulation, to which trial counsel consented, to the jury:

> There's been a stipulation by and between counsel that in the case of Commonwealth versus Dyshon Marable, Common Pleas Court No. 51-CR-0004827-2007 that in this courtroom, December 3rd, 2007, before the Honorable Judge Byrd, Dyshon Marable pled guilty to three counts of robbery. Victims being Vuthay Yun, Dina Khem, and Christina Khem. Plead guilty to burglary of the house al 720 Mifflin Street. Pled guilty to possession of an instrument of crime, conspiracy regarding the incident that happened on March 7th, 2007. In exchange to his guilty plea, it was negotiated, he was sentenced to a period no less than five no more than ten years incarceration.

*Id.,* 78.

During Detective Hopkins subsequent testimony, the trial prosecutor elicited the following:

> **Q.** And Marable was taken to South Detectives, correct?
> **A.** Yes, he was.
>
> **Q.** He was Mirandizcd, correct?
> **A.** Yes, he was.
>
> **Q.** And he did give a statement?
> **A.** Yes, he did.

*Id.,* 161. Trial counsel offered no objection.

In closing to the jury, the trial prosecutor stated:

> And you saw Dyshon Marable, he wouldn't even say his name, let alone be sworn in. Well, why? He took a plea, he's serving his time. He's not going to snitch on his buddy, no matter what the consequences are to him. You saw, you saw the attitude he gave everybody including the Judge. Well, that's his boy, I brought him down here. He's not going to testify for the Commonwealth, right?

27

*Id.,* 46. Trial counsel offered no objection.

### A. Knowing Marable Would Refuse to Testify, Trial Counsel was Ineffective Under the Sixth Amendment for Allowing the Commonwealth to Call Him as a Witness.

Trial counsel's decision to allow Marable to be called as a witness, and refuse to testify, permitted a procedure condemned by Pennsylvania law and federal constitutional law. Counsel performed deficiently in doing so, and his deficiency prejudiced Petitioner. Competent counsel would have been aware of Pennsylvania precedent, precluding the Commonwealth from calling a co-defendant when the Commonwealth knows that the witness will refuse to testify. *Commonwealth v. Terenda,* 301 A.2d 625 (Pa. 1973). Pennsylvania finds this practice to be especially prejudicial when it occurs after the Commonwealth has introduced evidence alleging that the co-defendant was in the defendant's company during the incident. *Id.,* 628. Under those circumstances, the adverse inference drawn by the jury from invocation of silence will naturally be transferred to the defendant on trial. *Id.* Such a spectacle improperly encourages the jurors, and did so in this case, to find a defendant guilty by association, without the co-defendant having to utter a word. The adverse inference also violates a defendant's Sixth Amendment right of confrontation, since the defendant has no means to confront the adverse inference elicited from the silent witness. *Id.*

The Pennsylvania Supreme Court reaffirmed *Terenda* in *Commonwealth v. DuVal,* 307 A.2d 229 (Pa. 1973), holding that "[i]t is prejudicial error for a prosecutor to summon a witness to the stand in a criminal trial with foreknowledge that the witness intends to invoke a privilege against self-incrimination." Thereafter, the Superior Court reaffirmed that calling the silent witness is particularly problematic "where the witness is likely to be thought by the jury to be associated with the defendant in the incident out of which the criminal charges arose." *Commonwealth v. Musolino,* 467 A.2d 605, 610 (Pa. Super. 1983).

Trial counsel should have also known that the practice violated Petitioner's Fourteenth Amendment right to due process and Sixth Amendment Right of confrontation and cross-examination. Due process of law precludes obtaining "convictions" that are "brought about by methods that offend a sense of justice." *Rochin v. California,* 342 U.S. 165, 173 (1952) (quotations omitted).  Allowing jurors to make a guilt-by-association inference that follows from calling a co-defendant, who then refuses to testify, fits that paradigm. Petitioner was denied his Sixth Amendment right of cross-examination, because when the witness refused to testify it left nothing on which to cross. The refusal to testify, however, spoke volumes to the jury, implicating Petitioner in the incident.

