IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

JOHN IN                    :      21-cv-0608
      Petitioner,     :
   v.                 :      HON. JOHN M. GALLAGHER
                     :      UNITED STATES DISTRICT JUDGE
MARK CAPOZZA,    :
Superintendent,      :      HON. MARILYN HEFFLEY
SCI Fayette,         :      UNITED STATES MAGISTRATE JUDGE
      Respondent.    :

_____

**PETITIONER'S BRIEF IN SUPPORT OF HIS
PETITION FOR A WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. §2254**

Karl Schwartz
Katherine Ernst
Wiseman & Schwartz, LLP
718 Arch Street, Suite 702 North
Philadelphia, PA 19106
(215) 450-3391
schwartz@wisemanschwartz.com

Counsel for Petitioner

Dated: December 6, 2021
Philadelphia, PA

# Table of Contents

Introduction ............................................................................................. 1

Preliminary Statement ............................................................................ 4

Procedural History ................................................................................. 4

Standards Governing Claims of Ineffective Assistance of Counsel ............... 5

Claim for Relief ...................................................................................... 8

Trial Counsel Was Ineffective Under the Sixth Amendment
for Failing to Request DNA Testing, the Results of Which Would Have
Created a Reasonable Probability of Petitioner's Acquittal; Petitioner
is Actually Innocent of the Charges for Which He Was Convicted

Conclusion .............................................................................................. 31

# INTRODUCTION

Mr. In's trial counsel failed to have DNA analysis performed that would have presented the jury with powerfully exculpatory evidence. But for that failure, there is a reasonable probability that the jury would have acquitted Mr. In (hereafter "Petitioner").[1] Instead, the jury convicted him, and he was sentenced to 25 to 50 years in custody. Trial counsel acknowledges that his failure to have the necessary testing performed was absent any strategic rationale. A24. Trial counsel's failure to seek and obtain the DNA testing that undersigned counsel, and the Commonwealth, performed during these habeas proceedings, establishes deficient performance and prejudice, entitling Petitioner to relief.

Petitioner was convicted of various crimes related to a home invasion robbery at the residence at 720 Mifflin Street, in Philadelphia. Witness testimony established that three men were involved in the robbery. This too was the Commonwealth's theory of the case. One of the men, Dyshon Marable, was apprehended in the residence's upstairs closet. The second man, Jerry Jean, was apprehended after he jumped out of an upstairs window. The third man held the homeowner at gunpoint in the basement and then fled through the front door. The Commonwealth's trial

---

[1] In his Habeas Petition, Mr. In raises several claims, which include his DNA claim addressed here. The Conviction Integrity Unit of the Philadelphia District Attorney's Office has indicated that it will concede relief based on trial counsel's ineffectiveness, relating to counsel's failure to request DNA testing. Therefore, in the interest of judicial economy, only the DNA claim is briefed below. However, Mr. In is prepared to fully brief the remaining claims if it later becomes necessary.

theory was that Petitioner was the third man in the basement, who escaped through the front door. Petitioner has consistently maintained he was not this third perpetrator, and had nothing to do with this crime.

Five pieces of evidence were recovered at the scene that were tested for DNA: three pieces of latex gloves and two guns. Petitioner's DNA was excluded from all of them. One latex glove piece was found in the front vestibule of the residence. It was tested for DNA and compared against co-defendant Jean and Petitioner. They both were excluded as contributors to the DNA on the glove piece. Trial counsel argued to the jury that these facts exonerated Petitioner, based on the following: The third perpetrator from the basement ran out of the house through the front vestibule. Thus, the glove piece was likely dropped by this third perpetrator, and because the one co-defendant not tested, Marable, never came downstairs, the DNA on the glove piece could not have been Marable's. Since the jury already knew that Jean and Petitioner were excluded as contributors to the glove piece, then the third perpetrator had to be someone unknown, and could not have been Petitioner.

The prosecutor, conversely, argued (or more accurately, speculated) that Marable *was* the person who dropped the glove piece in the front vestibule. Because Marable's DNA had never been tested, trial counsel could not refute that possibility. The prosecutor's argument essentially conceded that if all three men's DNA were excluded from the glove, that would be exculpatory for Petitioner, since there were

only three men in the house. Only because Marable's DNA was never tested, was the prosecutor able to argue that it was his DNA that was deposited on the glove piece in the vestibule. We know now that this not.

Prior to trial, Petitioner repeatedly requested that trial counsel seek a comparison of the glove piece from the vestibule with Marable's DNA. Petitioner knew that he was not involved in the crime. He reasoned, consistent with his lawyer's later closing to the jury, that the person who had been in the basement and ran through the front door, was the person who left the glove piece in the vestibule. Because he knew he was not that person, he also knew that DNA testing of the glove piece would reveal, not only that he did not wear it, but also that it was not worn by Marable, exonerating Petitioner. Nonetheless, trial counsel never honored Petitioner's request. Habeas counsel did, however, and obtained DNA testing that proved that the DNA on the glove piece did not come from Marable. Subsequently, the Commonwealth performed the same testing with the same results. As discussed below, the testing also revealed additional exculpatory evidence (i.e., commonalities between the profile on the glove piece and the profile on a gun discovered in the alleged getaway vehicle), further suggesting Petitioner's lack of involvement in the incident. But for trial counsel's failure to seek this exculpatory DNA testing, there is a reasonable probability that Petitioner would have been acquitted.

