**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN IN,** | : | |
| Petitioner | : | |
| | : | |
| v. | : | **No. 21-cv-0608** |
| | : | |
| **MARK CAPOZZA,** | : | |
| **Superintendent,** | : | |
| **SCI Fayette** | : | |
| Respondent | : | |

**ANSWER TO PETITION FOR
WRIT OF HABEAS CORPUS**

Petitioner John In ("In") is a Pennsylvania state prisoner who has been sentenced to 25 – 50 years of incarceration for a 2007 home-invasion robbery. Before this Court is his timely petition for a writ of habeas corpus alleging, among other claims, the ineffective assistance of his trial counsel.

The Commonwealth, through its Conviction Integrity Unit ("CIU"), conducted an independent investigation into those claims and now concedes that In is entitled to relief. *See* Ex. A. In fact, new DNA evidence suggests that an unidentified individual played the role in the

robbery that had been, until now, attributed to In.[1] The CIU's review has led it to conclude that In's trial counsel was ineffective for failing to request and test that exculpatory DNA evidence.[2]

Because the new DNA evidence—considered in conjunction with the pleadings, the trial and post-conviction records, and the factual record set forth below—undermines the Commonwealth's original theory of the case, the Commonwealth cannot have confidence in the integrity of In's conviction.

## I.  THE COMMONWEALTH'S TRIAL THEORY

During her closing argument, the trial prosecutor argued that In was *one of three men* who broke into a house located at 720 Mifflin Street ("Mifflin Street house") that was being occupied by at least five people. *See* N.T. 09/12/2008 at 42. According to the Commonwealth, the perpetrators first encountered one of the home's occupants in the kitchen. *Id.* at 40 – 41. There, In took Vuthary Yun ("Yun") hostage at gunpoint and led him to the basement, where he tied Yun up. *See id.* at 40 – 41, 45 – 46. Upon hearing the police arrive, Yun's daughter, Dina Khem ("Dina"), who had called the police from her cell phone, exited her room. *Id.* at 40. However, she retreated when In pointed his gun at her. *See id.* at 40 – 41. Then, when In heard the officers on the house's first floor move into the back yard, he seized the opportunity to flee out the front door

---

[1] In argues that this evidence also establishes his actual innocence. However, his claim of actual innocence presumes that the Commonwealth's trial theory—that *only three people* committed the crime—is factually accurate. Indeed, the new DNA evidence would be completely exonerating if every inference that could be drawn from it were taken in the light most favorable to In. However, after a detailed investigation into the case, the Commonwealth cannot say with sufficient certainty that the Commonwealth's trial theory was, in fact, accurate. As a result, while the DNA evidence proves In was not one of the three individuals known to be in the house during the home invasion, it does not prove In was completely uninvolved in the robbery. The Commonwealth believes that the evidence falls short of the "truly persuasive demonstration of 'actual innocence'" that might provide freestanding justification to grant In's habeas petition. *See Herrera v. Collins*, 506 U.S. 390, 427 (1993) (O'Connor, J., concurring). Accordingly, the Commonwealth agrees to relief only on the limited basis that In's counsel was ineffective.

[2] Should the Court grant relief as to the ineffective assistance of counsel ("IAC") claim, it need not address In's remaining claims because relief on the IAC claim will render In's remaining claims moot.

past two of the home's other occupants, Christina and Angela Khem ("Christina" & "Angela"). *Id.* at 43 – 44.

After fleeing the Mifflin Street house, In headed to a white Nissan Altima where he stowed his gun, then sped off when police approached the car. *See id.* at 44 – 45. Not long after, In crashed the Nissan Altima and tried to flee on foot, only to be caught by police. *See id.* at 41 – 42.

In support of this theory of the crime, the prosecution relied heavily on the fact that Dina identified In shortly after the incident and that In lived in the same general neighborhood (on the other side of town) as another intruder—Jerry Jean ("Jean")—who was apprehended fleeing the house and was also tied to the white Nissan Altima. *Id.* at 45. The prosecutor suggested it strained credulity that In would be so far from his home at 5:00 in the morning while his neighbors robbed a house nearby. *Id.* She also posited that it was hard to believe he would flee when he saw the police—unless he were part of the robbery. *See id.*

The prosecution struggled to account for DNA evidence introduced at trial. At some point during the robbery, one of the intruders dropped a piece of his latex glove in the Mifflin Street house's front vestibule. Scientific evidence introduced at trial excluded both In and Jean as the source of DNA retrieved from that fragment. In light of this evidence, the Commonwealth theorized that the piece of latex glove had been dropped by the third intruder, Dyshon Marable ("Marable"). *See id.* at 46 – 47. Marable's DNA, however, was never tested against that physical evidence. According to the prosecution, this was because Marable pled guilty to the robbery too quickly for a sample of Marable's DNA to be taken. *Id.* at 47. Without a DNA sample, there was no way to test the physical evidence for Marable's DNA and conclusively determine whether he was the latex fragment's source. Since Marable could not be excluded as the source of the latex scrap, while the other two defendants had been excluded, the prosecution argued that the glove

fragment found in the front vestibule *must* have come from Marable. *See id.* The prosecution used this logic to assure the jury that it could be true both that In's DNA had not been not found on a scrap of glove that Marable dropped, and that In was one of the three men who broke into the Mifflin Street house. *See id.*

## II.     RELEVANT FACTS OF THE CRIME

### A.  Uncontested Evidence of the Crime as Presented at Trial.

#### i.   *The home invasion.*

Early in the morning of March 7, 2007, three men entered the Mifflin Street house. N.T. 09/10/2008 at 101. There, the men encountered Yun in his kitchen, washing dishes. *Id.* at 102. They put a gun to Yun's head and began pushing him toward the basement while demanding that he give them money. *Id.* One man—by Yun's recollection, the tallest of the three, *id.* at 112—took Yun down into the basement, while the other two remained upstairs. *See id.* at 103. On the basement steps, the intruder kept a gun to Yun's head, tied Yun's hands behind his back with a red cord, and gagged him with a cloth, all while continuing to demand Yun's jewelry and cash. *Id.* at 103-04. The intruder's hood obscured his face, and Yun did not think it prudent to look more closely. *Id.* at 107 – 08.

