# First Judicial District of Pennsylvania

*51CR00047682007*
*John In*

---

*Trial (Jury) Volume 1*
*September 11, 2008*



**Court Reporting System**

---

*First Judicial District of Pennsylvania*
*100 South Broad Street, Second Floor*
*Philadelphia, PA 19110*
*(215) 683-8000   FAX:(215) 683-8005*

*Original File COMVIN^9-11-08.txt, 0 Pages*
*CRS Catalog ID: 08110836*

## Page 1

[1]
[2]          IN THE COURT OF COMMON PLEAS
[3]      FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
[4]           CRIMINAL TRIAL DIVISION
[5]                    -----
[6] COMMONWEALTH          :
                          :
[7]                       :
         vs.          :   C.P.# 51-CR-0004768-2007
[8]                       :
                          :
[9] JOHN IN              :
[10]                   -----
[11]       Room 801, Criminal Justice Center
[12]         Philadelphia, Pennsylvania
[13]                   -----
[14]        Thursday, September 11, 2008
[15]                   -----
[16]    **BEFORE:** THE HONORABLE SANDY L.V. BYRD, J.
[17]                   -----
[18]            JURY TRIAL
[19]                   -----
[20]
[21]
[22]
[23]
[24]
[25]

## Page 2

[1]
[2]
[3] **APPEARANCES:**
[4]      LAUREN BARALDO, ESQUIRE
         Assistant District Attorney
[5]      For the Commonwealth
[6]      RICHARD GIULIANI, ESQUIRE
         Attorney for the Defendant
[7]
[8]      BYRON HOUSTON, ESQUIRE
         Attorney for Dyshon Marable
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

## Page 3

[1]
[2]                    INDEX
[3]         COMMONWEALTH'S EVIDENCE
[4] WITNESS         DR.  CR.  RDR. RCR.
[5] DETECTIVE ROBERT CONN        8  21  24  25
[6] POLICE OFFICER ROBERT ROBINSON    27  38
[7] POLICE OFFICER THOMAS NOLAN    46  51  55
[8] POLICE OFFICER KEVIN CANNON    79  82
[9] SERGEANT STEVEN WOODS        87  92
[10] POLICE OFFICER ROGER BIRCH    93  101  112  112
[11] POLICE OFFICER PETER SEABRON    114 120  124 125
[12] POLICE OFFICER RAPHAEL McGOUGH    126
[13] POLICE OFFICER CAROL JENKINS    129 134
[14] SERGEANT WILFREDO APONTE    135 150  157
[15] DETECTIVE JOHN HOPKINS        159
[16] BENJAMIN LEVIN        167 176  181  181
[17]

                    EXHIBITS
[18]              FOR       IN
     NO.      DESCRIPTION    IDENT.  EVD.
[19]
     C-2     Jacket        10
[20]
     C-3     Property receipt  12
[21]
     C-4     Photograph      15
[22]
     C-5     Search & seizure  15
[23]
[24]
[25]

## Page 4

[1]
[2]
     C-6     Title        17
[3]
     C-7     Registration      18
[4]
     C-8     Traffic tickets (3) 18
[5]
     C-9     Shoprite card      20
[6]
     C-10    Sweatshirt      36
[7]
     C-11    Police 75-48      50
[8]
     C-12    Map          80
[9]
     C-13    Sweat jacket      91
[10]
     C-14    Handgun        117
[11]
     C-15    Property receipt  119
[12]
     C-16    Handgun        128
[13]
     C-17    Report        132
[14]
     C-18    Report        133
[15]
     C-19    Photograph      137
[16]
     C-20    Photograph      138
[17]
     C-21    Photograph      139
[18]
     C-22    Property receipt  142
[19]
     C-23    Property receipt  144
[20]
     C-24    Report        147
[21]
     C-25    Map          148
[22]
     C-26    Aerial map      148
[23]
[24]
[25]

Page 5

| NO. | DESCRIPTION | FOR IDENT. | IN EVD. |
|---|---|---|---|
| C-27 | Property receipt | 160 | |
| C-28 | Property receipt | 161 | |

DEFENDANT'S EVIDENCE

| WITNESS | DR. CR. RDR. RCR. |
|---|---|
| NONE | |

EXHIBITS

| NO. | DESCRIPTION | FOR IDENT. | IN EVD. |
|---|---|---|---|
| D-2 | Memo | 101 | |
| D-3 | Statement | 105 | |
| D-4 | Interview | 122 | |

Page 6

[2] **THE COURT**: Let's go on the record
[3] on Commonwealth versus John In,
[4] CP-51-CR-0004768-2007.
[5] Before we get started, the record
[6] should reflect the jury is not present. On
[7] yesterday there was some mention of an alleged
[8] co-conspirator testifying. Are there any issues
[9] that we'll need to address now?
[10] **MS. BARALDI**: I went down and saw
[11] Mr. Marable with a detective. I was informed by
[12] Mr. Marable that he doesn't even plan on giving me
[13] his name. I think that there will be possible
[14] contempt issues.
[15] **THE COURT**: All right.
[16] Mr. Houston, do you represent
[17] Mr. Marable?
[18] **MR. HOUSTON**: I did at a guilty
[19] plea, Your Honor, so my representation extends to
[20] now.
[21] **THE COURT**: Has he been sentenced?
[22] **MR. HOUSTON**: Yes, Your Honor.
[23] **THE COURT**: So there's no Fifth
[24] Amendment issues?
[25] **MR. HOUSTON**: None I can recognize

Page 7

[2] from this act.
[3] **THE COURT**: I have no way of knowing
[4] what your client intends to do, but if he does not
[5] answer questions I intend to hold him in
[6] contempt. So you should go down and advise him
[7] that each question he refuses to answer will be
[8] six months, minus one day and I will continue that
[9] as long as there are questions.
[10] **MR. HOUSTON**: Okay. Your Honor, do
[11] I have a time frame?
[12] **THE COURT**: That's right, you are
[13] assigned elsewhere, aren't you?
[14] **MR. HOUSTON**: 901, yes.
[15] **THE COURT**: Can you talk to him this
[16] morning and report as to what his position is and
[17] I'll release you until he's called.
[18] **MR. HOUSTON**: I'll go upstairs and
[19] Judge Bronson will --
[20] **THE COURT**: When do you expect to
[21] call him?
[22] **MS. BARALDI**: Whenever it's
[23] convenient for Mr. Houston. I can put Mr. Marable
[24] on today or tomorrow morning, whatever is good for
[25] Mr. Houston.

Page 8

[2] **MR. HOUSTON**: All right. Judge,
[3] I'll go in and check in and I'll let the Court
[4] know my status so I can go talk to him.
[5] **THE COURT**: All right. Let me see.
[6] Give me one moment and I'll see the attorneys.
[7] (Whereupon, a discussion was held off the record, not
[8] reported.)
[9] **THE COURT**: Okay. Let's get
[10] started.
[11] **THE COURT CRIER**: Please remain
[12] seated while the jurors enter the courtroom.
[13] (Jury enters the courtroom at 9:50 a.m.)
[14] **THE COURT**: Good morning, ladies and
[15] gentlemen. You may be seated.
[16] **THE JURY**: (Jury panel complies.)
[17] **THE COURT**: Counsel, you may call
[18] your next witness.
[19] **MS. BARALDI**: The Commonwealth calls
[20] Detective Robert Conn.
[21] **THE COURT CRIER**: Please state for
[22] the record, your name, spell your name, badge
[23] number, and your assignment.
[24] **THE WITNESS**: Detective Robert Conn,
[25] C-O-N-N, Badge No. 629, assigned to Northeast

[1]
[2]    Detective Division.
[3]         DETECTIVE ROBERT CONN, after having
[4]    been first duly sworn, was examined and testified
[5]    **as follows:**
[6]              - - -
[7]         DIRECT EXAMINATION
[8]              - - -
[9] **BY MS. BARALDI:**
[10] **Q.**   Good morning, Detective Conn.
[11] **A.**   Good morning.
[12] **Q.**   Detective Conn, back on March 7th, 2007, where
[13]   were you assigned?
[14] A.   At the South Detective Division.
[15] **Q.**   And what was your responsibility at that point in
[16]   time?
[17] A.   Working the steady midnight to 8:00 tour, as a
[18]   detective.
[19] **Q.**   Did you at some point respond to a crime scene
[20]   located at 720 Mifflin Street?
[21] **A.**   I did.
[22] **Q.**   What took you there?
[23] A.   There was a home invasion type robbery committed
[24]   at that residence.
[25] **Q.**   What happened when you arrived?

[1]
[2] A.   The incident happened about 5:15 a.m., myself and
[3] Detective Hopkins arrived around 6:15 a.m. We entered
[4] the property and the first thing I do, I was the lead
[5] assigned investigator in this case, so the first thing
[6] I do with the interior crime scene I like to secure the
[7] scene for myself. It's something I do.
[8] **Q.**   What do you mean by "secure the scene"?
[9] **A.**   Check the property myself in case anyone else is
[10] in there.
[11] **Q.**   Did you secure the scene?
[12] **A.**   Within minutes I was on the second floor front
[13] bedroom, and in a closet I found a co-defendant in this
[14] case, Dyshon Marable, hiding underneath some clothes.
[15] **Q.**   Do you remember what, if anything, Dyshon Marable
[16] was wearing?
[17] **A.**   A blue Addidas sweat-type jacket.
[18]         **MS. BARALDI**: If I could have this
[19]   marked as C-2.
[20]   (Jacket marked Commonwealth's Exhibit 2 for
[21]       identification.)
[22]         **THE COURT CRIER**: Marking Exhibit
[23]   C-2. Showing it to the defense.
[24] **BY MS. BARALDI:**
[25] **Q.**   Do you recognize C-2, Detective?

[1]
[2] **A.**   Yes. This is the blue Addidas sweatshirt, I just
[3]   made mention to, that Mr. Marable was wearing when I
[4]   found him in the closet.
[5] **Q.**   After you found the co-defendant in the closet,
[6]   what did you do next?
[7] **A.**   We checked the rest of the house and further
[8]   secured it. Mobile crime arrived a short time later
[9]   and began processing the scene there.
[10] **Q.**   You mean the Crime Scene Unit?
[11] **A.**   Yes.
[12] **Q.**   And those are the ones that collected any of the
[13]   evidence?
[14] **A.**   Yes.
[15] **Q.**   Did you collect any evidence yourself?
[16] **A.**   What I collected from the kitchen area was a red
[17]   cord or string-type thing, it's just a red cord.
[18]         **MS. BARALDI**: If the witness could
[19]   be shown what has been previously marked C-1.
[20] **BY MS. BARALDI:**
[21] **Q.**   Detective, do you recognize C-1?
[22] **A.**   Yes, this is the red cord I referred to just a
[23]   minute ago. I recovered it from the kitchen-type
[24]   area.
[25]   Mr. Yun, the complainant in this incident, told me

[1]
[2] this was used to tie him up during the robbery.
[3] **Q.**   And after you recovered the orange(sic) cord, what
[4]   did you do with it?
[5] **A.**   Submitted it on a property receipt.
[6]         **MS. BARALDI**: If I could have this
[7]   marked as C-3.
[8]   (Property receipt marked Commonwealth's Exhibit 3 for
[9]       identification.)
[10] **BY MS. BARALDI:**
[11] **Q.**   Detective, do you recognize C-3?
[12] **A.**   Yes, Property Receipt No. 2704765 for the red or
[13]   orange cord.
[14] **Q.**   And you said to the ladies and gentlemen that you
[15]   placed it on a property receipt. That's police speak
[16]   for what?
[17] **A.**   A property receipt gives it a specific number so
[18]   we can refer back to it later.
[19] **Q.**   And when you put it on the property receipt, where
[20]   does the evidence go?
[21] **A.**   The evidence was submitted to our evidence room at
[22]   City Hall.
[23] **Q.**   Did you do anything else at the scene?
[24] **A.**   Well, I did survey the scene. I went to the rear
[25]   yard. And by the rear next to the yard there was a gun

Page 13

[1]
[2] in some type of shed or cement, I don't know what it
[3] was. It looked like a coal bin to me that was in the
[4] rear yard.
[5] **Q.** And you did not recover that?
[6] **A.** I did not.
[7] **Q.** Did you have an opportunity to speak with the
[8] co-defendant, Dyshon Marable, after he was taken from
[9] the closet?
[10] **A.** At a later time, that's correct.
[11] **Q.** Where did you speak with him?
[12] **A.** South Detectives.
[13] **Q.** Did you give him his Miranda warnings?
[14] **A.** That's correct.
[15] **Q.** Was he cooperative?
[16] **A.** He was.
[17] **Q.** Did he provide you a statement with his and others
[18] actions for this incident?
[19] **A.** He did.
[20] **Q.** There was also a white Nissan Altima involved in
[21] this case. What did you have to do with this white
[22] Nissan Altima?
[23] **A.** As part of surveying the whole scene because it
[24] went a couple blocks, it went into the 500 block of
[25] Mifflin Street, that's where this white Nissan was up

Page 14

[1]
[2] against a building. I walked down with another
[3] officer, Officer Avon from the Crime Scene Unit and we
[4] were observing the vehicle and I observed a gun,
[5] handgun, on the driver's side on top of the seat in
[6] that vehicle.
[7] **Q.** And did you recover that gun?
[8] **A.** I did not.
[9] **Q.** Officer Wilson from Crime Scene did?
[10] **A.** That is correct.
[11] **Q.** Did you make any other observations regarding the
[12] Nissan Altima?
[13] **A.** Not at that time.
[14] **Q.** Someone placed that on the property receipt?
[15] **A.** The vehicle, that's correct.
[16] **Q.** And the vehicle would be in a police lot?
[17] **A.** Police garage, 4298 McAllister Street.
[18] **Q.** Did you make any other observations of the objects
[19] in the car?
[20] **A.** In the back seat area I saw a box, a CVS box,
[21] clear latex gloves in the back seat. I later recovered
[22] them on a search warrant, they were the clear kind.
[23] They were the clear kind, just the clear -- not the
[24] colored kind.
[25]     I also observed in the vestibule of 720 Mifflin

Page 15

[1]
[2] Street the same type or clear type of latex glove, a
[3] piece of one.
[4]          **MS. BARALDI**: If I could have this
[5]     marked as C-4.
[6]     (Photograph marked Commonwealth's Exhibit 4 for
[7]          identification.)
[8] **BY MS. BARALDI**:
[9] **Q.** Detective, what is C-4?
[10] **A.** C-4 is the driver's side -- it's a view of the
[11] driver's side of the white Nissan Altima. And you can
[12] see behind in this picture before behind the driver's
[13] seat is the CVS latex gloves I referred to.
[14] **Q.** Did you take that picture?
[15] **A.** I did.
[16] **Q.** And when did you take that picture?
[17] **A.** During the execution of the search and seizure
[18] warrant.
[19]          **MS. BARALDI**: And if I could have
[20]     this marked C-5?
[21] (Search and seizure warrant marked Commonwealth's Exhibit
[22]          5 for identification.)
[23] **BY MS. BARALDI**:
[24] **Q.** And, Detective, what is C-5?
[25] **A.** C-5 is a Search and Seizure Warrant No. 128228.

Page 16

[1]
[2] **Q.** And what is a search warrant?
[3] **A.** A search warrant is a legal document that the
[4] police must obtain, an approval from the District
[5] Attorney's office in order to search someone's personal
[6] effects, house or car.
[7] **Q.** When did you obtain that search warrant?
[8] **A.** The date on this is 3/26/07.
[9] **Q.** And what was the object to be searched?
[10] **A.** 1997 Nissan Altima, Pennsylvania license plate,
[11] GRC-0883, white in color.
[12] **Q.** And was that the same Nissan Altima you saw on the
[13] 500 block of Mifflin Street?
[14] **A.** That is correct.
[15] **Q.** And that was placed on a property receipt?
[16] **A.** That's correct.
[17] **Q.** Not by you though; is that fair to say?
[18] **A.** That's correct.
[19] **Q.** Was that property receipt 2691194?
[20] **A.** That's correct.
[21] **Q.** Now, what if, anything did you recover from the
[22] white Nissan Altima?
[23] **A.** There's a list on the first page of the search
[24] warrant, I'll read from that. Proof of ownership, and
[25] that ownership was in the name of a Roan Adderly,

Page 17

[1]
[2] R-O-A-N A-D-D-E-R-L-Y. There was also a title in that
[3] name as well a car title for the Nissan.
[4]     **MS. BARALDI:**  If I could have this
[5]     marked as C-6?
[6]     (Title marked Commonwealth's Exhibit 6 for
[7]         identification.)
[8] **BY MS. BARALDI:**
[9] **Q.**  What is C-6?
[10] **A.**  C-6 the copy of the title or is the title I
[11] recovered from the '97 Nissan in the name of Roan
[12] Adderly.
[13] **Q.**  And there was another object, photocopies, in the
[14] piece of paper.  Was that also recovered?
[15] **A.**  It was a Pennsylvania driver's license, first name
[16] on it is Smith, S-M-I-T-H.  The last name I'll spell,
[17] P-R-I-N-T-E-M-P-S.
[18] **Q.**  And what's the address?
[19] **A.**  6571 North Woodstop Street.
[20] **Q.**  And I'm sorry, what was the address of the
[21] individual who owned the car?
[22] **A.**  1313 Lowden Street.
[23] **Q.**  And you are familiar with the layout of
[24] Philadelphia?
[25] **A.**  That's correct.

Page 18

[1]
[2] **Q.**  Do you know what police district those driver's
[3] license are from?
[4] **A.**  That would be the 35th Police District or the
[5] North Division.
[6] **Q.**  And what, if anything, else was recovered?
[7] **A.**  Going from the list is one pink registration paper
[8] for ownership of the vehicle.
[9]     **MS. BARALDI:**  If I could have this
[10]     marked C-7?
[11] (Registration paper marked Commonwealth's Exhibit 7 for
[12]         identification.)
[13]     **THE WITNESS:**  C-7 is the pink
[14]     registration paper I just referred to a moment ago
[15]     in the name of Roan Adderly.
[16] **BY MS. BARALDI:**
[17] **Q.**  What's the address on that?
[18] **A.**  The address is 5008 North Warnock Street.
[19] **Q.**  Do you know where that is located?
[20] **A.**  That is also in the 35th Police District, or North
[21] Division.
[22] **Q.**  Continue on with your other recoveries.
[23] **A.**  Two men's coats, one black, one tan; three plastic
[24] drink containers, one box of CVS latex gloves, one holy
[25] curan, three traffic tickets in the name of Jerry Jean.

Page 19

[1]
[2]     **MS. BARALDI:**  If I could have these
[3]     marked as C-8A, B, and C?
[4]     (Traffic tickets marked collectively Commonwealth's
[5]     Exhibit 8A, B, and C for identification.)
[6] **BY MS. BARALDI:**
[7] **Q.**  If we could start with C-8A, Detective Conn?
[8] **A.**  Got it.
[9] **Q.**  What is C-8A?
[10] **A.**  C-8A is one of the traffic tickets I referred to a
[11] moment ago in the name of Jerry Jean.
[12] **Q.**  What's the address?
[13] **A.**  313 East Clarkson Avenue.
[14] **Q.**  What was the date, if you can tell?
[15] **A.**  The date on this ticket was 2/16/07.
[16] **Q.**  And C-8B?
[17] **A.**  C-8B is another traffic ticket in the name of
[18] Jerry Jean with an address of 313 East Clarkson Avenue
[19] and the date on this ticket is 2/16/07.
[20] **Q.**  And what about C-8C?
[21] **A.**  "C" is a traffic ticket in the name of Jerry Jean,
[22] 313 East Clarkson Avenue.  The date on this ticket is
[23] 2/17/07.
[24] **Q.**  Okay.
[25]     And where were those traffic tickets recovered

Page 20

[1]
[2] inside of the car?
[3] **A.**  The glove compartment area of the '97 Nissan.
[4] **Q.**  And was anything else recovered?
[5] **A.**  Going back to the list, one Shoprite card in the
[6] name of Jacquelyn Jean.
[7]     **MS. BARALDI:**  If I could have this
[8]     marked as C-9?
[9]     (Shoprite card marked Commonwealth's Exhibit 9 for
[10]         identification.)
[11] **BY MS. BARALDI:**
[12] **Q.**  What is C-9?
[13] **A.**  C-9 is the Shoprite card in the name of Jacquelyn
[14] Jean.
[15] **Q.**  And that was recovered from where inside of the
[16] car?
[17] **A.**  That was recovered in the front passenger seat
[18] area.
[19] **Q.**  And you mentioned there was two soda bottles in
[20] the car?
[21] **A.**  Three plastic drink containers.
[22] **Q.**  Did you do anything with the plastic drink
[23] containers?
[24] **A.**  Yes, took them back to South Detectives and
[25] examined them there for possible DNA evidence.  And

Page 21

[1]
[2] when I removed the caps it was crusty, the bottles were
[3] dirty to begin with, but when I removed to caps they
[4] were in the car for sometime. They were very crusty
[5] and not able to obtain any evidence from that bottle in
[6] the condition it was in.
[7] **Q.** Is that the sum and substance of the items
[8] recovered from that Nissan?
[9] **A.** There was one other item, one black T-shirt that
[10] was recovered inside of the vehicle.
[11]     **MS. BARALDI**: Thank you, Detective.
[12]     I don't have anything further questions.
[13]         **THE COURT**: Cross-examination.
[14]             - - -
[15]         CROSS-EXAMINATION
[16]             - - -
[17] **BY MR. GIULIANI**:
[18] **Q.** Good morning, Detective. You went through items
[19] inside of the car. The gun was recovered the day of
[20] the incident, correct?
[21] **A.** Yes.
[22] **Q.** So in other words, the gun was taken out but all
[23] of the items you found were pursuant to the search
[24] warrant issued later on, correct?
[25] **A.** That's correct.

Page 22

[1]
[2] **Q.** And the search warrant was issued on March 26th?
[3] **A.** That's correct.
[4] **Q.** So the car was taken from the scene on March 7th,
[5] taken to police storage and sat there for 19 days
[6] before --
[7] **A.** I had two other search warrants of the vehicle but
[8] because of the scheduling conflicts and things like
[9] that I had to void the other two search warrants until
[10] I got to this one.
[11] **Q.** Okay.
[12]     Now, you went to 720 Mifflin Street as well?
[13] **A.** That's correct.
[14] **Q.** As one of the things you did as the assigned, you
[15] went in and surveyed the scene, did you see any sign of
[16] forced entry of the front or rear doors?
[17] **A.** I did, as well as the windows.
[18] **Q.** What did you find?
[19] **A.** I noticed just from sight that the rear window in
[20] the kitchen area, they had bars up there, and a couple
[21] of them appeared to be spread apart.
[22] **Q.** And in your vision or looking at that window with
[23] the bars spread apart, would the space have been large
[24] enough for an individual?
[25] **A.** I think so, yes.