Trial counsel's alleged rationale, which he offered during his testimony at the PCRA hearing, was nonsensical, and nothing more than a post-hoc rationalization

for an unreasonable decision without any strategic basis. Trial counsel testified that he "wanted Mr. Marable to be able to come into the courtroom so that the jury could see his particular height. *Id.,* 19. But counsel gave no reasonable explanation as to why this was important, and he never established Marable's height nor its relevance to Petitioner's height. When the prosecutor suggested counsel called Marable to show that Marable was taller than Petitioner, he declined to accept that suggestion. *Id.,* 30. Indeed, he conceded that he never informed the jury how tall Mr. Marable was or, for that matter, how tall he (counsel) was. *Id.,* 43. Nor did he have Petitioner ever even stand next to Marable. *Id.,* 43. To complete the picture of counsel's ineptitude in calling Marable, he ultimately conceded that he did not even "recall when [he] saw Mr. Marable that [he] knew how tall he was." *Id.,* 44.

Because Vuthary Yun had testified that the tallest perpetrator took him into the basement, reasonably competent trial counsel might have sought to establish that Petitioner was not the tallest among Jean, Marable and himself. But Marable stood at 5'6"[2] – three inches shorter than Petitioner. Thus, placing him next to Petitioner, who according to the police discovery stood at 5'9", 7/7/17 at 42, would hardly prove that point. It was a boneheaded move, establishing that there was at least one person *shorter* than Petitioner. Any competent prosecutor would have pointed that out, and this one did. NT 9/12/08 at 45-46. Moreover, any in-court display to prove that one

---

[2] A5.

of the co-defendants was taller than Petitioner, was unnecessary at that point in the trial. There was evidence – already elicited by the time Marable was called as a witness – that Jerry Jean, stood at 6'4", NT 9/11/08 at 54, far taller than Petitioner. Had trial counsel really needed to display Marable to the jury, which he surely did not, he could have asked the trial court to have Marable identified and displayed, without having him sworn as a witness and questioned, and without having the trial court comment on, and emphasize, his refusal to testify. Trial counsel was obliged to object to each of those actions, yet he objected to none of them.

Finally, even if a court could divine for trial counsel a reason to allow Marable to have taken the stand, competent counsel would have insisted that the jury be instructed that it could not use his refusal to testify, against Petitioner. In the absence of such an instruction, that is surely how the jury received Marable's silence. Counsel was also ineffective for failing to request such an instruction.

### B. Trial Counsel was Ineffective Under the Sixth Amendment for Agreeing to Stipulate that Marable Pled Guilty and For Failing to Request a Cautionary Instruction Regarding the Plea

Pennsylvania law precludes consideration of a co-defendant's guilty plea against a defendant ""because [t]he defendant ha[s] a right to have his guilt or innocence determined by the evidence presented against him, not by what has happened with regard to a criminal prosecution against someone else." *Commonwealth v. Geho*, 302 A.2d 463, 465-466 (Pa. Super. 1973); *accord United*

*States v. Gambino*, 926 F.2d 1355, 1363 (3d Cir. 1991). Additionally, due process of law precludes "convictions" that are "brought about by methods that offend a sense of justice. *Rochin v. California,* 342 U.S. 165, 173 (1952) (quotations omitted). A "co-conspirator's guilty plea as substantive proof of a defendant's complicity in a conspiracy without cautionary instruction," fits squarely in that category. *Bisaccia v. Attorney Gen.,* 623 F.2d 307, 312 (3d Cir. 1980). That conclusion is grounded "on the concept of fundamental fairness inherently required in every criminal trial." *Id.*

The Commonwealth could say little to refute Petitioner's misidentification defense, so instead, the Commonwealth attempted to refute it by this improper, unconstitutional "guilt by association" inference, by introducing the stipulation. Ironically, a curative instruction generally acknowledges the proper use of the otherwise fraught evidence. Yet here, there was no purpose for the evidence other than to establish Petitioner's guilt, a clearly invalid purpose. Nonetheless, at the very least, the jury needed to be instructed that it could not use the evidence of Marable's guilty plea as proof of Petitioner's guilt.

In PCRA proceedings, trial counsel offered no rationale for agreeing to the stipulation, only a defense that Marable's plea to conspiracy "did not inculpate [Petitioner] because he was not [Marable's] only co-defendant." 7/17/17 at 27. That the jury might have assumed that the co-conspirator(s) Marable was referencing was not Petitioner, is a thin reed upon which to justify failing to object. It also belies

commons sense; why else would the prosecutor seek to introduce evidence of a co-defendant's guilty plea in a trial involving only Petitioner, if not to create the inference that Marable was referring to Petitioner? Additionally, Detective Robert Conn's testimony – also not objected to – that Marable's statement inculpated "others" (*see infra* at 25), obliterates the basis of trial counsel's defense (i.e., that Marable may have been referring to only one other charged co-conspirator.).