## PRELIMINARY STATEMENT

Citations to the transcripts from the state court appear as "date," followed by "Tr.", followed by transcript page. Although most of the cited material in his brief can be found in the state court record, certain cited documents in the record, as well as any cited extra-record documents, are attached in the Appendix.[2]

## PROCEDURAL HISTORY

On September 15, 2008, after a three-day jury trial before the Honorable Sandy L.V. Byrd, a Philadelphia Common Pleas jury returned a partial verdict on conspiracy, finding Petitioner guilty of that charge. The jury continued deliberating, and on September 16, 2008, it returned guilty verdicts on burglary, robbery (two counts), PIC and VUFA. At trial, Petitioner was represented by Richard Giuliani, Esquire ("trial counsel"). On December 19, 2008, the trial court sentenced Petitioner to an aggregate term of twenty-five to fifty years' imprisonment followed by ten years' probation.

Petitioner appealed and on July 23, 2010, the Superior Court affirmed the judgment of sentence. *See Commonwealth v. In*, 6 A.3d 571 (Pa.Super. 2010). On January 5, 2011, the Supreme Court of Pennsylvania denied allowance of appeal. *Commonwealth v. In*, 12 A.3d 370 (Pa. 2011).

---

[2] "A" citations refer to the Appendix filed along with this memorandum.

On July 15, 2011, Petitioner *pro se* filed his first PCRA petition. David Rudenstein, Esquire, was appointed to represent Petitioner. On July 19, 2013, Attorney Rudenstein filed a Supplemental Amended PCRA Petition. On October 11, 2013, the PCRA court dismissed the PCRA Petition without a hearing. On October 26, 2016, the Pennsylvania Superior Court remanded the case to the PCRA court to conduct an evidentiary hearing on Petitioner's claims of ineffective assistance of counsel. *Commonwealth v. In*, 2016 WL 6247993 (Pa.Super. Oct. 26, 2016). Craig M. Cooley, Esquire represented Petitioner on appeal, and for the duration of the subsequent PCRA proceedings. Following a July 7, 2017 evidentiary hearing before the PCRA court, that court again dismissed Petitioner's PCRA petition, on August 18, 2017. On April 23, 2019, the Superior Court affirmed. *Commonwealth v. In*, 2019 WL 1785335 (Pa.Super. Apr. 23, 2019). On May 27, 2020, the Pennsylvania Supreme Court denied Petitioner's Petition for Allowance of Appeal. *Commonwealth v. In*, 2019 WL 1785335 (Pa.Super. 2019).

## STANDARDS GOVERNING CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL

Because the claim pled herein is grounded in allegations of ineffective assistance of counsel in violation of the Sixth Amendment, Petitioner sets forth the following general principles and incorporates them into his ineffectiveness claim below.

Ineffective assistance of counsel claims under the Sixth and Fourteenth Amendments are evaluated under the familiar two-prong test of *Strickland v. Washington*, 466 U.S. 668 (1984). Thus, to prevail, Petitioner must show: (1) counsel's deficient performance, i.e., that his attorney's performance fell below "an objective standard of reasonableness," *id.* at 688; and (2) prejudice, i.e., that confidence in the result of the original proceeding is undermined as a result of counsel's deficiencies. *Id.* at 694; *see also Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005).

Counsel has "a duty to bring to bear such skill and knowledge as will render the [proceeding] a reliable adversarial testing process." *Strickland*, 466 U.S. at 688. This can be done only if counsel actually investigates the facts and circumstances surrounding the charges against his client. *See id.* at 691; ABA STANDARDS FOR CRIMINAL JUSTICE, 4-4(a) (3d ed. 1993) ("Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction."). This national standard was cited in *Strickland* as a guide to determining what constitutes reasonable performance. *Strickland*, 466 U.S. at 688-89.

Moreover, a reasonably competent attorney under *Strickland* knows the relevant law or "performs basic research" to learn the relevant law. *Hinton v. Alabama*, 571 U.S. 263, 274 (2014).

Prejudice is present whenever "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995);[3] *see also Strickland*, 466 U.S. at 693 ("a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case").

Because a reasonable probability is one "sufficient to undermine confidence in the outcome," *id.* at 694, the *Strickland* prejudice standard is not "stringent" – it is, in fact, "less demanding than the preponderance standard." *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001) (quoting *Barker v. Barbo*, 177 F.3d 149, 154 (3d Cir. 1999)); *see also Woodford v. Visciotti*, 537 U.S. 19, 22 (2002) (*Strickland* "specifically rejected the proposition that the defendant had to prove it more likely than not that the outcome would have been altered.").

---

[3] Although Kyles addressed a *Brady v. Maryland*, 373 U.S. 83 (1963) due process violation, *Brady* materiality and *Strickland* prejudice are coextensive. *Marshall v. Hendricks*, 307 F.3d 36, 53, 85, n.9 (3d Cir. 2002).