Unbeknownst to Yun or the intruder holding him captive, Yun's daughter, Dina, was awake in her basement bedroom and could hear the two speaking. *Id.* at 124. She called the police on her cellphone and, when she heard the first officer arrive upstairs, crept out of her room. *Id.* at 124 – 25. She encountered her father and the intruder at the top of the basement steps. *Id.* at 125. The intruder held a gun with one hand, while using his other hand to hold the knob on the basement door. *Id.*   at 126. Dina called out to her father in Cambodian but returned to her room when

4

threatened by the intruder, who pointed his gun at her and told her to "shut the fuck up." *Id.* at 127. As she retreated, Dina saw her youngest sister Angela try to open the basement door, but the intruder held it closed. *Id.* at 127 – 28.

Meanwhile, the other two perpetrators—later identified as Marable and Jean—made their way to the house's second floor. *See id.* at 75 – 76. There, they encountered Christina, another of Yun's daughters, asleep in her bed. *Id.* They woke Christina and demanded her jewelry. *Id.* at 77. Christina observed that one intruder was wearing a green sweatshirt and the other a blue sweatshirt. *Id.* at 76.

The man in the blue sweatshirt—Marable—then kept watch over Christina as the man wearing the green sweatshirt—Jean—headed into the next room. *Id.* at 77 – 78. There, Jean found Christina's eleven-year-old brother Keith asleep. *Id.* at 78. With Keith still asleep, Jean beckoned Marable and Christina into the room and demanded the family's money and jewelry. *Id.* at 78 – 79.

As Jean began to search the room for valuables, the police arrived at the house and called up the stairs, trying to locate whomever contacted 911. *Id.* at 79. One of the men ran out into the hallway to respond, shouting down that no one had called the police. *Id.* Jean then approached Christina and put his gun to her waist, covering her mouth with his hand (which was covered with a latex glove.) *Id.* at 80.

After police continued to call out, Jean released Christina and went into the second floor's back room. *Id.* Christina ran downstairs to where a group of police, along with her sister Angela, were waiting at the entryway to the house. *Id.* She pointed the officers upstairs, directing them to the back room. *Id.* at 82. Some of the officers headed upstairs, while others ran toward the back of the first floor. *Id.*

Officers Robert Robinson and Felicia Battles went to the back of the house. *See* N.T. 09/11/2008 at 31. As Officer Robinson passed through the house's back door into the yard, a man rushed past him toward the back of the yard. *Id.* Officer Robinson reasoned that the man had jumped from a rear second-story window, since there was no other way to get out of the house's rear. *Id.* at 32. The fleeing man—Jean—briefly took cover in a shed-like structure, then leapt the fence at the back of the property and fled up an alley. *See id.* at 33 – 34.

Rather than scale the fence themselves, Officers Robinson and Battles ran around to the front of the house to catch up with Jean. *id.* at 34. There, they encountered Officer Kevin Cannon in the process of apprehending Jean, after Officer Cannon found Jean crouching between two parked cars. *See id.* at 34 – 35, 80.

iii. *Marable's Arrest.*

Police found Marable on the second floor of the Mifflin Street house, roughly an hour after responding to Dina's 911 call, hiding in a closet underneath a pile of coats. *Id.* at 160.


**B. Conflicting evidence regarding In's apprehension and arrest introduced at trial.**

While the circumstances surrounding Jean and Marable's arrests were never disputed, the events leading up to In's arrest were hotly contested at trial. According to the evidence admitted at trial, while officers were occupied pursuing Jean, a tall individual wearing "dark clothing" ran past Christina and Angela and towards the front door, pausing only briefly to exclaim, "oh shit, what's happening," before exiting the house. N.T. 09/10/2008 at 81-83. Shortly afterward, when Officer Cannon got out of his car to apprehend Jean, he observed a white Nissan Altima parked nearby with its headlights on. N.T. 09/11/2008 at 80-81. Then, the Nissan Altima reversed and

sped off eastbound on Mifflin Street. *Id.* Although officers in the area were not yet aware that anyone other than Jean had fled the Mifflin Street house, they believed that the speeding Nissan Altima was likely tied to the home invasion. *See id.* at 89. Officers pursued the Nissan Altima, but—significantly—conflicting accounts of that pursuit make it difficult to determine exactly how the chase unfolded.

At trial, Officer Roger Birch testified that he first saw In kneeling behind the white Nissan Altima at roughly the time Officer Cannon spotted Jean crouched nearby. *Id.* at 96, 99. He then saw In jump into the Nissan Altima through its passenger-side door and began driving eastbound on Mifflin Street. *Id.* at 96. Officer Birch followed in his cruiser until the Nissan Altima crashed into a house on the 500 block of Mifflin Street after making a sudden turn, likely because a second police cruiser was approaching from the opposite direction. *Id.* According to Officer Birch's trial testimony, In then jumped out of the disabled Nissan Altima and fled. Officer Birch left his cruiser at the location of the crash and pursued In on foot. *Id.* at 96, 101.