Page 23

[1]
[2] **Q.** Any evidence that the window was broken into in
[3] any fashion?
[4] **A.** I didn't see that.
[5] **Q.** Did you talk to Mr. Yun about that as well?
[6] **A.** Yes. He said someone came up from behind him, so
[7] I don't know if he knows what direction they came in.
[8] **Q.** Did you take photographs of the window?
[9] **A.** Avon Wilson from Crime Scene did several
[10] photographs, so he would have that.
[11] **Q.** In the back seat of the Nissan you saw a box of
[12] latex gloves you said they were clear not color?
[13] **A.** That's correct.
[14] **Q.** And you also or somebody recovered a piece of a
[15] latex glove in the vestibule of the front of the house?
[16] **A.** I didn't recover it, but I saw a piece in the
[17] front vestibule.
[18] **Q.** You saw it, but didn't you seize it and put it on
[19] the property receipt, correct?
[20] **A.** That's correct.
[21] **Q.** But you did see it?
[22] **A.** Yes.
[23] **Q.** And you said it was a piece of a glove?
[24] **A.** Yes.
[25] **Q.** Do you know which of your fellow officers put that

Page 24

[1]
[2] piece of a glove on a property receipt?
[3] **A.** I do not.
[4] **Q.** The latex or the piece of latex glove that was
[5] found in the front vestibule, did that appear to be
[6] clear?
[7] **A.** Yeah, it was the same type of color and
[8] consistency as the one in the back of the car.
[9] **Q.** And do you know as the assigned there was a glove
[10] recovered in the back of the alley behind the house as
[11] well?
[12] **A.** Yes.
[13] **Q.** And did you see that even though you didn't
[14] recover it?
[15] **A.** I did not.
[16]     **MR. GIULIANI**: Court's indulgence,
[17] please.
[18]         (Pause.)
[19]     **MR. GIULIANI**: That's all I have.
[20] Thank you, Detective.
[21]     **THE COURT**: Any redirect?
[22]     **MS. BARALDI**: I do have one
[23] question.
[24]             - - -
[25]     REDIRECT EXAMINATION

Page 25

[1]
[2]                    - - -
[3] **BY MS. BARALDI**:
[4] **Q.**  Why had the gun been taken the night of the
[5] incident but none of the other items?
[6] **A.**  There would be several reasons and that's the
[7] decision of the person recovering it.  Public safety,
[8] it could be loaded, the car could be towed, a bump
[9] could make that gun go of and injure someone else.  So
[10] it's taken from the scene if it's in plain view.
[11] **Q.**  And that's common police procedure; is that
[12] correct to say?
[13] **A.**  Yes.
[14]               **MS. BARALDI**:  No further questions.
[15]                    - - -
[16]               RECROSS-EXAMINATION
[17]                    - - -
[18] **BY MR. GIULIANI**:
[19] **Q.**  As the assigned you're in charge of what evidence
[20] is submitted for either latent fingerprint analysis or
[21] DNA in any case?
[22] **A.**  It depends.  If Mobile Crimes recovered it they
[23] make that determination depending on what it is, so
[24] they make that determination.
[25] **Q.**  So the gun was recovered by Officer Wilson, was

Page 26

[1]
[2] recovered by Mobile Crimes, correct?
[3] **A.**  Yes.
[4] **Q.**  So Mobile Crimes would make that determination of
[5] whether to submit the latent fingerprint exam?
[6] **A.**  Yes.
[7] **Q.**  Are you aware where they did that?
[8] **A.**  I don't know.
[9]               **MR. GIULIANI**:  Fair enough.  Thank
[10] you, Detective.
[11]               **THE COURT**:  Anything else?
[12]               **MS. BARALDI**:  No.
[13]               **THE COURT**:  Detective, did you make
[14] reference in your testimony of observing one gun
[15] or two?
[16]               **THE WITNESS**:  Two.
[17]               **THE COURT**:  Can you tell the ladies
[18] and gentlemen what guns were seen, whether they
[19] were handguns, shotguns, rifle?
[20]               **THE WITNESS**:  The first gun was in
[21] the rear of 720 Mifflin Street, it looked like an
[22] old coal bin, it wasn't a shed.  But right next to
[23] fence in the rear yard, it was in that area.  And
[24] the second gun was --
[25]               **THE COURT**:  Was it a shotgun, a

Page 27

[1]
[2] rifle, handgun?
[3]               **THE WITNESS**:  That was -- if I may
[4] refer to my notes, Your Honor.  The weapon in the
[5] rear yard was a .9 mm semi-automatic pistol that
[6] was loaded with ten live rounds.
[7]               **THE COURT**:  And the next, you said
[8] you saw a second gun, where was that?
[9]               **THE WITNESS**:  In the driver's seat
[10] of the '97 Altima.  That was a Zig Zauer .9 mm
[11] semi-automatic handgun.
[12]               **THE COURT**:  Both were handguns
[13] then?
[14]               **THE WITNESS**:  Yes.  And that was
[15] loaded with 15 live rounds.
[16]               **THE COURT**:  Any questions based on
[17] my questions?
[18]               **MS. BARALDI**:  No, Your Honor.
[19]               **MR. GIULIANI**:  No Your Honor.
[20]               **THE COURT**:  Thank you, sir.  You may
[21] step down.
[22]               (Witness excused.)
[23]                    - - -
[24]               **MS. BARALDI**:  At this time the
[25] Commonwealth would be calling Police Officer

Page 28

[1]
[2] Robinson.
[3]               **THE COURT**:  Very well.
[4]               **THE COURT CRIER**:  Please state your
[5] full name, spell your last name, badge number, and
[6] assignment.
[7]               **THE WITNESS**:  Police Officer Robert
[8] Robinson, R-O-B-I-N-S-O-N, Badge NO. 3301,
[9] assigned to the 4th Police District.
[10]               POLICE OFFICER ROBERT ROBINSON,
[11] after having been first duly sworn, was examined
[12] **and testified as follows**:
[13]                    - - -
[14]               DIRECT EXAMINATION
[15]                    - - -
[16] **BY MS. BARALDI**:
[17] **Q.**  Good morning, Officer Robinson.
[18] **A.**  Good morning.
[19] **Q.**  Officer Robinson, I want to take you back to March
[20] 7th, 2007, were you working as a Philadelphia Police
[21] Officer at that time?
[22] **A.**  That's correct.
[23] **Q.**  What tour of duty were you working?
[24] **A.**  11:00 to 7:00.
[25] **Q.**  And were you assigned to the 4th District as well?

Page 29

[1]
[2] **A.** That's correct.
[3] **Q.** I want to draw your attention to 5 o'clock in the
[4] morning, were you working alone or with a partner?
[5] **A.** By myself.
[6] **Q.** Were you in uniform?
[7] **A.** Yes.
[8] **Q.** Did you hear a radio call?
[9] **A.** Yes, I did.
[10] **Q.** What do I mean by "a radio call"?
[11] **A.** A radio call is something that comes from police
[12] radio, which gives an assignment which can be anywhere
[13] from an auto accident or priority call.
[14] **Q.** And do you remember the context of the radio call?
[15] **A.** The call came out at 720 Mifflin Street. A call
[16] from the basement saying somebody heard somebody in
[17] their house, burglary in progress, for the most part.
[18] **Q.** And when you arrived at 720 Mifflin Street, were
[19] you met by any other officers?
[20] **A.** I was the third car there. Officer Battles and
[21] Nolan were on location at that time.
[22] **Q.** Were they inside of the house when you arrived?
[23] **A.** No.
[24] **Q.** They were outside?
[25] **A.** Yes.

Page 30

[1]
[2] **Q.** What happened when you arrived at 720 Mifflin?
[3] **A.** We all got out of the cars. Officer Battles
[4] stepped up the steps first, banged on the windows
[5] waiting for somebody to come to the door, we had no
[6] response. She then opened up the screen door and we
[7] all noticed that the door was ajar, meaning it was 2 or
[8] 3 inches open. It was left open. At that point the
[9] front door was pushed open because we didn't know what
[10] we had because of the nature of the call. Officer
[11] Battles entered the first floor, followed by Officer
[12] Nolan and myself.
[13]     At that point she asked, yelled out, did anybody
[14] call the police? I had noticed an Asian child, I guess,
[15] 10 or 12 maybe sitting off to the corner when she
[16] yelled, "did anybody call the police?"
[17]     I heard a black voice, an African-American voice
[18] from upstairs yell down, "nobody called the police."
[19]     But it looked a little odd because it's an Asian
[20] kid on the step on the couch to hear a black voice.
[21]     She yelled it again, "Did anybody here call the
[22] police."
[23]     The response again, "Nobody called the police.
[24] Everything is okay."
[25]     From the angle I was at the top of the steps

Page 31

[1]
[2] because the steps was more in front of me, I saw a
[3] sprint of legs in the back room. It was rapid movement
[4] in the back room. At that point Officer Nolan ran
[5] upstairs recognizing there's a problem and at that
[6] point, as this was happening, with the rapid movement
[7] in the back an Asian teenager came down the steps.
[8] "Help me, help me, they have guns there's somebody
[9] upstairs."
[10]     Nolan goes upstairs. I know there's back windows
[11] to these houses as long as there's a back face to the
[12] backyard or something like that, there's an egress to
[13] get out. So I assumed right there with nobody coming
[14] down the steps, they are going to try to go out the
[15] back window.
[16]     I went towards the back of the house to the
[17] kitchen area and there's a wooden door. I opened the
[18] wooden doors, there a metal gate that takes you out to
[19] the back door. I had to pull open to get into the
[20] backyard. As I opened that, a black male comes flying
[21] past me towards the back of the yard.
[22] **Q.** Do you know where that man came from?
[23] **A.** It would have to be from second floor because it
[24] was no other place to come out of the house except from
[25] the second floor. It would be to the back of the

Page 32

[1]
[2] house.
[3] **Q.** Did you see anybody falling out of the second
[4] floor?
[5] **A.** I am assuming that because there is no other exit
[6] other than a window on the second floor.
[7] **Q.** Where's Officer Battles at this point?
[8] **A.** She is between the kitchen and the steps.
[9] **Q.** Which steps are you referring to, the steps to the
[10] basement?
[11] **A.** The steps that lead upstairs.
[12] **Q.** So when this man runs past you, do you recall what
[13] he was wearing?
[14] **A.** He had a hoodie, he had a pair of jeans. He ran
[15] so fast once he passed me I went to the back of the
[16] yard behind him.
[17] **Q.** Okay.
[18] **A.** Officer Battles was then behind me to come in the
[19] back of the yard.
[20]     As you go out, if you're coming facing the from
[21] doorway in my viewpoint I have to go left, it's a small
[22] corridor probably the size of the width of this box.
[23] **Q.** To get in the back area?
[24] **A.** To get in the backyard area. There's something
[25] directly in front of me within 3 feet, so I have to

Page 33

[1]
[2] make a right or a left. To the right is a window, I
[3] guess part of the first floor of the house. To the
[4] left is an opening that takes me to the back part of
[5] the yard which widens within like 4 feet, it widens
[6] up. I followed this male, he actually -- I lost sight
[7] for one second. He goes to the back of the yard and to
[8] the left of me, as I am coming towards the back of the
[9] yard, there's a shed. The male is in the shed. Both
[10] of our guns are drawn, we give him commands to exit the
[11] shed to put his hands down to go to a prone position.
[12] **Q.** What do you mean "prone position"?
[13] **A.** Prone meaning no threat to us, so we are able to
[14] see his hands go to the ground, so we can apprehend
[15] him.
[16] **Q.** At this point the man is still in the shed?
[17] **A.** Yes. He is given several commands to leave the
[18] shed and he doesn't do it. It's second, seconds, he's
[19] hauling and moving around and we are not sure what he's
[20] doing.
[21] **Q.** Can you see inside of the shed at this point?
[22] **A.** No, just the movements. I think there was an
[23] alleyway in close proximity to that to give us some
[24] sort of light. At that point the male comes out of the
[25] shed with one the hand he goes down to the ground like

Page 34

[1]
[2] he's going to comply to the prone position.
[3]     At that point he reaches up to the fence and
[4] scales the fence. At that point he's given orders to
[5] come down to the ground again and he refuses. With
[6] that he goes to reach towards the inside of his
[7] pockets, his right pocket, and at this we are told they
[8] have weapons.
[9]     Officer Battles told him to stop what's he doing,
[10] he doesn't, she fires a shot at him.
[11] **Q.** Is he struck?
[12] **A.** To me he basically yells, "I'm shot. You shot
[13] me. Why did you shoot me."
[14]     At that point he continues to scale the fence.
[15] **Q.** What's on the other side of the fence?
[16] **A.** It's an alleyway and another yard.
[17] **Q.** Do you follow him over the fence?
[18] **A.** No.
[19] **Q.** What do you do?
[20] **A.** At that point the fence is about 8-foot high I
[21] know there is an alley exit at the other end. I go and
[22] run out of the front of the house, I run eastbound on
[23] Mifflin Street.
[24] **Q.** So east on Mifflin Street would have took you
[25] towards 7th or 6th?

Page 35

[1]
[2] **A.** It's the 700 block. I would hit 7th and then 6th
[3] after that.
[4] **Q.** So between 7th and 8th?
[5] **A.** No, I'm heading eastbound, so it would be -- the
[6] closest street when I'm going east would be 7th Street.
[7] **Q.** So you head in the direction of 7th Street?
[8] **A.** Right.
[9] **Q.** Do you see this male running?
[10] **A.** No, I am in the front of the house, he's still in
[11] the alleyway. I am looking for an exit for him to exit
[12] out of the alleyway.
[13]     At that point there's a lot of commotion and I
[14] hear Officer Birch go over the air with a car trying to
[15] leave the area. While I am still running down Mifflin
[16] Street I am still giving flashes in the alley going
[17] eastbound, he's wearing a hoodie, he's got a beard,
[18] give a brief flash. I can't find an exit. Right at
[19] that point when I look down, Officer Cannon, has him on
[20] the ground.
[21] **Q.** And did you identify that man when you reached
[22] Officer Cannon?
[23] **A.** Yes. He had somebody with him and I continued
[24] down because there was commotion further down.
[25] **Q.** When you say "he", do you mean Officer Cannon?

Page 36

[1]
[2] **A.** Yes.
[3] **Q.** Had another police officer with him?
[4] **A.** Right. So I can continue on with the people they
[5] were chasing.
[6] **Q.** And all you know at this point you hear Officer
[7] Birch over the radio saying he's chasing a car?
[8] **A.** Yes.
[9] **Q.** And that's the direction you continue on?
[10] **A.** Right.
[11] **Q.** Now, you said he was wearing a dark hoodie?
[12] **A.** Right.
[13] **Q.** Do you remember anything else about him?
[14] **A.** Just his description, he was about 6 foot, 200,
[15] 210 pounds, he had a beard, sideburns all the way like
[16] this (indicating).
[17] **Q.** Okay.
[18]     Do you remember the color of the sweatshirt?
[19] **A.** It was green.
[20]         **MS. BARALDI**: If I could have this
[21]     marked as C-10?
[22]     (sweatshirt marked Commonwealth's Exhibit 10 for
[23]         identification.)
[24] **BY MS. BARALDI**:
[25] **Q.** What is C-10?

[1]
[2] **A.** A green hoodie.
[3] **Q.** And is that the same green hoodie that Jerry Jean
[4] was wearing that night?
[5] **A.** Yes.
[6] **Q.** After you see that Officer Cannon and another
[7] officer have this defendant under control, you said you
[8] continued down Mifflin Street?
[9] **A.** Towards Sixth.
[10] **Q.** How far do you get before you turn back?
[11] **A.** Probably around 6th Street. I -- actually I had
[12] to go over the police radio, apparently they were
[13] chasing somebody in that area that met the flash of
[14] another, of somebody in the house.
[15] **Q.** Okay.
[16]     Do you double back to the house at this point?
[17] **A.** Yes.
[18] **Q.** When you get to the house, who is in the house
[19] still?
[20] **A.** Officer Battles.
[21] **Q.** So Officer Battles never leaves the house. She
[22] stay in the house; is that fair to say?
[23] **A.** Yes -- no, after I left when she came back she was
[24] there. She was there originally and when I came back
[25] she was still there.

[1]
[2] **Q.** And was Officer Nolan in the house?
[3] **A.** No.
[4] **Q.** So when this whole incident occurs prior to the
[5] defendant in the green sweatshirt, Jerry Jean, the only
[6] three officers in the house are who?
[7] **A.** Myself, Officer Nolan, and Battles.
[8] **Q.** Are you all in uniform?
[9] **A.** Yes.
[10] **Q.** Are there any plainclothes officers at the scene
[11] at that point?
[12] **A.** No.
[13] **Q.** When you return back in the house after you see
[14] Jerry Jean is secured, are there any plainclothes
[15] officers at that point; if you can recall?
[16] **A.** I don't remember.
[17] **Q.** At some point are you the officer who took Dina
[18] and Christina down to South Detectives?
[19] **A.** Yes.
[20] **Q.** And you transported those two girls to the wagon
[21] to make identifications; is that fair to say?
[22] **A.** Yes.
[23]     **MR. BARRY**: Thank you, Officer
[24] Robinson. I don't have any further questions.
[25] Thank you.

[1]
[2]          - - -
[3]     CROSS-EXAMINATION
[4]          - - -
[5] **BY MR. GIULIANI**:
[6] **Q.** Good morning, Officer. How are you?
[7] **A.** Good morning.
[8] **Q.** When you get the call of a burglary in progress
[9] where in the 4th District are you at that point in and
[10] time, if you can recall?
[11] **A.** My sector is on the east end.
[12] **Q.** Which would be?
[13] **A.** A sector would be Delaware River to Tasker to
[14] Wolf.
[15] **Q.** So you get the call, and you're in the police
[16] cruiser by yourself?
[17] **A.** That's correct.
[18] **Q.** You get to 720 Mifflin Street in less than five
[19] minutes?
[20] **A.** Two to three minutes.
[21] **Q.** Okay.
[22]     So you get there and arrive almost simultaneously
[23] with Officer Nolan and Battles?
[24] **A.** That's correct.
[25] **Q.** And they are working alone in separate police

[1]
[2] cruisers, correct?
[3] **A.** Yes.
[4] **Q.** So the three of you approach the house and when
[5] the three of you entered it was Battles who went first,
[6] Nolan, and you bring up the rear?
[7] **A.** Right.
[8] **Q.** So you go in and noticed there's a young Asian
[9] male there, correct?
[10] **A.** It was an Asian older child, 10 or 11 maybe, 12.
[11] **Q.** And you hear when you call a black voice, did
[12] anybody call the cops?
[13] **A.** Right.
[14] **Q.** Then the Asian female comes running down steps,
[15] correct?
[16] **A.** Right.
[17] **Q.** But you may not have known at that particular time
[18] but you know now that's Christina Khem, correct?
[19] **A.** Correct.
[20] **Q.** Because she was one of the two females you brought
[21] to the scene to identify?
[22] **A.** Yes.
[23] **Q.** She comes running down the steps and says there's
[24] guys with guns up there?
[25] **A.** Yes.

Page 41

[1]
[2] **Q.** And based on that Nolan goes upstairs, you and
[3] Battles don't go upstairs, right?
[4] **A.** Right.
[5] **Q.** And you and Battles, with you in the lead, go
[6] towards the back of the house, right?
[7] **A.** Right.
[8] **Q.** You go into the kitchen and see there's a single
[9] back door to the backyard, right?
[10] **A.** A door and a metal gate.
[11] **Q.** And you proceed to go to the backyard because
[12] you're looking to prevent what happened, somebody
[13] jumping out of the second floor and escape out of the
[14] back?
[15] **A.** That's correct.
[16] **Q.** As you go through the kitchen, do you notice
[17] there's a basement door there?
[18] **A.** Yes.
[19] **Q.** Do you remember whether the door was open or
[20] shut?
[21] **A.** No.
[22] **Q.** No, you don't recall?
[23] **A.** I don't recall.
[24] **Q.** So does it take you a little bit of time to get to
[25] that back door and back metal gate; if you recall.

Page 42

[1]
[2] **A.** Five seconds.
[3] **Q.** We are talking some time here but this happened
[4] extremely quickly; is that fair to say?
[5] **A.** Yes.
[6] **Q.** When you opened that back door and back metal gate
[7] you go outside and saw a black male pass you?
[8] **A.** He ran past me and I followed behind.
[9] **Q.** And you know the only place he could have came
[10] from was the second floor?
[11] **A.** Yes.
[12] **Q.** And when you did that, I think you testified and
[13] told the jury, but you're outside and Battles remains
[14] inside at that point in time, right?
[15] **A.** No.
[16] **Q.** Did you not say, I want to be clear, at some point
[17] you say, you begin to go outside and Battles remains
[18] inside between the kitchen and the steps to go
[19] upstairs?
[20] **A.** That was prior to me exiting the building.
[21] **Q.** So when you went out, she followed you?
[22] **A.** That's correct.
[23] **Q.** Then you have the incident outside and the male
[24] goes out to the shed. You and Battles draw your
[25] weapons and he tries to get away, makes a movement, and

Page 43

[1]
[2] Battles fires, correct?
[3] **A.** Yes.
[4] **Q.** You don't discharge your weapon?
[5] **A.** No.
[6] **Q.** The male climbs the fence.
[7] **A.** Right.
[8] **Q.** And you and Battles don't climb the fence, you go
[9] out in the street, correct?
[10] **A.** Officer Battles remained, I continued through the
[11] house and out eastbound.
[12] **Q.** So Battles stayed in the backyard and you ran out
[13] of the front of the house?
[14] **A.** After the male left the area there was no threat
[15] to us, I went in foot pursuit parallel to the front
[16] compared to him being in the alleyway.
[17] **Q.** Okay.
[18]    So you ran out of the front door?
[19] **A.** Yes.
[20] **Q.** And when you ran out the front door, you didn't
[21] see any other individual at that point in time?
[22] **A.** Not that I recall.
[23] **Q.** And when you ran out of the front door you turn
[24] left towards 7th Street?
[25] **A.** I would turn right.

Page 44

[1]
[2] **Q.** Right. I'm sorry, it's on the south side of the
[3] street. You turned right to 720 Mifflin Street and
[4] down to 7th and 6th, right?
[5] **A.** Yes.
[6] **Q.** As you do that, do you see anybody running in
[7] front of you?
[8] **A.** No.
[9] **Q.** You don't see anybody fleeing the scene?
[10] **A.** No.
[11] **Q.** And you say that at some point you are running
[12] down Mifflin Street and towards 7th, and you hear over
[13] police radio and hear Officer Birch come over and say
[14] that he sees somebody running or chasing a car?
[15] **A.** I think it was about somebody chasing a car.
[16] **Q.** Did you know it was Birch who was talking, did you
[17] recognize his voice?
[18] **A.** I wasn't paying attention. Just that somebody was
[19] in a car leaving the area.
[20] **Q.** Did you see the car leave the area?
[21] **A.** No.
[22] **Q.** But you were running down Mifflin Street?
[23] **A.** Yes.
[24] **Q.** And you run down to 7th and at that point in time
[25] you know Officer Cannon has Jerry Jean on the ground?

Page 45

[1]
[2] **A.** Yes.
[3] **Q.** And where exactly is that?
[4] **A.** That would be on the southeast corner.
[5] **Q.** Of 7th and Mifflin Street?
[6] **A.** Yeah, he's got him on the ground. This hoodie is
[7] underneath a back tire of the last car on the corner.
[8] **Q.** Okay.
[9]     So then to get to where Mr. Jean was, you would go
[10] down Mifflin and go through the intersection of 7th and
[11] Mifflin Street?
[12] **A.** Yes.
[13] **Q.** Right down the intersection, that's where Mr. Jean
[14] and Officer Cannon was?
[15] **A.** Yes.
[16]     **MR. GIULIANI:** Court's indulgence,
[17] please.
[18]     (Pause.)
[19]     **MR. GIULIANI:** Officer, that's all I
[20] have. Thank you, sir.
[21]     **THE COURT:** Any redirect?
[22]     **MS. BARALDI:** I do not.
[23]     **THE COURT:** Thank you, sir. You may
[24] step down.
[25]     (Witness excused.)

Page 46

[1]
[2]     - - -
[3]     **MS. BARALDI:** At this time, the
[4] Commonwealth would be calling Police Officer
[5] Nolan.
[6]     Your Honor, may I excuse Officer
[7] Robinson?
[8]     **THE COURT:** Yes.
[9]     **THE COURT CRIER:** Please state your
[10] name, spell your last name, unit and assignment.
[11]     **THE WITNESS:** Police Officer Thomas
[12] Nolan, assigned to the 4th District, Badge No.
[13] 3527.
[14]     POLICE OFFICER THOMAS NOLAN, after
[15] having been first duly sworn, was examined and
[16] **testified as follows:**
[17]     - - -
[18]     DIRECT EXAMINATION
[19]     - - -
[20] **BY MS. BARALDI:**
[21] **Q.** Good morning, Officer Nolan.
[22] **A.** Good morning.
[23] **Q.** Officer Nolan, back on March 7th, 2007, were you
[24] assigned to the 4th Police District then as well?
[25] **A.** Yes.

Page 47

[1]
[2] **Q.** Were you working alone or with a partner?
[3] **A.** Alone.
[4] **Q.** Were you in uniform?
[5] **A.** Yes.
[6] **Q.** And about 5 o'clock in the morning, did you hear a
[7] radio call for a burglary in progress?
[8] **A.** Yes.
[9] **Q.** Did you go to 720 Mifflin Street?
[10] **A.** Yes.
[11] **Q.** When you arrived at the location, did you have any
[12] brother or sister officers there?
[13] **A.** Yes, Officer Battles and Officer Robinson.
[14] **Q.** Do the three of you approach the house together?
[15] **A.** Yes, we do.
[16] **Q.** Tell us what happened when you approached the
[17] house?
[18] **A.** Battles is in front, I was in the middle, somebody
[19] was behind me. The door was cracked open, we entered
[20] the property. Officer Battles announced: Did anybody
[21] call police? From the upstairs area a male called down
[22] saying nobody called police, police are not needed.
[23]     As we are standing there a young female came down
[24] and said, "Help me." And at that point I ran up to the
[25] top of the steps. When I got to the top of the steps I

Page 48

[1]
[2] heard noises coming from the back bedroom. I
[3] approached the back bedroom and witnessed a male was
[4] sliding out of the window and one-half from his waist
[5] down was hanging from the window area and I went to
[6] grab him and pull him back. Unable to pull him back
[7] he was able to get loose and sliding down the window.
[8] At which point I ran down the steps and heard one
[9] single shot.
[10] **Q.** When you hear the single shot, where are you in
[11] the house?
[12] **A.** At the stop of the steps.
[13] **Q.** The second floor steps?
[14] **A.** Yes.
[15] **Q.** After you hear the shot, what do you do?
[16] **A.** I continue down to the backyard where Robinson and
[17] Offers Battles were out there at that time.
[18] **Q.** What happens next?
[19] **A.** Robinson said the male jumped over the fence and
[20] was heading down the alleyway, and we turned down to
[21] the front of the house around down the corner to the
[22] entrance of the alleyway to see if he was coming down
[23] that way.
[24] **Q.** So when you exit the house, you go on Mifflin
[25] Street?