Trial counsel failed to act as the reasonably competent advocate guaranteed by the Sixth Amendment first, for agreeing to an improper unconstitutional stipulation, and thereafter, failing to obtain a cautionary instruction.

### C.   Trial Counsel was Ineffective Under the Sixth Amendment for Failing to Object to Detectives Hopkins' and Conn's Testimony Regarding Marable's Statement

Conn's and Hopkins' testimony that Marable gave a voluntary Mirandized statement had no relevance at Petitioner's trial. Remarkably, trial counsel acknowledged this, yet failed to object. 7/7/17 at 23. The evidence was presented only to suggest that Marable freely incriminated Petitioner in his statement, because why else would the prosecutor have called him? In a trial where Petitioner was the only defendant, it required no great powers of deduction, for the jurors to figure out that Marable would never have been called had he not implicated Petitioner in a prior statement. That point was driven home by Conn's testimony that Marable's statement did not just implicate Marable, but it implicated "other**s**" as well. The use

of the plural was not accidental. It was meant to include not just the co-defendant Jean, who pled guilty, but Petitioner too. To the extent counsel's failure to object to Conn's testimony was based on counsel's assumption that Marable was going to testify; following Marable's refusal, counsel was obliged to move to strike Conn's references to Marable's statement.

At the PCRA hearing, counsel was unable to articulate a strategic reason for not objecting to Hopkins' and Conn's testimony. Nor could trial counsel provide a strategic reason for failing to request a cautionary instruction that the jury could not draw an adverse inference against Petitioner based on the incriminating evidence that Marable gave a voluntary statement.

For all intents and purposes, trial counsel's failure to object, allowed the prosecutor to get what she wanted in the first place: Evidence before the jury allowing it to infer the substance of Marable's statement. And this evidence, proved more impactful because it was not subjected to cross-examination. It was irrelevant under Pennsylvania law, and violated Petitioner's right of confrontation under the Sixth Amendment, since Petitioner was unable to rebut, through cross-examination, the incriminating inference that reference to Marable's statement created. The prejudice was exacerbated by the fact of Marable's refusal to testify. The jurors understood that, at a trial involving just one defendant, a prosecutor who calls a witness who had given a voluntary statement, does so because it will help her case

34

against that defendant. The fact of a former voluntary statement, and present refusal to testify is thus quite clear: it suggests that Marable voluntarily accused Petitioner of involvement in the crime, and only refused to reassert that accusation when forced to confront Petitioner.

These inferences, based on the detectives' testimony, were impermissible violations of Pennsylvania and federal constitutional law. Trial counsel failed his duty to his client when he declined to object to the detectives' testimony.

### D. Trial Counsel was Ineffective Under the Sixth Amendment for Failing to Object to the Prosecutor's Reference to Marable's Silence

Any doubt as to the Commonwealth's intention in calling Marable to the stand was eliminated, by the prosecutor's comment on his refusal to testify. As discussed above, under federal constitutional law and Pennsylvania law, a juror may draw *no* inference from a witness's refusal to testify. Here, during the PCRA evidentiary hearing, the Commonwealth conceded that this is exactly what the prosecutor was asking the jury to do, draw and inference. *See* NT 7/7/17 at 36-37 (Question: "When the prosecutor mentioned the fact that Mr. Marable refused to testify ***and she asked the jury to draw inferences from that fact*** . . . . "). This case involved the prosecution of John In, alone. The only purpose of the prosecutor's reference, was to inculpate Petitioner. It was thus impermissible and trial counsel's failure to object, indefensible.

And, not surprisingly, the prosecutor made no bones about the fact that Marable's refusal *should* be used against Petitioner. The prosecutor asked the jury why a person who has already pled guilty and is serving time, would refuse to say, what he had already said, to Conn and Hopkins. Just one reason, "[h]e's not going to snitch on his buddy, no matter what the consequences are to him." *Id,* 46. The not-so-veiled message was clear – Marable did "snitch on his buddy" when he made the statement to Conn and Hopkins. It was a "back door" way to inform the jury that Marable had pointed the finger at Petitioner in his voluntary Mirandized statement. Its impact was no less than it would have been had the prosecutor presented actual evidence of a Marable statement in which he "snitched on his buddy." Even trial counsel was constrained to acknowledge this, testifying that "I don't think it would be fair [for] the prosecutor to argue that Mr. Marable would have said something inculpatory against the defendant and that they could infer that simply by his silence. I don't think that's fair." NT 7/7/17 at 37.