**TRIAL COUNSEL WAS INEFFECTIVE UNDER THE SIXTH AMENDMENT FOR FAILING TO REQUEST DNA TESTING, THE RESULTS OF WHICH WOULD HAVE CREATED A REASONABLE PROBABILITY OF PETITIONER'S ACQUITTAL; PETITIONER IS ACTUALLY INNOCENT OF THE CHARGES FOR WHICH HE WAS CONVICTED.**

## Introduction

On March 7, 2007, three men committed a home invasion robbery at the residence at 720 West Mifflin Street, in Philadelphia. 9/10/08 Tr. 101. One of the men, Dyshon Marable, was apprehended in the residence's upstairs closet. 9/11/08 Tr. 160. The second man, Jerry Jean, was apprehended after he jumped out of an upstairs window. *Id.* at 48. Both of these men pleaded guilty. Petitioner has consistently maintained that he was not involved in this incident, and thus not the third perpetrator, who was alleged to have been in the basement of the home, and then fled out of the home through a front vestibule. The main evidence against Petitioner was an identification by a witness who briefly saw the third perpetrator during the incident and thereafter made an identification of Petitioner at a show-up. 9/10/08 Tr. 130.

Latex gloves were recovered by the police at the scene. 9/11/08 Tr. 24. One was found in a back alleyway near where Jean attempted to flee. *Id.* When it was tested for DNA, Jean's DNA was, in fact, present. 9/11/08 Tr. 170. A second latex glove piece was found in the front vestibule of the home. *Id.* at 24. It was tested for

DNA and compared against Jean and Petitioner. *Id.* at 175. Jean and Petitioner were both excluded as contributors to the DNA. *Id.* Trial counsel argued that in a case where there were only three perpetrators, this exonerated Petitioner for the following reasons: Marable—who did not come downstairs after hiding in an upstairs closet (until apprehended) —was likely not the person who discarded the glove piece in the foyer, and thus, his DNA would not be found on the glove piece, 9/12/08 Tr. 25; and since Petitioner's and Jean's DNA excluded both of them as wearers of the glove piece, the third perpetrator had to be someone other than Petitioner. *Id.*

The prosecutor, conversely, argued (as she had to in order to convict Petitioner), that it was Marable who dropped the glove piece. *Id.* at 47. Her argument was an acknowledgment that if Marable, Jean and Petitioner were all excluded from the glove piece, it would mean that some other wearer of the glove – and not Petitioner – was the person who escaped from the basement through the front vestibule. *Id.* She excused the fact that police never compared the glove against Marable's DNA, by arguing that because Marable had pleaded guilty before Jean and Petitioner were swabbed for DNA, the Commonwealth had no ability to obtain Marable's DNA. *Id.*

When convicting Petitioner, the jury, therefore, accepted the prosecutor's argument that the glove piece from the vestibule contained Marable's DNA. Trial counsel knew of the glove piece DNA evidence prior to trial; he had been provided

notice of it in discovery. Yet he never sought to have the necessary comparison with Marable's profile performed, that would have conclusively disproved the Commonwealth's theory that Petitioner was the third perpetrator inside the residence at 720 Mifflin. A24. Counsel was ineffective under the Sixth Amendment for failing to do so, and has admitted as much. *Id.* Petitioner, through undersigned counsel, recently performed the DNA testing that trial counsel failed to perform. A3. The Commonwealth subsequently performed its own testing which confirmed Petitioner's results. A25. It is Petitioner's position that those results exonerate Petitioner; and even if they did not, the failure to obtain and present this DNA evidence – that excludes Marable as a contributor to the DNA on the glove piece – establishes *Strickland* prejudice. But for trial counsel's failure, there is a reasonable probability that Petitioner would have been acquitted (a point the Commonwealth now concedes, *see* fn. 1). As discussed below, those results compel the granting of the writ in this case.

**Facts Relevant to this Claim**

Mr. Vuthary Yun lived at 720 Mifflin Street, along with his three daughters, Christina, Angela and Dina Khem, and one son, Keith Khem. 9/10/08 Tr. 74-75. On the morning of March 7, 2007, three men entered his house and accosted him while he was doing the dishes. *Id.* at 101-102. Two of the men—Jerry Jean and Dyshon Marable—went upstairs to a second-floor bedroom occupied by Christina. *Id.* at 75-

80. Jean, accompanied by Marable, held Christina at gunpoint. *Id.* at 80. The third perpetrator—the tallest of the three—took Mr. Yun at gunpoint from the kitchen on the ground floor down to the basement where the perpetrator tied him up. *Id.* at 100-104. Mr. Yun's daughter Dina, who was sleeping in a bedroom in the basement, heard the commotion and called the police from inside her bedroom. *Id.* at 124. When Dina later heard the police arrive, she left her bedroom and walked over to the steps that led to the ground floor. *Id.* at 124-25. She saw her father and the third perpetrator with a gun standing near the top of the steps. *Id.* at 125-26. She spoke to her father, and the perpetrator pointed a gun at her and told her to "shut the fuck up." *Id.* at 126-27. She then went back to her bedroom. *Id.* at 127. At trial, she identified Petitioner as the man in the basement *Id.* at 125. Mr. Yun, however, did not identify Petitioner. *Id.* at 107.

After the police arrived, Officers Robinson and Battles went to the rear alley to apprehend Jean, the man who jumped out of the upstairs window. 9/11/08 Tr. 31-35. Jean was chased for about a block and then was apprehended by Officer Kevin Cannon in the vicinity of 6th and Mifflin. *Id.* Jean's DNA was found on a latex glove in the rear alley behind the house in the 700 block of Mifflin. *Id.* at 146, 170. Defendant Marable was later found by police in an upstairs bedroom closet where he had stayed hidden for over an hour. *Id.* at 160.