This account is contradicted by Officer Birch's own accounts of the events as memorialized in police investigative records. First, according to a memorandum that Officer Birch prepared a few hours after In's arrest, In was already sitting in the Nissan Altima's driver's seat when Birch first arrived on scene. *Id.* at 105. Second, in an interview he gave to police detectives after the incident, Officer Birch explained that when he first spotted In, In was not interacting with the Nissan Altima at all. Rather, he was running northbound on Sixth Street while the Nissan Altima was parked at 7th and Mifflin. *Id.* at 109.

Transcripts from Officer Birch's contemporaneous police radio transmissions and testimony given by Officer Peter Seabron also both contradict the testimony Officer Birch gave at trial. According to Officer Birch's trial testimony, he witnessed the crash on the 500 block of

Mifflin Street and left his cruiser at that location while he pursued In on foot. *Id.* at 96 – 97. But Officer Birch's radio transmissions show that after In was arrested, Officer Birch asked for other officers to retrieve his vehicle from the 700 block of Mifflin Street. Officer Seabron's trial testimony corroborated Officer Birch's radio call. Officer Seabron testified at trial that he arrived at the crash site after the driver had fled, parked his cruiser directly behind the crashed Nissan Altima, and secured the area. *Id.* at 117 – 18, 121. During the course of these events, Officer Seabron did not see Officer Birch's car anywhere on the 500 block of Mifflin Street. *See id.* at 122.

Although the reasons for, and the circumstances surrounding, In's flight from police are uncertain, there is no dispute that In attempted to flee from (or evade) the police shortly after the crime was committed. When apprehended, In was arrested by Sergeant Steven Woods, *id.* at 91, and put in the back of a car alongside Jean. *See* N.T. 09/10/2008 at 91 – 92. Victims Christina and Dina were both taken to the car to identify the men. *Id.* at 92. Christina was able to identify Jean based on a sweatshirt that he had been wearing, but could not identify In. *See id.* at 92 – 93. Dina did not recognize Jean, but identified In as the man she encountered in her basement. *Id.* at 130.


### C. Physical evidence recovered from the crime scene.

In addition to arresting Jean, Marable, and In, police also recovered physical evidence during the course of their investigation. A gun was recovered from the back yard of the Mifflin Street house, in the structure where Jean briefly hid from police. *See* N.T. 09/11/2008 at 145. A scrap of latex glove was recovered from the alley behind the house, near where Jean scaled a fence to avoid arrest. *See id.* at 146 – 47. Another scrap of latex glove was recovered from the highway at the 600 block of Mifflin Street. *Id.* at 147. A third scrap of latex glove was recovered from the Mifflin Street house's front vestibule. *Id.*

Police also searched the crashed Nissan Altima for evidence. From the car, they recovered another firearm, *id.* at 144, as well as a rubber glove and a box of latex gloves. *Id.* at 139. The car also contained proof of ownership for someone named Roan Adderly, a Pennsylvania driver's license in the name of Smith Printemps, three traffic tickets in the name of Jerry Jean, and assorted personal items. *See id.* at 17 – 18.

When he was arrested, Jean was sitting on a green hoodie, which police seized. *Id.* at 131. In the hoodie's front pockets, police found the fingertip portions of a latex glove. *Id.* at 132.

Five of the items collected as evidence—three scraps of latex and two firearms—were swabbed for DNA, which was then compared to DNA from Jean and In that had been obtained via buccal swab. The scrap of latex glove found in the alley behind the Mifflin Street house yielded a DNA sample that matched Jean, but not In. *See id.* at 170. Although the scrap of latex glove found on the highway on the 600 block of Mifflin Street did not conclusively match Jean, Jean could not be excluded as a possible contributor. *See id.* at 172. In, however, was excluded as a possible contributor. *Id.* Both Jean and In were excluded as contributors to the scrap of latex glove found in the home's front vestibule. *Id.* at 175. Finally, Jean and In were also excluded as contributors to the DNA samples collected from the two guns. *Id.* at 175 – 76. None of the DNA swabs were tested against Marable's DNA. *See* N.T. 09/12/2008 at 47.

### D. The CIU's post-conviction investigation.

After accepting In's case for review, the CIU undertook an independent investigation into the evidence that formed the basis of the instant habeas petition.

To that end, the CIU obtained a voluntary buccal swab from Marable. The CIU then requested the Office of Forensic Services ("OFS") at the Philadelphia Police Department to

compare the buccal swab with the DNA reports prepared in anticipation of In's original trial. Ex. A. After analyzing Marable's reference sample, OFS concluded that Marable was excluded as a contributor to the DNA recovered from the scrap of latex glove originally found in the Mifflin Street house's entryway vestibule. *Id.* The OFS DNA analyst also concluded that there were enough alleles in common between the latex scrap and the firearm recovered from the crashed Nissan Altima that it was possible the DNA obtained from both items was deposited by the same individual. *Id.*

In addition to the DNA testing, the CIU also interviewed In's trial attorney, Richard Giuliani, in an effort to understand why trial counsel did not pursue DNA testing at the time of trial given In's pre-trial claim of innocence and the possibility that testing would disprove the Commonwealth's theory of the crime. During the interview, trial counsel informed the CIU that he remembered the case well and that he had no strategic basis for failing to investigate and/or pursue DNA testing to determine whether Marable was in fact the source of the DNA obtained from the latex scrap found in the home's vestibule.

## III.   PROCEDURAL POSTURE

### A.  Procedural history.

In was sentenced on December 19, 2008 to an aggregate term of 25-50 years of imprisonment, followed by ten years of probation. He appealed, and the Pennsylvania Superior Court affirmed on July 23, 2010. *See Commonwealth v. In*, 6 A.3d 571 (Pa. Super. 2010). The Supreme Court of Pennsylvania denied allowance of appeal on January 5, 2011. *Commonwealth v. In*, 12 A.3d 370 (Pa. 2011).