Page 49

[1]
[2] **A.** We go on Mifflin Street downwards 7th Street.
[3] **Q.** And other than the torso down, do you ever get a
[4] good look at this male?
[5] **A.** No, I don't.
[6] **Q.** Was there anything specific that you can recall
[7] that would help you identify him?
[8] **A.** He had on dark jeans with a silver stitching on
[9] the pockets and black sneakers?
[10] **Q.** So you are running eastbound on Mifflin Street
[11] towards 7th?
[12] **A.** Correct.
[13] **Q.** Is Robinson next to you or are you both on the
[14] street?
[15] **A.** We are both running towards there. I don't know
[16] if he was in front of me or behind me at the time.
[17] **Q.** What happens next?
[18] **A.** As we turned the corner towards to the alleyway,
[19] Officer Cannon had someone between the cars towards 7th
[20] Street on Mifflin Street. At which point ran over and
[21] I assisted him in arresting the male suspect between
[22] two cars hiding.
[23] **Q.** Did anybody ever ask you to identify Jerry Jean?
[24] **A.** No.
[25] **Q.** The best way to identify him would have been by

Page 50

[1]
[2] his jeans; is that fair to say?
[3] **A.** Correct.
[4] **Q.** You prepared some police paperwork, as a result of
[5] this incident, right?
[6] **A.** Yes.
[7] **Q.** Okay.
[8]          **MS. BARALDI**: If I could have this
[9]     marked collectively as C-11 and just for the
[10]     record it's four pages.
[11]     (Police 48 marked Commonwealth's Exhibit 11 for
[12]          identification.)
[13] **BY MS. BARALDI**:
[14] **Q.** Officer Nolan, what are those four pages of
[15] papers?
[16] **A.** These are 48s from the job.
[17] **Q.** 48 in police language, what does that mean to
[18] everybody else?
[19] **A.** A basic description of what happened during this
[20] incident.
[21] **Q.** And a 48 is just the type of form; is that fair to
[22] say?
[23] **A.** Correct.
[24] **Q.** And you were the one, I guess, as the first
[25] responding officer or one of the first responding

Page 51

[1]
[2] officers who would have prepared these reports?
[3] **A.** Yes.
[4] **Q.** And these would have been done the night of the
[5] incident?
[6] **A.** Yes.
[7] **Q.** And then submitted to Detective Conn as the
[8] assigned; is that fair?
[9] **A.** Yes.
[10]          **MS. BARALDI**: Court's indulgence for
[11]     one second.
[12]          (Pause.)
[13]          **MS. BARALDI**: I don't have any
[14]     further questions.
[15]          **THE COURT**: Mr. Giuliani?
[16]          **MR. GIULIANI**: Thank you.
[17]          - - -
[18]          CROSS-EXAMINATION
[19]          - - -
[20] **BY MR. GIULIANI**:
[21] **Q.** I just have a couple questions. When you get to
[22] the house yourself, Officer Battles, and officer
[23] Robinson enter the property and notice that the door is
[24] cracked open, right?
[25] **A.** Right.

Page 52

[1]
[2] **Q.** You go in and eventually a young woman we know
[3] Christina Khem comes running downstairs and says "help
[4] me, help me, they have guns," right?
[5] **A.** She just said, "help me, help me."
[6] **Q.** You, out of these three officers, go upstairs?
[7] **A.** Correct.
[8] **Q.** Do you have your gun drawn when you do that?
[9] **A.** Yes.
[10] **Q.** Battles and Robinson stay downstairs, correct?
[11] **A.** Correct.
[12] **Q.** As soon as you get to the top landing say you
[13] trying to clear that there's no one pointing a gun at
[14] you.
[15] **A.** Correct.
[16] **Q.** As you proceed up the steps and see it's clear,
[17] then you notice an individual we know now who is Jerry
[18] Jean get out of the window?
[19] **A.** Correct.
[20] **Q.** At that time you believe but you weren't sure
[21] there may have been one more male up there?
[22] **A.** That's correct.
[23] **Q.** When you get up there you see the one that goes
[24] out the window, correct?
[25] **A.** Correct.

Page 53

[1]
[2] **Q.** As soon as that guy jumps out of the window, is it
[3] fair to say you run back downstairs?
[4] **A.** Yes.
[5] **Q.** Okay.
[6]    So by the time that you left and went up the
[7] steps, saw Mr. Jean, go through the window, jump out,
[8] and come back downstairs, what are you talking about 20
[9] or 30 seconds?
[10] **A.** Roughly, 20 or 25 seconds.
[11] **Q.** Okay.
[12]    When you go back downstairs, where do you go? Do
[13] you go through the backyard or stay inside of the
[14] house?
[15] **A.** I go to the backyard.
[16] **Q.** And when go to the backyard you got to go through
[17] kitchen, right?
[18] **A.** Correct.
[19] **Q.** Did you notice that time whether or not there was
[20] a door to the basement from the kitchen?
[21] **A.** No, I went straight to the yard.
[22] **Q.** And at any point in time after you exit -- after
[23] you came back down from the second floor, did you see
[24] any other non-police individual in the house?
[25] **A.** No.

Page 54

[1]
[2] **Q.** Officer Nolan, is it also fair to say that a large
[3] number of officers eventually responded to the scene?
[4] **A.** Yes.
[5] **Q.** And is it also fair to say that everything
[6] happened extremely quickly?
[7] **A.** Yes.
[8] **Q.** And there was a lot of confusion and chaos because
[9] of the number of individuals, the threat of guns,
[10] people inside; is that fair to say too?
[11] **A.** Yes.
[12] **Q.** You didn't know then, but found out there was a
[13] male upstairs hiding in the closet?
[14] **A.** Yes.
[15] **Q.** Who wasn't found for like an hour later?
[16] **A.** Right.
[17] **Q.** The individual who you helped assist arrest,
[18] Mr. Jean, he's a big guy, isn't he?
[19] **A.** Yes.
[20] **Q.** He's 6 foot 2, something like that?
[21] **A.** Six-four.
[22] **Q.** So he's about my height?
[23] **A.** Approximately.
[24] **Q.** Huskier than me?
[25] **A.** Yes, he's a big boy.

Page 55

[1]
[2] **Q.** Now, you go back downstairs into the backyard and
[3] Battles is back there, correct?
[4] **A.** Correct.
[5] **Q.** Had Robinson already left and went out of the
[6] front?
[7] **A.** He was back there also.
[8] **Q.** He was there too. Okay.
[9]    Did he run out of the front door?
[10] **A.** We both went out the front door we he said he went
[11] in the alley and he took off down there.
[12] **Q.** And you would have to make a right towards 7th
[13] Street?
[14] **A.** Right.
[15] **Q.** And run down Mifflin?
[16] **A.** Right.
[17] **Q.** Did you see a vehicle fleeing the scene at that
[18] point?
[19] **A.** No.
[20]    **MR. GIULIANI:** Thank you, Officer.
[21]    **THE COURT:** Any redirect?
[22]    **MS. BARALDI:** Just one question.
[23]       - - -
[24]    REDIRECT EXAMINATION
[25]       - - -

Page 56

[1]
[2] **BY MS. BARALDI:**
[3] **Q.** At the point when you and Officer Robinson exit
[4] the house after Officer Battles discharged, had any
[5] other officers arrived at that location?
[6] **A.** No.
[7] **Q.** So it was the three of you in the property at the
[8] point which you exit?
[9] **A.** Correct.
[10]    **MS. BARALDI:** I don't have anything
[11] further.
[12]    **THE COURT:** Thank you, sir. You
[13] may step down.
[14]    (Witness excused.)
[15]    **THE COURT:** You may call your next
[16] witness.
[17]    **MS. BARALDI:** Your Honor, may I
[18] excuse Officer Nolan?
[19]    **THE COURT:** Yes.
[20]    **MS. BARALDI:** At this time the
[21] Commonwealth would be calling Officer Cannon.
[22]    **THE COURT:** We are going to take a
[23] quick -- we are going to take a break.
[24]    **THE COURT CRIER:** Please remain
[25] seated while the juror exits the courtroom.

Page 57

[1]
[2]        (Jury departs the courtroom at 10:45 a.m.)
[3]            (Short recess.)
[4]            **THE COURT:** Let me see counsel for a
[5]    moment.
[6]    (Whereupon, a discussion was held off the record, not
[7]            reported.)
[8]    (Mr. Giuliani, Mr. Houston, Ms. Baraldi, and the Court
[9]    present.)
[10]           **MS. BARALDI:** If I may, after
[11]   Mr. Marable is done testifying, I would ask
[12]   Detective Hopkins to come in prior to.
[13]           **THE COURT:** Okay.
[14]           **MR. GIULIANI:** And can we ask
[15]   Sheriff Guess if that show up would be permissible
[16]   at some point?
[17]           **THE COURT:** At some point counsel is
[18]   going to walk over and ask Mr. Marable to stand so
[19]   he can stand next to him just for purposes of
[20]   demonstrative evidence. Is that your request?
[21]           **MR. GIULIANI:** Yes, I'm not going to
[22]   ask any questions.
[23]           **THE COURT:** At this juncture we are
[24]   outside the hearing of the jury. The jury is on
[25]   break. Mr. In is here with his attorney.

Page 58

[1]
[2]    Mr. Giuliani and Ms. Baraldi for the Commonwealth.
[3]        Who is your next witness, ma'am?
[4]           **MS. BARALDI:** Dyshon Marable.
[5]           **THE COURT:** Mr. Marable is on the
[6]    witness stand. Let's have him sworn in.
[7]        Would you stand up, sir?
[8]           **THE WITNESS:** (Witness complies.)
[9]           **THE COURT CRIER:** State for the
[10]   record your name and name for the record.
[11]           **THE WITNESS:** (No audible response.)
[12]           **THE COURT:** Answer the question,
[13]   Mr. Marable. What is your name and spell it,
[14]   please?
[15]           **THE WITNESS:** (No audible response.)
[16]           **THE COURT:** Are you refusing to
[17]   state your name, sir?
[18]           **THE WITNESS:** Yeah.
[19]           **THE COURT:** Mr. Houston?
[20]           **MR. HOUSTON:** Yes, may I address the
[21]   Court?
[22]           **THE COURT:** Would you tell us, on
[23]   the record, what your relationship is to this
[24]   defendant?
[25]           **MR. HOUSTON:** Yes, Byron Houston,

Page 59

[1]
[2]    Defenders Association. I was trial counsel for
[3]    Mr. Marable and I talked to him in the cell room
[4]    in the last hour about the issues presented here
[5]    today, Your Honor.
[6]        And if I could inform the Court,
[7]    Your Honor, I have from independent sources as
[8]    well as from my client he has been subject to
[9]    several threats since he has been brought down
[10]   from penitentiary.
[11]           **THE WITNESS:** Wait.
[12]           **MR. HOUSTON:** I am speaking now.
[13]       He has been warned that, anything
[14]   that may be detrimental to anybody will have
[15]   consequences. And he understands that to be
[16]   physical and his life and health has been
[17]   threatened.
[18]           **THE COURT:** Let me be clear on
[19]   something. You represented Mr. Marable in a case
[20]   related to this matter?
[21]           **MR. HOUSTON:** That's correct, Your
[22]   Honor.
[23]           **THE COURT:** And in particular, what
[24]   were the circumstances?
[25]           **MR. HOUSTON:** The circumstances I

Page 60

[1]
[2]    think and attested to at trial here, I can't
[3]    remember the night in question, the police went to
[4]    a house --
[5]           **THE COURT:** I mean his --
[6]           **MR. HOUSTON:** Well, it ended -- he
[7]    pleaded guilty, Your Honor.
[8]           **THE COURT:** With respect to
[9]    Mr. Marable his case was listed before me on
[10]   12/3/07, and you were counsel. What happened at
[11]   his proceeding?
[12]           **MR. HOUSTON:** He entered a plea of
[13]   guilty to a robbery and burglary and the sentence
[14]   was five to ten years. He was sentenced and that
[15]   was in December.
[16]           **THE COURT:** All right. So that the
[17]   record is clear on this part of these proceedings,
[18]   I am well aware that Mr. Houston is an officer of
[19]   the Court, however, at this juncture on your
[20]   representation that he entered a guilty plea you
[21]   should advise Mr. Marable whether or not he has a
[22]   Fifth Amendment privilege in this matter.
[23]           **MR. HOUSTON:** I have so advised him,
[24]   but I will do it again.
[25]       Mr. Marable, I would like for you to

Page 61

[1]
[2] understand that because you entered the plea and
[3] the Judge accepted the plea, the Judge sentenced
[4] you pursuant to plea agreement and your 30 days
[5] have elapsed since that sentence imposed.
[6] Therefore, you have no rights as I recognize at
[7] this point, Fifth Amendment rights, that pertain
[8] to that case whatsoever. So that means that if
[9] you choose not to testify pursuant to the Fifth
[10] Amendment, which the law allows you to do or the
[11] Sixth, I'm not sure of the Sixth, then you receive
[12] none of the protections that the Fifth Amendment
[13] usually affords, that mean nobody can do anything
[14] to you about it.
[15]        **THE COURT**: Mr. Marable, you have
[16] refused to give your name and be sworn in; is that
[17] correct?
[18]        **THE WITNESS**: Yes.
[19]        **THE COURT**: I want you to understand
[20] that this conduct has occurred in the presence of
[21] this Judge and it is impermissible; do you
[22] understand that?
[23]        **THE WITNESS**: Meaning what?
[24]        **THE COURT**: It is not permissible;
[25] do you understand that?

Page 62

[1]
[2]        **THE WITNESS**: So meaning I got to do
[3] what?
[4]        **THE COURT**: Did you hear my
[5] statement?
[6]        **THE WITNESS**: Yeah.
[7]        **THE COURT**: Do you understand it?
[8]        **THE WITNESS**: No, that's what I am
[9] asking you.
[10]        **THE COURT**: You don't have a right
[11] to decline to give your name and/or to testify
[12] because you have pled guilty in this case and have
[13] no Fifth Amendment privilege; do you understand
[14] that?
[15]        **THE WITNESS**: Yes.
[16]        **THE COURT**: Now, the consequences of
[17] your conduct are that I can hold you in contempt
[18] of court and sentence you to a term of
[19] incarceration over and above what your serving
[20] now; do you understand that?
[21]        **THE WITNESS**: Yeah.
[22]        **THE COURT**: Okay. Now, do you
[23] understand?
[24]        **THE WITNESS**: Yes.
[25]        **THE COURT**: Do you intend to

Page 63

[1]
[2] continue this impermissible conduct?
[3]        **THE WITNESS**: Yeah, I ain't telling
[4] on nobody.
[5]        **THE COURT**: I didn't understand
[6] you.
[7]        **THE WITNESS**: Yes.
[8]        **THE COURT**: Okay. If you continue
[9] with this impermissible conduct and I conclude you
[10] will, based on your answer, such conduct is
[11] intentional, it is willful; do you understand
[12] that?
[13]        **THE WITNESS**: Yes.
[14]        **THE COURT**: I am now directing you
[15] to give your name and answer questions.
[16]        Swear in the witness.
[17]        **THE COURT CRIER**: Please state for
[18] the record, your name and spell your name.
[19]        **THE WITNESS**: (No audible response.)
[20]        **THE COURT**: Is that silence?
[21]        **THE WITNESS**: Yes.
[22]        **THE COURT**: You are declining to
[23] give your name?
[24]        **THE WITNESS**: Yes.
[25]        **THE COURT**: Do you intend to testify

Page 64

[1]
[2] if questions are asked of you?
[3]        **THE WITNESS**: No.
[4]        **THE COURT**: I want you to know that
[5] your conduct is willful, it's intentional, it
[6] disrupts this Court's proceeding, it obstructs
[7] this Court's proceeding, it interrupts the orderly
[8] progression of justice and it is derogatory to
[9] this Court and to that jury; do you understand
[10] that?
[11]        **THE WITNESS**: Yes.
[12]        **THE COURT**: Now the jury is not in
[13] the room at this juncture for this reason. We
[14] wished to ascertain outside of their presence
[15] whether or not you would be in contempt; do you
[16] understand?
[17]        **THE WITNESS**: Yes.
[18]        **THE COURT**: At this juncture it is
[19] required on my part to preserve the authority of
[20] this Court that you either comply with my
[21] directives or I am impose sanctions; do you
[22] understand?
[23]        **THE WITNESS**: What's that?
[24]        **THE COURT**: That I find you in
[25] contempt.

Page 65

[1]
[2]        **THE WITNESS**: Okay.
[3]        **THE COURT**: Do you understand that?
[4]        **THE WITNESS**: Yeah.
[5]        **THE COURT**: Take a moment, sit down,
[6] and think about what you want to do and let me
[7] know if you intend to continue to conduct yourself
[8] in a contemptible fashion.
[9]        (Pause.)
[10]        **THE COURT**: Have you had a moment to
[11] think about it?
[12]        **THE WITNESS**: Yes.
[13]        **THE COURT**: Do you wish to speak to
[14] your attorney?
[15]        **THE WITNESS**: No.
[16]        **THE COURT**: Let the record reflect
[17] that the defendant's conduct of record occurred in
[18] the presence of this Judge. That the conduct is
[19] impermissible, the defendant -- the witness rather
[20] is aware of that and I so instructed him. That
[21] the witness has been advised of the consequences
[22] of this conduct. That the conduct is both willful
[23] an intentional and the conduct obstructs, impedes,
[24] disrupts, interrupts, and is derogatory to this
[25] Court. Therefore, the Court finds the defendant

Page 66

[1]
[2] in contempt of court.
[3]        Now, before I impose the contempt,
[4] do you wish to respond to the findings that I have
[5] made?
[6]        **THE WITNESS**: No.
[7]        **THE COURT**: Then the Court states or
[8] reinstates its finding. I find you guilty of
[9] contempt, direct criminal contempt.
[10]        Now, having done so, I must instruct
[11] you that you may be sentenced immediately unless,
[12] of course, you decide to purge yourself with the
[13] contempt and testify; do you understand. Do you
[14] wish to do that?
[15]        **THE WITNESS**: Sentenced to what?
[16]        **THE COURT**: Well, unfortunately or
[17] fortunately for you we must do this in steps. So
[18] the first thing we do is sentence. I am telling
[19] you we will not go to sentence if you decide to
[20] purge yourself of the contempt and answer the
[21] questions. Do you understand wish to?
[22]        **THE WITNESS**: What would I be
[23] sentenced to?
[24]        **THE COURT**: I haven't decided yet.
[25] You don't wish to purge yourself of

Page 67

[1]
[2] contempt?
[3]        **THE WITNESS**: Yes.
[4]        **THE COURT**: Then having found you in
[5] contempt of court the Court convenes a sentencing
[6] proceeding. You have been through this before you
[7] have been sentenced in court so you know at such a
[8] proceeding you have the right of allocution and
[9] have a right to be heard. Yes or no?
[10]        **THE WITNESS**: Yes.
[11]        **THE COURT**: Is there anything you
[12] wish to say before sentence is imposed?
[13]        **THE WITNESS**: When I took the deal I
[14] told them I wasn't going to tell on nobody.
[15]        **THE COURT**: Anything else?
[16]        **THE WITNESS**: No.
[17]        **THE COURT**: The Court having found
[18] the defendant in contempt imposes a sentence of
[19] six months less one day and a fine of $499. The
[20] sentence is to be consecutive to any sentence he's
[21] now serving.
[22]        Do you understand the sentence?
[23]        **THE WITNESS**: Yes.
[24]        **THE COURT**: Mr. Houston, give him
[25] his rights.

Page 68

[1]
[2]        **MR. HOUSTON**: Do you understand you
[3] have been found in contempt by the Judge and
[4] sentenced. You have a right to ask the Judge to
[5] change the finding of contempt and sentence. You
[6] should do it in the next ten days because if you
[7] don't you will lose certain rights within the next
[8] 30 days.
[9]        My office will represent you if you
[10] want to file those things because they have to be
[11] done in writing, but you to tell us about it.
[12]        Do you understand?
[13]        **THE WITNESS**: (No audible response.)
[14]        **THE COURT**: Do you understand?
[15]        **THE WITNESS**: Yes.
[16]        **THE COURT**: Okay. All right. If
[17] everybody can stay in place, if I could see the
[18] attorneys for one moment.
[19] (Whereupon, a discussion was held off the record, not
[20]        reported.)
[21]        **THE COURT**: We are back on the
[22] record.
[23]        Deputy Guess would you take
[24] Mr. Marable into the room right there?
[25]        **THE SHERIFF**: Yes.

Page 69

[1]
[2]                (Witness excused.)
[3]          **THE COURT**: All right. We are at
[4]   this juncture, counsel, the witness has been held
[5]   in contempt. He has declined to testify and I
[6]   have found him in contempt and sentenced him. How
[7]   do you wish to proceed?
[8]          **MS. BARALDI**: I wish to call him as
[9]   my witness, have him not say whatever it is he is
[10]  going to say. I am going to ask Sheriff Guess to
[11]  read his wristband and ask Detective Hopkins to
[12]  come in and testify.
[13]          **THE COURT**: Where does that get
[14]  you?
[15]          **MS. BARALDI**: Then I can introduce
[16]  copies of the statement?
[17]          **THE COURT**: What's the basis of
[18]  introducing the statement.
[19]          **MS. BARALDI**: He's unavailable.
[20]          **THE COURT**: If he is unavailable
[21]  then he is giving prior testimony, it comes in.
[22]          **MS. BARALDI**: Well, arguably could
[23]  his prior testimony be his plea because it was
[24]  taken under oath?
[25]          **THE COURT**: It could if that had

Page 70

[1]
[2]   been some opportunity for the defendant to engage
[3]   him in full and fair cross-examination, that
[4]   wasn't the case. I'll tell you what I will do,
[5]   I'll allow you to continue with your other witness
[6]   and you can address this over the luncheon
[7]   recess. But at this juncture if it's a
[8]   Brady/Lively situation, that's a prior
[9]   inconsistent statement and he has to give some
[10]  testimony under oath that's inconsistent with the
[11]  statement he advised us, he's not going to give
[12]  any testimony, he won't even tell you his name.
[13]          So unless I am mistaken, then you
[14]  have an opportunity to prove me wrong that it's
[15]  not a Brady/Lively situation. If it's prior
[16]  testimony to be produced for an unavailable
[17]  witness, we need the circumstances wherein he
[18]  testified and was subject to cross-examination. I
[19]  don't know that that's the case. Those are the
[20]  only two exceptions that readily come to mind.
[21]  You have the issue of "Crawford," you have the
[22]  issue of just plain old hearsay. Do you want to
[23]  think about it, and we've had an off-the-record
[24]  discussion, perhaps Mr. Giuliani is not going to
[25]  raise those objections he raised off the record.

Page 71

[1]
[2]          **MR. GIULIANI**: I would raise those
[3]   objections I raised off the record.
[4]          **THE COURT**: I want the record to
[5]   reflect that we had a sidebar and Mr. Giuliani
[6]   objected to the witness testifying. He did not
[7]   object to witness testifying, he objected to the
[8]   statement coming in on the ground that -- well,
[9]   you state your objection.
[10]          **MR. GIULIANI**: Yes, Your Honor.
[11]  It's become clear from the colloquy that you had
[12]  with Mr. Marable that he will persist in refusing
[13]  to testify. Based on that it was the
[14]  Commonwealth's intention to have Detective Hopkins
[15]  or Detective Conn come in and read verbatim the
[16]  statement Mr. Marable gave to them.
[17]          **THE COURT**: Is that a fair
[18]  statement?
[19]          **MS. BARALDI**: Yes.
[20]          **MR. GIULIANI**: Based on that, Your
[21]  Honor, it is clear that the only two ways the
[22]  statement would come in as Your Honor said under
[23]  Rule 613 if this was a prior inconsistent
[24]  statement. However, the rule states that one of
[25]  the requirements that it could come in as

Page 72

[1]
[2]   substantive evidence would be the opposite party,
[3]   my client and myself had the opportunity to
[4]   question the witness about the inconsistent
[5]   statement and since he is refusing to testify we
[6]   don't have that opportunity.
[7]          And the other is since he is clearly
[8]   unavailable under the hearsay, Rule 804, and his
[9]   persisted refusal to testify under court order,
[10]  the only exception that would apply as Your Honor
[11]  pointed out is former testimony. And, again, the
[12]  crux of that is we be given a fair opportunity to
[13]  cross-examine and that has not happened. Were the
[14]  Commonwealth able to read the statement into
[15]  evidence, they would have the benefit of
[16]  Mr. Marable offering testimony for the truth of
[17]  the matter asserted against my client saying he's
[18]  involved, and I have no opportunity to question
[19]  that testimony. It's clearly hearsay and I
[20]  object.
[21]          **THE COURT**: Ms. Baraldi, I'll give
[22]  you full opportunity to respond.
[23]          **MS. BARALDI**: I don't argue with
[24]  that. I think that's a fair and accurate
[25]  representation as to how the laws currently

Page 73

[1]  stand. I would still ask that Mr. Marable be
[2]  brought out, he be asked his name, that Sheriff
[3]  Guess identify him. I would still ask that
[4]  Detective Hopkins be allowed to come in and I ask
[5]  Detective Hopkins if that defendant gave a
[6]  statement, although the context of that statement
[7]  would not be coming in.
[8]         MR. GIULIANI: I don't object to any
[9]  of that, Your Honor.
[10]        THE COURT: Are there any other
[11] arguments you have for admission of the
[12] statement?
[13]        MS. BARALDI: No.
[14]        THE COURT: And the procedure just
[15] outlined is not objectionable to the defense?
[16]        MR. GIULIANI: It is not, Your
[17] Honor.
[18]        THE COURT: Then let's do that.
[19]        MS. BARALDI: Okay.
[20]        THE COURT: Should we bring in the
[21] jury?
[22]        MS. BARALDI: Yes. Just for
[23] purposes of scheduling, should we have another
[24] witness ready after Mr. Marable?