In *Bisaccia,* the Court found that the prosecutor's comment on the co-defendant's guilty plea was critical to a finding of a due process violation. 623 F.2d at 313. In Petitioner's case, the comment was more egregious. In *Bisaccia,* it referenced the co-defendant's plea to conspiracy as a way to suggest *Bisaccia*'s guilt. While that is bad enough, here, the prosecutor's comment suggested the actual

content of Marable's prior statement (snitching on his buddy) and what Marable knew, but was refusing to disclose.

The accusation that the prosecutor divined for the jury, contained in the co-defendant's refusal to testify, further exploited the error attendant under Pennsylvania law in introducing evidence of the co-defendant's guilty plea, (*see* discussion above). The *Duval* Court found the witness's refusal as completely irrelevant to the question of guilt or innocence. 307 A.2d at 233. Thus, there was no basis under Pennsylvania law for the prosecutor's argument. The prosecutor's comment also exploited the error under the due process clause of the Fourteenth Amendment and Petitioner's right to confrontation and cross examination guaranteed by the Sixth Amendment.

Trial counsel failed to perform as the reasonably competent advocate guaranteed by the Sixth Amendment, when he failed to object to the prosecutor's statement in closing. He admitted as much, conceding that he had "[n]o strategic reason" for failing to object, and that he "should have objected." 7/7/17 at 29.

**Prejudice**

Separately, and cumulatively, all of these categories of errors by trial counsel prejudiced Petitioner. But for the errors, there was a reasonable probability of a different result. They permitted the jury to find Petitioner guilty by association by connecting Marable's refusal to testify and entry of a guilty plea, with Petitioner,

just as Pennsylvania and federal constitutional law envisages and condemns. They also encouraged the jurors to find that Marable, in his earlier statement, implicated Petitioner in the incident; again, in violation of Pennsylvania law, and Petitioner's rights to confrontation and due process. The prosecutor's exploitation of counsel's errors in closing also violated Pennsylvania law and the aforementioned constitutional provisions. Trial counsel's failure to object to any of this, satisfies *Strickland*'s prejudice prong.

Petitioner incorporates by reference, as if set forth fully herein, his prejudice argument, *supra* at 14-20. The Commonwealth's evidence consisted of a single identification and evidence of flight. These two lynchpins of the Commonwealth's case were each compromised in critically significant ways outlined in detail above.

The writ should issue.

## CLAIM IV

### PETITIONER IS ENTITLED TO RELIEF BECAUSE OF THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE

Courts have long recognized that constitutional claims of error are to be considered cumulatively as well as individually, and that cumulative error or prejudice may provide a basis for relief whether or not the effect of individual errors warrants relief.

If the Court finds cumulative prejudice, it eliminates the need to analyze the individual prejudicial effect of each deficiency. Moreover, if the court finds itself in equipoise as to effect of these cumulative errors, such that it merely has grave doubt as to the existence of prejudice, relief must be granted.

Here, the cumulative effect of counsel's serious failures and the constitutional errors committed by the court so undermined the fairness of the trial that Petitioner's conviction and sentence must be overturned. Whatever their effects individually, these errors, cumulatively created a reasonable probability that both for counsel's ineffectiveness, there is a reasonable probability that the outcome of trial would have been different.

## CONCLUSION

For all of the above reasons, and based upon the full record of this matter,

Petitioner, John In requests that the Court provide the following relief:

A)    That Petitioner be granted such discovery as is necessary for full and fair resolution of the claims contained in this Petition;

B)    That leave to amend this Petition, if necessary, be granted;

C)    That an evidentiary hearing be conducted on all claims involving disputed issues of fact;

D)    That Petitioner be granted permission to file a *Brief in Support*.

E)    That Respondents be Ordered to respond to this Petition and forthcoming Brief; and

F)    That Petitioner's convictions and sentence be vacated.

Respectfully submitted,

s/ *Karl Schwartz*

Karl Schwartz

Wiseman & Schwartz, LLP
718 Arch Street, Suite 702 North
Philadelphia, PA 19106
(215) 450 - 3391
schwartz@wisemanschwartz.com

Dated:  February 9, 2021
        Philadelphia, PA

## CERTIFICATE OF SERVICE

On this 9th day of February, 2021, I certify that a copy of the foregoing Petition and Appendix were served upon the Philadelphia District Attorney's Office, Habeas Corpus Unit, through the Court's ecf system.

*s/Karl Schwartz*
Karl Schwartz