While the police were in the rear apprehending Jean, the third perpetrator exited the basement and ran through the front vestibule, out of the house. 9/10/08 Tr. 82-84. Christina Khem had come downstairs when the police arrived, and she was standing by the front door when the man ran right past her. *Id.* at 84. She testified that in order to get out of the house, the man had to run through the vestibule. *Id.* When the man ran past her, she heard him yell, "oh shit." 9/10/08 Tr. 82-83. A piece of latex glove was later found in the vestibule. 9/11/08 at 23; A1 (Commonwealth DNA Report, Item #2).

Petitioner was arrested a few blocks away and placed in a police wagon. *Id.* at 91, 130. While in the wagon, Petitioner was displayed by police to Christina and Dina Khem. 9/10/08 Tr. 92-95. Christina did not identify Petitioner as the man she saw run by her out of the house. *Id.* at 93-94. Petitioner was, at the same time, presented to Dina Khem. *Id.* at 130. Dina Khem identified him as the perpetrator from the basement. *Id.* Petitioner was arrested, brought to trial, and convicted of burglary, robbery, conspiracy, and related offenses, primarily on the basis of Dina's identification.

DNA samples were taken from Petitioner and Jean. According to the trial prosecutor, the Commonwealth never took DNA from Marable. 9/12/08 Tr. 47. DNA was obtained from five locations at the crime scene. 9/11/08 Tr. 168-176; A1-2. They included three pieces of latex gloves found on or near the crime scene,

including the one found behind the residence with Jean's DNA on it and the one found in the vestibule. *Id.* DNA was also taken from two guns, including one found in a white Nissan Altima that the Commonwealth alleged was driven by the third perpetrator fleeing the scene. *Id.* The other gun was found in an area where Jean had been observed behind the residence. *Id.* at 12-13; 32-37. ***Petitioner was excluded from every DNA sample***. A1-2.

Because the Commonwealth's expert excluded both Petitioner and Jean as contributors to the DNA found on the glove piece from the vestibule, under the Commonwealth's theory (and the witnesses' testimony), that there were three perpetrators involved in the incident, the only way for Petitioner to have been the third perpetrator would have been for the glove piece in the vestibule to have been worn by Marable. *Id.* at 172. If that glove piece had not been worn by Marable, then the person who left his DNA on the glove was an unknown, true third perpetrator (that is, not Petitioner).

As discussed above, since Marable was apprehended upstairs in the house and never exited through the front vestibule, trial counsel argued to the jury that the glove piece would likely not have had Marable's DNA on it, and thus, the glove that it came from must have been worn by an unknown third perpetrator (since Petitioner and Jean had been excluded as contributors to the DNA on the glove piece). 9/12/08 Tr. 24-25.

**Deficient Performance**

While it was the defense ***theory*** that the glove piece was not worn by Marable, and therefore Petitioner was innocent, trial counsel did nothing to prove that theory. And the trial prosecutor, in the absence of a DNA comparison between Marable and the glove piece, disputed the defense theory. Trial counsel failed to utilize the readily available evidence—the glove piece and the person of Marable—to do the necessary comparison testing. A24. This opened the door for the trial prosecutor to assure the jury that there was no unknown third perpetrator and instead argue that Marable was the man who dropped the glove piece. *See id.* at 47 (ridiculing the defense argument by restating it as "[John In] is not guilty because ***Dyshon [Marable] dropped the glove***…"). Thus, according to the prosecutor, the DNA on the glove was from Marable, and therefore the fact that Petitioner's DNA was not on the glove (or anywhere else) was meaningless. *Id.* This freed the jury to find that Petitioner was the third perpetrator. To obtain a conviction, the prosecutor was forced to make this fallacious argument, in light of her concession, required by the evidence, that only three men were involved in the robbery. 9/12/08 Tr. 42.

In attempting to explain the absence of scientific proof to support her argument that the DNA was Marable's, the prosecutor told the jury that Marable's DNA was not taken because the date of his plea "predates the day the buccal swabs was (sic) taken from Jerry Jean or John In. So, there was no buccal swab from

Dyshon Marable." *Id.* at 47. The prosecutor never explained, nor could she have, why Marable's earlier plea precluded the Commonwealth from obtaining a court order for Marable's DNA. In fact, Marable's plea did just the opposite; it put Marable's DNA into a readily accessible data base. Under Pennsylvania law, Marable was required to provide his DNA following his conviction and sentence. *See* 44 Pa. C.S.A. § 2316 (Marable's felony counted as an "other felony" under this act, requiring him to provide his DNA). Moreover, on his way into prison, about ten (10) months prior to Petitioner's trial, Marable's DNA would have been collected. *See Commonwealth v. Derk*, 895 A.2d 622 (Pa.Super. 2006) (even third retail theft conviction required the defendant to provide his DNA).

Regardless, Marable's admission of guilt, coupled with the relevance of his DNA profile, meant that obtaining his DNA would have been a mere formality. *See Commonwealth v. Brison*, 618 A.2d 420, 425 (Pa.Super. 1992) (recognizing a trial court's obligation to order DNA testing, upon a defendant's request when it would bear on the question of guilt or innocence); *see also Commonwealth v. Terry*, 393 A.3d 490, 494 (Pa.Super. 1978) (trial court's refusal to subpoena defense witness violated defendant's right to present a defense); *Washington v. Texas*, 388 U.S. 14, 23 (1967) (same).

The trial prosecutor's argument —in the absence of supporting scientific evidence that the prosecutor could have easily obtained—that the DNA on the glove piece was Marable's, in and of itself, undermined the integrity of this conviction.