In timely filed his first Post Conviction Relief Act ("PCRA") petition on July 14, 2011 and David Rudenstein was appointed to represent him. On October 11, 2013, the PCRA court dismissed In's petition without a hearing. In appealed and Craig M. Cooley represented him on appeal. On October 26, 2016, the Superior Court remanded the case so that the PCRA court could conduct an evidentiary hearing on In's claims. *See Commonwealth v. In*, No. 3021 EDA 2013, 2016 WL 6247993 at *4 (Pa. Super. Ct. Oct 26, 2016). Cooley continued to represent In throughout the subsequent PCRA proceedings.

On July 7, 2017, the PCRA court held an evidentiary hearing. On August 18, 2017, the court once again dismissed In's petition. This time, the Superior Court affirmed on April 23, 2019. *See Commonwealth v. In*, No. 2858 EDA 2017, 2019 WL 1785335 at *9 – 10 (Pa. Super. Ct. Apr. 23, 2019). The Supreme Court of Pennsylvania denied allowance of appeal on May 27, 2020. *See Commonwealth v. In*, 234 A.3d 406 (Pa. 2020). In timely filed this Petition for a Writ of Habeas Corpus on February 9, 2021.

### B. The Commonwealth waives any procedural default.

When In failed to raise the ineffectiveness of his trial counsel in his first PCRA petition, he procedurally defaulted the claim. *See Lines v. Larkins*, 208 F.3d 153, 159 – 60 (3d Cir. 2000). Although the Commonwealth believes that In is entitled to overcome that default because of his first post-conviction counsel's subsequent ineffectiveness, *see Martinez v. Ryan*, 566 U.S. 1, 9 (2012), the Commonwealth instead chooses to knowingly and intentionally waive In's procedural default. [3]

---

[3] Because the Commonwealth is waiving its right to raise petitioner's default as an affirmative defense, this brief will not address the merits of In's ineffective assistance of post-conviction counsel claim in detail. The Commonwealth agrees with In that his post-conviction counsel was constitutionally deficient, but because that deficiency enables In to overcome his default, rather than entitling him to relief, the Commonwealth's waiver renders his ineffective

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996 permits—but does not require—states to raise a petitioner's procedural default during state court proceedings as an affirmative defense to federal habeas corpus claims. *See Showers v. Beard*, 635 F.3d 625, 629 (3d Cir. 2011) (citing *Trest v. Cain*, 522 U.S. 87, 89 (1997)). The Commonwealth may forego a procedural bar to relief by explicitly waiving the issue or by failing to raise the issue in its answer. *See Szuchon v. Lehman*, 273 F.3d 299, 321 (3d Cir. 2001). When issues of comity and federalism require, a court may raise the issue of procedural default *sua sponte*. *See id.*

No such issues present themselves in this case, however. The Commonwealth's waiver is explicit, and In adhered to Pennsylvania's established procedures for vindicating claims that were defaulted due to post-conviction counsel's ineffectiveness. In failed to raise his claims in state court because his post-conviction counsel's oversight interacted with Pennsylvania's post-conviction review process in a manner that prevented him from doing so. *See Bey v. Superintendent Greene SCI*, 856 F.3d 230, 243 – 44 (3d Cir. 2017) ("Since collateral review with new counsel is the first possible instance in which to raise claims of ineffective assistance of trial counsel, PCRA counsel's failure to raise an ineffectiveness claim in the initial petition means that 'no state court at any level will hear the prisoner's claim.'"); *see also* Pet'r' Br. 24, ECF No. 19 (outlining post-conviction counsel's ineffectiveness). In did not attempt to willfully "deprive[] state courts of the opportunity even to examine" the issues. *Cf. Szuchon*, 273 F.3d at 321. Rather, the Pennsylvania Supreme Court created a process in which federal courts would almost always be the first tribunal to hear claims involving ineffective assistance of post-conviction counsel. *See Commonwealth v. Bradley*, 261 A.3d 381, 399 (Pa. 2021) ("[A] petitioner, lacking an adequate procedure to challenge

---

assistance of post-conviction counsel claim moot.  Post-conviction counsel, Mr. Rudenstein, died before the instant petition was filed.

PCRA counsel's effectiveness, must seek relief in the federal system.").[4] This eliminates any possibility that it would be "unseemly . . . for a federal district court to upset [this] state court conviction without an opportunity [for] the state courts to correct [the] constitutional violation." *Duncan v. Walker*, 533 U.S. 167, 179 (2001).

## IV.   ARGUMENT

### A. The Commonwealth concedes that In's trial counsel was ineffective for failing to secure and present an analysis of Marable's DNA.

The Commonwealth agrees that trial counsel's failure to obtain and present an analysis of Marable's DNA constituted deficient performance. To prove that an attorney provided ineffective assistance, a petitioner must show: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In's trial attorney failed to act with reasonable competence when he neglected to obtain an analysis of Marable's DNA. Had he done so, there is a reasonable probability that In would have been acquitted.

#### i.   *Trial counsel's failure constituted deficient performance.*

In's trial counsel was deficient when he failed to obtain and present any analysis of Marable's DNA because he did not conduct a reasonable investigation into the facts that were relevant to his trial strategy. Trial counsel's failure to investigate allowed the jury to speculate that Marable dropped the latex scrap found in the Mifflin Street house's front vestibule. This ultimately fatal vulnerability could have been eliminated by more thoroughly investigating the

---

[4] On October 20th, 2021, the Supreme Court of Pennsylvania filed *Bradley*, creating a new mechanism for certain PCRA petitioners to raise claims alleging ineffective assistance of PCRA counsel in state court, if new counsel is retained. *See* 261 A.3d at 401  However, this mechanism did not exist when In's case proceeded through state court and could not realistically be raised during the course of a first PCRA petition, forcing petitioners to raise those claims—as In does here—for the first time in federal court. *See id.* at 397 – 400.

facts surrounding In's case, and trial counsel had no strategic purpose for failing to conduct that investigation.