Page 74

[1]
[2]         THE COURT: Yes, I think we should
[3]  go as late as we can.
[4]         Are we going to -- after we finish
[5]  with this process, will he be escorted out in the
[6]  jurors' presence or go out again?
[7]         MS. BARALDI: I mean, they are
[8]  obviously going to know he's incarcerated.
[9]         THE COURT: So it doesn't matter.
[10]        MR. GIULIANI: It doesn't matter.
[11] Just so long as Your Honor permits me to allow
[12] Mr. Marable to stand.
[13]        THE COURT: So you have a tactical
[14] reason to consenting to this process?
[15]        MR. GIULIANI: Yes.
[16]        THE COURT: So long as everybody
[17] understands what the other person is doing.
[18]        Bring out the jury.
[19]        THE COURT CRIER: Please remain
[20] seated while the juror enters the courtroom.
[21] (Jury enters the courtroom at 11:55 a.m.)
[22]        THE COURT: Thank you, ladies and
[23] gentlemen, you may be seated.
[24]        You may call your next witness.
[25]        MS. BARALDI: At this time the

Page 75

[1]
[2]  Commonwealth calls Dyshon Marable.
[3]         THE COURT: Mr. Marable, would you
[4]  stand?
[5]         THE WITNESS: (Witness complies.)
[6]         THE COURT: Swear in the witness,
[7]  please.
[8]         THE COURT CRIER: Please stated for
[9]  the record, your name and spell your name for the
[10] record court.
[11]        THE WITNESS: (No audible response.)
[12]        THE COURT: Let the record reflect
[13] the witness refused to give his name.
[14]        MS. BARALDI: I would ask that
[15] Sheriff Guess identify the witness for us.
[16]        THE COURT: Any objection?
[17]        MR. GIULIANI: No objection, Your
[18] Honor.
[19]        THE SHERIFF: Dyshon Marable,
[20] D-Y-S-H-O-N M-A-R-A-B-L-E, PP No. 949714, with his
[21] picture on the ID.
[22]        MS. BARALDI: And does that picture
[23] match who is standing there today?
[24]        THE SHERIFF: Yes, it does.
[25]        MS. BARALDI: At this time I would

Page 76

[1]
[2]  ask that Detective Hopkins be allowed to enter the
[3]  courtroom.
[4]         THE COURT: Bring in Detective
[5]  Hopkins.
[6]         THE COURT CRIER: Yes.
[7]         THE COURT: Yes.
[8]  (Detective Hopkins enters the courtroom.)
[9]         MS. BARALDI: I would ask that
[10] Detective Hopkins to be allowed to look at the
[11] witness for purpose of future questioning.
[12]        THE COURT: He may.
[13] (Detective Hopkins exits the courtroom.)
[14]        THE COURT: Anything else?
[15]        MS. BARALDI: Obviously this witness
[16] will not be testifying.
[17]        MR. GIULIANI: With the Court's
[18] permission, may I approach the witness?
[19]        THE COURT: Yes.
[20]        MR. GIULIANI: With the Court's
[21] permission, Sheriff Guess' permission, may I stand
[22] next to Mr. Marable and request him to stand,
[23] please?
[24]        THE COURT: Yes.
[25]        THE WITNESS: (Witness complies.)

Page 77

[1]
[2]          **MR. GIULIANI**: Thank you, Your
[3] Honor.
[4]          **THE COURT**: Anything else from
[5] either side?
[6]          **MS. BARALDI**: No, sir.
[7]          **THE COURT**: You may escort the
[8] witness out.
[9]          (Witness excused.)
[10]          - - -
[11]          **MS. BARALDI**: Your Honor, if I may,
[12] there has been a stipulation.
[13]          **THE COURT**: May I see the two of
[14] you?
[15] (Whereupon, a discussion was held off the record, not
[16]          reported.)
[17]          **THE COURT**: Mr. Giuliani, are you
[18] ready to proceed?
[19]          **MR. GIULIANI**: Yes, we are. Thank
[20] you, Your Honor.
[21]          **THE COURT**: Ladies and gentlemen, in
[22] my preliminary instructions I told you that
[23] statements made by the attorneys did not
[24] constitute evidence, therefore they were not
[25] binding on you. There are exceptions to this rule

Page 78

[1] and one such exception is a stipulation. When the
[2] Commonwealth and the defense stipulate that, is
[3] when they agree that a certain fact or facts are
[4] true, their stipulation is evidence of that fact
[5] and you jurors should regard stipulated or agreed
[6] upon facts as proven.
[7]          You may proceed.
[8]          **MS. BARALDI**: Thank you.
[9]          There's been a stipulation by and
[10] between counsel that in the case of Commonwealth
[11] versus Dyshon Marable, Common Pleas Court No.
[12] 51-CR-0004827-2007 that in this courtroom,
[13] December 3rd, 2007, before the Honorable Judge
[14] Byrd, Dyshon Marable pled guilty to three counts
[15] of robbery. Victims being Vuthay Yun, Dina Khem,
[16] and Christina Khem. Plead guilty to burglary of
[17] the house at 720 Mifflin Street. Pled guilty to
[18] possession of an instrument of crime, conspiracy
[19] regarding the incident that happened on March 7th,
[20] 2007.
[21]          In exchange to his guilty plea, it
[22] was negotiated, he was sentenced to a period no
[23] less than five no more than ten years
[24] incarceration.

Page 79

[1]
[2]          **THE COURT**: Is that so stipulated?
[3]          **MR. GIULIANI**: So stipulated, sir.
[4]          **THE COURT**: You may proceed.
[5]          **MS. BARALDI**: At this time the
[6] Commonwealth will be calling Police Officer
[7] Cannon.
[8]          **THE COURT CRIER**: Please state your
[9] name, spell your last name, badge number, and
[10] assignment for the he can record.
[11]          **THE WITNESS**: Officer Kevin Cannon,
[12] C-A-N-N-O-N, Badge No. 1367, assigned to the 3rd
[13] District.
[14]          POLICE OFFICER KEVIN CANNON, after
[15] having been first duly sworn, was examined and
[16] **testified as follows**:
[17]          - - -
[18]          DIRECT EXAMINATION
[19]          - - -
[20] **BY MS. BARALDI**:
[21] **Q.**  Good afternoon, Officer Cannon.
[22] **A.**  Good afternoon.
[23] **Q.**  Officer Cannon, back on Wednesday, March 7th,
[24] 2007, were you working as a police officer as well?
[25] **A.**  Yes, I was.

Page 80

[1]
[2] **Q.**  What district were you assigned to?
[3] **A.**  Third District.
[4] **Q.**  Were you working alone or with a partner?
[5] **A.**    By myself.
[6] **Q.**  Were you in a uniform?
[7] **A.**  Yes.
[8] **Q.**  Were you operating a patrol car?
[9] **A.**  Yes.
[10] **Q.**  Did you happen to respond to a radio call for a
[11] burglary at 720 Mifflin Street?
[12] **A.**  That's correct.
[13] **Q.**  Can you please tell the ladies and gentlemen what
[14] you did?
[15] **A.**  At that time I pulled up to the intersection of
[16] 7th and Mifflin. Upon arrival at the intersection I
[17] observed on the southeast corner, on the 600 block of
[18] Mifflin Street, a white Nissan Altima with a
[19] Pennsylvania tag of GRC-0883. That vehicle was parked
[20] with his headlights on. In front of that vehicle was a
[21] gold-colored Honda. As I looked to the front of that
[22] vehicle I observed a black male crouched down hiding in
[23] between two parked cars.
[24]          At that time I exited my vehicle began to approach
[25] that male. As I got about half-way across the

Page 81

[1]
[2] intersection, the white Nissan Altima parked on the
[3] corner went into reverse. At that time it continued at
[4] a high rate of speed eastbound on the 600 block of
[5] Mifflin.
[6]     As it proceeded eastbound, Officer Birch, who was
[7] also on location, went in pursuit of that vehicle.
[8] After he passed by I continued over to the black male
[9] between the two cars. At that time I took that black
[10] male into custody and a short time later, I was met by
[11] other officers including Officer Nolan who positively
[12] ID'd the male as being the male he observed inside of
[13] the property at 720 Mifflin.
[14]         **MS. BARALDI**: If I could have this
[15]     marked as C-12.
[16] (Map marked Commonwealth's Exhibit 12 for identification.)
[17] **BY MS. BARALDI**:
[18] **Q.**  I believe Officer Cannon, if you open behind you,
[19] if you could describe for the ladies and gentlemen what
[20] is this?
[21] **A.**  This here is the location of the actual call, the
[22] burglary in progress of 720 Mifflin street. I am
[23] coming southbound on 7th Street against traffic. And
[24] that's when I get to the intersection of 7th and
[25] Mifflin here. At 7th and Mifflin on the southeast

Page 82

[1]
[2] corner of the 600 block of Mifflin is where I observed
[3] the white Nissan Altima. That's where it was parked
[4] with the headlights on. Directly in front of that
[5] vehicle was the gold-colored Honda in front of that
[6] Honda, that's were I observed the black male identified
[7] as Jerry Jean hiding between the two parked cars.
[8] **Q.**  Did you find anything between the cars?
[9] **A.**  Yes, in between two parked cars where he was
[10] hiding he had his hands up behind the front bumper of
[11] the Honda, that's where we recovered a green-colored
[12] sweatshirt.
[13]         **MS. BARALDI**: I believe this was
[14]     previously marked C-10.
[15] **BY MS. BARALDI**:
[16] **Q.**  Officer, is this the sweatshirt you are referring
[17] to?
[18] **A.**  That's correct.
[19] **Q.**  Now, when you were coming down the wrong way on
[20] 7th Street, you said that Officer Birch was in your
[21] general vicinity, where was he?
[22] **A.**  Yes, that's correct. When we came to the stop I
[23] was in the middle of the intersection, he was forward
[24] to me more southbound on 7th Street in front of my car.
[25] **Q.**  Officer Cannon was Jerry Jean shot?

Page 83

[1]
[2] **A.**  No.
[3]         **MS. BARALDI**: I have no further
[4]     questions.
[5]         **THE COURT**: You may cross-examine.
[6]                 - - -
[7]         CROSS-EXAMINATION
[8]                 - - -
[9] **BY MR. GIULIANI**:
[10] **Q.**  Good afternoon, Officer Cannon.
[11] **A.**  How are you?
[12] **Q.**  Good, thank you. Do you recall where you were
[13] when you got the radio call for assist officer?
[14] **A.**  I believe originally I was in the vicinity of the
[15] 500 block of Tasker when I had just gotten a radio call
[16] for a disturbance on the highway in the vicinity.
[17] That's when the burglary call came out and I started to
[18] proceed that way.
[19] **Q.**  So you are only four or five blocks away?
[20] **A.**  When the burglary call comes out, yes.
[21]         **MR. GIULIANI**: May I approach the
[22]     witness?
[23]         **THE COURT**: Yes.
[24] **BY MR. GIULIANI**:
[25] **Q.**  So 7th Street runs northbound, correct?

Page 84

[1]
[2] **A.**  Yes.
[3] **Q.**  But when you heard the radio call, you were going
[4] southbound against traffic?
[5] **A.**  Yes.
[6] **Q.**  And because it was 5 o'clock in the morning you
[7] didn't hit any cars?
[8] **A.**  Right.
[9] **Q.**  So you come down 7th Street in a police cruiser by
[10] yourself?
[11] **A.**  Yes.
[12] **Q.**  And Officer Birch is in a cruiser in front of
[13] you?
[14] **A.**  Right.
[15] **Q.**  So you are bumper to bumper almost, you're
[16] following his lead?
[17] **A.**  Not bumper to bumper, but he's in front of me.
[18] **Q.**  So you get into the intersection and he's slightly
[19] ahead of you, correct?
[20] **A.**  Yes.
[21] **Q.**  You said when you get to the intersection there's
[22] the gold-colored Honda -- excuse me, the white Altima
[23] on the corner?
[24] **A.**  Correct.
[25] **Q.**  Gold color in front of it?

Page 85

[1]
[2] **A.** Right.
[3] **Q.** And Mr. Jean is crouched in front of the
[4] gold-colored Honda?
[5] **A.** Yes.
[6] **Q.** And when you noticed the white Altima, it had its
[7] lights on?
[8] **A.** Yes.
[9] **Q.** Could you tell it was running?
[10] **A.** No.
[11] **Q.** Did you ever see Mr. Jean go over to that white
[12] Altima and try to get inside?
[13] **A.** No.
[14] **Q.** You know there was a sweatshirt that was taken off
[15] of his body and right there, you saw that, right?
[16] **A.** The sweatshirt I saw after the fact.
[17] **Q.** But he's not in front of the white Altima, is he?
[18] **A.** No.
[19] **Q.** And you never saw him try to get into that car,
[20] right?
[21] **A.** No.
[22] **Q.** And at that point in time you never saw who was
[23] driving the Altima, right?
[24] **A.** Right.
[25] **Q.** So the Altima backs up and goes eastbound on

Page 86

[1]
[2] **Q.** Mifflin, right?
[3] **A.** Right.
[4] **Q.** You stay on the scene?
[5] **A.** Yes.
[6] **Q.** Does Birch follow the Altima?
[7] **A.** That's correct.
[8] **Q.** Is he in his cruiser or on foot?
[9] **A.** In his car.
[10] **Q.** And just so we are clear, did you see Mr. Jean
[11] arrive on the scene? Did you see him running before
[12] you saw him crouched behind the car?
[13] **A.** No. The initial time I saw him he was crouched
[14] behind the car.
[15] **Q.** Okay. Thank you.
[16]         **MR. GIULIANI**: Court's indulgence,
[17]     please.
[18]         (Pause.)
[19] **BY MR. GIULIANI**:
[20] **Q.** Did Officer Robinson come on the scene and help
[21] you take down Jean?
[22] **A.** Yes.
[23] **Q.** Mr. Jean a pretty big guy?
[24] **A.** Yes, he's tall, yeah.
[25]         **MR. GIULIANI**: Your Honor, that's

Page 87

[1]
[2] all I have.
[3]         **THE COURT**: Any redirect?
[4]         **MS. BARALDI**: No.
[5]         **THE COURT**: Thank you, Officer.
[6]         (Witness excused.)
[7]         - - -
[8]         **THE COURT**: You may call your next
[9] witness.
[10]         **MS. BARALDI**: Thank you.
[11]         At this time the Commonwealth is
[12] going to call Sergeant Woods.
[13]         **THE COURT CRIER**: Please state your
[14] name, for the record, and assignment for the
[15] court.
[16]         **THE WITNESS**: Sergeant Steven Woods,
[17] Badge No. 8886, assigned to the 4th Police
[18] District.
[19]         SERGEANT STEVEN WOODS, after having
[20] been first duly sworn, was examined and testified
[21] **as follows**:
[22]         - - -
[23]         DIRECT EXAMINATION
[24]         - - -
[25] **BY MS. BARALDI**:

Page 88

[1]
[2] **Q.** Good afternoon, Sergeant Woods.
[3] **A.** Good afternoon.
[4] **Q.** Sergeant, were you working back on March 7th,
[5] 2007?
[6] **A.** Yes, I was.
[7] **Q.** Were you assigned to the 4th District as well?
[8] **A.** Yes, I was.
[9] **Q.** And at some point around 5 o'clock in the morning,
[10] did you respond to a radio call of a burglary in
[11] progress?
[12] **A.** No, I responded to the initial incident of the
[13] shots fired.
[14] **Q.** Of the shots fired?
[15] **A.** Yes.
[16] **Q.** So where were you prior to arriving on location,
[17] do you recall?
[18] **A.** I think I was down at 2nd and Snyder.
[19] **Q.** Okay.
[20]     So you are not in the general vicinity when the
[21] burglary call comes out; is that fair to say?
[22] **A.** No.
[23] **Q.** So once the subsequent call of shots fired comes
[24] out, that's when you come to the scene?
[25] **A.** Yes.

[1]
[2] **Q.** And you would have been supervising Officer
[3] Battles, Nolan, and Robinson?
[4] **A.** That's correct.
[5] **Q.** So tell the ladies and gentlemen what happened
[6] when you arrive, where are you coming from?
[7] **A.** I was on 2nd Street, I was in route to a location
[8] prior to my arrival on the location. There was
[9] information received from Officer Birch in reference to
[10] a male fleeing the scene in a white Nissan Altima. At
[11] that point I was westbound on Mifflin Street at
[12] approximately the 400 block with my lights on going the
[13] wrong way up Mifflin. An officer stated the male
[14] crashed the vehicle and was in foot pursuit. I
[15] couldn't continue up Mifflin, so I had to change course
[16] and went around 6th Street where I observed Officer
[17] Birch following a male on foot.
[18]      The male jumped over one fence and entered the 500
[19] block of Mifflin, between 6th and Mifflin, and jumped
[20] over a fence. Birch followed him over the fence, I ran
[21] over the side and jumped over the other side and ran
[22] around the yard and around the corner, and pursued him
[23] until he was on the 500 block of Mifflin Street.
[24] **Q.** Do you see the man today?
[25] **A.** The man to the right of counsel.

[1]
[2]      **MS. BARALDI**: For the record,
[3]   indicating the defendant, John In.
[4]      **THE COURT**: The record will so
[5]   reflect.
[6] **BY MS. BARALDI**:
[7] **Q.** The map that is marked C-12, Officer, is it fair
[8] to say -- you said you were driving westbound on
[9] Mifflin Street?
[10] **A.** That's correct.
[11] **Q.** Could you please point to the where you were
[12] coming?
[13] **A.** Westbound on Mifflin.
[14] **Q.** So you are driving the opposite way of traffic?
[15] **A.** Yes, I was going the wrong way.
[16] **Q.** And do you see the Altima that crashed into 524
[17] Mifflin?
[18] **A.** No, I was still on the 400 block coming westbound.
[19] **Q.** And were your lights and sirens on at that point?
[20] **A.** That's correct.
[21] **Q.** And when you arrived, it's fair to say the car
[22] crash occurred?
[23] **A.** I may have caused the car crash.
[24] **Q.** When you arrived, what's the first thing you see?
[25] **A.** When I arrived I might have had to go around the

[1]
[2] block. I went down 5th Street here, up this street
[3] here over to 6th. Officer Birch's car was here
[4] blocking the street. I was starting to come down here
[5] and Birch was running westbound. There's a fence right
[6] here where the defendant jumped over.
[7] **Q.** Did you see the defendant jump the fence?
[8] **A.** Yes, I did. I parked my car here, right
[9] here (indicating).
[10] **Q.** And right here for the record would be?
[11] **A.** On the end of the 500 block of Mifflin, right at
[12] 6th and Mifflin Street.
[13] **Q.** So the defendant jumps --
[14] **A.** There's a gate, I believe, right on this where the
[15] grassy area is here, there's a fence here. The
[16] defendant jumped over that fence into this yard and
[17] Birch was following behind. I ran back around here
[18] there was no gate or fence in this area here into this
[19] yard.
[20]      The defendant jumped over another fence and ran
[21] back out. The defendant ran out of this alleyway here
[22] on Hoffman Street into a dirt lot where he was
[23] apprehended by myself and Officer Birch.
[24] **Q.** Okay.
[25]      Do you remember what the defendant was wearing?

[1]
[2] **A.** Yes, I do.
[3] **Q.** Can you describe it for me?
[4] **A.** It was a dark blue hooded sweat jacket with a --
[5] the one with the TBA or whatever the writing is on it.
[6]      **MS. BARALDI**: Your Honor, if this
[7]   could be marked as C-13?
[8] (Blue sweat jacket marked Commonwealth's Exhibit 13 for
[9]      identification.)
[10] **BY MS. BARALDI**:
[11] **Q.** Just for the record, Sergeant, what is C-13?
[12] **A.** It's a blue and black camouflage hooded sweat
[13] jacket.
[14] **Q.** And this is the jacket he was wearing -- that John
[15] In was wearing when you apprehended him?
[16] **A.** That's correct.
[17]      **MS. BARALDI**: Thank you, Sergeant
[18]   Woods. I don't have any further questions.
[19]      **THE COURT**: Cross-examination.
[20]      - - -
[21]      CROSS-EXAMINATION
[22]      - - -
[23] **BY MR. GIULIANI**:
[24] **Q.** Good afternoon. I just have a couple questions.
[25]      When you came down 6th Street you saw my client

Page 93

[1]
[2] running and you eventually apprehended him in the lot
[3] like you said?
[4] **A.** Yes.
[5] **Q.** Did you see him throw anything away or toss
[6] anything?
[7] **A.** No.
[8] **Q.** Was he wearing latex gloves?
[9] **A.** I did not see any.
[10] **Q.** And when you found him and stopped him, you
[11] arrested him and patted him down for your safety?
[12] **A.** Yes.
[13] **Q.** Did you find any weapons on him?
[14] **A.** No, I did not.
[15]         **MR. GIULIANI:** That's all I have,
[16] Sergeant. Thank you, sir.
[17]         **THE COURT:** Any redirect?
[18]         **MS. BARALDI:** No, Your Honor.
[19]         **THE COURT:** Thank you, sir. You may
[20] step down.
[21]         (Witness excused.)
[22]         - - -
[23]         **MS. BARALDI:** At this time the
[24] Commonwealth will be calling Police Officer Birch.
[25]         **THE COURT CRIER:** Please state for

Page 94

[1]
[2]     the record your name and spell your name, badge
[3]     number for the record.
[4]         **THE WITNESS:** Police Officer Birch,
[5]     Badge No. 6325, assigned to the 3rd District.
[6]         POLICE OFFICER ROGER BIRCH, after
[7]     having been first duly sworn, was examined and
[8]     **testified as follows:**
[9]         - - -
[10]         DIRECT EXAMINATION
[11]         - - -
[12] BY MS. BARALDI:
[13] **Q.** Good afternoon, Officer Birch.
[14] **A.** Good afternoon.
[15] **Q.** I want to take you back to March 7th, 2007, about
[16] 5 o'clock in the morning, were you working as a
[17] Philadelphia Police Officer at that time?
[18] **A.** That's correct.
[19] **Q.** Were you working alone or with a partner?
[20] **A.** By myself.
[21] **Q.** Were you in uniform?
[22] **A.** Yes, ma'am.
[23] **Q.** Were you in a patrol car?
[24] **A.** Yes.
[25] **Q.** And you are assigned to the 3rd District. Were

Page 95

[1]
[2] you assigned to the 3rd District back then as well?
[3] **A.** That's correct.
[4] **Q.** Did you respond to a radio call?
[5] **A.** That's correct, a radio call.
[6] **Q.** What was the radio call for?
[7] **A.** Assist officer, shots fired.
[8] **Q.** Where were you coming from; do you recall?
[9] **A.** From the 3rd District.
[10] **Q.** In relation to the 700 block of Mifflin Street, is
[11] it north, south, east or west?
[12] **A.** It runs northbound but we were going southbound.
[13] **Q.** So your district is located north of Mifflin
[14] Street?
[15] **A.** North of Mifflin, that's correct.
[16] **Q.** And Officer Cannon actually works in your
[17] district, in the 3rd?
[18] **A.** That's correct.
[19] **Q.** Now, you said you were coming south on what
[20] street?
[21] **A.** Seventh Street.
[22] **Q.** So you would have been going the opposite way of
[23] traffic?
[24] **A.** That's correct.
[25] **Q.** And what happens when you are driving south on 7th