Under *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland v. Washington*, 466 U.S. 668, 691 (1984). Trial counsel admitted in a declaration dated October 7, 2021, that he had "no reasonable strategic rationale for not seeking to obtain Marable's DNA profile." A24. Moreover, trial counsel admitted that "had the jury known [that Marable's DNA had been excluded from the glove in the vestibule], it would have had no basis to convict Mr. In." *Id.* Thus, trial counsel was deficient in failing to have the DNA profile from the glove piece from the vestibule compared to Marable's DNA profile.

During the habeas investigation in this case, Marable agreed to provide Petitioner's habeas counsel with a buccal swab so that a DNA analysis could be performed. On February 25, 2020, Marable was swabbed, and his sample was sent to a DNA Laboratory, DNA Diagnostics Center, of Fairfield, Ohio. A3-5. On February 28, 2020, DNA Diagnostics Center issued its report revealing Marable's profile. A6-7. After undersigned counsel obtained the Marable profile and alerted the Commonwealth, the Commonwealth made arrangements to obtain its own buccal swab from Marable, to allow an analysis and comparison. The

Commonwealth's own DNA report (A25-27) is dated July 15, 2021. The Commonwealth's report supports the results obtained by Petitioner's expert Arthur W. Young, of Guardian Forensic Sciences in Abington, Pennsylvania. A8-15 (discussed in the following paragraph). Mr. Young analyzed the Marable profile in conjunction with the other profiles in the case, and arrived at the following conclusions.

Mr. Young compared the Marable profile with the DNA found on the glove piece from the vestibule as reported in the Commonwealth DNA report at A1-2. Mr. Young concluded that Marable was excluded as a contributor to the DNA from the glove piece in the vestibule. A17. Since Petitioner and Jean were long ago excluded as wearers of this vestibule-glove, and now Marable is excluded, it is Petitioner's position that there is now no doubt that the third person involved in this crime was someone other than Petitioner; at the very least, the Marable DNA profile presents a reasonable probability of a different result.

In addition, Mr. Young offers even more exculpatory evidence that further demonstrates that, but for trial counsel's failure to seek Marable's DNA profile, there is a reasonable probability that Petitioner would have been acquitted. Mr. Young found a number of common alleles between Item #2 (the glove piece in the vestibule) and Item #4 (the firearm in a Nissan Altima that the Commonwealth argued was driven by the third perpetrator fleeing the scene). A18. The Commonwealth's

evidence demonstrated the likelihood that the person who alighted from the basement and ran through the vestibule, attempted to escape in that Nissan Altima. Mr. Young's discovery of commonalities between the alleles in the DNA on Items 2 and 4 means that "it cannot be ruled out [that] there is at least one common contributor," between those two items. A18. It would certainly stand to reason that the person who fled the residence through the vestibule, discarding the glove piece, was the same person who attempted to escape in the Altima, and was in possession of the gun found in that car. Petitioner was excluded as a contributor to the DNA profiles on both the firearm and the glove piece.

Trial counsel failed to act as the reasonably competent advocate guaranteed by the Sixth Amendment, when he failed to seek to obtain co-defendant Marable's DNA profile. Petitioner repeatedly requested that trial counsel seek testing of Marable before trial. A23. Petitioner knew that he was not involved in the crime, let alone present in the vestibule, and he related the same to his attorney. *Id.* Trial counsel never honored Petitioner's request. A24. Moreover, trial counsel should have known, even absent Petitioner's request, that because Petitioner was excluded from being a contributor to the DNA, there was no risk, and an extraordinarily high reward—exoneration—in having the testing done.

**Prejudice**

The prejudice resulting from trial counsel's failure was extreme. The Commonwealth's theory was dependent upon Petitioner being one of three perpetrators of the home invasion; that he entered the house along with Jean and Marable, that he held Mr. Vuy and his daughter Dina at gun point, that he tied up Mr. Vuy, and that he escaped from the basement out the front door of the house. The DNA analyses that should have been done before trial, powerfully refute the facts underlying this theory.

This was not a strong case for the Commonwealth.[4] The single witness's identification was based on a fleeting observation at 5:00 in the morning in a basement. For all of the reasons discussed herein, DNA evidence demonstrating that Petitioner was not the third perpetrator would have established his innocence; and at the very least, would have created a reasonable likelihood of a different result. Even without this DNA evidence, Dina Khem's identification was undermined by much of the other evidence in this case. First, her sister Christina testified that the perpetrator passed right by her in the house before alighting through the vestibule.

---

[4] Indeed, the trial court's prejudice assessment in its opinion regarding Petitioner's PCRA appeal, cited by the Superior Court (*In*, 2019 WL 1785335 (2019), relied on a patently erroneous fact—that Petitioner "dropp[ed a] latex glove" (Tr. Op. at 11) in the residence—the glove from which he was *excluded* as having been a contributor.

9/10/08 Tr. 90. Yet, when Christina viewed Petitioner a short time later, she did not recognize him as anyone she had ever seen before. 9/10/08 Tr. 94.