Trial counsel was deficient when he unreasonably failed to investigate whether Marable could be linked to the vestibule glove fragment through DNA testing. To establish that an attorney's performance was deficient, "a defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. The reasonableness of trial counsel's conduct must be assessed "as of the time of counsel's conduct." *Maryland v. Kulbicki*, 577 U.S. 1, 4 (2015). At the time of In's trial, counsel had a well-established duty to make reasonable investigations into the facts and circumstances surrounding his client's case. *Strickland*, 466 U.S. at 690 – 91. However, trial counsel failed to fully investigate the relevant facts. Trial counsel argued to the jury that his client could not have been one of the three intruders because an analysis of the DNA found on the latex scrap recovered from the front vestibule excluded In and Jean as contributors. N.T. 09/12/2008 at 24. Marable was likewise excluded, the defense theorized, because he never returned to the house's first floor after the police arrived. *Id.* But the defense did nothing to prove that the scrap of glove had not been dropped when Marable first arrived at the Mifflin Street house or that the DNA on that scrap of glove was not Marable's— either of which could have short-circuited speculation from the jury about the scrap's provenance. In fact, trial counsel did not undertake any investigation into whether Marable's potentially exonerating DNA was even available for testing. *See* Pet'r's Br. 15, ECF No. 19. Further investigation into the facts surrounding In's case would have foreclosed the—ultimately fatal— inference that it was Marable who dropped the scrap of latex glove in the Mifflin Street house's vestibule.

Trial counsel had reason to know that the latex scrap could be tested against Marable's DNA. He was aware that a useable DNA profile had been obtained from the scrap and that Marable was in custody following a guilty plea for the Mifflin Street robbery. *See* N.T. 09/12/2008 at 24 – 25. Nevertheless, trial counsel failed to even request a sample of Marable's DNA from either the Commonwealth or Marable, himself—a request that was quite likely to be granted. *See Commonwealth v. Brison*, 618 A.3d 420, 425 (Pa. Super. Ct. 1992) (finding that the trial court erred when it failed to perform the potentially exculpatory DNA tests that an indigent defendant requested); *see also* 44 Pa. C.S.A. § 2316 (requiring Marable to provide DNA to the state following conviction and sentence); Section II(D) *infra* at 9 – 10 (detailing Marable's willingness to provide samples to both the Commonwealth and the defense). Conclusively proving that someone dropped the scrap while Marable was hiding in a closet upstairs ultimately may not have been possible, but comparing the DNA on the scrap to Marable's was—provided In's trial attorney conducted a sufficiently thorough investigation. Trial counsel's failure to undertake that investigation fell below the objective standard for reasonableness that existed at the time of In's trial.

An attorney's alleged failures may be excused when they are attributable to tactical considerations. *See Workman v. Superintendent Albion SCI*, 915 F.3d 928, 943 (3d Cir. 2019). However, trial counsel's failure to obtain and compare Marable's DNA with that found on the latex scrap cannot be attributed to any reasonable strategic judgment. In a declaration dated October 7, 2021, and during a subsequent interview with the CIU, trial counsel stated that there was "no reasonable strategic rationale for not seeking to obtain Marable's DNA profile." Pet'r's App. at A24, ECF No. 19-1. But even without trial counsel's admission, it is difficult to identify a strategic reason for opting not to have Marable's DNA analyzed. Even the worst outcome for the defense—that testing revealed Marable's DNA on the latex scrap—would have hindered In's case

only slightly. That is, had the worst-case come to pass, the defense would have only lost the ability to point to the scrap as possible evidence of an un-identified intruder. That argument had a significant weakness, however, in that it required the jury to draw particular inferences that were favorable to In. This reliance on favorable inferences left the argument vulnerable. On the other hand, the potential exculpatory benefits of testing were enormous. In light of this lop-sided cost-benefit analysis, it would have been unreasonable for trial counsel to strategically forego analyzing Marable's DNA.

None of the concerns that might have led trial counsel to forego DNA testing were relevant during In's PCRA proceedings, yet his PCRA also failed to analyze the latex scrap against Marable's DNA. Once In's case proceeded from a criminal trial into a PCRA petition, any evidence linking Marable to the latex scrap posed very little threat to In's prospects: In had already been found guilty—notwithstanding trial counsel's argument that Marable could not have dropped the latex scrap—and newly discovered evidence stood the best chance of exonerating him. But, despite the almost non-existent risk that testing posed, as well as the significant role that newly discovered evidence—especially DNA evidence—plays in successful post-conviction litigation, In's PCRA counsel also failed to test the latex scrap against Marable's DNA. This obvious oversight speaks to the likelihood that trial counsel might also have overlooked the possibility of analyzing Marable's DNA, and supports the conclusion that trial counsel's failure to do so was not a strategic decision.

Given the foregoing, the CIU agrees that trial counsel's failure to conduct DNA testing was constitutionally deficient performance. Trial counsel has admitted that there was no strategic reason underlying his failure to test, and the surrounding circumstances support that assertion.