Page 96

[1]
[2] Street?
[3] **A.** When I arrived on the corner at 7th and Mifflin
[4] Street, I observed a male which is seated right there
[5] next to the defense.
[6]         **MS. BARALDI:** Let the record reflect
[7]     Officer Birch identified the defendant, John In.
[8]         **THE COURT:** The record will so
[9]     reflect.
[10]         **THE WITNESS:** He was kneeled down
[11]     behind a white car, a Nissan Altima, PA tag of
[12]     GRC-0883, we made eye contact. At that point the
[13]     male jumped through the passenger's side of the
[14]     car and proceeded to put it in reverse and took
[15]     off eastbound on the 600 block of Mifflin Street
[16]     at a high rate of speed.
[17] BY MS. BARALDI:
[18] **Q.** What did you do?
[19] **A.** At that point I went to pursue the male, I gave
[20] off flash. And when I got to the 500 block, he noticed
[21] another police officer coming the opposite direction,
[22] he turned into the house, crashed the car into a
[23] house. And at that point jumped out and ran westbound
[24] on the 500 block of Mifflin Street.
[25] **Q.** When you are pursuing him, are you on foot or

Page 97

[1]
[2] still in your vehicle?
[3] **A.** In my vehicle.
[4] **Q.** So when he crashes into the house on 5th and
[5] Mifflin Street, does he immediately bail out of the
[6] car?
[7] **A.** Yes, he jumped out.
[8] **Q.** What did you do next?
[9] **A.** At that point I put my car in park and jump out
[10] of my vehicle and I pursued him on foot westbound.
[11] **Q.** So he's running westbound and he's running back in
[12] the opposite direction that he was just driving; is
[13] that fair to say?
[14] **A.** That's correct.
[15] **Q.** What happened next?
[16] **A.** At that point there's an open yard there, the male
[17] jumped over the fence to the yard. I jumped over the
[18] fence behind him and he exits the 500 block of Hoffman
[19] Street where he ran into Sergeant Woods, and that's
[20] when he was apprehended.
[21] **MS. BARALDI**: Your Honor, may I
[22] approach?
[23] **THE COURT**: Yes.
[24] **BY MS. BARALDI**:
[25] **Q.** Officer Birch, I am going to show you C-13. You

Page 98

[1]
[2] said you were going southbound on 7th?
[3] **A.** Yes.
[4] **Q.** Going the opposite way of traffic?
[5] **A.** Yes.
[6] **Q.** When you first see the defendant, he was where?
[7] **A.** He was on the corner right here where the car was
[8] parked (indicating).
[9] **Q.** Right on the corner of 7th and Mifflin?
[10] **A.** Yes, on the southeast corner.
[11] **Q.** On the southeast corner which would be --
[12] **A.** On the 600 block. This is the 7th, this is the
[13] 600 block, so he was right there parked on the corner
[14] (indicating).
[15] **Q.** And when you first take notice of him where
[16] exactly --
[17] **A.** He's on the passenger's side kneeled down by the
[18] side of the car.
[19] **Q.** And he immediately jumped through which door,
[20] front seat or back seat?
[21] **A.** Jumped through the front seat of the passenger's
[22] side.
[23] **Q.** And at this point when he jumped into the car, if
[24] you could show us on the map, where are you?
[25] **A.** I'm a little bit beyond the intersection, but I

Page 99

[1]
[2] can see him clearly, like, right next to the sidewalk.
[3] So when he backed the car up and proceeded eastbound, I
[4] had to back my patrol vehicle up and proceeded
[5] eastbound.
[6] **Q.** And that's how you are able to see him on the
[7] passenger's side which is closer to the sidewalk?
[8] **A.** Yes.
[9] **Q.** Do you remember seeing Officer Cannon at this
[10] point?
[11] **A.** Yes, at this point I seen Officer Cannon exit his
[12] vehicle. If I am not mistaken, he was approaching the
[13] black male kneeled down.
[14] **Q.** Did you see that black male?
[15] **A.** I didn't get a good look at him, I just seen a
[16] black male and he was walking over to him at that
[17] point.
[18] **Q.** So you then followed the Altima on Mifflin Street
[19] towards 6th, correct?
[20] **A.** That's correct.
[21] **Q.** And if you could point for the ladies and
[22] gentlemen, you said the car crashed on the 500 block of
[23] Mifflin, where exactly?
[24] **A.** Right here (indicating).
[25] **Q.** Which would be what address?

Page 100

[1]
[2] **A.** 524 Mifflin Street.
[3] **Q.** Where does your car end up?
[4] **A.** My car ends up right next to him at 524 Mifflin
[5] Street.
[6] **Q.** So John In exits the car?
[7] **A.** Yes, exits the car and runs westbound. This is
[8] the yard right here, and came up at the 500 of Hoffman
[9] Street.
[10] **Q.** And that's when Sergeant Woods --
[11] **A.** Sergeant Woods grabbed him at the 500 block of
[12] Hoffman Street.
[13] **Q.** And you get there?
[14] **A.** Yes.
[15] **MS. BARALDI**: I am going to show the
[16] witness now --
[17] **BY MS. BARALDI**:
[18] **Q.** Well, if you could tell the ladies and gentlemen
[19] of the jury, what was John In wearing?
[20] **A.** Blue jacket, dark blue jacket with camouflage
[21] writing on it.
[22] **MS. BARALDI**: If I could show the
[23] officer what's been marked as C-13?
[24] **THE COURT**: Yes.
[25] **BY MS. BARALDI**:

[1]
[2] **Q.** Officer, do you recognize that?
[3] **A.** Yes.
[4] **Q.** What is that?
[5] **A.** The jacket he was wearing that night.
[6] **Q.** Now, after John In is secured, at some point you
[7] go back to your patrol car?
[8] **A.** That's correct.
[9] **Q.** Do you make any observations regarding the white
[10] Nissan Altima?
[11] **A.** Yes. At that times Officer Seabron recovered the
[12] car, because it was still running at the location so he
[13] stayed with the Nissan. There was a gun on the floor,
[14] on the front seat of the floor, and there were some
[15] gloves recovered?
[16] **Q.** What kind of gloves?
[17] **A.** Latex gloves.
[18] **MS. BARALDI:** Thank you, Officer
[19] Birch. I don't have any further questions.
[20] **THE COURT:** Thank you.
[21] Mr. Giuliani?
[22] **MR. GIULIANI:** Yes, Your Honor.
[23] - - -
[24] CROSS-EXAMINATION
[25] - - -

[1]
[2] **BY MR. GIULIANI:**
[3] **Q.** Good afternoon, Officer.
[4] **A.** Good afternoon.
[5] **MR. GIULIANI:** Your Honor, I'd ask
[6] that this be marked as D-2, I believe, and shown
[7] to the witness, please?
[8] **THE COURT:** Yes, sir.
[9] (Memo marked Defense Exhibit 2 for identification.)
[10] **BY MR. GIULIANI:**
[11] **Q.** Officer Birch, the court officer is showing you
[12] what's been marked as D-2. Would you please take a
[13] look at that and when you've had an opportunity to look
[14] at it please let me know.
[15] **A.** I see it.
[16] **Q.** Have you seen it?
[17] **A.** Yes, sir.
[18] **Q.** Okay.
[19] I want to talk to you about that.
[20] **A.** Okay.
[21] **Q.** Defense Exhibit 2 is, like, a handwritten memo; is
[22] it not?
[23] **A.** That's correct.
[24] **Q.** And it's got some writing on there and at the
[25] bottom it appears to be a name of P/O Roger Birch with

[1]
[2] an identification number. Is that your badge number?
[3] **A.** Yes, it is.
[4] **Q.** And the next number is the payroll number?
[5] **A.** Payroll and district number.
[6] **Q.** Did you write this?
[7] **A.** Yes, I did.
[8] **Q.** Now, this is not dated is it?
[9] **A.** Yes, it is dated.
[10] **Q.** It is, where?
[11] **A.** At the top, where it says 3/7.
[12] **Q.** Is that the date this memo was made? We are
[13] talking about the events of 3/7, but is that when this
[14] was made, that night?
[15] **A.** Yes, it was.
[16] **Q.** Okay.
[17] Well, let's talk about it. So this incident
[18] happened around 5:15 in the morning, around that time,
[19] correct?
[20] **A.** Correct.
[21] **Q.** Do you remember how long afterwards you made this
[22] memorandum?
[23] **A.** It had to be early in the morning, around 9
[24] o'clock that morning.
[25] **Q.** Within a couple hours?

[1]
[2] **A.** Yeah, within a couple hours.
[3] **Q.** I'd like to go over it quickly, if you don't
[4] mind.
[5] It says, "On 3/7/07 while working uniform RPC-33."
[6] By the way, tell the ladies and gentlemen what
[7] does "RPC" mean?
[8] **A.** Radio patrol vehicle.
[9] **Q.** That's your police cruiser?
[10] **A.** Yes.
[11] **Q.** And it says, "12 X 8," that's your shift, right?
[12] **A.** Yes.
[13] **Q.** Commonly known as last out?
[14] **A.** Yes.
[15] **Q.** "Responded to a radio call of assist officer, 4th
[16] District;" is that correct?
[17] **A.** That's correct.
[18] **Q.** "720 Mifflin. Arrived on location, 7th and
[19] Mifflin, observed male sitting inside white Nissan
[20] Altima," and it has the license plate number.
[21] Do you see that?
[22] **A.** That's correct.
[23] **Q.** Now, you're telling the jury today that when you
[24] pulled into the intersection you came southbound the
[25] wrong way on 7th and you see my client kneeling next to

Page 105

[1]
[2] the passenger's side.
[3] **A.** Yes.
[4] **Q.** Well, in your memo that you made a couple hours
[5] later you say you see him sitting inside, but you don't
[6] say nothing about him kneeling next to the car?
[7] **A.** Because that night, you know, was a chaotic
[8] situation, it may have been left out, but that's all it
[9] was. Other than that, the male was kneeled down by the
[10] side of the passenger side when I approached him.
[11] **Q.** And according to your testimony, if I heard you
[12] right, he's kneeling on the passenger's side outside of
[13] the car?
[14] **A.** Outside the car, that's correct.
[15] **Q.** And then he gets into the car by the front
[16] passenger seat, right?
[17] **A.** He jumps over. He opened the door and jumped over
[18] to the driver's side.
[19] **Q.** You saw that?
[20] **A.** Yes.
[21] **Q.** Is this a four-door or two-door vehicle?
[22] **A.** Four-door vehicle.
[23] **Q.** Okay.
[24]     Now, did you see the other black male who was
[25] there at approximately the same time?

Page 106

[1]
[2] **A.** I didn't see him until I proceeded to drive off.
[3] I saw Officer Cannon to my left, he was walking across
[4] the street. And I looked back in my mirror and I could
[5] see a black male bent down, kneeling down, between one
[6] of the vehicles.
[7] **Q.** Did you see any interaction between that black
[8] male and my client?
[9] **A.** No, I didn't.
[10] **Q.** Did you see them talking or running together?
[11] **A.** No, sir.
[12]     **MR. GIULIANI**: Now, I'd ask that
[13]   this be marked D-3, please.
[14] (Statement marked Defense Exhibit 3 for identification.)
[15] **BY MR. GIULIANI**:
[16] **Q.** Officer Birch, you have been shown D-3. Please
[17] take a look at that, and the same thing.
[18] **A.** I have seen it.
[19] **Q.** You saw it before in preparation for today's
[20] testimony, have you not?
[21] **A.** I seen it yesterday, that's correct.
[22] **Q.** Now, this is a statement, a more formal statement,
[23] you gave to Detective Conn, right?
[24] **A.** No, he went off the memo, if I am not mistaken.
[25] **Q.** Oh, he went off the memo. Let's talk about this.

Page 107

[1]
[2] This is a statement, correct?
[3] **A.** Yes, it is.
[4] **Q.** And at the top -- by the way, the format is the
[5] standard statement format that the Philadelphia
[6] Detective Division takes?
[7] **A.** That's correct.
[8] **Q.** You've seen hundreds of these, correct?
[9] **A.** Yes.
[10] **Q.** And at the top it's got your name and badge number
[11] and district, right?
[12] **A.** That's correct.
[13] **Q.** And it says interviewer at the top right, it says
[14] Detective Conn; is that correct?
[15] **A.** That's correct.
[16] **Q.** Now, do you see half-way down the page it says,
[17] "place of interview"?
[18] **A.** Yes.
[19] **Q.** What does it say on the back?
[20] **A.** "South Detectives".
[21] **Q.** And go to the right, it has a date and time when
[22] this interview was conducted; do you see that?
[23] **A.** Yes, I see that.
[24] **Q.** What date and time does it say?
[25] A. It says, "3/20/07, 4:55 in the morning."

Page 108

[1]
[2] **Q.** And there's another line it says, "We are
[3] questioning you concerning," and then some typing
[4] underneath that, correct?
[5] **A.** That's correct.
[6] **Q.** What does it says underneath?
[7] **A.** "Home invasion, robbery, on 720 Mifflin on
[8] 3/7/07."
[9] **Q.** Let me get this straight. Did you actually have
[10] an interview, a sit down with Detective Conn, on March
[11] 20th, 2007 at 5 o'clock in the morning?
[12] **A.** Yes, I did.
[13] **Q.** So you were at South Detectives and gave this
[14] interview?
[15] **A.** I gave the interview.
[16] **Q.** Okay. I wasn't sure from your testimony.
[17]   It's not in question and answer format, but it
[18] says, "On 3/7/07 at approximately 5:15 a.m. I was
[19] working in uniform as RPC-33. There was a radio call
[20] at 720 radio call for 'assist officer.' I responded."
[21]   Is that correct?
[22] **A.** That's correct.
[23] **Q.** The next line, "I saw an Asian guy."
[24]   Now, the Asian guy you are talking about, are you
[25] talking about John In right here?

Page 109

[1]
[2] **A.** Yes.
[3] **Q.** "I saw an Asian guy running northbound on 6th
[4] Street."
[5] Is that accurate?
[6] **A.** No, that's not accurate.
[7] **Q.** How did that get in the statement that you gave?
[8] **A.** You would have to ask Detective Conn about that
[9] one.
[10] **Q.** Okay. Maybe I'll do that.
[11] But you'd agree with me it says, "I saw an Asian
[12] guy running northbound on 6th Street."
[13] And it continues, "There was a white Nissan Altima
[14] parked on the southeast corner of 6th and Mifflin
[15] Street."
[16] Do you see that?
[17] **A.** Yes, I see that.
[18] **Q.** Is that accurate?
[19] **A.** It's on the 600 block of Mifflin Street, if I am
[20] not mistaken.
[21] **MR. GIULIANI:** May I approach and
[22] show him C-12?
[23] **THE COURT:** You may.
[24] **THE WITNESS:** This is 7th Street,
[25] 700 block of Mifflin. He was parked on the

Page 110

[1]
[2] corner, which would be the 600 block.
[3] **BY MR. GIULIANI:**
[4] **Q.** Okay.
[5] That's true, this is the 600 block. But let's
[6] look at the statement and see what the statement says.
[7] The statement says, "There was a white Nissan
[8] Altima parked on the southwest corner of 6th and
[9] Mifflin Street."
[10] Southeast corner of 6th and Mifflin Street,
[11] Officer, is a whole another block down the street.
[12] Where you say you saw this incident was right here
[13] on the southeast corner of 7th and Mifflin, right?
[14] **A.** Exactly.
[15] **Q.** This is the southeast corner of 7th and Mifflin,
[16] the one we got here, right?
[17] **A.** I guess it would be, but it was the 600 block of
[18] Mifflin that I was on.
[19] **Q.** Now, do you have any idea where the phrase, "I saw
[20] an Asian guy running northbound on 6th and Mifflin
[21] Street," how did that wind up on your statement?
[22] **A.** No, sir.
[23] **MR. GIULIANI:** Court's indulgence,
[24] please.
[25] (Pause.)

Page 111

[1]
[2] **BY MR. GIULIANI:**
[3] **Q.** And one thing you testified on direct examination,
[4] after this was all done -- strike that.
[5] You chased the car out down the street, you said
[6] my client gets out, runs, there's a pursuit, and
[7] ultimately Sergeant Woods apprehends him in your sight,
[8] correct?
[9] **A.** That's correct.
[10] **Q.** You go back to where you left your squad car
[11] running on the 500 block of Mifflin running?
[12] **A.** That's correct.
[13] **Q.** And Officer Seabron is there tending to your
[14] vehicle?
[15] **A.** And the car the --
[16] **Q.** And the Altima?
[17] **A.** Yes, sir.
[18] **Q.** And you said you looked inside the Altima and you
[19] saw a gun on the floor, the driver's side floor?
[20] **A.** Driver's side floor.
[21] **Q.** So that would be in the area where you go into a
[22] car seat, sit down, where the peddles are, that's where
[23] it is, the gun is down there?
[24] **A.** Exactly.
[25] **Q.** And you don't touched nothing?

Page 112

[1]
[2] **A.** No.
[3] **Q.** You didn't touch that gun, you just made sure no
[4] one went near it?
[5] **A.** That's correct.
[6] **Q.** You saw the gloves in the back?
[7] **A.** That's correct.
[8] **Q.** Were you using a flashlight to see if you see
[9] anything?
[10] **A.** Yes, sir.
[11] **Q.** But at no point did you, Officer Seabron, or
[12] anybody go into that vehicle, enter, or move anything
[13] around?
[14] **A.** No.
[15] **MR. GIULIANI:** Okay. Thank you,
[16] Officer.
[17] **THE COURT:** Any redirect?
[18] **MS. BARALDI:** I have a couple
[19] questions.
[20] - - -
[21] REDIRECT EXAMINATION
[22] - - -
[23] **BY MS. BARALDI:**
[24] **Q.** Officer, this statement marked as D-3, you did
[25] have a meeting with Detective Conn; is that fair to

Page 113

[1] say?

[2] **A.** That's correct.

[4] **Q.** And you just sat down and had a conversation?

[5] **A.** That's correct.

[6] **Q.** Was he at the computer typing verbatim what you

[7] were saying?

[8] **A.** I don't recall that.

[9] **Q.** Do you remember signing the statement?

[10] **A.** No, ma'am.

[11] **Q.** Do you remember reading it over prior to me

[12] showing it to you yesterday?

[13] **A.** No, ma'am.

[14] **Q.** And the handwriting statement is in your

[15] handwriting from that evening?

[16] **A.** That's correct.

[17]     **THE COURT**: Anything else?

[18]     **MR. GIULIANI**: Yes.

[19]     - - -

[20]     RECROSS-EXAMINATION

[21]     - - -

[22] **BY MR. GIULIANI**:

[23] **Q.** You don't remember you talked to Detective Conn on

[24] March 20th, 2007 at about 5 o'clock in the morning at

[25] the South Detective Division about this very incident;

Page 114

[1] you do remember that?

[3] **A.** Yes, sir.

[4]     **MR. GIULIANI**: Thank you.

[5]     **THE COURT**: You may step down.

[6]     (Witness excused.)

[7]     - - -

[8]     **THE COURT**: Indulge us one moment.

[9]     (Pause.)

[10]     THE COURT. Ladies and gentlemen,

[11] let's take our luncheon recess. We will take an

[12] hour and be back here at ten minutes to 2:00.

[13]     Mr. McNeal, would you tell them

[14] where to meet.

[15]     Please remember don't discuss the

[16] case with anyone and keep an open mind. Keep your

[17] clipboard in the back of your chairs and we'll see

[18] you back in an hour.

[19]     **THE COURT CRIER**: Everyone remain

[20] seated while the jury exit the courtroom.

[21]     (Jury departs the courtroom at 12:45 p.m.)

[22]     (Luncheon recess.)

[23]     **THE COURT**: Are we ready?

[24]     **MS. BARALDI**: Yes.

[25]     **MR. GIULIANI**: Yes, Your Honor.

Page 115

[2]     **THE COURT CRIER**: Please remain

[3] seated while the jury enters the courtroom.

[4]     (Jury enters the courtroom at 2:15 p.m.)

[5]     **THE COURT**: Good afternoon, ladies

[6] and gentlemen. You may be seated.

[7]     **THE JURY**: (Jury panel complies.)

[8]     **THE COURT**: Ma'am, you may call your

[9] next witness.

[10]     **MS. BARALDI**: The Commonwealth calls

[11] Police Officer Seabron.

[12]     **THE COURT CRIER**: Please state your

[13] name, spell your last name, badge number, for the

[14] record.

[15]     **THE WITNESS**: Peter Seabron, Badge

[16] No. 2607, 3rd District.

[17]     POLICE OFFICER PETER SEABRON, after

[18] having been first duly sworn, was examined and

[19] **testified as follows**:

[20]     - - -

[21]     DIRECT EXAMINATION

[22]     - - -

[23] **BY MS. BARALDI**:

[24] **Q.** Good afternoon, Officer Seabron.

[25] **A.** Good afternoon.

Page 116

[2] **Q.** Back on March 7th, 2007, in the early morning

[3] hours, were you working as a Philadelphia Police

[4] Officer?

[5] **A.** Yes.

[6] **Q.** Were you assigned to the 3rd Police District as

[7] well?

[8] **A.** Yes.

[9] **Q.** Were you alone or with a partner?

[10] **A.** Solo, alone.

[11] **Q.** Police uniform?

[12] **A.** Yes.

[13] **Q.** Were you operating a patrol car?

[14] **A.** Yes.

[15] **Q.** And you responded to a radio call for assist

[16] officer, shots fired?

[17] **A.** Yes.

[18] **Q.** And at that point you were located in the 3rd

[19] District, that would be north in the 700 block of

[20] Mifflin Street; is that fair to say?

[21] **A.** North, yes.

[22] **Q.** And can you tell the ladies and gentlemen when you

[23] arrived on the scene and what you saw.

[24] **A.** There was a foot pursuit that stemmed from that

[25] initial radio call that ended with a car crashing at

Page 117

[1]
[2] the 500 block of Mifflin, so I went to the car that had
[3] crashed.
[4] **Q.** And when you arrived on location, did you see any
[5] people there?
[6] **A.** No.
[7] **Q.** So tell us what you saw?
[8] **A.** I saw the white maximum(sic) that was explained
[9] from the pursuit that the officer had.
[10] **Q.** And where was it?
[11] **A.** It was at 524 Mifflin.
[12] **Q.** Was it in the street, sidewalk, where was it?
[13] **A.** It was against the house because the person
[14] obviously crashed into the house and then fled.
[15] **Q.** Okay.
[16] When you arrived on location, was the car still
[17] running?
[18] **A.** Yes.
[19] **Q.** Was it still in drive?
[20] **A.** Yes.
[21] **Q.** Did you see any patrol car in that area?
[22] **A.** No.
[23] **Q.** What about Officer Birch's car?
[24] **A.** I don't remember seeing Birch's car.
[25] **Q.** So you responded directly to the white car at 524?

Page 118

[1]
[2] **A.** Yes.
[3] **Q.** And do you secure the automobile?
[4] **A.** Yes.
[5] **Q.** So what did you do?
[6] **A.** I approached the automobile, it was still in
[7] drive, and I put it in park.
[8] **Q.** Okay.
[9] Did you see anything inside of the car?
[10] **A.** Yes.
[11] **Q.** What did you see?
[12] **A.** A black handgun.
[13] **Q.** And where was the black handgun when you first saw
[14] it?
[15] **A.** On the floor.
[16] **MS. BARALDI:** If I could have this
[17] marked, and just so Your Honor is aware, Sheriff
[18] Guess has seen this.
[19] **THE COURT:** Very well.
[20] **THE COURT CRIER:** Marking the
[21] Exhibit C-14, showing to the defense and showing
[22] to the witness.
[23] (Handgun marked Commonwealth's Exhibit 14 for
[24] identification.)
[25] **BY MS. BARALDI:**

Page 119

[1]
[2] **Q.** Do you recognize that weapon?
[3] **A.** Yes.
[4] **Q.** Is that the black handgun you saw in the white
[5] car?
[6] **A.** It looks like it.
[7] **Q.** Where was it when you first saw it?
[8] **A.** On the driver's side floor.
[9] **Q.** Did you move it?
[10] **A.** Yes, I did.
[11] **Q.** Where did you move it to?
[12] **A.** I put it on the seat.
[13] **Q.** Is this before or after you put the car in park?
[14] **A.** It was before because it was on the floor. I
[15] didn't want to have my feet pushing on the peddle near
[16] this gun.
[17] **Q.** Okay.
[18] Did you notice anything else on the car?
[19] **A.** I don't remember anything else other than that
[20] gun.
[21] **Q.** Did you put the car on a property receipt?
[22] **A.** Yes.
[23] **MS. BARALDI:** If I could have this
[24] marked as C-15?
[25] (Property receipt marked Commonwealth's Exhibit 15 for

Page 120

[1]
[2] identification.)
[3] **BY MS. BARALDI:**
[4] **Q.** Officer Seabron, what is C-15?
[5] **A.** C-15 is a copy of the property receipt I prepared.
[6] **Q.** And what's the number?
[7] **A.** 2691194.
[8] **Q.** And what was put on that property receipt?
[9] **A.** I can't make out the year, but it's a Nissan
[10] Altima and the VIN and the tag.
[11] **Q.** What's the tag?
[12] **A.** GRC-0883.
[13] **Q.** And is that the same Nissan you saw on the scene?
[14] **A.** Yes.
[15] **Q.** Other than moving the weapon onto the passenger
[16] seat, did you clear it or do anything else with it?
[17] **A.** No.
[18] **Q.** That would have been the responsibility of Crime
[19] Scene; is that fair to say?
[20] **A.** Yes.
[21] **MS. BARALDI:** No further questions.
[22] **THE COURT:** Cross-examination?
[23] - - -
[24] CROSS-EXAMINATION
[25] - - -

Page 121

[1]
[2] **BY MR. GIULIANI**:
[3] **Q.** Good afternoon, Officer Seabron.
[4] **A.** Good afternoon.
[5] **MR. GIULIANI**: May I approach the
[6] witness?
[7] **THE COURT**: Yes.
[8] **BY MR. GIULIANI**:
[9] **Q.** You came to the 500 block of Mifflin for the white
[10] Nissan Altima; is that correct?
[11] **A.** Yes.
[12] **Q.** You were in the patrol car?
[13] **A.** Yes.
[14] **Q.** From which direction did you come, could you show
[15] the jury on the map, please?
[16] **A.** I came south on 6th.
[17] **Q.** That would be in this direction, right?
[18] **A.** Yes, sir.
[19] **Q.** That's with traffic?
[20] **A.** Yes.
[21] **Q.** And then east on Mifflin. And that would have
[22] been a left turn?
[23] **A.** Yes.
[24] **Q.** And did you park the cruiser behind --
[25] **A.** Yes, behind the Nissan Altima.