Second, Dina Khem's father testified that the third perpetrator from the basement was the tallest of the three men, and he saw them all standing together. 9/10/08 Tr. 112. However, according to Commonwealth witness Officer Thomas Nolan, one of the three perpetrators, Jean, stood at 6'4". 9/11/08 Tr. 54. Petitioner, according to police discovery, stood at 5'9" (PCRA Hearing 7/17/17 Tr. 42). No one was mistaking him for a man taller than 6'4". Even Dina Khem, who viewed Petitioner and Jean at the post-incident confrontation, acknowledged that Petitioner was clearly the shorter of the two. 9/10/08 Tr. 143.

Third, in a case where relevant DNA was harvested from several pieces of evidence on the scene, Petitioner was excluded as a contributor from every DNA profile.

Fourth, the Commonwealth's theory was that it was Petitioner who fled in the white Altima and left his gun in the car. 9/12/08 Tr. 41-42. Yet, when DNA was found on the firearm, Petitioner was excluded as a contributor. 9/11/08 Tr. 175.

Fifth, none of the witnesses, including Christina Khem, described the clothing worn by the man who ran from the basement through the vestibule as blue camouflage-style with writing on it, that Petitioner was wearing when he was arrested after the incident. 9/11/08 Tr. 132.

20

Finally, Dina Khem's post-incident identification took place under highly suggestive circumstances. Petitioner was presented to her in the back of a paddy wagon, standing right next to the guilty Jerry Jean. 9/10/08 Tr. 130. Thus, she viewed two suspects at once, an inherently suggestive procedure. *Id.* at 93. She viewed them in the company of her sister Christina, also inherently suggestive. *Id.* Moreover, police commentary suggested to Dina Khem the criminal involvement of the men presented to her. *Id.* at 94. During the identification process, police stated that the man standing next to Petitioner had earlier been wearing the green sweatshirt that Christina had seen Jean wearing in her bedroom. *Id.*

The only other evidence against Petitioner was his alleged flight. That evidence, however, was thin, inconsistent and highly dubious. Police Officer Roger Birch testified that when he arrived on the scene, he saw a man whom he identified as Petitioner "kneeled down" behind a white Nissan Altima in the 600 block of Mifflin Street, near the corner of 7th and Mifflin. 9/11/08 Tr. 96. According to Birch at trial, Petitioner then jumped through the passenger side of the car, put it in reverse, and drove eastbound until it crashed into a house at the 500 block of Mifflin. *Id.* Birch testified that he then saw Petitioner take off running. *Id.*

Birch was the only officer to place Petitioner anywhere near the Altima. There were many reasons for the jury to doubt Birch's testimony, and thus reject his contention that Petitioner had any connection to the Altima.

First, as noted above, while a gun was found in the car, DNA testing excluded Petitioner, *gloveless at arrest*, from being a contributor. 9/11/08 Tr. 175.

Second, Birch's various accounts over time of the man he saw by the Altima were wildly inconsistent. On the same day of the incident, March 7, 2007, Birch wrote a report stating that when he arrived on the scene "he observed a male [alleged to be Petitioner] sitting inside the (white) Nissan…." 9/11/08 Tr. 102-104, 105. There was no hint of his later 2008 trial testimony that the male had been kneeling by the car, or that the male jumped through the passenger side. When Birch made a second written statement, on March 20, 2007, he offered a third version of the actions of the man in the Altima, strikingly different than the other two. *Id.* at 108-109. In that statement, Birch stated that when he first arrived, the man was not seated in the car as he had written two weeks earlier, nor kneeling behind the car, as he testified at trial, but rather the man was "running Northbound on 6th St." *Id.* at 109. Additionally, in this account—contrary to his trial testimony—the man, and the Altima, were at the corner of 6th and Mifflin, not 7th and Mifflin. *Id.* at 110.

Third, Birch's testimony flatly and consequentially contradicted the testimony of his fellow officer Kevin Cannon. Birch placed Cannon on the scene with him at 7th and Mifflin. 9/11/08 Tr. 99. At trial, Cannon testified to having approached the corner where the Altima was located, and seeing a man—Jean, not Petitioner—

crouched, moments before the Altima took off. 9/11/08 Tr. 80-81. Cannon never saw Petitioner, let alone saw him engaging in the activity Birch described.

Fourth, Birch's own assertions – in real time, over police radio – contradicted his trial testimony that he was next to the Altima when he saw the person he identified as Petitioner, flee from the Altima after it had stopped. Birch's fellow Officer, Peter Seabron, also directly contradicted this critical part of Birch's trial testimony.

Birch testified that he pursued the Altima *in his cruiser* until the Altima crashed into a house at the 500 block of Mifflin Street. 9/11/08 Tr. 96. He testified that the 500 block was where he put his vehicle in park, exited it, and proceeded to chase the man, he identified as Petitioner, who, Birch claimed, jumped out of the Altima on foot. *Id.* at 96-97. Birch testified that he followed the man and soon thereafter participated in apprehending him. 9/11/08 Tr. 100.

But *after* Petitioner was already in police custody, Birch put out a call to his fellow officers to retrieve his vehicle, which he described on the police radio as "sitting…on the ***700 block*** of Mifflin Street," not the 500 block where the Altima was actually abandoned. A20.

Officer Peter Seabron also confirmed that Birch did not drive into the 500 block of Mifflin, near where the vehicle was abandoned. Birch had testified that when he returned to his vehicle allegedly in the 500 block of Mifflin, Officer Seabron

23

was tending to it. 9/11/08 Tr. 101, 111. But Seabron refuted this. Seabron testified that yes, he was in the 500 block of Mifflin with the abandoned Altima after the driver fled, ***but he did not see Birch's car there.*** 9/11/08 Tr. 122.