The Commonwealth concedes that there is a reasonable probability that, but for trial counsel's deficient performance, the results of In's trial would have been different. *Strickland*, 466 U.S. at 694. The newly-discovered DNA evidence undermines the Commonwealth's theory of this case almost entirely, and its introduction at trial likely would have been fatal to the prosecution. The latex fragment found in the front vestibule to Yun's home, and the implication that it had been dropped by the true co-conspirator, were central to In's defense. *See* N.T. 09/12/2008 at 24 – 25. Conclusive proof that it was dropped by an unidentified intruder would, on its own, likely have had a significant impact on the jury's deliberations. However, testing the latex scrap against Marable's DNA also yielded exculpatory evidence above and beyond what the petitioner originally sought: similarities between the DNA found on the latex fragment and the firearm recovered from the Nissan Altima. Significantly, this linked the unidentified co-conspirator to the crashed Nissan Altima and could have been used at trial to further undermine Officer Birch's already shaky testimony.

a.   The scrap of latex glove.

Evidence that someone other than Marable dropped the scrap of latex in the front vestibule suggests that, although the identity of the third intruder remains unknown, it was not In. Solid evidence that In was never inside the Mifflin Street house would have held considerable persuasive power when compared with the highly speculative version of events that the prosecution advanced.

Accepting for purposes of this analysis that the Commonwealth's original three-intruder theory was correct, and given the relative certainty with which Jean and Marable were identified as the other two intruders, *see e.g.*, N.T. 09/11/2008 at 160 – 61 (detailing Marable's discovery in a second-floor closet), In—if he had any involvement at all—must have been the man who held

Yun hostage in the Mifflin Street house's basement. The same man who held Yun hostage also had to be the intruder who fled past Christina and Angela through the house's front door, since there was no testimony suggesting that either Jean or Marable returned to the first floor of the house after police arrived.[5]

Based on these uncontroverted facts, In's trial counsel argued that the man in the basement was the only intruder who had an opportunity to drop the scrap of latex glove in the front vestibule, and that because In was excluded on the DNA sample on that glove, he was similarly excluded as a participant in the robbery. *See* N.T. 09/12/2008 at 23 – 24. He argued that Jean could not have dropped the latex scrap, because—in addition to never having returned to the second floor after the police arrived—he was excluded as a contributor to any DNA on the glove. *Id.* at 24. Nor could Marable could have dropped it, because he was hiding in a second-floor closet and did not return to the first floor until well after the police secured the house. *Id.* Finally, In could not have dropped the latex scrap, because he was also excluded by DNA testing. *Id.* at 25. If Jean, Marable, and In all could not have dropped the glove fragment that was found in the front vestibule, it necessarily suggested that someone other than those three men had been part of the robbery—taking In's place as the third member of the three-man operation. *Id.* at 25.

The defense's theory had a significant weakness: it required jurors to agree that the scrap of latex glove was dropped by the man who held Yun hostage. Although it was uncontested that Marable never returned to the first floor after police arrived, he spent time on the first floor immediately after entering the house. *See* N.T. 09/10/2008 at 102. A juror could have easily found that Marable dropped the glove fragment before he went upstairs in the first place because there

---

[5] It remains undisputed that Jean attempted to evade police by leaping out a second-floor window, *see* N.T. 09-11-2008 at 32, while Marable hid in a second-floor closet. *Id.* at 160 – 61.

was no testimony elicited at trial about when the fragment first appeared in the front vestibule or when the intruders' gloves first began to fall apart, nor was the fragment analyzed against Marable's DNA.

Evidence presented at trial also left open the possibility that Marable passed through the front vestibule at some point prior to moving upstairs. The jury viewed photographs of the Mifflin Street house's kitchen, showing that bars on the room's windows were bent out of shape—suggesting that the intruders may have gained entry via those windows. *See* N.T. 09/11/2008 at 140. However, Yun—the first Mifflin Street resident to encounter the intruders—could not say with certainty how they gained entry to the house, although he speculated that the intruders had to have entered through the front door. N.T. 09/10/2008 at 110. The front door opened directly into the front vestibule, so if the jury agreed with Yun that the intruders likely entered through the front door, it also afforded Marable an opportunity to drop a fragment of latex in the vestibule.

While accepting the possibility that Marable dropped the latex scrap required a significant amount of speculation from the jury, the jurors essentially had no choice but to accept it if they found Dina's eyewitness identification of In to be credible. Attributing the latex scrap to Marable was the only explanation that could reconcile Dina's testimony with the DNA evidence. The DNA tended to exclude In as a participant in the home invasion, but Dina's identification of In as one of the intruders was unwavering—and particularly powerful because she first identified In shortly after he was arrested. *Id.* at 129 – 30. This incentivized the jury to accept any narrative in which both of those things could be true.

Dina's identification, however, was not without its problems. The identification process was incredibly suggestive, taking place while In and his co-defendant were sitting in the back of a police car. *Id.*; *see also United States v. Brownlee*, 454 F.3d 131, 138 (3d Cir. 2006) (observing

that a show-up procedure "is inherently suggestive because, by its very nature, it suggests that the police think they have caught the perpetrator of the crime"). The accuracy of Dina's identification was also called into question by inconsistencies between In's physical appearance and Yun's description of his captor. Most significantly, In described his captor as the "tallest" of the intruders, N.T. 09/10/2008 at 112, but In is shorter than either of the other defendants.[6] *See id.* at 118 – 19. The identification's accuracy was further complicated by the fact that neither Yun nor Christina—who both also had an opportunity to observe the intruder alleged to be In—were able to make a positive identification. *Id.* at 92 -93, 107 – 08. Nevertheless, eyewitness identifications are persuasive to a degree that belies their accuracy, and, given that the jury ultimately delivered a guilty verdict, it is likely that they accepted Dina's identification as the truth.[7] If the jury assumed that Dina's identification was accurate, it was much more likely to accept any theory that could explain evidence, like the DNA, that was seemingly at odds with that identification.