Page 122

[1]
[2] **Q.** And you told the jury you did not see Birch's car
[3] there?
[4] **A.** That's correct.
[5] **Q.** So when you went south on 6th, made a left on
[6] Mifflin, saw the white Nissan and there's no police
[7] cruiser between 524 and Mifflin and 6th and Mifflin,
[8] correct?
[9] **A.** I don't remember seeing it.
[10] **Q.** Otherwise there's one lane of traffic, correct?
[11] **A.** Yes.
[12] **Q.** If there was a cruiser there, you would not be
[13] able to get around it?
[14] **A.** Yes.
[15] **Q.** Did you learn that Birch was on the 600 block of
[16] Mifflin, did you see that?
[17] **A.** I don't remember where he was.
[18] **Q.** There was a lot of police activity that morning,
[19] right?
[20] **A.** Yes.
[21] **MR. GIULIANI**: Your Honor, may this
[22] be marked Defense Exhibit 4, please?
[23] **THE COURT**: Yes.
[24] **THE COURT CRIER**: Marking exhibit
[25] D-4.

Page 123

[1]
[2] (Interview marked Defense Exhibit 4 for identification.)
[3] **BY MR. GIULIANI**:
[4] **Q.** Officer, please take a look at D-4, when you've
[5] had the opportunity to, let me know, please.
[6] **A.** Yes.
[7] **Q.** Tell the members of the jury what that is, Officer
[8] Seabron.
[9] **A.** That's an interview I gave to South Detectives.
[10] **Q.** And that's to Detective Conn, the assigned in this
[11] case, right?
[12] **A.** Yes.
[13] **Q.** Now, the statement is dated March 20th, 2007 and
[14] given about 6:40 a.m.; is that right?
[15] **A.** Yes.
[16] **Q.** Okay.
[17] Now, it's not signed by you, is it?
[18] **A.** No.
[19] **Q.** But you do recall sitting down and having an
[20] interview with Detective Conn on that date and time?
[21] **A.** Right.
[22] **Q.** So it's 13 days post-incident, correct?
[23] **A.** Yes.
[24] **Q.** And he asked you questions and frankly there is
[25] only one paragraph of words on there, right?

Page 124

[1]
[2] **A.** Yes.
[3] **Q.** I want to focus on the line that begins with this,
[4] "There was white Nissan," this is four lines down, a
[5] license number, "driver's door open."
[6] You told that to Detective Conn?
[7] **A.** Yes, I did.
[8] **Q.** The next sentence, "the engine is still running,"
[9] you told that to Detective Conn?
[10] **A.** Yes.
[11] **Q.** The car was still in gear?
[12] **A.** Yes.
[13] **Q.** You told them you put it in park, you told that to
[14] counsel?
[15] **A.** Yes.
[16] **Q.** "I noticed a dark colored semi-automatic handgun
[17] on the driver's seat."
[18] **A.** Yes.
[19] **Q.** Is that accurate?
[20] **A.** That's where I left the weapon, but it was on the
[21] floor.
[22] **Q.** But you'll agree with me in the statement it
[23] doesn't say; "I noticed a weapon on the floor, I picked
[24] it up"?
[25] **A.** Yes.

Page 125

[1]
[2] **Q.** "I picked it up and put it on the driver's seat,"
[3] correct?
[4] **A.** Correct.
[5] **Q.** The statement says you noticed it on the driver's
[6] seat?
[7] **A.** Yes.
[8] **Q.** So let's make sure the truth is you saw it on the
[9] floor of the driver's side of the vehicle, correct?
[10] **A.** Yes.
[11] **Q.** You picked it up and placed it on the driver's
[12] seat?
[13] **A.** Yes.
[14] **Q.** When you picked it up, were you wearing gloves?
[15] **A.** No.
[16] **Q.** Did you grab it, like grab it or pick it up with
[17] two fingers; do you recall?
[18] **A.** I don't remember how I moved it.
[19]        **MR. GIULIANI**: Thank you, officer.
[20]        **THE COURT**: Anything else?
[21]        **MS. BARALDI**: Yes.
[22]        - - -
[23]        REDIRECT EXAMINATION
[24]        - - -
[25] **BY MS. BARALDI**:

Page 126

[1]
[2] **Q.** Do you remember speaking with Officer Birch and he
[3] coming back on the scene?
[4] **A.** That same day, I don't remember if I spoke with
[5] him or not.
[6] **Q.** So you don't have any recollection of Officer
[7] Birch arriving back to get his car?
[8] **A.** I don't remember.
[9] **Q.** You don't remember.
[10]        **MS. BARALDI**: Okay. Thank you.
[11]        **MR. GIULIANI**: May I have one
[12]    question?
[13]        **THE COURT**: Yes.
[14]        - - -
[15]        RECROSS-EXAMINATION
[16]        - - -
[17] **BY MR. GIULIANI**:
[18] **Q.** When you moved the car, were there any other
[19] fellow officers right there on the scene?
[20] **A.** No.
[21] **Q.** Just you?
[22] **A.** Yes.
[23]        **MR. GIULIANI**: Thank you.
[24]        **THE COURT**: Anything else, ma'am?
[25]        **MS. BARALDI**: No, Your Honor.

Page 127

[1]
[2]        **THE COURT**: You may step down, sir.
[3]        (Witness excused.)
[4]        - - -
[5]        **THE COURT**: You may call your next
[6]    witness.
[7]        **MS. BARALDI**: The next witness is
[8]    Police Officer McGough.
[9]        **THE COURT CRIER**: Please state your
[10]    name, spell your last name, badge number, and
[11]    assignment for the record.
[12]        **THE WITNESS**: Police Officer Raphael
[13]    J McGough, Badge No. 5464, I work in the 4th
[14]    District.
[15]        POLICE OFFICER RAPHAEL MCGOUGH,
[16]    after having been first duly sworn, was examined
[17]    **and testified as follows**:
[18]        - - -
[19]        DIRECT EXAMINATION
[20]        - - -
[21] **BY MS. BARALDI**:
[22] **Q.** Good afternoon, Officer.
[23] **A.** Good afternoon.
[24] **Q.** Back on March 7th, 2007 around 5 o'clock in the
[25] morning were you assigned to the 4th Police District?

Page 128

[1]
[2] **A.** That night I was not. I was assigned to 17th
[3] District as Greys Ferry, beat four, it was a detail.
[4] **Q.** So your response would have been to a radio to
[5] assist officer shots fired?
[6] **A.** That's correct.
[7] **Q.** And when you arrived at 720 Mifflin Street, at
[8] some point were you in the backyard?
[9] **A.** Yes, I was.
[10] **Q.** Were you with Officer Nolan?
[11] **A.** Yes.
[12] **Q.** And could you describe to the ladies and gentlemen
[13] what, if any, actions you took in the rear yard?
[14] **A.** Based on information I received from another
[15] officer I went out to -- there was like a cement shed
[16] or concrete shed and when I looked inside there was a
[17] pile -- a little pile of leaves and underneath you
[18] could see what looks to be a gun, and it turned out
[19] there was a handgun in that shed.
[20] **Q.** And did you remove the gun?
[21] **A.** I don't remember which one of us moved it, but I
[22] remember it was moved to, like, a shelf there, like a
[23] ledge.
[24] **Q.** And when you say which one of us, you or who else?
[25] **A.** Myself or Officer Nolan.

Page 129

[1]
[2]          **MS. BARALDI**: And if I could have
[3]    this one marked as C-16.
[4]    (Handgun marked Commonwealth's Exhibit 16 for
[5]          identification.)
[6] **BY MS. BARALDI**:
[7] **Q.**  Officer, what is C-16?
[8] **A.**  It's a semi-automatic handgun.
[9] **Q.**  And does that look like the gun you seen in the
[10]   shed?
[11] **A.**  Yeah, it looks like it.
[12] **Q.**  But you didn't put that on the property receipt;
[13]   is that fair to say?.
[14] **A.**  That's fair to say.
[15] **Q.**  That was done by Crime Scene?
[16] **A.**  I don't know who did it.
[17] **Q.**  It wasn't done by you?
[18] **A.**  It wasn't me.
[19]          **MS. BARALDI**: Thank you. I don't
[20]   have any further questions.
[21]          **THE COURT**: Cross-examination?
[22]          **MR. GIULIANI**: I apologize, I have
[23]   no questions for you, sir.
[24]          **THE WITNESS**: Okay.
[25]          **THE COURT**: You may step down, sir.

Page 130

[1]
[2]          **THE WITNESS**: Thank you, Your Honor.
[3]    (Witness excused.)
[4]          - - -
[5]          **THE COURT**: You may proceed, ma'am.
[6]          **MS. BARALDI**: The Commonwealth
[7]    proceeds to call Police Officer Carol Jenkins.
[8]          **THE COURT CRIER**: Please state your
[9]    name, spell your last name, badge number, and
[10]   district.
[11]          **THE WITNESS**: Police Officer Carol
[12]   Jenkins, Badge No. 4444, from the 4th District.
[13]          POLICE OFFICER CAROL JENKINS, after
[14]   having been first duly sworn, was examined and
[15] **testified as follows**:
[16]          - - -
[17]          DIRECT EXAMINATION
[18]          - - -
[19] **BY MS. BARALDI**:
[20] **Q.**  Good afternoon, Officer.
[21] **A.**  Good afternoon.
[22] **Q.**  Back on March 7th, 2007, were you detailed to the
[23]   4th district then as well?
[24] **A.**  That's correct.
[25] **Q.**  Were you working alone or with a partner?

Page 131

[1]
[2] **A.**  With a partner.
[3] **Q.**  What's your partner's name?
[4] **A.**  Kevin Baldwin.
[5] **Q.**  Did you operate a radio control car?
[6] **A.**  We usually drive EPW-400, emergency patrol wagon.
[7] **Q.**  Were you operating the wagon that night?
[8] **A.**  Yes, we were.
[9] **Q.**  Did you respond to the location of 7th and
[10]   Mifflin?
[11] **A.**  Yes, we did.
[12] **Q.**  Can you tell the ladies and gentlemen, what, if
[13]   any, action did you take?
[14] **A.**  As we were approaching, there were officers in
[15]   foot pursuit. When we got to the area of 6th and
[16]   Mifflin, there had been one male apprehended and
[17]   basically with the wagon we were picking that prisoner
[18]   up.
[19] **Q.**  And what, if anything, happened next?
[20] **A.**  When we picked the prisoner up?
[21] **Q.**  Yes.
[22] **A.**  It's standard procedure to search the individual
[23]   before placing them in the wagon.
[24] **Q.**  Was anything recovered from him?
[25] **A.**  He was sitting on a hoodie, which was part of the

Page 132

[1]
[2]    flash that was put out, it was a green hoodie, so we
[3]    picked that up.
[4]        And during the search inside of the front pouch of
[5]    the hoodie I found latex finger tips from a glove and
[6]    the male had a standard rubberband on the right wrist
[7]    and had a rolled band which is typical from a latex
[8]    glove, completely rolled off, white color, and it
[9]    matched the latex tips in the pouch.
[10] **Q.**  After you picked up that male, did you then
[11]   proceed to the area of 5th and Mifflin?
[12] **A.**  Yes, we did. There was another person we needed
[13]   to pick up there.
[14] **Q.**  Do you see that person today?
[15] **A.**  Yes, I do (indicating).
[16]          **MS. BARALDI**: Indicating the
[17]   defendant, for the record.
[18]          **THE COURT**: The record will so
[19]   reflect.
[20] **BY MS. BARALDI**:
[21] **Q.**  Do you remember what he was wearing at that point
[22]   in time?
[23] **A.**  This male would have been in a blue -- it was a
[24]   camouflage patten of a hoodie.
[25] **Q.**  And I am going to show you what we marked as C-10

Page 133

[1]
[2] and C-13. Do you recognize C-10?
[3] **A.** Yes. This is where the latex glove fingerprints
[4] were.
[5] **Q.** And C-13?
[6] **A.** This would be the hoodie I observed him in.
[7] **Q.** Now, as part of your duties, Officer Jenkins, do
[8] you fill out any police paperwork?
[9] **A.** Yes. It's standard procedure when we take any
[10] prisoners in custody, we have to fill out a form called
[11] 75-229, which is biological information of any
[12] individual and a medical checklist.
[13] **Q.** The biographical information that you get, who do
[14] you get the information from?
[15] **A.** From the person itself, from the defendant.
[16]     **MS. BARALDI:** If I could have this
[17] marked as C-17.
[18] (Biographical information report marked Commonwealth's
[19]     Exhibit 17 for identification.)
[20] **BY MS. BARALDI:**
[21] **Q.** Officer, if we could start with C-17.
[22] **A.** Okay.
[23] **Q.** What is it?
[24] **A.** This is the 229 that my partner filled out for
[25] Mr. Jerry Jean.

Page 134

[1]
[2] **Q.** And is there an address there?
[3] **A.** There is an address of 313 Clarkson Avenue,
[4] Philadelphia, Pennsylvania, 19120.
[5]     (Report marked Exhibit 18 for identification.)
[6] **Q.** And as regard to C-18?
[7] **A.** Okay. This is a biographical for Mr. Lin.
[8] **Q.** Is Lin the name of the defendant at that point?
[9] **A.** Yeah, and I asked him to spell it and he told me
[10] L-I-N, and I wrote it down. And later on when we were
[11] at the holding facility, the corporal come in to check
[12] a medical checklist and ask the defendant and he said
[13] his name was not L-I-N, it was I-N.
[14] **Q.** And what is the address that this defendant gave
[15] that night?
[16] **A.** He gave an address of 5246 Rorer Street,
[17] Philadelphia, Pennsylvania, 19120.
[18] **Q.** And if we could go back quickly to Jerry Jean's
[19] 75-229, he gives his height as what?
[20] **A.** He gave his height as 6 foot.
[21] **Q.** And his weight?
[22] **A.** 190.
[23] **Q.** And John Lin or John In, his height is what?
[24] **A.** Five-nine, 165.
[25] **Q.** And the date of birth for Jerry Jean?

Page 135

[1]
[2] **A.** His date of birth is 3/9/84.
[3] **Q.** And for John In?
[4] **A.** 8/5/83.
[5]     **MS. BARALDI:** Thank you. I don't
[6] have any further questions.
[7]     **THE COURT:** Mr. Giuliani?
[8]     **MR. GIULIANI:** Thank you.
[9]     - - -
[10]     CROSS-EXAMINATION
[11]     - - -
[12] **BY MR. GIULIANI:**
[13] **Q.** The male with the latex that you saw that was
[14] Jerry Jean?
[15] **A.** That's correct.
[16] **Q.** And you had the opportunity to see Mr. Jean and my
[17] client together?
[18] **A.** That's correct.
[19] **Q.** Mr. Jean is larger than my client?
[20] **A.** Yes.
[21] **Q.** And would you agree having see Mr. Jean, he is 6
[22] foot or bigger than that?
[23] **A.** I really don't recall. I -- like I said, my
[24] partner did the boy. I don't recall if he was taller
[25] than that, he was taller than me, that's all I know.

Page 136

[1]
[2] **Q.** When you take him to the station there's not a
[3] chart that you can measure?
[4] **A.** That's information given by the male being
[5] detained. There is a chart, I don't know whether CCTV
[6] uses that.
[7]     **MR. GIULIANI:** Thank you, Officer.
[8] That's all I have.
[9]     **MS. BARALDI:** No further questions.
[10]     **THE COURT:** Thank you, ma'am.
[11]     (Witness excused.)
[12]     - - -
[13]     **MS. BARALDI:** At this time the
[14] Commonwealth would be calling Sergeant Aponte.
[15]     **THE COURT CRIER:** Please state your
[16] name, spell your last name, badge number, and unit
[17] of assignment.
[18]     **THE WITNESS:** Sergeant Wilfredo
[19] Aponte, A-P-O-N-T-E, Badge No. 8819, assigned to
[20] the Crime Scene Unit.
[21]     SERGEANT WILFREDO APONTE, after having been
[22] first duly sworn, was examined and testified as follows:
[23]     - - -
[24]     DIRECT EXAMINATION
[25]     - - -

Page 137

[1]
[2] **BY MS. BARALDI:**
[3] **Q.** Good afternoon, Sergeant Aponte.
[4] **A.** Good afternoon.
[5] **Q.** Back on March 7th, 2007, were you assigned to
[6] Mobile Crimes scene then?
[7] **A.** Yes, I was.
[8] **Q.** Were you working alone or with a partner?
[9] **A.** Police Officer Avon Wilson, Badge No. 9736.
[10] **Q.** And were you called to investigate a scene at 720
[11] West Mifflin Street?
[12] **A.** That's correct.
[13] **Q.** And that was as a result of a home
[14] invasion/robbery?
[15] **A.** Home invasion/robbery, and police discharge, which
[16] took place in the yard of that location.
[17] **Q.** So the police discharge that would have brought
[18] you there?
[19] **A.** That's correct.
[20] **Q.** Tell the ladies and gentlemen what you do as part
[21] of the Crime Scene Unit?
[22] **A.** Our main function is to respond to scenes of a
[23] crime. And usually we are summoned by detectives.
[24] Once they get to the scene they evaluate it and
[25] determine whether they need our services. And we are

Page 138

[1]
[2] responsible for photographing the scene, sketching the
[3] scene, and looking for and recovering any evidence that
[4] may be on the scene. If there is latent prints to be
[5] done, we also take care of that.
[6]     And once we retrieve the evidence, our job is to
[7] place it on the property receipt and submit it to
[8] firearms, criminalistics, or send it to City Hall for
[9] future court presentation.
[10] **Q.** Okay.
[11]         **MS. BARALDI:** If I could have this
[12]     marked C-19?
[13]     (Photograph marked Commonwealth's Exhibit 19 for
[14]         identification.)
[15] **BY MS. BARALDI:**
[16] **Q.** I am going to start with the scene at 500 Mufflin,
[17] if you could describe what the picture shows?
[18] **A.** Okay. Starting with the exhibit which is marked
[19] "U," it's a view of the recovered partial rubber glove
[20] and on the 600 block.
[21]     And there is the 500 block, and here is the
[22] exhibit marked "V" is the view east showing a white
[23] vehicle against the residence of the 500 block of
[24] Mifflin. And the car is right here.
[25]     We go to the next exhibit, Exhibit W is the view

Page 139

[1]
[2] of the front of the vehicle against a 524 West Mifflin
[3] Street and it's resting against the front of it.
[4]     This is exhibit is marked "X," overall view of the
[5] driver's side vehicle.
[6]     Exhibit Y is the view of the passenger's side of
[7] the vehicle.
[8]     And Exhibit C is a closeup view of a recovered
[9] semi-automatic weapon in the front seat of the car
[10] right there.
[11]     And Exhibit AA is the view of a rubber glove in
[12] the front console area.
[13]     And this one is showing a CVS box of latex gloves
[14] in the rear seat of that vehicle.
[15] **Q.** And this alleyway, which I guess I did it
[16] backwards, where's that rear alley?
[17] **A.** This is in the rear. This is Exhibit T, the east
[18] view in the rear alley which is directly behind the
[19] property which is considered the south side. He's
[20] taking the photograph from 720 West Mifflin looking
[21] east down the alley. This is what you see, a bunch of
[22] debris.
[23]         **MS. BARALDI:** And if we could have
[24]     this marked as C-20?
[25]     (Photograph marked Commonwealth's Exhibit 20 for

Page 140

[1]
[2]         identification.)
[3]         **THE WITNESS:** The first one, upper
[4]     left, is the Exhibit A, the view in front of 720
[5]     West Mifflin.
[6]         And this Exhibit B, the view of the
[7]     front sidewalk in front of 720 Mifflin.
[8]         And taking a picture looking west
[9]     Exhibit C is a close view of the locks on the
[10]     storm door, it shows there is no damage to it.
[11]         And Exhibit D is a view of a locked
[12]     steel gate of 720 Mifflin Street.
[13]         And Exhibit E, is the bars in the
[14]     rear kitchen pulled apart.
[15]         And Exhibit F is a view of the
[16]     stairs leading up to the second floor hallway.
[17]         And Exhibit G is a view looking
[18]     north from the top of the stairs looking towards
[19]     the front bedroom area.
[20]         **MS. BARALDI:** If I may mark this as
[21]     C-21?
[22]         **THE COURT CRIER:** Marking Exhibit
[23]     C-21.
[24]     (Photograph marked Commonwealth's Exhibit 21 for
[25]         identification.)

Page 141

[1]
[2]     **THE WITNESS**: Starting with Exhibit
[3] H, is a view inside of the front bedroom looking
[4] back towards the rear hallway area.
[5]        Exhibit I, a view north of the
[6] bedroom itself.
[7]        Exhibit J, is a view west in the
[8] bedroom showing a wooden closet.
[9] **BY MS. BARALDI:**
[10] **Q.** Is that the same closet Dyshon Marable was found
[11] in?
[12] **A.** I wasn't there for that.
[13] **Q.** Okay.
[14] **A.** Exhibit K, a view of the west window in the rear
[15] bedroom. The blinds are pulled apart and the windows
[16] are in an up position.
[17]     Exhibit L is a view looking southwest, 722 West
[18] Mifflin Street rear yard.
[19]        **THE COURT**: Is that L?
[20]        **THE WITNESS**: That is L. And there
[21] is a west 3-foot alley behind the home.
[22]        Exhibit M, is a view straight down
[23] from the window of the second floor bedroom.
[24]        Exhibit N, is a view towards the
[25] rear yard of 720 West Mifflin Street, and there's

Page 142

[1]
[2] a note evidence marker No. 1, which is a recovered
[3] .9 mm fired cartridge casing.
[4]        Exhibit O, is a view northwest in
[5] the rear yard, showing a recovered .9 mm fired
[6] cartridge case circled by the white chalk.
[7]        Exhibit P, is a view of a shelter of
[8] where the semi-automatic was found. It was here
[9] were marker No. 2 is.
[10]        And this would be a close-up view of
[11] the weapon, next to marker No. 2.
[12]        And Exhibit R, is a view west in the
[13] alley from 720 West Mifflin Street. Earlier I
[14] showed you the one looking east and this is one
[15] looking the other direction, west.
[16]        And Exhibit S, is a close view of
[17] recovered rubber glove which was in the rear alley
[18] west of 720 West Mifflin Street.
[19]        **MS. BARALDI**: Your Honor, can I
[20] approach?
[21]        **THE COURT**: Yes.
[22] **BY MS. BARALDI:**
[23] **Q.** So this picture you see here, picture letter "N,"
[24] is this the backyard or the side alley?
[25] **A.** That is the side alley.