For all of these reasons, Birch's identification of Petitioner as the driver of the fleeing Altima, was exceedingly doubtful, and informs any prejudice analysis.

Indeed, without even having heard the evidence that Marable's DNA was not present on the glove piece, the jury struggled with the question of Petitioner's involvement. The jury sent nine questions and requests to the trial court regarding various witnesses and items of evidence. 9/12/09 Tr. 90-91; 9/15/08 Tr. 1-18. The jury deliberated for three days before returning verdicts on all charges. 9/16/08 Tr. 5-7.

Thus, given the weakness of the Commonwealth's case at trial and the compelling new DNA evidence, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The writ should issue.

**Exhaustion and Procedural Default**

This claim of ineffectiveness of trial counsel was not presented to the state courts. There is no longer an available remedy to exhaust this ineffectiveness claim (*see Commonwealth v. Gamboa-Taylor*, 753 A.2d 780 (Pa. 2000)), thus giving rise to the question of procedural default. Respondent, however, has represented to

Petitioner that Respondent will explicitly waive any procedural default bar to merits review, *Szuchon v. Lehman,* 273 F.3d 299, 321 (3d Cir. 2001), and Petitioner expects that Respondent will state so in the Answer to this Brief.

Even if Petitioner were required to address the procedural default issue, he would be entitled to merits review based on his invocation of both *Martinez v. Ryan*, 566 U.S. 1 (2012), since he can demonstrate cause (post-conviction counsel's ineffectiveness), and prejudice for the default of this claim: and *Schlup v. Delo*, 513 U.S. 298 (1995), since he demonstrates innocence. Either gateway independently allows for merits review of this claim.

### Martinez v. Ryan

"Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance of counsel at trial." *Martinez*, 566 U.S. at 9. "To qualify for *Martinez*'s exception, a habeas petitioner must show (1) that the procedural default was caused by either the lack of counsel or ineffective counsel on post-conviction review; (2) that this lack or ineffectiveness of counsel was in the first collateral proceeding when the claim could have been heard; and (3) that the underlying claim of ineffective assistance of trial counsel is substantial." *Richardson v. Superintendent Coal Twp. SCI*, 905 F.3d 750, 762 (3d Cir. 2018) (internal quotation marks and citations omitted).

In this case, each *Martinez* element is met.

**(1)    Default Was Caused by Ineffective Post-Conviction Counsel.** On February 9, 2021, PCRA Counsel Craig Cooley, Esquire executed a declaration pursuant to 28 U.S.C. §1746. In that declaration, Mr. Colley averred, *inter alia*:

> 7. I have, within the last month, learned that habeas counsel obtained Marable's DNA profile, and I have learned that it excludes Marable as a contributor to DNA found on the glove piece in the vestibule.

> 8. If that is correct, this new evidence exculpates Mr. In. It demonstrates that the person who discarded the glove piece—who could not have been John In, or the two admitted perpetrators of the incident (Jean and Marable)—was the third person involved in the home invasion.

> 9. I concur with habeas counsel that trial counsel was constitutionally ineffective for failing to seek to obtain Marable's DNA profile. This could have been easily accomplished, as profiles were obtained from the other two co-defendants, and in any event, Marable, having been convicted of a qualifying offense, was required to provide a DNA sample.

> 10. In state post-conviction proceedings, I had no tactical reason to not assert this trial ineffectiveness claim. My not raising this claim was an oversight. This ineffectiveness claim is a substantial one, and assuming habeas counsel's testing is accurate, the claim not only has "some" merit, but it compels a finding that, but for trial counsel's failure, any rational jury surely would have acquitted Mr. In.

A22-23.

**(2)    PCRA Review Is the First Collateral Proceeding in Which Trial Counsel Ineffectiveness Can Be Heard in Pennsylvania.** In *Commonwealth v. Grant*, 813 A.2d 726 (Pa. 2002), the Pennsylvania Supreme Court held that a defendant shall wait to raise claims of ineffective assistance of trial counsel until

collateral review. *See, e.g., Bey v. Superintendent Greene SCI*, 856 F.3d 230 (3d Cir. 2017) (granting relief under *Martinez* for a claim of PCRA counsel's ineffectiveness for failing to raise trial counsel's ineffectiveness). Thus, the PCRA proceedings were the first collateral proceeding in which this claim of trial counsel ineffectiveness could have been heard.

(3)     **Claim of Trial Counsel Ineffectiveness is Substantial.** A claim is substantial in this context if it meets the standard for issuance of a certificate of appealability (COA). *Bey v. Superintendent*, 856 F.3d 230, 238 (3d Cir. 2017). The standard for issuance of a COA is not stringent.   Under 28 U.S.C. § 2253 and F.R.A.P. To obtain a COA, the applicant must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  *Slack v. McDaniel*, 529 U.S. 473, 483 (2000) concluded that, "[e]xcept for substituting the word 'constitutional' for the word 'federal,'" AEDPA's COA requirement is merely "a codification of" the pre-AEDPA standard for granting a certificate of probable cause, as "announced in *Barefoot v. Estelle*," 463 U.S. 880, 894 (1983). Thus, the purpose of the COA requirement is "to prevent frivolous appeals." *Barefoot*, 463 U.S. at 893.