A DNA analysis that excluded Marable from being the glove's wearer would have substantially decreased the possibility that jurors convicted In. The possibility that Marable dropped the latex scrap when he first entered the house would have been eliminated, discouraging jurors from accepting any explanation for the latex scrap that also fit with Dina's identification. The jury would then have had no choice but to engage head-on with the possibility that Dina's identification was mistaken in some way. Had the jury been forced to grapple with directly conflicting pieces of evidence, without the convenience of any tidy explanation that could thread

---

[6] Additionally, the various descriptions of what In was wearing that were given at trial did not exactly match In's clothing at the time of his arrest—although they were not entirely inconsistent. *See* N.T. 09/10/2008 at 83 (describing dark clothes and a hood or hat); *id.* at 102, 117 (describing a dark grey or black sweatshirt with the hood up); *id.* at 130 (describing a dark hoodie). At the time of his arrest, shortly after the home invasion, In was wearing a blue and grey camouflage-patterned hoodie with words on the front. N.T. 09/11/2008 at 132.

[7] Certainly, Dina's identification was a major part of the prosecution's closing argument. *See* N.T. 09/12/2008 at 10 ("For John In to be not guilty, Dina Khem would have to had gotten up here, sworn under oath, in front of God and all of you and lied. . . . Now if you believe that, that's the only way that John In is not guilty.").

the needle between them, there is a reasonable probability that the trial would have reached a different conclusion.

      b.   Possible links between the latex scrap and the gun used to hold Yun hostage.

The prejudice that In suffered from his trial counsel's failure was compounded by the inadvertent discovery of similarities between the DNA found on the latex scrap and that found on the gun taken from the crashed Nissan Altima. While reviewing the DNA evidence related to the case, the petitioner's expert observed—and the Commonwealth's expert confirmed—that the common alleles in the DNA on the latex fragment and the firearm made it possible that the two items were handled by the same individual. And, because all three defendants were excluded from the DNA profile found on the latex fragment, the individual who handled both the glove and the gun could not have been Jean, Marable, or In. By tying the gun recovered from the Nissan Altima to the individual who held Yun at gunpoint via DNA—even if not definitively—the defense would have been able to buttress the argument that it made during its closing: that it strained credulity to believe that In could have held someone at gunpoint while wearing crumbling latex gloves and not leave any DNA on the gun. *See* N.T. 09/12/2008 at 32.

The possibility that the glove and gun belonged to the same person also supplies a compelling narrative that the defense could have used to convincingly rebut the Commonwealth's theory of the case. In this alternate theory, the unidentified intruder—rather than In—held Yun at gunpoint in his basement. When the police arrived, the unknown intruder fled past Christina and Angela through the Mifflin Street house's front door, dropping a torn scrap of latex in the front vestibule as he ran. The intruder then fled to the Nissan Altima that was parked nearby, tucking his gun under the front seat. Jean attempted to reach the Nissan Altima, himself, but was forced to take cover between cars when he saw police approaching. The unknown intruder also spotted the

police and sped off in the Nissan Altima, leaving Jean behind. Officer Birch pursued the Nissan Altima on foot, coming upon the wreck after the unknown co-conspirator had already fled the scene.

The defense could have plausibly argued that In simply had the misfortune of being in the wrong place at the wrong time. In happened to be near the Nissan Altima when the driver fled from police, and he began running as well. His flight could be explained by In's prior encounters with police as a juvenile and adult.[8] Officer Birch saw him running up the sidewalk near Jean and the Nissan Altima, and when the Nissan Altima's driver was nowhere to be found, Officer Birch pointed to In as the driver.

This alternate theory of the case would have provided a place for the defense to anchor any doubts the jury might have had about Officer Birch's conflicting accounts of the incident, and even a small amount of additional evidence may have been enough to tip the scales with regard to the jury's assessment of Officer Birch's testimony. The jury submitted nine questions during their deliberations, and at least six of them were related—either directly or indirectly—to the white Nissan Altima and Officer Birch's testimony regarding In's flight. *See* N.T. 09/12/2008 at 89 – 91. This suggests that the jury struggled with what to make of Officer Birch's conflicting statements, and that any additional exculpatory evidence might have led to a different outcome.

Viewed together, the information that would have been available to the defense but-for trial counsel's failure calls into question almost every piece of evidence that the Commonwealth relied on at trial. The Commonwealth submits that, had that information been available at trial, there is a reasonable probability that there would have been a different result.

---

[8] In's juvenile charges resulted in adjudications, while the adult charges were generally withdrawn or In was found not guilty. In had adult convictions for Knowing and Intentional Possession of a Controlled Substance, 35 P.S. § 780-113(a)(16) and Escape, 18 Pa. Cons. Stat. § 5121, that predated his arrest in connection with this incident.

# V.     CONCLUSION

The Commonwealth agrees that the facts of this case, as outlined above, demonstrate that In has met his burden of proof regarding his trial counsel's ineffectiveness. Accordingly, the Commonwealth concedes that In is entitled to relief on that basis and that this Court should grant habeas relief. Because the dispositive facts are part of the record and the parties agree on the nature and significance of trial counsel's failure for purposes of satisfying the legal test for ineffective assistance laid out in *Strickland*, no evidentiary hearing is necessary for the resolution of In's petition.