Page 143

[1]
[2] **Q.** So if you were to come out of the kitchen door,
[3] this would be what you would see; is that fair to say?
[4] **A.** Yes.
[5] **Q.** And then picture "O," this corner right here,
[6] where I guess the evidence marker 1, that's actually
[7] the rear yard, correct?
[8] **A.** That's correct.
[9] **Q.** And around the corner would be what?
[10] **A.** This particular area here, where you can see the
[11] three pieces of it lined up.
[12] **Q.** Okay.
[13] And "Q" is actually a close-up of this cement shed
[14] that everyone was going to which is also "P?"
[15] **A.** Which is in the southeast corner of the yard.
[16] **Q.** And all of this debris would have been in at the
[17] time you got there, correct?
[18] **A.** That's correct.
[19] **Q.** As part of the Mobile Crime Scene you actually
[20] recovered the weapons in this case?
[21] **A.** Yes, we did.
[22] **Q.** And you placed them on a property receipt?
[23] **A.** Yes, they were placed on a property receipt.
[24]        **MS. BARALDI**: If I can, this will be
[25] C-22 I believe.

Page 144

[1]
[2] (Property receipt marked Commonwealth's Exhibit 22 for
[3]        identification.)
[4] **BY MS. BARALDI:**
[5] **Q.** Sergeant, what is C-22?
[6] **A.** C-22 is a property receipt, which is marked
[7] 9006283, and it contains a description of the two
[8] weapons that were recovered at the scene.
[9] **Q.** And what are those descriptions?
[10] **A.** Item No. 1 is .9 mm pistol, Zig Zauer, six black
[11] with a serial number of U370260. And in parenthesis
[12] there was an attempt to scratch out the serial number.
[13] And they had 14 live rounds in the magazine and one
[14] live round in the chamber. And that was found in the
[15] front seat of the Altima with a PA tag of GRC-O883 and
[16] that was in front of 524 west Mifflin Street.
[17]     Item No. 2 on this property receipt is a .9 mm
[18] pistol, a P-200, with Serial No. 0121001353, and it
[19] contained the live rounds in the magazine and one live
[20] round in the chamber, and it was found in the rear yard
[21] of 720 West Mifflin Street, which is item No. 2.
[22]        **MS. BARALDI**: If I could have the
[23] witness shown C-14, please.
[24] **BY MS. BARALDI:**
[25] **Q.** Do you recognize C-14?

Page 145

[1]
[2] **A.** Yes. This is the Zig Zauer that was found inside
[3] of the white Altima in the front seat.
[4] **Q.** And in that envelope attached to the weapon?
[5] **A.** In this envelope is the live rounds that were
[6] found in the gun itself.
[7] **Q.** Is the magazine in the box itself?
[8] **A.** The magazine here, which obviously goes in here.
[9] **Q.** And then this would be C-16. What is C-16?
[10] **A.** C-16 is the gun that was recovered in the rear
[11] yard of 720 Mifflin Street. And in the envelope it
[12] contains the live rounds that were found in the weapon,
[13] and this is the magazine that goes to the weapon.
[14] **Q.** And that had nine live rounds in it and one in the
[15] chamber?
[16] **A.** That's correct.
[17] **Q.** You also recovered the .9 mm fired cartridge
[18] casing too; is that fair to say?
[19] **A.** Yes, we did.
[20] **Q.** And that would have been fired from Officer
[21] Battles' weapon?
[22] **A.** That's correct.
[23]          **MS. BARALDI**: Now, if I could have
[24] this marked -- Court's indulgence one second.
[25]          (Pause.)

Page 146

[1]
[2]          **MS. BARALDI**: If I could have this
[3] marked as C-23?
[4] (Property receipt marked Commonwealth's Exhibit 23 for
[5]          identification.)
[6] **BY MS. BARALDI**:
[7] **Q.** Now, in addition to recovering the fired cartridge
[8] casings, and the weapons, you recovered the latex
[9] gloves in that picture; is that fair to say?
[10] **A.** That's correct.
[11] **Q.** Did you place them on the property receipt?
[12] **A.** Yes, 9006285.
[13] **Q.** And in addition to those latex gloves. If you
[14] could remind everybody where they were recovered from?
[15] **A.** Sure. The first one, the latex glove which was
[16] the one I showed you was in the rear alley behind 720
[17] West Mifflin Street.
[18]          **MS. BARALDI**: If I could show the
[19] witness what's been previously marked C-12?
[20]          **THE WITNESS**: It's actually Exhibit
[21] S, rubber glove recovered on 720 West Mifflin
[22] Street which is item No. 1.
[23] **BY MS. BARALDI**:
[24] **Q.** Okay.
[25]          And is that also shown on this map previously

Page 147

[1]
[2] marked on C-12?
[3] **A.** Well, what we have here is the red markers
[4] indicating the alleyway which is in the rear of 720
[5] West Mifflin Street. Two properties over in the rear
[6] alley is where we found latex gloves. This indicates
[7] the alleys that are behind and alongside the
[8] properties.
[9] **Q.** And what was item No. 2 on the property receipt?
[10] **A.** Item No. 2 is a latex glove, white, which was
[11] found in the front vestibule on 720 West Mifflin
[12] Street.
[13]          Item No. 3 is a piece of latex gloves found on the
[14] highway, 600 block of West Mifflin Street.
[15] **A.** And also on this property receipt was a list of
[16] four swabs taken from the weapons.
[17]          Item No. 4 was a swab taken from item No. 4 which
[18] is on Property Receipt No. 9006283.
[19]          Item No. 5 was a swab taken from Item No. 2 on
[20] Property Receipt No. 9002683, which is the P-2000 .9 mm
[21] pistol.
[22]          Item No. 6 is a swab taken from a live round which
[23] was in the chamber of item No. 1 on Property Receipt
[24] No. 9006283.
[25]          And item No. 7 was a swab taken from the live

Page 148

[1]
[2] round in the chamber of item No. 2 on Property Receipt
[3] No. 9006283. That was DNA swabbing.
[4] **Q.** Now, when you take a swab from a handgun, what's
[5] the process?
[6] **A.** The process is to take a sample of swabbing from
[7] where the grips are but as to where -- on the weapon
[8] and alongside where the slide is where you pull back
[9] at. That's placed in an enveloped and shipped off to a
[10] DNA laboratory.
[11] **Q.** What about a live round?
[12] **A.** Live round, we would swab the rear area where
[13] somebody would push it on the weapon and on the casing
[14] itself.
[15]          **MS. BARALDI**: If I could have this
[16] marked as C-24?
[17] (Report marked Commonwealth's Exhibit 24 for
[18]          identification.)
[19] **BY MS. BARALDI**:
[20] **Q.** Do you recognize C-24?
[21] **A.** Yes. C-24 is Crime Scene Unit service report and
[22] basically it describes the services that we performed
[23] at that location, 720 West Mifflin Street and 524 West
[24] Mifflin Street.
[25] **Q.** And on the third page it talks about a latent

Page 149

[1]
[2] examination.
[3] **A.** Yes.
[4] **Q.** Can you please explain that to the ladies and
[5] gentlemen.
[6] **A.** In this particular -- when an examination is taken
[7] on the weapons basically what we do is look at it on
[8] the magnifying glass without putting any chemicals or
[9] Super Glue on it to see if there are any latent prints
[10] on them.
[11]     And then we place them in the fuming tank, a Super
[12] Glue tank, they release warm water into the atmosphere
[13] and Super Glue packets, and the moisture from your
[14] hands and residue left on the weapon or anything on the
[15] weapon itself would turn to a white powder color.
[16]     We would then take it out of the chamber and
[17] examine it. If there's anything that resembles ridges,
[18] we would then place black powder on it and try to lift
[19] it to see if we have fingerprints.
[20] **Q.** Were any prints able to be seen on these weapons
[21] in this case?
[22] **A.** There were none.
[23]     **MS. BARALDI:** If I could have this
[24] marked C-25 and C-26.
[25] (Map marked Commonwealth's Exhibit 25 for identification.)

Page 150

[1]
[2]     (Aerial map marked Commonwealth's Exhibit 26 for
[3]     identification.)
[4] **BY MS. BARALDI:**
[5] **Q.** C-26, what does that show?
[6] **A.** It shows an area of the map which shows 720
[7] Mifflin Street where it's at here indicated by a red
[8] marker, and also 313 East Parkson Avenue which is
[9] located in the 19120 zip code, along with 5246 Rorer
[10] Street, which is 19120 zip code. And it's .8 miles in
[11] a straight line from 720 Mifflin to that particular
[12] area.
[13] **Q.** And those two addresses, the address on Clarkson
[14] or Rorer, what police district is that?
[15] **A.** They are in the 35th Police District.
[16] **Q.** Do you know what neighborhood of the city that is?
[17] **A.** I am not sure the name in the city its called, but
[18] it's north of the Boulevard.
[19] **Q.** And if you could look at C-26 for me, what is
[20] C-26?
[21] **A.** C-26 is a computer-generated, overall view showing
[22] how it would look from the sky. And what you'll see if
[23] I can show you, you have Rising Sun Avenue here and
[24] Clarkson Street, which runs here east and west, Tacony
[25] Park in this area, and then down here you have 5246

Page 151

[1]
[2] Rorer Street.
[3]     **THE COURT:** Could you spell that
[4]     last street name.
[5]     **THE WITNESS:** R-O-R-E-R.
[6] **BY MS. BARALDI:**
[7] **Q.** And do you know how far those addresses are?
[8] **A.** Between the addresses it's .8 miles.
[9]     **MS. BARALDI:** Thank you, sir.
[10]     **THE COURT:** Cross-examination?
[11]     - - -
[12]     CROSS-EXAMINATION
[13]     - - -
[14] **BY MR. GIULIANI:**
[15] **Q.** Good afternoon, Sergeant.
[16] **A.** Good afternoon.
[17] **Q.** Let's start backwards with C-26. Those two
[18] addresses that are highlighted on that map, do you know
[19] whose address they are?
[20] **A.** I personally do not.
[21] **Q.** Okay.
[22]     Between those addresses and in that area, can you
[23] tell me how many people live in that area?
[24] **A.** I couldn't tell you that.
[25] **Q.** It looks like a lot, a lot of houses. How high up

Page 152

[1]
[2] is this, by the way? Can you tell how high up this is
[3] in the air?
[4] **A.** It's a satellite image.
[5] **Q.** It's pretty high.
[6] **A.** Yes, it is.
[7] **Q.** Now, Sergeant, the photo arrays, Exhibits 19, 20,
[8] and 21, with all of the photographs you were just
[9] talking about, are those the sum of all of the photos
[10] that were took?
[11] **A.** What's on these three boards?
[12] **Q.** Yes.
[13] **A.** No, we took a total of 35 photographs.
[14] **Q.** Did you take any of the basement of this
[15] residence?
[16] **A.** No, we did not.
[17] **Q.** Any reason you did not take anything of the
[18] basement?
[19] **A.** No reason at all.
[20] **Q.** Were you told there was supposedly a man that had
[21] somebody down in the basement?
[22] **A.** We did not have that information, no.
[23] **Q.** And those photographs that were taken , was that
[24] the day after the incident?
[25] **A.** That's correct.

Page 153

[1]
[2] **Q.** A couple hours afterwards?
[3] A. Yes. We arrive on location at 6:40 a.m. and
[4] departed at 9:45 a.m.
[5] **MR. GIULIANI:** May I approach,
[6] please?
[7] **THE COURT:** Yes.
[8] **BY MR. GIULIANI:**
[9] **Q.** Sergeant, I am going to put back up on the easel
[10] Commonwealth's Exhibit No. 19, and there are four
[11] photographs from there that show the white Altima. Do
[12] you see that?
[13] **A.** There's actually three that show the outside of
[14] the Altima and there's three interior shots.
[15] **Q.** Thank you.
[16] Now, the location of the Altima in these three
[17] photographs, "W," "X," and "Y," is that how you found
[18] it when you arrived on the scene?
[19] **A.** That's correct.
[20] **Q.** Did you notice any -- but aside from the
[21] photographs, but did you notice any substantial front
[22] end damage to the Altima?
[23] **A.** No. We did not see any substantial damage, no.
[24] **Q.** So there's nothing that would indicate that this
[25] Altima was going at a high speed and crashed into a

Page 154

[1]
[2] house?
[3] **A.** No.
[4] **Q.** No shattered lights, bumpers, no broken glass, or
[5] anything like that?
[6] **A.** No.
[7] **Q.** Now, you also testified about two gloves that were
[8] recovered. Let's go backwards, if I may.
[9] **MR. GIULIANI:** May I approach the
[10] Sergeant with C-12?
[11] **THE COURT:** You may.
[12] **BY MR. GIULIANI:**
[13] **Q.** This is that aerial shot that we have been
[14] speaking about, the jurors have seen. Can you point to
[15] the house we are talking about, 720?
[16] **A.** 720 is marked as 720.
[17] **Q.** Now, if someone was to go outside into the alley
[18] and run this direction, they would be going eastbound,
[19] correct?
[20] **A.** That's correct.
[21] **Q.** The glove found in the alley is found behind 724
[22] Mifflin, correct?
[23] **A.** That's correct.
[24] **Q.** That would be two houses to the west?
[25] **A.** That's correct.

Page 155

[1]
[2] **Q.** The glove is over here, but Mr. Jean is someplace
[3] over here when he is arrested, right?
[4] **A.** I wouldn't have knowledge of that.
[5] **Q.** In your opinion, the location of the glove in the
[6] alley behind 724 Mifflin would that be far enough where
[7] someone went in the alley and threw it one direction
[8] and ran the other direction?
[9] **A.** That would be hard to say.
[10] **Q.** Okay.
[11] Do you recall the distance between the back of 720
[12] and the back of 724 where that glove was found?
[13] **A.** It's approximately 30 feet.
[14] **Q.** Thirty feet. Okay.
[15] You also found a second glove in the vestibule of
[16] 720 Mifflin?
[17] **A.** That's correct.
[18] **Q.** Now, it's not photographed, right?
[19] **A.** No, it's not.
[20] **Q.** But you saw or you showed the jury the photo of a
[21] front door, a storm door?
[22] **A.** Yes.
[23] **Q.** And you entered the property, obviously, correct?
[24] **A.** Yes, we did.
[25] **Q.** So you would open the storm door and enter, and

Page 156

[1]
[2] there is an area before you get into the house proper?
[3] **A.** Correct.
[4] **Q.** And that's were you found the glove on the floor?
[5] **A.** Yes.
[6] **Q.** That was taken and collected for evidence?
[7] **A.** Yes.
[8] **Q.** Now, your report indicates that the Zig Zauer was
[9] the .9 mm pistol found in the Altima was swabbed for
[10] DNA?
[11] **A.** Yes, it was.
[12] **Q.** Did you do that yourself?
[13] **A.** No, that was Officer Wilson.
[14] **Q.** Tell the jury, briefly, when you say it's swabbed,
[15] what is done?
[16] **A.** Basically you take a cotton swab like a Q-tip and
[17] you dip it in a water solution. And with that you take
[18] and swab the back of the weapon, like I said, and also
[19] the slide which is the top portion of the gun.
[20] After you do that you stick it into a protected
[21] covering and place it inside of the envelope and submit
[22] it to the criminalistics laboratory.
[23] **Q.** When you say you place it into an envelope, you
[24] are talking about the swab?
[25] **A.** The swab itself.

[1]
[2] **Q.** Not the gun?
[3] **A.** No.
[4] **Q.** And this is something you've done many times
[5] yourself?
[6] **A.** I have done it, yes.
[7] **Q.** You spoke to the jury about the latent
[8] examination, you were looking for the fingerprints on
[9] the gun.
[10] **A.** That's correct.
[11] **Q.** And you didn't find any on either?
[12] **A.** That's correct.
[13] **Q.** And, again, looking for fingerprints on a gun is
[14] something you've done many times?
[15] **A.** That's correct.
[16] **Q.** And even though you are not a fingerprint expert,
[17] you're aware that if someone touches a gun that doesn't
[18] mean someone is going to leave a print?
[19] **A.** That's correct.
[20] **Q.** But if someone is wearing latex gloves and grabs a
[21] gun, points it, they definitely are not going to leave
[22] prints?
[23] **A.** No.
[24] **Q.** No, they are not or, no, I am wrong?
[25] **A.** No, they are not going to leave prints if they

[1]
[2] have gloves on.
[3]         **MR. GIULIANI:** Okay. Court's
[4] indulgence, please.
[5]         (Pause.)
[6]         **MR. GIULIANI:** That's all I have
[7] Sergeant. Thank you.
[8]         **THE COURT:** Anything else?
[9]         **MS. BARALDI:** Just one question.
[10]         - - -
[11]         REDIRECT EXAMINATION
[12]         - - -
[13] BY MR. GIULIANI:
[14] **Q.** You were in the rear alley behind 720, correct?
[15] **A.** Correct.
[16] **Q.** Now, is there away to get out of the alley if you
[17] are running west, is there an exit going west?
[18] **A.** Yes, there is.
[19] **Q.** Where would that be?
[20] **A.** The actual red arrow is indicating there is a
[21] alley running right alongside of the property and you
[22] can get out onto Mifflin Street.
[23] **Q.** And is there also an exit towards 7th Street?
[24] **A.** There's also an exit alleyway here, an open area
[25] here which you could get out.

[1]
[2] **Q.** And the debris, when we saw the picture, would
[3] the debris have been going in which direction?
[4] **A.** It would be east, which is that.
[5] **Q.** And east on this map is which way?
[6] **A.** East is this direction.
[7] **Q.** So if somebody was leaving, jumping the fence,
[8] 720, if they look to the left is the debris and to the
[9] right is the clear path is where we would see, and to
[10] the right is where you found the latex glove?
[11] **A.** Yes.
[12]         **MS. BARALDI:** Thank you.
[13]         **THE COURT:** Anything else?
[14]         **MR. GIULIANI:** No, sir. Thank you.
[15]         **THE COURT:** Thank you, sir. You may
[16] step down.
[17]         **THE WITNESS:** Thank you, Your Honor.
[18]         (Witness excused.)
[19]         - - -
[20]         **MS. BARALDI:** At this time the
[21] Commonwealth will call Detective Hopkins.
[22]         **THE COURT CRIER:** Please state your
[23] name, spell your last name, badge number, and
[24] assignment.
[25]         **THE WITNESS:** Detective John

[1]
[2] Hopkins, Badge No. 691, South Detective division.
[3]         DETECTIVE JOHN HOPKINS, after having
[4] been first duly sworn, was examined and testified
[5] **as follows**:
[6]         - - -
[7]         DIRECT EXAMINATION
[8]         - - -
[9] BY MS. BARALDI:
[10] **Q.** Good afternoon, Detective Hopkins.
[11] **A.** Good afternoon.
[12] **Q.** You were called in earlier today to take a look at
[13] a witness.
[14] **A.** That's correct.
[15] **Q.** Did you recognize that person?
[16] **A.** That is Dyshon Marable.
[17] **Q.** And after this incident were you present when
[18] Mr. Marable was found in the closet?
[19] **A.** Yes, I was.
[20]         **MS. BARALDI:** And if I can approach,
[21] Your Honor?
[22]         **THE COURT:** Yes.
[23] BY MS. BARALDI:
[24] **Q.** I am showing the witness what has been marked as
[25] C-21 specifically picture "J." Do you see that,

Page 161

[1]
[2] Detective?
[3] **A.** Yes, I do.
[4] **Q.** What is that a picture of?
[5] **A.** A picture of the wardrobe closet where Dyshon
[6] Marable was secreted.
[7] **Q.** And he was taken to South Detectives, correct?
[8] **A.** Yes, he was.
[9] **Q.** He was Mirandized, correct?
[10] **A.** Yes, he was.
[11] **Q.** And he did give a statement?
[12] **A.** Yes, he did.
[13] **Q.** And additionally you collected swabs?
[14] **A.** That's correct.
[15] **Q.** And if I can -- tell us what a buccal swab is?
[16] **A.** The swab in question were the DNA collection
[17] taken, swab of the tongue of the person you are looking
[18] to obtain DNA evidence from. It's submitted to our DNA
[19] lab where they will take the sample, code it, and then
[20] they'll let us know if they come back to a known
[21] suspect.
[22] **Q.** And you took a swab from defendant Jerry Jean?
[23] **A.** I did.
[24]         **MS. BARALDI:** If I could have this
[25] marked C-27?

Page 162

[1]
[2] (Property receipt marked Commonwealth's Exhibit 27 for
[3]         identification.)
[4] **BY MS. BARALDI:**
[5] **Q.** What is C-27?
[6] **A.** C-27 is a copy of a property receipt, Property
[7] Receipt No. 2720376, which I prepared for the DNA
[8] sample. That sample was obtained on 12/12/07.
[9] **Q.** And did you also obtain a buccal swab from the
[10] defendant, John In?
[11] **A.** Yes, I did on the same date.
[12]         **MS. BARALDI:** If I could have this
[13] marked as C-28?
[14] (Property receipt marked Commonwealth's Exhibit 28 for
[15]         identification.)
[16] **BY MS. BARALDI:**
[17] **Q.** What is C-28?
[18] **A.** Copy of Property Receipt No. 2720377. A
[19] property receipt for the sample obtained from Defendant
[20] John In.
[21] **Q.** And what date was that obtained?
[22] **A.** That was also 12/12/07.
[23] **Q.** Did you swab anybody else?
[24] **A.** No, I did not.
[25]         **MS. BARALDI:** I have no further

Page 163

[1]
[2] questions.
[3]         **THE COURT:** You may cross-examine.
[4]         **MR. GIULIANI:** I have no questions,
[5] Detective.
[6]         **THE COURT:** Thank you, sir. You may
[7] step down.
[8]         (Witness excused.)
[9]            - - -
[10]        **THE COURT:** You may continue.
[11]        **MS. BARALDI:** At this time the
[12] Commonwealth would be calling Ben Levin from the
[13] DNA lab.
[14]        **THE COURT:** Does anybody need a
[15] break before we go forward?
[16]        There's three hands so we'll take a
[17] break.
[18]        **THE COURT CRIER:** Everyone remain
[19] seated while the jury exits the courtroom.
[20] (Jury departs the courtroom at 3:20 p.m.)
[21]        (Short recess.)
[22]        **THE COURT CRIER:** Please remain
[23] seated while the jury enters the courtroom.
[24] (Jury enters the courtroom at 3:35 p.m.)
[25]        **THE COURT:** Thank you, ladies and

Page 164

[1]
[2] gentlemen. You may be seated.
[3]         **THE JURY:** (Jury panel complies.)
[4]         **THE COURT:** You may continue.
[5]         **MS. BARALDI:** The Commonwealth would
[6] call Benjamin Levin.
[7]         **THE COURT:** Very well.
[8]         **THE COURT CRIER:** Please remain
[9] standing, state your full, spell your last name,
[10] position please.
[11]        **THE WITNESS:** Benjamin Levin,
[12] Forensic Scientist II.
[13]        BENJAMIN LEVIN, after having been
[14] first duly sworn, was examined and testified as
[15] **follows:**
[16]            - - -
[17]        VOIR DIRE EXAMINATION
[18]            - - -
[19] **BY MS. BARALDI:**
[20] **Q.** Good afternoon.
[21] **A.** Good afternoon.
[22] **Q.** Where are you currently employed?
[23] **A.** City of Philadelphia Police Department, DNA
[24] Laboratory.
[25] **Q.** How long have you been so employed?

[1]
[2] **A.** Five years.
[3] **Q.** And what's your background educationally
[4] speaking?
[5] **A.** I received a Bachelor's of Science from Temple
[6] University.
[7] **Q.** And when was that?
[8] **A.** 1996.
[9] **Q.** And after that, what did you do?
[10] **A.** After that I worked in several science-related
[11] jobs in agriculture, nothing related to this position.
[12] In addition where my current employment is concerned I
[13] received additional training which is required for
[14] on-the-job training for the particular duties of a DNA
[15] analyst.
[16] **Q.** And what is that training?
[17] **A.** It includes training on the specific type of
[18] extraction techniques, the use of instrumentation that
[19] are used in the laboratory, the generation of
[20] statistics from the profiles generated from the DNA
[21] samples, as well as report writing and other related
[22] duties as far as things such as chain of custody and
[23] other sorts of paperwork-type duties.
[24] **Q.** About how many hours of on-the-job training did
[25] you receive?