In *Miller-El v. Cockrell*, 537 U.S. 322 (2003), the Court summarized this non-stringent standard: "A petitioner must show that reasonable jurists could debate whether (or for that matter, agree that) the petition should have been resolved in a

different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Id.*, 336. The Court further explained:

> [A] COA does not require a showing that the appeal will succeed. Accordingly, a court of appeals should not decline the application for a COA merely because it believes the applicant will not demonstrate an entitlement to relief. The holding in *Slack* would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail. It is consistent with § 2253 that a COA will issue in some instances where there is no certainty of ultimate relief. After all, when a COA is sought, the whole premise is that the prisoner "has already failed in that endeavor." *Barefoot*, at 893, n. 4.

*Miller-El*, 537 U.S. at 337.

Here, trial counsel has acknowledged that he had no strategic reason for not performing the exculpatory DNA testing at issue, and he additionally states that had the jury known that the DNA found on the glove piece did not come from Marable, "it would have had no basis to convict Mr. In." A24. Thus, this claim of trial counsel ineffectiveness is substantial.

Where, as here, a petitioner can overcome the default, he is entitled to merits review of his claim per *Martinez*, and such review is *de novo*. By its plain language, § 2254(d), and its deferential review, applies to a claim only when it "was adjudicated on the merits" by the state court, and only where that adjudication resulted in a "decision" on the claim. *See Chadwick v. Janecka*, 312 F.3d 597 (3d Cir. 2002). Here, in light of post-conviction counsel's failure to raise the claim, there

was no decision on it, and thus review is *de novo*. *Bey*, 856 F.3d at 236 (applying *de novo* review of a defaulted claim reviewed for first time in habeas via *Martinez*); *Richardson*, 950 F.3d at 767 (same).

### Schlup v. Delo

Independent from the *Martinez* gateway described above, Petitioner's demonstration of innocence also defeats any procedural default. *Schlup v. Delo*, 513 U.S. 298 (1995). "[A] convincing showing of actual innocence enabled habeas petitioners to overcome a procedural bar to consideration of the merits of their constitutional claims." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013); *see also Reeves v. Fayette, SCI*, 897 F.3d 154, 164 (3d Cir. 2018) (same).

When a petitioner presents a claim of innocence, concepts of cause and prejudice "must yield to the imperative of correcting a fundamentally unjust incarceration.'" *Murray v. Carrier*, 477 U.S. 478, 496 (1986) (quoting *Engle v. Isaac*, 456 U.S. 107, 135 (1982)). This "miscarriage of justice" exception applies to cases of "probable innocence," *Schlup v. Delo*, 513 U.S. 298, 317, 324-25, 326-27 & n.42 (1995).

A petitioner need not show he is actually innocent of the crime he was convicted of, but only that in light of the evidence of innocence, "a court cannot have confidence in the outcome of the trial." *Id.* at 316. The *Schlup* standard is significantly easier to meet than the sufficiency of evidence standard set forth in

*Jackson v. Virginia*, 443 U.S. 307 (1979). *Schlup*, 513 U.S. at 330. A petitioner asserting innocence as a gateway to defaulted claims must only show that "in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327; *Glass v. Vaughn*, 65 F.3d 13, 16-17 (3d Cir. 1995). *Schlup*'s "more likely than not" burden of proof is a lower burden of proof than the *Sawyer v. Whitley*, 505 U.S. 333 (1992) standard of clear and convincing evidence. *See Schlup*, 513 U.S. at 327.

"Because a *Schlup* claim involves evidence the jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall newly supplemented record." *House*, 547 U.S. 518, 555 (2006). "The *Schlup* inquiry…requires a holistic judgment about all the evidence, and its likely effect on reasonable jurors applying the reasonable doubt standard." *Id.* Evidence that casts doubt upon the reliability of the proof of guilt, but which does not affirmatively prove innocence, can be enough to pass through the *Schlup* gateway. *See Schlup*, 513 U.S. at 327 ("[U]nder the gateway standard…, the newly presented evidence may indeed call into question the credibility of the witnesses presented at trial."); *Carriger v. Stewart*, 132 F.3d 463, 478-79 (9th Cir. 1997).

Petitioner pleads facts that cast sufficient doubt on the reliability of proof of guilt as to constitute a "miscarriage of justice." By the Commonwealth's own evidence and theory, the newly revealed DNA evidence provides powerful evidence

that Petitioner could not have been one of the three perpetrators alleged to have committed the home invasion in this case. At the minimum, this new evidence casts compelling reasons to doubt the reliability of the proof of guilt, such that writ must be granted.

## CONCLUSION

For all of the above reasons, and based upon the full record of this matter, Petitioner, John In, requests that this Court grant the writ, and vacate Petitioner's convictions and sentence.

Respectfully Submitted:

*s/Karl Schwartz*_____
KARL SCHWARTZ, ESQ.
KATHERINE ERNST, ESQ.
Wiseman & Schwartz, LLP
718 Arch Street, Suite 702 N
Philadelphia, PA 19106
schwartz@wisemanschwartz.com
(215) 360 – 3988


DATE:       December 6, 2021
            Philadelphia, PA

**Certificate of Service**

I, Karl Schwartz, hereby certify that on this 6th date of December, 2021, I served the foregoing upon the following persons by email, and by filing the same with this Court's ECF Filing System:

> Patricia Cummings
> Conviction Integrity Unit
> Philadelphia County
> District Attorney's Office

> */s/ Karl Schwartz*

> Karl Schwartz