Respectfully submitted,

LAWRENCE KRASNER
District Attorney of Philadelphia

*/s/ Michael Garmisa*
Michael Garmisa (PA Bar # 203708)
Assistant District Attorney
Interim Supervisor, Conviction Integrity Unit

*/s/ Graham Sternberg*
Graham Sternberg (PA Bar # 329468)
Assistant District Attorney
Conviction Integrity Unit
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107
215-686-5718

Date: January 14, 2022

# EXHIBIT A



**CITY OF PHILADELPHIA**
Police Department
Office of Forensic Science
843-849 N. 8th Street
Philadelphia, PA 19123
(215) 685-3161



# DNA Laboratory Report

Philadelphia Police Department
South Detective Division
24th and Wolf Streets
Philadelphia, PA 19145

Philadelphia District Attorney's Office
Conviction Integrity Unit
3 South Penn Square
Philadelphia, PA 19107

**DATE:** 7/15/2021

**LAB #:** OFS 08-0266685

**DC #:** 07-04-009377

Supplemental #1

---

## Investigation of a Robbery

DNA testing procedures were performed on the below listed sample(s). Sample(s) that proceeded for STR analysis were amplified using Polymerase Chain Reaction (PCR) and typed using the GlobalFiler® PCR Amplification kit. The analysis of the below listed sample(s) and any conclusion(s) drawn from the results thereof were conducted in accordance with the Philadelphia Police Department DNA Laboratory Quality Assurance Manual, FBI Quality Assurance Standards and ANSI-ASQ National Accreditation Board ISO/IEC 17025 Accreditation and Supplemental Requirements for Forensic Testing.

The dates of examination for the evidence analyzed in this report are 5/3/2021 to 7/12/2021.

| Sample # | PR # | Item Description |
|----------|---------|------------------|
| 24775 | 9006285 | Item #1, swab from white latex glove, rear alley behind 724 W. Mifflin |
| 72740 | 3437960 | Buccal swab from Dyshon Marable |

## CONCLUSIONS:

Please refer to the previous PPD DNA Laboratory Report # 07-70327, dated 3/6/2008.

1. The DNA detected in sample 24775 is consistent with a mixture originating from at least three individuals, at least one of whom is male. Due to the complexity of the mixture and insufficient data, the origin of the DNA mixture detected in sample 24775 relative to Dyshon Marable is inconclusive.

2. Dyshon Marable is excluded as a contributor of the DNA mixture detected in sample 24776.

3. Due to the complexity of the mixture, the origin of the DNA detected in sample 24777 relative to Dyshon Marable is inconclusive.

4. Dyshon Marable is excluded as a contributor of the DNA mixture detected in sample 24778.

5. Dyshon Marable is excluded as a contributor of the DNA mixture detected in sample 24779.

6. A DNA profile originating from a male source was obtained from sample 72740 (Dyshon Marable).

## CODIS ENTRY:

A DNA profile from sample number 72740 has been entered into the Combined DNA Index System (CODIS) at the local, state and/or national level(s) in accordance with regulations. Regular searches will be performed and notification will be issued if there is a hit in the database or if the profile is removed from CODIS at any time in the future.

**DISPOSITION OF EVIDENCE:**
All DNA extracts have been retained in the Criminalistics Unit. Evidence shall be maintained by the PPD in accordance with all applicable directives, standards and/or legal requirements.

**Summary of STR Typing:**

| Sample Number | 24775 | 72740 |
|---|---|---|
| D3S1358 | 15, 16, 17 | 17, 18 |
| vWA | (15), 16, (17) | 15, 17 |
| D16S539 | (11), 12, 15 | 10, 11 |
| CSF1PO | (10), 11, (12), (13) | 11, 11 |
| TPOX | 11 | 11, 11 |
| Y indel | 2 | 2 |
| Amelogenin | X, (Y) | X, Y |
| D8S1179 | (10), 12, (14) | 12, 13 |
| D21S11 | 29, 30 | 29, 31 |
| D18S51 | 13, (14), 15, (17), 19 | 16, 16 |
| DYS391 | 10 | 10 |
| D2S441 | (10), 11, (14) | 11, 14 |
| D19S433 | 13, (14), (14.2), 15.2 | 13, 13.2 |
| TH01 | (6), (7), 8, (9.3) | 7, 7 |
| FGA | (21), 24 | 21, 23 |
| D22S1045 | 14, (15), 16, (17) | 10, 11 |
| D5S818 | 8, (11), 12 | 8, 12 |
| D13S317 | (11), 12 | 11, 11 |
| D7S820 | 8, (10), 11 | 8, 9 |
| SE33 | 19, 19 | 17, 24.2 |
| D10S1248 | (12), (13), 14, (15) | 13, 13 |
| D1S1656 | 11, 12, 16.3, 17.3 | 12, 20 |
| D12S391 | (17), 18, (20), (23) | 15, 19 |
| D2S1338 | 17, (19), (22) | 17, 19 |

| ( ) |
|---|
| Lighter intensity allele |

Benjamin S. Levin
Forensic Scientist 4

**Laboratory User Fee Requested: $ 1,050.00**

This report accurately reflects the findings and opinions of the forensic examiner who performed the analysis. All of the examinations and tests were performed in compliance with validated and industry-approved procedures and standards.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

**JOHN IN,**                :
      Petitioner         :
                        :
           **v.**             :         **No. 21-cv-0608**
                        :
**MARK CAPOZZA,**      :
**Superintendent,**       :
**SCI Fayette**            :
      Respondent       :

---

### CERTIFICATE OF SERVICE

I, Graham Sternberg, certify that on January 14, 2022, a copy of this Response was served via the Court's electronic case filing system on:

> *Karl Schwartz*
> *Katherine Ernst*
> Wiseman & Schwartz, LLP
> 718 Arch Street, Suite 702 North
> Philadelphia, PA  19106

 

*/s/ Graham Sternberg*
_____
Graham Sternberg (PA Bar # 329468)
Assistant District Attorney
Conviction Integrity Unit
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107
215-686-5718