[1]
[2] **A.** I don't know how many hours, but there's a
[3] required six-month period of training at a CODIS
[4] participating laboratory. "CODIS" meaning Combined DNA
[5] Index System. Because we submit samples to the
[6] national database, which is kept by the FBI, so they
[7] require a six-month period of on-the-job training.
[8] **Q.** And have you been in your current position for the
[9] past five years?
[10] **A.** In the DNA laboratory for about four.
[11] **Q.** And have you ever testified as an expert in the
[12] Court of Common Pleas before today?
[13] **A.** Yes.
[14] **Q.** And have you qualified as an expert on every one
[15] of those occasions?
[16] **A.** Yes.
[17] **Q.** Have you ever not been qualified?
[18] **A.** No.
[19] **Q.** About how many times have you testified as an
[20] expert?
[21] **A.** I would say 20.
[22]        **MS. BARALDI**: Your Honor, at this
[23] point I would offer Mr. Levin as an expert in
[24] forensic DNA analysis.
[25]        **THE COURT**: Any questions on

[1]
[2] cross-examination on qualifications?
[3]        **MR. GIULIANI**: I do not, Your Honor.
[4]
[5]        **THE COURT**: The Court will accept
[6] Mr. Levin as an expert in DNA forensic analysis
[7] capable of rendering opinions in the area of his
[8] expertise.
[9]        Members of the jury, an expert has
[10] special knowledge or skill in some science, art,
[11] profession, occupation, or subject that a witness
[12] acquired by training, education, or experience.
[13] Now, because an expert has this special, this is
[14] out of the ordinary knowledge or skill, he may be
[15] able to supply you jurors with specialized
[16] information, explanations, and opinions that will
[17] help you decide the case.
[18]        Regular witnesses are bound by two
[19] limitations that do not apply to an expert.
[20] First, regular witnesses generally can testify
[21] only about things they personally perceive, things
[22] they saw or heard themselves. And second, regular
[23] witnesses are not allowed to express opinions
[24] about matters that require special knowledge or
[25] skill.

[1]
[2]        By contrast an expert is allowed to
[3] express an opinion about a matter that is within
[4] the area of his expertise. Furthermore, while an
[5] expert may base an opinion on things personally
[6] perceived, he may also base an opinion based on
[7] factual information learned from other sources.
[8]        If the expert bases an opinion on
[9] things not personally perceived, he can describe
[10] the information on which he relies and identify
[11] its source when explaining the opinion.
[12]        Ma'am, you may continue.
[13]        - - -
[14]        DIRECT EXAMINATION
[15]        - - -
[16] **BY MS. BARALDI**:
[17] **Q.** Mr. Levin, what are your duties in the DNA lab?
[18] **A.** They include retrieval of evidence from the
[19] criminalistics laboratory which is the laboratory that
[20] does the initial examination of items submitted, in
[21] addition to extraction of DNA from the samples using
[22] one of the variety of extraction techniques.
[23]        Then in addition, there are other laboratory
[24] techniques such as quantitation determining the amount
[25] of DNA in a particular sample, electrophoresis which is

Page 169

[1]
[2] separation of the DNA samples for which you we generate
[3] a DNA profile. And from that profile then I also would
[4] generate a report and any statistical analysis that
[5] would be necessary, if they would be needed for that
[6] particular type of case.
[7]         **MS. BARALDI**: If I could have this
[8] marked as C-29?
[9]     (DNA report marked Commonwealth's Exhibit 29 for
[10]             identification.)
[11] **BY MS. BARALDI**:
[12] **Q.** Mr. Levin what is C-29?
[13] **A.** This is the DNA report, our laboratory
[14] No. 0770327.
[15] **Q.** And what, if anything, can you tell us about what
[16] you did in this case?
[17] **A.** In this case, as I mentioned before, I retrieved
[18] the associated samples, performed DNA extraction on
[19] them, and through other laboratory procedures I
[20] generated these profiles, these DNA profiles. And in
[21] this particular case I also generated statistics
[22] associated with some of the samples.
[23] **Q.** I want to start you with item No. 1 on your
[24] report, which was sample No. 24775. What is item No.
[25] 1?

Page 170

[1]
[2] **A.** The conclusion?
[3] **Q.** No, what is it?
[4] **A.** Item No. 1 is a swab from a white latex glove,
[5] rear alley behind 724 West Mifflin.
[6] **Q.** Was any DNA recovered off that glove?
[7] **A.** It was, yes.
[8] **Q.** And did you come to any conclusions regarding that
[9] DNA?
[10] **A.** Yes, I did.
[11] **Q.** And what was that?
[12] **A.** If I may read the conclusion from the report?
[13] **Q.** Yes.
[14] **A.** Jerry Jean is included as a contributor of the
[15] major component of the DNA mixture detected as the FGA,
[16] D8S1179, VWA, Amelogenin, D18S51, D21S11, TH01,
[17] D3S1358, Penta D, D16S539, D7S820, D13S17, and DS818
[18] loci in sample No. 24775.
[19]     All of those numbers and letters refer to
[20] particular regions of the DNA that we are testing. So
[21] in these areas Jerry Jean was included as a contributor
[22] of the DNA.
[23] **Q.** So those regions of Jerry Jeans' DNA happens to
[24] match those regions of the latex glove?
[25] **A.** Yes. If we compare it, a reference sample in this

Page 171

[1]
[2] case a buccal swab, the swab of the inside of the
[3] mouth, and from profile that was obtained from that
[4] swab we compare to the question samples. So that's
[5] what's being compared in this report.
[6] **Q.** What is the likelihood of such a match?
[7] **A.** Well, I can continue the conclusion. The
[8] frequency of DNA types is 1 in 4466 quadrillion in the
[9] random unrelated African-American population, 1 in 288
[10] quintillion in the random unrelated Caucasian
[11] population, and 1 in 692 quadrillion in the random
[12] Hispanic population.
[13]     If I may continue the conclusion, Jerry Jean also
[14] cannot be excluded as a contributor of the DNA mixtures
[15] detected that TPOX, Penta D, and CSFIPO loci. However,
[16] due to the low intensity of the loci these loci were
[17] excluded from the statistical analysis.
[18]     No further conclusions could be made at this time
[19] regarding any additional contributors of the DNA
[20] detected in the sample.
[21] **Q.** As to item No. 2, Sample No. 24776, what was that?
[22] **A.** Again referring to conclusion No. 3 on the
[23] report. The partial DNA mixture profile of that sample
[24] itself is item No. 2 was the swab from white latex
[25] glove in the front vestibule of 720 West Mifflin.

Page 172

[1]
[2]     And the conclusion on that is, the partial DNA
[3] mixture profile detected in No. 24776 consist of a
[4] mixture of at least two contributors one of which is
[5] male. Jerry Jean and John In are excluded as
[6] contributors of the DNA detected in the sample. No
[7] further conclusions can be made at this time regarding
[8] any additional contributors of the DNA detected in this
[9] sample.
[10] **Q.** As to your sample No. 24777, which was item No. 3,
[11] the swab from the piece of latex glove on the highway
[12] on the 600 block of West Mifflin Street, what
[13] conclusions did you come to?
[14] **A.** This is listed as conclusion No. 4. The DNA taken
[15] in sample No. 24777 consist of a mixture of three
[16] contributors, one of which is male. Jerry Jean could
[17] not be excluded as a partial contributor of the DNA
[18] detected in this sample. However both DNA types
[19] possessed were not detected in the Penta E, D18S51,
[20] CSF1PO, loci. The inability to detect both DNA types
[21] at these loci could be attributed to the ailelic
[22] dropout. John In excluded as a DNA detected in the
[23] sample.
[24]     No further conclusions could be made at this time
[25] from the DNA detected in this sample.

Page 173

[1]
[2] **Q.** The inability to detect both DNA types at these
[3] loci could be contributed to ailelic dropout, what does
[4] that mean in English?
[5] **A.** This sample was, if I remember correctly, was a
[6] low concentration sample. And when there's a low
[7] amount of DNA often in one of the steps of the
[8] procedure, which is amplification. There are some
[9] regions that won't amplify or won't generate a profile
[10] because of the level of DNA. So we may get some
[11] profile of it but because of the low concentration
[12] those ailelic dropout, they will not be amplified.
[13] **Q.** When you extract, say the piece of the white latex
[14] glove comes into to criminalistics, what it is
[15] procedure to extract the DNA?
[16] **A.** The procedure would be that criminalistics would
[17] receive the piece of glove or the glove itself and then
[18] swab it and that swab would be what I would use for
[19] extraction. And one of the steps after extraction
[20] which is quantitation.
[21] **Q.** What's extraction?
[22] **A.** Extraction is we would take a small section of the
[23] swab and place it in a tube with a variety of different
[24] chemicals and enzymes to break down the cells
[25] themselves and then to remove the purified DNA from

Page 174

[1]
[2] that sample, and that would be then our DNA extract, a
[3] purified sample of DNA.
[4]     And then that sample would be sent for a
[5] quantitation where we would take small amount of that
[6] sample and determine the amount of that DNA in a
[7] particular sample, and that's how we would figure out a
[8] low level or concentration of DNA sample or not.
[9] **Q.** And after that's done, what's the next step?
[10] **A.** The next step after that -- if it happens to be a
[11] low level sample, the next step would be concentration.
[12] If it's assembled with a high concentration of DNA,
[13] then we would dilute it down to a particular
[14] concentration which is ideal for the following step.
[15]     So after it was concentrated or diluted, the next
[16] step would be amplification where we would amplify
[17] these specific regions that are in the report, 16 loci,
[18] 16 ailelic. Fifteen of them being from -- one of them
[19] being a sex determinant the X Y chromosomes. And then
[20] after we do that amplification --
[21] **Q.** What do you mean by "amplification?"
[22] **A.** Amplification is where we amplify or increase the
[23] number of copies of DNA from these 16 particular areas
[24] of the DNA.
[25]     And in addition to that it's not just copying,

Page 175

[1]
[2] it's also tagging these small segments of DNA with
[3] florescent markers. It's a chemical that will give off
[4] light so that way later in a further step we'll be able
[5] to visualize these copied steps of DNA, so that would
[6] be amplification.
[7]     And the reason we do that is because these samples
[8] have low concentration of DNA to begin with, this will
[9] allow to us increase the DNA of these particular
[10] regions to make it easy for visualization.
[11] **Q.** Now, with regard to sample No. 2778, item No. 4,
[12] which is a swab of the Zig Zauer pistol placed on
[13] Property Receipt No. 9006283, what, if any, conclusion
[14] did you come to make?
[15] **A.** This is listed as conclusion No. 5. The partial
[16] DNA mixture profile consist of a mixture from at least
[17] two contributors. The major component originates from
[18] an unknown male. Jerry Jean and John In are excluded
[19] as contributors in the DNA detected in the sample. No
[20] further conclusions can be made at this time regarding
[21] any contributors detected in this sample.
[22] **Q.** And as for your sample No. 24779, item No. 5 which
[23] would be the swab of the other pistol placed on
[24] Property Receipt No. 9006283, what if any conclusions
[25] did you draw?

Page 176

[1]
[2] **A.** This would be conclusion six of the report. The
[3] partial DNA mixture profile detected in No 24779,
[4] consisted of a mixture of two contributors one of which
[5] is male. Jerry Jean and John In are excluded as
[6] contributors in the DNA detected in the sample. No
[7] further conclusions made at this time regarding any
[8] additional contributes in the DNA in this sample.
[9] **Q.** And as to No. 24760 and 24781 both of which were
[10] swabs taken from live rounds one from each pistol,
[11] what, if any, conclusions did you drew?
[12] **A.** I believe you might have 24780?
[13] **Q.** Yes, I'm sorry.
[14] **A.** Both of those are listed in conclusion 7. No DNA
[15] results were listed in samples No. 24780 and 24781.
[16] **Q.** How is it if I am handling this pen, what is the
[17] DNA that would be on this?
[18] **A.** It would be expected possibly that we would find
[19] your DNA on that pen.
[20] **Q.** What is my DNA in the form of that would be on
[21] this pen?
[22] **A.** It would be from what are called epithelial cells,
[23] skin sells that would scrape off on the surface of the
[24] pen.
[25] **Q.** Is it possible if I touch the pen and place the

Page 177

[1]
[2]  pen down and my DNA is not on it?
[3]  **A.**  It's a possibility.
[4]  **Q.**  How does that happen?
[5]  **A.**  The surface of the pen itself, whatever item that
[6]  is itself touching, if it's very smooth it's less
[7]  likely there will be epithelial cells on the pen.  In
[8]  addition it depends on the individual touching it.
[9]  Some people would leave what they have what we call
[10] shedders, they shed more cells than others.  They may
[11] leave more skin cells on the pen, some they might not.
[12] **Q.**  If I am holding this pen and wearing latex gloves,
[13] would you expect to find my DNA on that pen?
[14] **A.**  I would not.
[15]          **MS. BARALDI:**  I don't have any
[16]     further questions.
[17]          **THE COURT**:  Mr. Giuliani?
[18]          **MR. GIULIANI:**  Yes, Your Honor.
[19]              - - -
[20]          CROSS-EXAMINATION
[21]              - - -
[22] **BY MR. GIULIANI:**
[23] **Q.**  Mr. Levin, how are you?
[24] **A.**  Good afternoon.
[25] **Q.**  I am going to show you what has been marked as

Page 178

[1]
[2]  Commonwealth's Exhibit 14.  This is the Zig Zauer
[3]  pistol which the jury heard was found inside of a white
[4]  Altima and from which a swab was taken.
[5]  **A.**  Yes.
[6]  **Q.**  Now, you just told the jurors that one of the
[7]  things that could possibly lead to a person touching an
[8]  item and not leaving any DNA would be the smoothness of
[9]  the item that was touched?
[10] **A.**  That's correct.
[11] **Q.**  As well as the second factor which is if someone
[12] is not a shedder, right?
[13] **A.**  Yes.
[14] **Q.**  You are familiar with firearms in your line of
[15] work, right?
[16] **A.**  Not particularly, but somewhat.
[17] **Q.**  You don't have to touch this, but take a look at
[18] the grip of the gun.  Would you mind touching that and
[19] rubbing that?
[20] **A.**  (Witness complies.)
[21] **Q.**  Would you agree with me that the grip on this
[22] particular firearm is rough, it's not smooth?
[23] **A.**  That's correct.
[24] **Q.**  So that would be a surface that if someone was
[25] going to handle that it would be more likely DNA would

Page 179

[1]
[2]  rub off on?
[3]  **A.**  As opposed to a smooth surface, yes.
[4]  **Q.**  So if we could go over your report briefly.  Item
[5]  No. 24780 and 24781 are the rounds that were taken from
[6]  both guns and you found no detectable DNA on either
[7]  round?
[8]  **A.**  That's correct.
[9]  **Q.**  And that's not unusual?
[10] **A.**  Not unusual.
[11] **Q.**  No. 24779, that's the Heckler & Koch .9 mm
[12] pistol.  And basically you conclude there's three
[13] contributors, three different people's DNA on that gun,
[14] correct?
[15] **A.**  Yes.
[16] **Q.**  At least one of which is male, you are able to
[17] tell that?
[18] **A.**  That is correct.
[19] **Q.**  But you're also able to specifically exclude John
[20] In here as being the male that contributed to that?
[21] **A.**  That's correct.
[22] **Q.**  And Jerry Jean?
[23] **A.**  That's correct.
[24] **Q.**  And then there's the gun, the Zig Zauer I just
[25] showed you, that's No. 24778.  And your conclusion is

Page 180

[1]
[2]  that there is DNA on there, correct?
[3]  **A.**  That's correct.
[4]  **Q.**  And it comes from a mixture of two people, right?
[5]  **A.**  Yes.
[6]  **Q.**  The major component originates from an unknown
[7]  male, correct?
[8]  **A.**  That's correct.
[9]  **Q.**  And you exclude John In as being the person that
[10] contributed to that?
[11] **A.**  Yes.
[12] **Q.**  And Jerry Jean?
[13] **A.**  Yes.
[14] **Q.**  The latex glove found on the highway at 6th and
[15] Mifflin, that's 24777, you say there are at least three
[16] people contributing to it.  And what you say is Jerry
[17] Jean might be one, but you don't know because of the
[18] amplification process that you spoke of and there was a
[19] problem with not enough DNA, right?
[20] **A.**  Because of the complexity of the mixture.
[21] **Q.**  So you can't rule him out?
[22] **A.**  Can't be excluded.
[23] **Q.**  He's excluded, John In?
[24] **A.**  Yes, that's correct.
[25] **Q.**  Okay.

Page 181

[1]
[2]     Now, 24776, that's the white latex glove found in
[3] the vestibule of 720 Mifflin. Your conclusion is
[4] there's two people whose DNA is on that glove, one of
[5] them is male, correct?
[6] **A.** That's correct.
[7] **Q.** Neither of those people are John In or Jerry Jean?
[8] **A.** That's correct.
[9] **Q.** So we have an unknown male whose DNA was found on
[10] the glove inside the vestibule just outside the front
[11] door of that property.
[12] **A.** I am assuming that's where it is on that sample.
[13] **Q.** Now, that glove found on the back alley, that's
[14] the last item. The glove in the alley, you talk about
[15] frequencies of 1 in 466 quadrillion. How many zeros
[16] are in a quadrillion?
[17] **A.** I believe there's 18.
[18] **Q.** Is that more or less than a quintillion?
[19] **A.** A quintillion is a thousand more.
[20] **Q.** So that glove was touched by Jerry Jean, no doubt
[21] about it.
[22] **A.** I would say yes.
[23] **Q.** And, again, conclusion No. 1 on this report, John
[24] In is excluded as a contributor of the DNA in the
[25] samples I just read to you?

Page 182

[1]
[2] **A.** That's correct.
[3]          **MR. GIULIANI:** Thank you, sir.
[4]          **THE COURT:** Any redirect?
[5]          **MS. BARALDI:** I do. I just have one
[6] question.
[7]          - - -
[8]          REDIRECT EXAMINATION
[9]          - - -
[10] **BY MS. BARALDI:**
[11] **Q.** Say I handled this gun and after I handled the gun
[12] Mr. Giuliani handles the gun, is it possible my skin
[13] cells would have been wiped off by a subsequent person?
[14] **A.** It is possible.
[15]          **MS. BARALDI:** I have no further
[16] questions.
[17]          **THE COURT:** Anything else?
[18]          - - -
[19]          RECROSS-EXAMINATION
[20]          - - -
[21] **BY MR. GIULIANI:**
[22] **Q.** Well, for me using counsel's suggestion, would it
[23] not be true that I would have to, in essence, touch the
[24] gun in the exact same place basically and in such a
[25] fashion to erase all of her cells off that gun?

Page 183

[1]
[2] **A.** You would have to make contact with wherever her
[3] skin cells are.
[4] **Q.** Now, I am not going to do it, and for the record,
[5] I am holding up Commonwealth 14. Let's assume I had
[6] that weapon. Let's say I gripped it in away that I had
[7] my hand all the way around the grip and the finger on
[8] the trigger.
[9] **A.** Yes.
[10] **Q.** For someone else to touch that and grip that
[11] weapon in such a fashion as to completely eradicate my
[12] DNA, would they have to grab it the same way, wipe it
[13] off clean or something like that?
[14] **A.** If you touch the same area, it might wipe it off,
[15] but I can't say how a person touches an object. If you
[16] touch exactly where they would be holding, then you
[17] might wipe it off, but the gripping items is not quite
[18] my expertise. I would say if you touched exact where
[19] the person touched or in a general area then that would
[20] wipe off wherever the previous person's skin cells
[21] would have been.
[22]          **MR. GIULIANI:** That's all I have.
[23]          **THE COURT:** Either one of you may
[24] object to this question.
[25]          Are you telling this jury that each

Page 184

[1]
[2] time a person grips a handle of a gun, he or she
[3] leaves the DNA on that gun?
[4]          **THE WITNESS:** Yes. That possibility
[5] is very high, yes.
[6]          **THE COURT:** Thank you. You may step
[7] down.
[8]          (Witness excused.)
[9]          - - -
[10]          **THE COURT:** You may continue.
[11]          **MS. BARALDI:** Your Honor, that's the
[12] Commonwealth's final witness. There are a number
[13] of stipulations, if I may at this time.
[14]          **THE COURT:** Ladies and gentlemen,
[15] you will recall that I instructed you as to what
[16] and how you should consider stipulated evidence.
[17]          There are stipulations, Counsel?
[18]          **MS. BARALDI:** Yes.
[19]          **MR. GIULIANI:** Yes, Your Honor.
[20]          **THE COURT:** You may offer your
[21] stipulations.
[22]          **MS. BARALDI:** If Police Officer
[23] Timothy Foley were called to testify, he would
[24] testify he was working with his partner Sergeant
[25] Liczbinski on March 7th, 2007. That he recovered

Page 185

[1]
[2] a blue Addidas sweatshirt and placed it on
[3] Property Receipt No. 2691195. The same officer
[4] would also testify that he recovered the blue
[5] camouflage hoodie and placed that on Property
[6] Receipt No. 2691026. As well as this green hoodie
[7] placed on Property Receipt No. 2691025 that he
[8] submitted it to evidence and retrieved from
[9] evidence and brought it here.
[10]     So stipulated?
[11]     **MR. GIULIANI**: So stipulated, Your
[12] Honor.
[13]     **MS. BARALDI**: And finally, if Police
[14] Officer Leonard Johnson were called to testify
[15] before you, he would tell you he works in the
[16] Police Department Firearms Identification Unit and
[17] that he test-fired both of the weapons that
[18] everyone has seen, which was specifically placed
[19] -- which were marked as C-14 and C-15, that he's
[20] qualified to do so, and that both of those pistols
[21] were operable at the time they were submitted to
[22] firearms identification.
[23]     **MR. GIULIANI**: So stipulated, Your
[24] Honor.
[25]     **THE COURT**: Thank you.

Page 186

[1]
[2]     **MS. BARALDI**: And, Your Honor, with
[3] that, the Commonwealth rests.
[4]     **THE COURT**: All right. How do you
[5] wish to proceed, sir?
[6]     **MR. GIULIANI**: May we have a
[7] five-minute break, Your Honor?
[8]     **THE COURT**: Yes. Let's take short
[9] recess.
[10]     **THE COURT CRIER**: Please remain
[11] seated while the jury exits the courtroom.
[12]     (Jury departs the courtroom at 4:10 p.m.)
[13]     **MR. GIULIANI**: At this point in time
[14] the defense would make a motion of acquittal on
[15] one count of the victims for robbery, the victim
[16] would be Dina Khem. The evidence set forth by the
[17] Commonwealth the individual in the light most
[18] favorable to the Commonwealth, the individual who
[19] was my client was in the basement, has her father
[20] down the steps. When she comes down the steps, he
[21] points a gun at her. And the evidence is that he
[22] tells her to "shut the fuck up."
[23]     I specifically asked her if any
[24] money was demanded from her or items, I believe
[25] counsel asked the same question, and she

Page 187

[1]
[2] repeatedly said no. And for that basis I would
[3] say there is insufficient evidence to prove
[4] attempted theft with regards to that witness.
[5] Everything else would be a question for the jury,
[6] so I that would be my motion.
[7]     **MS. BARALDI**: I don't have any
[8] argument.
[9]     **THE COURT**: Motion granted.
[10]     **MS. BARALDI**: Your Honor, I
[11] apologize, I rested prior to entering my exhibits.
[12]     **THE COURT**: Do you wish to reopen?
[13]     **MS. BARALDI**: I wish to reopen.
[14]     **THE COURT**: Motion granted. How
[15] many exhibits?
[16]     **MS. BARALDI**: C-1 through C-29, I
[17] believe.
[18]     **THE COURT**: We are about to recess
[19] for the day. The Commonwealth having rested the
[20] defense has not rested, however, both attorneys
[21] know what the remaining evidence will be and we
[22] have decided to have an informal charging
[23] conference, and then a formal conference at the
[24] end of the defendant's case.
[25]     Is that agreed?

Page 188

[1]
[2]     **MR. GIULIANI**: Yes, Your Honor.
[3]     **MS. BARALDI**: Yes, Your Honor.
[4]     **THE COURT**: You can bring them out.
[5]     **THE COURT CRIER**: Please remain
[6] seated while the jury enters the courtroom.
[7]     (Jury enters the courtroom at 4:30 p.m.)
[8]     **THE COURT**: Ladies and gentlemen, if
[9] you would be so kind as to remain standing, this
[10] should not take very long. It's 4:30 and the
[11] decision is we should recess today. And I will
[12] tell you that we expect tomorrow morning. The
[13] case, at some point tomorrow morning, the case
[14] will be submitted to you jurors for your
[15] deliberations. However, the case is not
[16] concluded, so please keep an open mind, don't
[17] discuss the case with anyone, not amongst
[18] yourselves. Enjoy your evening and we'll see you
[19] tomorrow, at 9 o'clock tomorrow morning.
[20]     **THE COURT CRIER**: Please remain
[21] seated while the jurors exit the courtroom.
[22]     (Jury departs the courtroom at 4:32 p.m.)
[23]         (Court adjourned.)
[24]
[25]

[1]
[2]        I hereby certify that the proceedings
[3] and evidence are contained fully and accurately in the
[4] notes taken by me on the trial of the above cause, and
[5] this copy is a correct transcript of the same.
[6]
[7]
[8]
[9]
[10]        _____
[11]        Samanda Rios
[12]        Court Reporter
[13]
[14]
[15]
[16]
[17]        (The foregoing certification of this
[18] transcript does not apply to any reproduction of the same
[19] by any means unless under the direct control and/or
[20] supervision of the certifying reporter.)
[21]
[22]
[23]
[24]

Court Reporting System (Generated 2016/04/20 18:28:07)

Lawyer's Notes

