# First Judicial District of Pennsylvania

*51CR00047682007*
*John In*

*Trial (Jury) Volume 1*
*September 12, 2008*



**Court Reporting System**

*First Judicial District of Pennsylvania*
*100 South Broad Street, Second Floor*
*Philadelphia, PA 19110*
*(215) 683-8000   FAX:(215) 683-8005*

*Original File COMVIN^9-12-08.txt, 0 Pages*
*CRS Catalog ID: 08111995*

Page 1

[1]       IN THE COURT OF COMMON PLEAS
[2]   FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
[3]         CRIMINAL TRIAL DIVISION
[4]       -----
[5] COMMONWEALTH       :
                     :
[6]                 :
       vs.      : C.P.# 51-CR-0004768-2007
[7]                 :
                 :
[8] JOHN IN     :
[9]      -----
[10]    Room 801, Criminal Justice Center
[11]    Philadelphia, Pennsylvania
[12]    -----
[13]    Friday, September 12, 2008
[14]    -----
[15] BEFORE: THE HONORABLE SANDY L.V. BYRD, J.
[16]    -----
[17]       JURY TRIAL
[18]    -----
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 2

[1] **APPEARANCES:**
[2]   LAUREN BARALDI, ESQUIRE
     Assistant District Attorney
[3]   For the Commonwealth
[4]   RICHARD GIULIANI, ESQUIRE
     Attorney for the Defendant
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 3

[1]
[2]      **THE COURT**: Mr. In, you have been
[3] sworn. Tell me your full name, state your age,
[4] and give me your date of birth.
[5]      **THE DEFENDANT**: John In, I-N,
[6] 8/5/83.
[7]      **THE COURT**: How old are you?
[8]      **THE DEFENDANT**: Twenty-five.
[9]      **THE COURT**: What's the highest grade
[10] you completed in school, sir?
[11]     **THE DEFENDANT**: Graduated high
[12] school.
[13]     **THE COURT**: So you read, write,
[14] understand English, correct?
[15]     **THE DEFENDANT**: Yes.
[16]     **THE COURT**: Where did you graduate
[17] high school?
[18]     **THE DEFENDANT**: Olney High.
[19]     **THE COURT**: Have you been diagnosed
[20] with and treated for mental illness or disease?
[21]     **THE DEFENDANT**: No.
[22]     **THE COURT**: Are you now under the
[23] influence of drugs, alcohol, or medication?
[24]     **THE DEFENDANT**: No.
[25]     **THE COURT**: You heard your attorney,

Page 4

[1]
[2] Mr. Giuliani, tell me that you have decided not to
[3] testify in this case; is that correct?
[4]     **THE DEFENDANT**: Yes, Your Honor.
[5]     **THE COURT**: You understand that you
[6] are the defendant in this case and for that reason
[7] you have a panoply of rights.
[8]     **THE DEFENDANT**: Right.
[9]     **THE COURT**: You've seen that play
[10] out. You are presumed to be innocent, the
[11] Commonwealth is obliged to prove guilt beyond a
[12] reasonable doubt. Your attorney has confronted
[13] the witnesses and you've observed that the
[14] Constitutional rights that are yours have been
[15] protected. Agreed?
[16]     **THE DEFENDANT**: Yes.
[17]     **THE COURT**: Now, we are at the
[18] juncture where the Commonwealth has rested and
[19] there's been a witness called for defense, and I
[20] must advise you and ask as to what your options
[21] are. I do this knowing full well that you have
[22] had this discussion with Mr. Giuliani and he has
[23] spoken to you in his role as counsel. I am simply
[24] making a record.
[25]     Do you understand that?

[1]
[2]          THE DEFENDANT: Yes.
[3]          THE COURT: Every defendant in a
[4]  criminal trial has an absolute right to testify,
[5]  he or she's a right to call witnesses if the
[6]  defendant elects to do so.
[7]          Do you understand?
[8]          THE DEFENDANT: Yes.
[9]          THE COURT: On the other hand, every
[10] defendant in a criminal case has a Constitutional
[11] right against self-incrimination. You have a
[12] right of silence at trial.
[13]         Do you understand?
[14]         THE DEFENDANT: Yes.
[15]         THE COURT: You have no obligation
[16] to testify and/or call witnesses for that matter;
[17] do you understand that?
[18]         THE DEFENDANT: Yes.
[19]         THE COURT: However, whether or not
[20] you testify is a decision that you must make. It
[21] is entirely up to you. It is not a decision that
[22] Mr. Giuliani can make.
[23]         Do you understand that?
[24]         THE DEFENDANT: Yes.
[25]         THE COURT: Now, do you understand

[1]
[2]  what your rights are?
[3]          THE DEFENDANT: Yes.
[4]          THE COURT: Do you understand what
[5]  your options are?
[6]          THE DEFENDANT: Yes.
[7]          THE COURT: Do you understand you
[8]  can testify, if you want to?
[9]          THE DEFENDANT: Yes.
[10]         THE COURT: Do you understand if you
[11] do not wish to testify, you can advise me that you
[12] do not wish to testify and that decision would be
[13] honored.
[14]         THE DEFENDANT: Yes.
[15]         THE COURT: Is that clear to you?
[16]         THE DEFENDANT: Yes.
[17]         THE COURT: Now, have you thought
[18] about this?
[19]         THE DEFENDANT: Yes.
[20]         THE COURT: Having thought about
[21] this, have you made a decision?
[22]         THE DEFENDANT: Yes.
[23]         THE COURT: What is your decision?
[24]         THE DEFENDANT: I do not wish to
[25] testify.

[1]
[2]          THE COURT: Is that your decision of
[3]  your own free will?
[4]          THE DEFENDANT: Yes.
[5]          THE COURT: Is that your decision?
[6]          THE DEFENDANT: Yes.
[7]          THE COURT: Is it made of your own
[8]  free will?
[9]          THE DEFENDANT: Yes.
[10]         THE COURT: Did you discuss that
[11] with your attorney?
[12]         THE DEFENDANT: Yes.
[13]         THE COURT: Are you satisfied with
[14] his services?
[15]         THE DEFENDANT: Yes.
[16]         THE COURT: You understand not
[17] withstanding all of that, it is not his decision,
[18] it's your decision?
[19]         THE DEFENDANT: Yes.
[20]         THE COURT: Is the decision not to
[21] testify yours?
[22]         THE DEFENDANT: Yes.
[23]         THE COURT: Are you doing this of
[24] your own free will?
[25]         THE DEFENDANT: Yes.

[1]
[2]          THE COURT: Did anybody promise you
[3]  anything or force you to give up your right to
[4]  testify?
[5]          THE DEFENDANT: No.
[6]          THE COURT: You are doing this of
[7]  your own free will?
[8]          THE DEFENDANT: Yes.
[9]          THE COURT: Mr. Giuliani, there is
[10] an instruction 3.10(a) that reads as follows:
[11]         It is entirely up to the defendant
[12] whether or not to testify. He has an absolute
[13] right founded on the Constitution to remain
[14] silent. You may not draw any inference of guilt
[15] or any inference adverse from the defendant from
[16] the fact that he did not testify.
[17]         Does your client wish me to give
[18] that instruction?
[19]         MR. GIULIANI: Yes, Your Honor.
[20]         THE COURT: Would you discuss with
[21] him again, so that I can note that a discussion
[22] took place?
[23] (Discussion between defendant and his counsel.)
[24]         MR. GIULIANI: Thank you, Your
[25] Honor.

Page 9

[1]
[2]　　　　THE COURT: Mr. In, did you hear me
[3]　read the instruction?
[4]　　　　THE DEFENDANT: Yes.
[5]　　　　THE COURT: Did you hear your
[6]　attorney say he wished to have me give that
[7]　instruction on your behalf?
[8]　　　　THE DEFENDANT: Yes.
[9]　　　　THE COURT: Once again there are
[10]　cases in the literature where defendants later on
[11]　appeal that say I did not want that instruction.
[12]　So it's been my practice to ask the defendant if
[13]　he wants me to give that instructions.
[14]　　　　Do you understand that?
[15]　　　　THE DEFENDANT: Yes.
[16]　　　　THE COURT: Did you discuss this
[17]　with your attorney?
[18]　　　　THE DEFENDANT: Yes.
[19]　　　　THE COURT: And I don't want to know
[20]　what you discussed, I want to know what decision
[21]　you made?
[22]　　　　THE DEFENDANT: Yes, I want the
[23]　instruction.
[24]　　　　THE COURT: Did anyone promise you
[25]　anything, threaten you, or force you to make this

Page 10

[1]
[2]　decision?
[3]　　　　THE DEFENDANT: No.
[4]　　　　THE COURT: Is it your decision?
[5]　　　　THE DEFENDANT: Yes.
[6]　　　　THE COURT: Is made it of your own
[7]　free will?
[8]　　　　THE DEFENDANT: Yes.
[9]　　　　THE COURT: Nevertheless, this is
[10]　your decision?
[11]　　　　THE DEFENDANT: Yes.
[12]　　　　THE COURT: John In's decision?
[13]　　　　THE DEFENDANT: Yes.
[14]　　　　THE COURT: I'll give the
[15]　instruction, which brings to us the last part of
[16]　this which is the formal charging conference. So
[17]　the Court hereby convenes a formal charging
[18]　conference.
[19]　　　　The Court makes the following
[20]　**finding**: The Court finding the defendant has
[21]　knowing, intelligently, and voluntarily exercised
[22]　his right of silence and determined that he will
[23]　not be testifying.
[24]　　　　What points of charge, if any, are
[25]　you requesting, Mr. Giuliani?

Page 11

[1]
[2]　　　　MR. GIULIANI: Your Honor, I don't
[3]　believe there are any other specific points for
[4]　charge that are necessary or unique to this
[5]　particular case, but for the no adverse inference
[6]　which we already discussed.
[7]　　　　THE COURT: And the Commonwealth?
[8]　　　　MS. BARALDI: I don't have any
[9]　additional points for charge.
[10]　　　　THE COURT: Both of you on yesterday
[11]　off the record said that you would be satisfied
[12]　with the standard instructions. Mr. Giuliani said
[13]　in fact he wanted to be sure I charge false in
[14]　one, false in all. And I am going to tell you
[15]　that constitute standard instructions. I charge
[16]　the jury on what a stipulation is, I charge the
[17]　jury on expert witness. I'll give, at its
[18]　request, consciousness of guilty, flight, and the
[19]　defendant's failure to testify.
[20]　　　　Are those among the standard
[21]　instructions?
[22]　　　　MS. BARALDI: Yes, Your Honor.
[23]　　　　THE COURT: Any objections?
[24]　　　　MR. GIULIANI: No, Your Honor.
[25]　　　　THE COURT: Is that the request?

Page 12

[1]
[2]　　　　MS. BARALDI: Yes, Your Honor.
[3]　　　　THE COURT: Let me give you the
[4]　verdict sheet to look at and tell me if you have
[5]　any objection, give one to each of the attorneys.
[6]　　　　That is merely a proposed verdict
[7]　sheet I submit it to you for corrections or
[8]　objections. If you have concerns about it, mark
[9]　it up, and I will obviously make every effort to
[10]　have the verdict sheet reflect your request.
[11]　　　　MR. GIULIANI: I believe it's
[12]　acceptable, Your Honor.
[13]　　　　THE COURT: I told the two of you
[14]　earlier that I don't have a great facility for
[15]　names. Mr. Giuliani was successful on his motion
[16]　of acquittal on one of the three robberies, I want
[17]　to make sure we have the right name remaining.
[18]　　　　MR. GIULIANI: You do, Your Honor.
[19]　　　　THE COURT: Now, if you look at --
[20]　　　　MS. BARALDI: I apologize, Mr. Yun's
[21]　name is spelled incorrectly. It should be Y-U-N,
[22]　its spelled V-U-N on the verdict sheet.
[23]　　　　THE COURT: Counsel, what are you
[24]　alleging to be the objective of the conspiracy,
[25]　robbery and or burglary?

[1]
[2]          **MS. BARALDI**: Yes, both robbery
[3]    and/or burglary.
[4]          **THE COURT**: And the overt act?  That
[5]    doesn't go on the sheet but that's part.
[6]          **MS. BARALDI**: The unlawful--
[7]          **THE COURT**: Do you have the Bills
[8]    there?  I think at some point, I mean, it can be
[9]    any number of, but to took another's property, is
[10]   that sufficient?
[11]         **MS. BARALDI**: Yes.
[12]         **THE COURT**: Mr. Giuliani and
[13]   Ms. Baraldi, do you agree that where there are
[14]   multiple alleged criminal objectives, the jury has
[15]   to determine which one, all or none, which is why
[16]   I have the interrogatory.  Any objection to that?
[17]         **MR. GIULIANI**: No, Your Honor.
[18]         **MS. BARALDI**: No, Your Honor.
[19]         **THE COURT**: I am going to get the
[20]   sheet corrected and will you guys be ready to make
[21]   your closings?
[22]         **MS. BARALDI**: Yes, Your Honor.
[23]         **MR. GIULIANI**: Yes, Your Honor.
[24]         **THE COURT**: You may bring out the
[25]   jury.

[1]
[2]          **THE COURT CRIER**: Please remain
[3]    seated while the ladies and gentlemen enter the
[4]    courtroom.
[5]       (Jury enters the courtroom at 11:50 a.m.)
[6]          **THE COURT**: Thank you, ladies and
[7]    gentlemen.  You may be seated.
[8]          Mr. Giuliani, you may continue, sir.
[9]          **MR. GIULIANI**: At this point in time
[10]   the defense would move for the admission of
[11]   Defense Exhibits 1 through 7, and defense would
[12]   rest.
[13]         **THE COURT**: Any objection?
[14]         **MS. BARALDI**: None, Your Honor.
[15]         **THE COURT**: The exhibits will be
[16]   received.  The defense rests, is the evidence
[17]   closed counsel for both sides?
[18]         **MS. BARALDI**: Yes, Your Honor.
[19]         **MR. GIULIANI**: Yes, Your Honor.
[20]         **THE COURT**: Very well.
[21]         Ladies and gentlemen of the jury,
[22]   the first order of business is for you to put your
[23]   note pads and pens away.  If you would placed them
[24]   under your seat on this occasion.
[25]         Members of the jury, now that you

[1]
[2]    heard all of the evidence which is to be presented
[3]    in this case, the next step is for the attorneys
[4]    make their closing arguments.  Now, even though
[5]    these arguments do not constitute evidence, you
[6]    should consider them carefully.  In their
[7]    arguments the attorneys for both sides will call
[8]    to your attention to the evidence which they
[9]    consider material and they will ask you to draw
[10]   certain inferences from that evidence.
[11]         You must keep in mind, however, that
[12]   you are not bound by the attorney's recollection
[13]   of the evidence.  It is your recollection of the
[14]   evidence and yours alone which must guide you in
[15]   your deliberations.  So if there is a discrepancy
[16]   between the attorney's recollection of the
[17]   evidence and your own, you are obviously bound by
[18]   your recollection of the evidence.  Nor are you
[19]   limited in your consideration of the evidence to
[20]   that which is mentioned by the attorneys.  You
[21]   must as jurors consider all of the evidence which
[22]   you deem material to the issues involved in this
[23]   case.
[24]         Now to the extent that the
[25]   inferences which the attorneys ask you to draw are

[1]
[2]    supported by the evidence and appeal to your
[3]    reason and judgment you may obviously consider
[4]    them in your deliberations.  Jurors, the attorneys
[5]    may call to your attention certain principles of
[6]    law in the course of their arguments.  Please
[7]    remember, you are not bound by any principle of
[8]    law mentioned by any attorney.  You must on you
[9]    oath both accept and apply only the law in which I
[10]   instruct you and you must apply that law to the
[11]   facts as you determine the facts to be in reaching
[12]   your verdict.
[13]         Now, ladies and gentlemen, under the
[14]   rules promulgated by the Supreme Court of
[15]   Pennsylvania, Mr. Giuliani, the attorney for the
[16]   defendant Mr. In will address you first followed
[17]   thereafter by Ms. Baraldi the attorney for
[18]   Commonwealth.  After which I shall instruct you in
[19]   the law which you must accept and apply to the
[20]   facts as you determine the facts to be in reaching
[21]   your verdict.
[22]         Mr. Giuliani, are you ready to
[23]   address the jury, sir?
[24]         **MR. GIULIANI**: I am, Your Honor.
[25]         **THE COURT**: You may.

[1]
[2]   **MR. GIULIANI:** Thank you.
[3]   May I please the Court, Counsel,
[4]   members of the jury. Good morning.
[5]   Before I begin my closing I think it
[6]   appropriate to give you a word of thanks, really,
[7]   thank you for being here. It may sound strange
[8]   from me since I'm partially responsible or
[9]   partially to blame for you being here, but I say
[10]   thank you anyway.
[11]   This trial is many things. It's an
[12]   attempt to do justice, a search for truth, and
[13]   elaborate presentation for you. You are our
[14]   ultimate audiences. Everything we do here is for
[15]   you and I would say there is very, very little
[16]   that Ms. Baraldi and I agree upon, but I don't
[17]   think we are out of line by saying we have paid
[18]   attention to you and listened to the evidence, and
[19]   for that I thank you and my client thanks you.
[20]   But, now, ladies and gentlemen, the
[21]   most difficult of your service is about to begin.
[22]   You are going sit in judgment on a fellow
[23]   citizen. What do we know about this case? Well,
[24]   the defendant is charged with robbery, two counts,
[25]   burglary, criminal conspiracy, possession of an

[1]
[2]   instrument of crime, and firearms offense. And
[3]   the Judge is going to give you the formal
[4]   definitions. Robbery, taking property from
[5]   another person by threat of force. Burglary,
[6]   entering a property. Conspiracy, agreeing someone
[7]   to commit a burglary or robbery. Having the gun,
[8]   that would be a firearms offense.
[9]   And let me break it down clearly to
[10]   you. If you believe beyond a reasonable doubt
[11]   that John In is the third guy in that house in the
[12]   basement, then you must convict him of everything,
[13]   you must. There's no other way to it, you have to
[14]   convict him.
[15]   You know that there's three males in
[16]   that house. You know two of them. We know Dyshon
[17]   Marable is upstairs. You know Jerry Jean starts
[18]   upstairs and dives out downstairs, we know that.
[19]   So who is guy No. 3. Let's talk about that. Guy
[20]   No. 3. The Commonwealth tells you it's John In.
[21]   Let's look at the people inside of
[22]   the house. Christina Khem is upstairs, she
[23]   doesn't identify anybody upstairs; Mr. Yun cannot
[24]   identify anyone. Dina, can. Now, she identifies
[25]   the person who has the gun to her father as John

[1]
[2]   In. So let's talk about her identification but
[3]   all of the other physical and circumstantial
[4]   evidence about that identification.
[5]   Ms. Khem says I wake up and I think
[6]   she was 15 or 16 years old when this happened, and
[7]   by the way, let me say this again, I am going to
[8]   touch on a lot of facts as I heard it. But it's
[9]   not what I believe, not what I find. You are the
[10]   factfinders, you and you alone. So if I say
[11]   something inconsistent with your recollection,
[12]   yours controls, not mine. If that happens, please
[13]   understand I would not intentionally mislead you.
[14]   Anyway, Dina Khem says I wake up and
[15]   hear this noise. And it's clear when she's in her
[16]   bed she makes that phone call which you heard that
[17]   call. It's clear in that bedroom downstairs she
[18]   has no vision, no sight, she can't see who's on
[19]   the steps. She says she makes the call. And we
[20]   know at that point in time it's clear that three
[21]   officers respond, Battles, Robinson, and Nolan.
[22]   And she testifies that after she
[23]   hears an officer come in and say "police, police"
[24]   who we know as Officer Battles, only then does she
[25]   go to the base of the steps and she sees her

[1]
[2]   father with the gun pointed to him, and the
[3]   individual has one hand on the door.
[4]   Now, she says I got to see that
[5]   individual for two or three minutes. I stared at
[6]   him from 40 feet away and the lights were on and
[7]   it's John. That was her testimony.
[8]   However, if you recall again, I got
[9]   her to admit that she had the gun pointed at her
[10]   by that individual who told her, "shut the fuck
[11]   up," that at the very end she said I was there for
[12]   two or three seconds and turns around
[13]   immediately. And I also showed you through her
[14]   testimony that she had testified before in this
[15]   case and she said before I saw him for two or
[16]   three seconds. Two or three seconds to identify
[17]   somebody you don't know, you never seen before.
[18]   Now, compare and contrast that with
[19]   Mr. Yun. Mr. Yun doesn't know these individuals
[20]   who go in the house. He says I turn around and
[21]   there's three males behind him. He can't identify
[22]   who they are. But then we have this issue which I
[23]   hope didn't annoy you by doing this over and over
[24]   again. The tallest one is the one with the gun
[25]   and the tallest one took me in the basement. He

Page 21

[1]
[2] said it before under oath at the preliminary
[3] hearing, he said it again here, and statement in
[4] evidence, the tallest one.
[5]         Now, ladies and gentlemen, you can
[6] see somebody even under hectic circumstances,
[7] dangerous circumstances, and not recognize their
[8] face or get a glimpse. But if you see three
[9] people and maybe you don't, you can't tell their
[10] age, race, or what they are wearing, but if you
[11] see three people right there behind you and you
[12] look at them, I submit to you it's easy to compare
[13] and contrast them and say one is bigger than the
[14] other.
[15]         I'll bet you that on the first day
[16] of jury selection when you saw Mr. In, myself, and
[17] Ms. Baraldi, that maybe you don't remember three
[18] days ago what I was wearing, maybe you don't know
[19] each of our heights, but if I were to ask you
[20] which one of us, these three people here, is the
[21] tallest, you would be able to tell me that,
[22] wouldn't you? Because you are able to see and
[23] compare one against the other.
[24]         Mr. Yun's testimony is contradictory
[25] to his daughter's because we know from the

Page 22

[1]
[2] evidence in the 75-449 John In is five-nine.
[3] That's the evidence we have that's before you,
[4] that's in evidence. You saw Dyshon Marable, you
[5] saw how big he was, and we had that instance where
[6] I had asked the Judge to stand him up and stand
[7] him next to me. And Jerry Jean depending on which
[8] officer you ask was anywhere between 6-4 and 6
[9] foot, somewhere in there. I think Officer Nolan
[10] had him 6-4, 225 or husky or something like that.
[11] Clearly, Jerry Jean is the tallest.
[12]         So let's use logic and reason. And
[13] if you didn't know it before today when you heard
[14] this chaos outside, mass confusion and chaos
[15] outside and understandably so. A house filled
[16] with kids, you heard all of those calls on there,
[17] you heard the frantic, running back and forth.
[18] You heard it, it's confusion. And when things
[19] like that happen in a confused state, mistakes are
[20] made, even by trained police officers.
[21]         You heard Officer Battles today, we
[22] put her up. She was the first one in there. She
[23] gives a statement later on that in her IAD
[24] statement that the guy was wearing an orange hoody
[25] and came out of the kitchen area. Well, I am not

Page 23

[1]
[2] putting that evidence on to say that Officer
[3] Battles saw Jerry Jean came out of the basement.
[4] That's not the purpose of that evidence. The
[5] purpose is to show that even people, trained
[6] police officers, in the heat of the moment when
[7] these excited events happen, they make mistakes
[8] too. They are human just like us. They are
[9] human, that's okay. And that's all right because
[10] that happens on the street and we don't convict or
[11] find guilt on the street.
[12]         The stakes in here are most
[13] definitely not okay. This is where we sort it out
[14] and this is where we hear the evidence and
[15] presented and this is where through
[16] cross-examination we get to tell who is telling
[17] the truth and who is accurate. That's why we have
[18] trials and need trials in this case.
[19]         Marable and Jean are the two guys
[20] upstairs. The third guy in the basement is not
[21] John In. That guy is not here, he's not caught.
[22] You hear out in the alley after the discharge of
[23] Officer Battles' weapon that gloves are found.
[24] You hear that there is DNA taken from John In and
[25] from Jerry Jean. You hear conclusively that

Page 24

[1]
[2] chances that this would randomly be connected to
[3] Jerry Jean in one in something-quadrillion, the
[4] glove has all of the DNA which fits all of the
[5] evidence. Christina Khem says the big guy went
[6] out of the back door and Officer Nolan tried to
[7] get him as he was jumping out of the window and he
[8] threw a glove and got rid of it, it's his.
[9]         What about the glove found in the
[10] front vestibule of the house that is not Jerry
[11] Jeans' glove. It has DNA on it, it has DNA from a
[12] male, a male's DNA, it's not Jerry Jean because
[13] they have his sample. They matched it and it
[14] doesn't fit. It's not John In, so I am going to
[15] ask you whose is it? We know it can't be
[16] Marable. Marable goes upstairs, does anybody say
[17] Marable has latex gloves on? Did you hear that?
[18] When this rocket scientist figured he'll hide in
[19] the bottom of the closet for three days until the
[20] family goes to work and he'll slip out of the
[21] house. He's not wearing gloves. And once he goes
[22] upstairs the evidence is he never comes back down
[23] until he is arrested. Jerry Jean doesn't go out
[24] of the front door.
[25]         The only logical conclusion is that

Page 25

[1]
[2] the guy in the basement when Battles and Robinson
[3] went out of the back door to chase after Jerry
[4] Jean and Nolan is upstairs, the guy in the
[5] basement runs out of the front door. That's
[6] exactly what happened. That's reason and logic.
[7] That's the only way to look at this case and say
[8] this is what happened. And it's that guy, ladies
[9] and gentlemen, who dropped that glove. That's a
[10] logical inference that you should make, an unknown
[11] male. Because if it's this guy, his DNA would be
[12] on it.
[13]      John In is not the guy in the
[14] basement, it's another unknown male. That's not
[15] me telling you, that's science. That's science,
[16] that's DNA. He's excluded, it can't be him, it
[17] can't be him.
[18]      And by the way, since Baraldi
[19] brought it up on Battles' cross-examination about
[20] the navy blue zip-up sweats that she grabbed John
[21] In's shirt that he was wearing. This is Dyshon
[22] Marable's zip-up, it seems like there's a zipper
[23] on this one too. And you can quibble over navy
[24] blue, the fact is it's blue and it has a zipper
[25] and when Officer Battles puts that flash out,

Page 26

[1]
[2] Mr. Marable is upstairs. They don't know where he
[3] is. The science sets this man free, it's not
[4] him. Clearly, it's not him, there's somebody
[5] else.
[6]      So then if he's not the guy inside,
[7] what role, if any, does he have? Well, let's talk
[8] about that. John is supposedly driving the white
[9] Altima and in the Altima are traffic tickets for
[10] Jerry Jean, which he received a couple weeks
[11] before. Latex gloves and a gun. Let's talk about
[12] that, because I am going to tell you right now,
[13] there is no foregoing conclusion that John In is
[14] going to prove it to you. Remember, I don't have
[15] a burden, but I'm going to show you.
[16]      Now, who is the one officer who
[17] tells you that John In gets into that car, there's
[18] only one officer that says it. Remember, Nolan,
[19] Robinson, and Battles are in the house. And
[20] Battles stays in the house after everything
[21] happens. Nolan and Robinson run out of the
[22] front. I said did you see anybody running away or
[23] in a car and they said no. Who is the officer
[24] that comes on the scene and says I see him
[25] kneeling next to the passenger's side? Remember?

Page 27

[1]
[2] Officer Birch, RPC33.
[3]      Let's talk about Officer Birch's
[4] testimony. He said John In was kneeling next to
[5] the passenger's side, that he then jumped in
[6] through the door into the driver's seat and took
[7] off, that's what Birch told us. Now, you also
[8] know Defense Exhibit 2 which is in evidence, this
[9] was a memo he made that night and signed. And in
[10] this memo he says he arrived on location and
[11] observed the male sitting inside the Nissan
[12] Altima. That's a little bit different. He
[13] doesn't say he's outside kneeling outside of it.
[14] And then, of course, there's Defense Exhibit 3 the
[15] statement he gave later on, 3/20/07.
[16]      "On 3/7/07 at 5:15 I was working in
[17] uniform as RPC-33. There was a radio call at 720
[18] Mifflin for assist officer, I responded. I saw an
[19] Asian guy running northbound on 6th Street. There
[20] was a white Nissan Altima parked on the southeast
[21] corner on 6th and Mifflin, that's a whole block
[22] away. And when I asked Officer Birch about this,
[23] he said it's the 600 block of Mifflin, same
[24] thing. No, it's not. If the vehicle is
[25] supposedly here on the corner of 7th and Mifflin

Page 28

[1]
[2] he says he sees him in the southeast corner of 6th
[3] Street, he sees a male running northbound on 6th,
[4] that's what he says and gets into a car here. Why
[5] the difference three weeks later giving a
[6] statement? Why such a change in testimony?
[7] That's not a small inconsistency, that's a big
[8] deal, a whole block away.
[9]      And let me continue because you
[10] heard a lot of evidence, you heard a lot of
[11] evidence. But how about this radio tape this
[12] morning, a lot of it was boring, but we had this
[13] chart up here about who the officers were who were
[14] talking. And, again, just so you are clear, the
[15] Commonwealth's evidence was that Birch comes, and
[16] I'm going to hold up C-12, the map. That Birch
[17] comes down the wrong way down 7th followed by
[18] Seabron, and stops here just through the
[19] intersection and jumps into the car, and go down
[20] the street and takes off after him in this
[21] vehicle. He goes all the way through here, puts
[22] his car on 5th and Mifflin, my client jumps out of
[23] the car, and chases after to him. Do you remember
[24] that testimony? Your recollection controls.
[25]      The problem with that, there's

Page 29

[1]
[2]  multiple problems with that. There's an officer,
[3]  I would argue and you heard it, it's the guy that
[4]  went into the white Altima, he went westbound on
[5]  Mifflin Street. You know it's actually
[6]  eastbound. All right, I can understand that
[7]  mistake, west versus east. No big deal. He just
[8]  cut down 5th Street, I got another car behind me.
[9]  Let's think about that. Fifth
[11] Street is all the way down here to the edge of the
[12] picture. If you are a police officer in a police
[13] cruiser and turn down Mifflin and following the
[14] white Altima which we know comes to rest at 524,
[15] it doesn't go any further. Why would you tell
[16] police radio, when it's happening that he cut down
[17] 5th, all the way down here. Why would he say
[18] that? Why? I'm going to tell you why or suggest
[19] to you a reason why in a minute.
[20] Page five of the transcript of the
[21] call that you just heard, "Radio 33, let me know,
[22] and this is 33, it's Officer Birch, "Let me
[23] know if anybody retrieved my vehicle, it was
[24] sitting on the 700 block of Mifflin Street. I
[25] jumped out after this male."
        Well, that's interesting because he

Page 30

[1]
[2]  told you in his testimony coming down 7th, drove
[3]  all the way and followed and stopped on 5th Street
[4]  and saw the male get out who he identifies as John
[5]  In as the guy getting out of the car. On the
[6]  police radio, he's asking someone else to pick up
[7]  this car which he left running on the 700 block of
[8]  Mifflin. Why is that? Because he got out of his
[9]  car at 7th and Mifflin.
[10] The reason why he thinks the car
[11] turns down 5th Street is because he's up here, he
[12] got out on foot, 7th Street, somewhere down here.
[13] And when the car does turn right towards this
[14] house, he's more than a block away, and he says
[15] the car made a right turn, he must have turned
[16] down 5th street. That's what happened. He was
[17] not right behind that car.
[18] And I'll give you even more evidence
[19] to show you that Birch was not behind that car,
[20] how about Officer Seabron, who testified
[21] yesterday. Remember what he said, Oh, yeah, I
[22] went up to the car, the Altima on 5th and Mifflin,
[23] 524, and I asked him and Ms. Baraldi did too,
[24] where was Birch's car? Remember what he said? I
[25] didn't see it, it wasn't there. It wasn't there.

Page 31

[1]
[2]  Of course, Birch is the only officer
[3]  that says this man gets out of that car, he's the
[4]  only one. Now Sergeant Woods ends up capturing
[5]  the defendant. He sees him running, but where's
[6]  he coming from? Where's he coming from? The only
[7]  person who puts him inside of the car is Birch.
[8]  And Birch also tells you, ladies and gentlemen,
[9]  and I hope you caught his testimony, he told you I
[10] saw Sergeant Woods apprehend him at 5th and
[11] Hoffman. He saw it. Let's go back to this
[12] transcript.
[13] "RPC-4 Charlie," which we know from
[14] our chart is Sergeant Woods, "get me a wagon, get
[15] me a wagon at 5th and Hoffman."
[16] Then Radio 400, we know that's
[17] Officer Jenkins. We saw her testify and they were
[18] in a wagon. 5th and Hoffman.
[19] Then you hear, 33, here's Birch
[20] again, "33, that's where you want me at, 5th and
[21] Hoffman?"
[22] Why is Birch asking the radio
[23] whether he should go to 5th and Hoffman if he's
[24] already there and he witnessed Sergeant Woods
[25] apprehend this man. It's because he ain't there.

Page 32

[1]
[2]  He was not on the scene when John got arrested.
[3]  And he didn't see him get out of that car.
[4]  How did the car get there, Giuliani?
[5]  Did it drive itself? Obviously not. Obviously
[6]  not. Who drove it? I don't know, it's not my
[7]  burden to prove it. I do know that in that car
[8]  there's a gun, a gun. And if the Commonwealth's
[9]  case is accurate and what the Commonwealth wants
[10] you to believe is John In was the guy in the
[11] basement, took off out of the house, ran out to
[12] the Altima, got in the Altima with the gun, and
[13] drove down the street, took off when the police
[14] came, ran out of the car and got caught and that's
[15] his gun.
[16] What's the problem with that, ladies
[17] and gentlemen? What's the big problem with that?
[18] No DNA on the gun. Well, there is DNA on the gun,
[19] excuse me. It's not his. How do you explain
[20] that? How do you explain the fact that Dina Khem
[21] and Mr. Yun both say the guy pointed a gun at me.
[22] You got to figure, whoever it is, is pointing it
[23] at the guys head, at this poor man's head taking
[24] him down in the basement, points it at Mr. Yun.
[25] And when Dina Khem comes out of her bedroom,

Page 33

[1]
[2] points it at her, and says "shut the fuck up."
[3] Did anybody say that person, John In, was wearing
[4] gloves, no. No evidence of that. So how did DNA
[5] from an unknown male happen to get on that gun and
[6] it's not his? If he really took it in that car,
[7] got in that car, ditched it in the car and ran out
[8] of the car, explain that to you. You know why,
[9] because science doesn't lie. People can be
[10] mistaken; people can be mistake, the cops can be
[11] mistaken, it happens. If it happens on the street
[12] in this situation, these facts, this danger,
[13] that's okay. If it happens on the street; it's
[14] not okay if it happens here?
[15]        Science doesn't lie to you. Why is
[16] his DNA not on that gun if that's his gun. That's
[17] the Commonwealth's case, ladies and gentlemen. I
[18] didn't hire the DNA guy, the police did. And
[19] thank God that they did, that's unusual evidence
[20] to have and a reflection of the seriousness of
[21] this case, and it's appropriate to have it. If I
[22] had a dollars for every time I heard a DA open a
[23] case and say forget what you heard about CSI, we
[24] don't have that in most of these cases, but we got
[25] it here. That's a tool for you, you need that to

Page 34

[1]
[2] do your job. You need that to look at this
[3] critically and say how do you explain this?
[4] That's the Commonwealth's case. There is only one
[5] person, one officer, who says he's driving the car
[6] and that's Birch. And I showed you from his
[7] testimony what that means. It doesn't add up,
[8] it's not just one piece. Ms. Baraldi talked about
[9] Legos, she is right, she's correct. But they
[10] don't add up. The evidence doesn't add up. The
[11] Commonwealth's case doesn't fit, it doesn't make
[12] sense.
[13]        The Judge is going to give you a lot
[14] of different instructions and no doubt the
[15] Commonwealth will mention and rely on the fact
[16] that there's an instruction, flight from police
[17] equals consciousness of guilty. What that means
[18] is that the guilty man who is faced with the
[19] police is going to run. And the Judge is going to
[20] tell you that you may listen to the instruction,
[21] that you may infer consciousness of guilty from
[22] someone running from police, not must. You don't
[23] have to. The Judge is also going to tell you in
[24] that instruction that flight from the police alone
[25] is not enough to convict you. You have to have

Page 35

[1]
[2] all of the other evidence, all of it.
[3]        Ladies and gentlemen, there's not
[4] much good that comes out of this case. There is
[5] one good thing and that's that nobody got hurt, no
[6] cops, no victims, no defendants, thank God.
[7] That's the only positive thing that came out of
[8] this case, that's it. And they got two of the
[9] guys, they got him. They got Marable, they got
[10] Jean, without question. But when you go back here
[11] to deliberation, remember, there has been a lot of
[12] evidence that you heard. Remember, this is a
[13] fellow citizen of yours, his life is in your
[14] hands, it's all about him.
[15]        The Judge is going to tell you and
[16] explain the definition of reasonable doubt is the
[17] kind of doubt that would make a person hesitate
[18] and pause in a matter of greatest important in his
[19] or her life. I am not asking you to lay down for
[20] him or turn a blind eye. That's to the contrary,
[21] I want you to look at it in a critical eye. Look
[22] at it, study it, make it yours, this is what we
[23] need. We need good hard working people to go in
[24] there and talk about. It's not just to take
[25] everything for granted and say, well, that's what

Page 36

[1]
[2] the cops tell me and the police tell me,
[3] whatever. And it's not an issue if again --
[4] because I am going to ask you and you should find
[5] this defendant not guilty of all charges. And I
[6] am going to tell you if you do do that, let me
[7] tell you what it is and what's the not.
[8]        First of all, it is not an
[9] indictment of the police department in any
[10] fashion. You are not saying they did a terrible
[11] job or a bad job, absolutely not, to the contrary.
[12] If anything these officers are brave,
[13] particularly, Battles, Robinson, and Nolan who go
[14] charging in there, to a house with multiple people
[15] with guns. That's extremely brave what they do,
[16] there's no doubt about it. The Judge is also
[17] going to tell you you can't decide for or against
[18] the defendant based on prejudice or sympathy.
[19] Look where we are today, in the courtroom. It's
[20] not a house of worship or a public awards service,
[21] there's other days and other times, this is a
[22] courtroom. We are here to seek the truth.
[23] Sometimes exposing the true facts can be a little
[24] trouble. The truth hurts and stings a little
[25] bit. Sometimes exposing the true facts can be

Page 37

[1]
[2] troubling. Because at first glance when you look
[3] at the case the young lady identifies my client as
[4] being the gunman inside of the house tying up her
[5] dad, running out of the house, getting in the car
[6] away from the scene and ditching the car with a
[7] gun in it, that's bad.
[8]       But you know more than that now, you
[9] know a lot more. You know there's a lot more than
[10] just that DNA. His DNA is on nothing here,
[11] nothing. Some other male's is.
[12]       Ladies and gentlemen, it comes to a
[13] point in time in each of our lives when we are
[14] forced to make a decision which could be
[15] unpopular, might be difficult, but an important
[16] decision that affects others. This is one of
[17] those times, ladies and gentlemen. This, here,
[18] today, now. Step up in time. So I'm asking you,
[19] do you have the guts if you go back there and look
[20] at this evidence and say to each other, I am not
[21] satisfied. Do you have the guts to come in here
[22] individually and say not guilty? You have that
[23] strength, that's what I am asking you and he's
[24] asking you for that.
[25]       And when you go back there you may

Page 38

[1]
[2] look at certain evidence, Dina Khem seemed to know
[3] what she was saying, but on the other hand there's
[4] DNA issue, but then the car goes down the street
[5] and he's seen running around from it; well, on the
[6] over hand there's a gun in there and it's got some
[7] other guy's DNA on it. You know what that is,
[8] that waffling back and forth, that's reasonable
[9] doubt. That's what that is, that is reasonable
[10] doubt. Not beyond all reasonable doubt the Judge
[11] is going tell you, not beyond a mathematical
[12] certainty, but that's reasonable doubt. That's
[13] what that is. And if you find reasonable doubt
[14] you got to say not guilty. There's supposed to be
[15] some evidence in every case, if there was no
[16] evidence, there would be no case. But the
[17] standard is guilty beyond a reasonable doubt. And
[18] if you are not satisfied or if you are not sure,
[19] or if you are unsure about it, you got to say not
[20] guilty.
[21]       That's what you have to do, you took
[22] a sworn oath today, so that's what I am asking you
[23] to do. You are going to get this verdict sheet
[24] and it's going to have each of these counts on
[25] here. Burglary, two counts of robbery, possession

Page 39

[1]
[2] of an instrument of crime, two firearms offense,
[3] and criminal conspiracy. Your verdict, ladies and
[4] gentlemen, is on the right of each charge. The
[5] only two possible verdicts are guilty or not
[6] guilty. I am arguing to you, ladies and
[7] gentlemen, this verdict should be not guilty --
[8] excuse me, not guilty.
[9]       Not guilty. Let me say it again,
[10] not guilty. Not guilty. Let me say it again, not
[11] guilty. Use this service, use your service today,
[12] ladies and gentlemen, as an opportunity to do
[13] something to do justice and how often do you get a
[14] chance to really do justice, really you can do
[15] that here. So I ask you to use this opportunity,
[16] seize it and make it yours, and come out here as a
[17] group after full deliberations and say out loud
[18] publicly, the evidence is not enough and if you do
[19] on each and every count on that verdict, not
[20] guilty. Thank you for your time.
[21]       **THE COURT**: Thank you,
[22] Mr. Giuliani.
[23]       Ms. Baraldi, you may address the
[24] jury.
[25]       **MS. BARALDI**: Thank you, Your Honor.

Page 40

[1]
[2]       Good afternoon, everyone, Counsel,
[3] and Your Honor.
[4]       For John In to be not guilty, Dina
[5] Khem would have to had gotten up here, sworn under
[6] oath, in front of God and all of you and lied.
[7] For John In to be not guilty Officer Birch would
[8] have stood in front of all of you, took an oath to
[9] God and lied. Now, if you believe that, that's
[10] the only way that John In is not guilty.
[11]       Dina Khem doesn't see John In first
[12] today 18 months later. Every opportunity Dina
[13] Khem has been given to identify the man who
[14] pointed a gun to her and had her dad tied up with
[15] this orange cord, she has told you it is John In.
[16] She told you the police officers that night at the
[17] paddy wagon within how many minutes, seven, it was
[18] John In. She goes to a preliminary hearing five
[19] weeks in front of a Judge, not this one, and tells
[20] the Court then, it's John In. She come in here
[21] and unequivocally tells all of you it's John In.
[22]       How do you know? His nose. It's in
[23] her head. It's in her head. If somebody is
[24] pointing a gun at you you are going to have the
[25] memory burned in your head. This girl is scared

[2] to death. Somebody has got her dad. She's got
[3] the presence of mind to call 9-1-1, she comes out
[4] only after there is safety there. She says, Pa,
[5] which in Cambodia means dad. He tells her in a
[6] muffled voice to be quiet. Well, that's the point
[7] John In realizes that she's there. He turns and
[8] points the gun at her and says shut the fuck up.
[9] While this is going on, her little sister Angela,
[10] has opened the basement door and he's pulled it
[11] back shut. Now me telling you those events took
[12] longer than two to three seconds, didn't it.
[13]        She looked him in the face. Not
[14] only did she have to look him in the face that
[15] night, she looked him in the face in the basement,
[16] out in the street in the paddy wagon, in the
[17] courtroom twice in front of all of you, and told
[18] you it was John In. She didn't hesitate, she
[19] didn't waiver, it was John In.
[20]        Officer Birch, you've heard the
[21] radio, he is contemporaneously given a description
[22] of his location. For he to have been lying as he
[23] sits here today, he would have to had at the time
[24] realized 18 months later we would be here and, oh,
[25] well, I am going to say he fled from a car because

[2] the car crashed here. I'm going to say it's this
[3] guy when he's over the radio tape
[4] contemporaneously giving description of where the
[5] guy is, as Sergeant Woods came around the corner.
[6] And let's be serious no one else is out there at 5
[7] o'clock in the morning than Jerry Jean and John In
[8] because if they would they would have been
[9] stopped, we have the radio tapes.
[10]        Counsel can't explain that away. He
[11] lives around the corner from Jerry Jean, seven
[12] miles from the location. He's there because he's
[13] the guy in the basement, common sense. Common
[14] sense. Counsel makes a big argument about DNA.
[15] In the Judge's instruction you will not hear the
[16] word "DNA." Do you want to you know why? You
[17] don't need them for a conviction. How many people
[18] touch that gun? You know the officer. You know
[19] the Officer moved the gun. He told you when he
[20] got in the car because the car was still in drive
[21] because he ran into a building before he flees.
[22]        And, come on, you really think three
[23] guys go to rob a house and the only one smart
[24] enough to wear the latex glove in the back seat is
[25] Jerry Jean. Come on, they all had them on. And

[2] the Judge asked the DNA guy, would the DNA be on
[3] the gloves? No, that's the point of wearing the
[4] latex gloves.
[5]        I talked about the Legos, Counsel,
[6] brought it up in his closing too. And there's a
[7] reason for it too because when it comes to Officer
[8] Birch, we have Officer Cannon behind him. And
[9] then you have Officer Birch and Officer Cannon
[10] from the north from the 3rd, and they are telling
[11] you where they were coming from and tell you 2nd
[12] Street they are coming down.
[13]        These are the pieces to our puzzle.
[14] Okay? First of all, we have Dina Khem, three
[15] times after the incident identifying our
[16] defendant. In court identification and
[17] identification on the street. We also have, if
[18] you recall, Christina Khem saying after the police
[19] runs out in the back she's left alone in that
[20] living room for a second. Procedurally wise,
[21] should an officer have gone upstairs, in the back,
[22] and in the basement, yes. But as you hear this is
[23] happening in realtime.
[24]        There is a period of time when
[25] Christina and Angela are left on the first floor

[2] and sees someone running in a dark sweatshirt.
[3] And we learn from the radio tapes that Angela Khem
[4] also gives the dark sweatshirt. Because we know
[5] she's the little girl on the couch. And which
[6] have the white Altima, who counsel somehow wants
[7] you to believe that Officer Birch didn't see all
[8] that happen although we have him giving
[9] description of everything that's going on, and
[10] you'll have the radio tapes and transcripts to
[11] review later on. We know John In is in the
[12] Altima, there's not a question about that. Okay?
[13]        And the reason Officer Birch has to
[14] be lying because counsel can't get around the fact
[15] that inside of the Altima happens to be tickets to
[16] the co-defendant Jerry Jean, in addition to
[17] Jacqueline Jeans Shoprite card from a month before
[18] and parking tickets to that Altima. There are
[19] three of them.
[20]        Also, so we have in the white
[21] Altima, we have the tickets to Jerry Jean. Now,
[22] also in the Altima Detective Conn is the one that
[23] testified to this, there was a title not in
[24] anybody's name and an additional license. But
[25] what's significant to all of this is all of these

Page 45

[1]
[2] addressees comes from 35th, which happens to be by
[3] their own admission where they live. The
[4] defendants told police officers in their 229 where
[5] they live. And crazy that Jerry Jean is here and
[6] John In is about a mile away. Yet at 5 o'clock in
[7] the morning they are five miles away, but counsel
[8] wants us to believe they are not involved. And
[9] all of the addresses on the car, all of the 35th
[10] addresses to Louden Street and the address to the
[11] license. Also, in the white Altima are the latex
[12] gloves. Also in the Altima is the gun he held to
[13] Mr. Yun's head and the gun he pointed to Dina
[14] Khem. And look, let's be serious, he runs from
[15] the police. He runs from the police. I mean, he
[16] ran from the police, there's a chase. They catch
[17] him two blocks away through the alleyway. They
[18] catch him at 5th and Hoffman. The car crashes on
[19] 5th and Mifflin.
[20]         John In is the person in the
[21] basement. How did they get in the house? We
[22] don't know. Vuthay Yun standing at the sink. He
[23] told us in part English and Cambodian that he
[24] could only turned his head slightly. But he could
[25] tell, the person that took him in the basement was

Page 46

[1]
[2] taller than the person standing next to him.
[3] Okay? Well, what if the person standing next to
[4] John In was Dyshon Marable because we all saw how
[5] short Dyshon Marable was. And if you are standing
[6] this way and turn your head slightly, can you see
[7] who that person is right here? No.
[8]         It was John In, Dyshon Marable, and
[9] Jerry Jean who was standing behind Mr. Yun. And
[10] John In takes Mr. Yun in the basement.
[11]         And you saw Dyshon Marable, he
[12] wouldn't even say his name, let alone be sworn in.
[13] Well, why? He took a plea, he's serving his
[14] time. He's not going to snitch on his buddy, no
[15] matter what the consequences are to him. You saw,
[16] you saw the attitude he gave everybody including
[17] the Judge. Well, that's his boy, I brought him
[18] down here. He's not going to testify for the
[19] Commonwealth, right?
[20]         So when John In takes Mr. Yun to the
[21] basement and he hears the police commotion, Dina
[22] comes out of the room, which explains why John In
[23] would be at the basement door because he hears
[24] "police, police," and brings Mr. Yun up with him.
[25] Which make sense because Angela is on the couch

Page 47

[1]
[2] and tries to open the door and pulls the door back
[3] shut. So he's standing there and Battles and
[4] Robinson goes into the backyard and he's thinking
[5] great, all clear, and he runs out of the front.
[6] Which explains why Christina Khem and Angela Khem
[7] see a dark sweatshirt running out of the front
[8] door.
[9]         Counsel was also talking about DNA
[10] in the latex glove. Dyshon Marable's DNA was not
[11] taken. You heard the date of the plea predates
[12] the day the buccal swabs was taken from Jerry Jean
[13] or John In. So there was no a buccal swab from
[14] Dyshon Marable. So he's not guilty because Dyshon
[15] dropped the glove, that doesn't make any sense in
[16] light of the evidence we have here.
[17]         This evidence that counsel cannot
[18] get around, I am not asking you to find him guilty
[19] based on any one of these, not because Officer
[20] Birch saw him running, not because all of this
[21] stuff that is in the Altima. But if you wrap it
[22] all together, John In is the guy in the basement,
[23] John In is guilt of all of the charges.
[24]         It is a piece of the puzzle if you
[25] put them together. You cannot get around the fact

Page 48

[1]
[2] that John In is the guy in the basement. John In
[3] held this gun to that poor man's head in his own
[4] house. And he has no idea who else is in there
[5] and has four kids in the house, imagine how
[6] Mr. Yun felt. And imagine how Dina Khem felt when
[7] she saw her dad at the top of the steps with a gun
[8] to his head and pointed at her. And then you are
[9] going to tell me Dina Khem came in here and lied.
[10]         John In is guilty of all charges and
[11] I know and I confident that when you go back there
[12] and look all of the evidence the Commonwealth has
[13] there's no question in your mind.
[14]         Thank you for your attention.
[15]         **THE COURT**: Thank you, ma'am.
[16]         If you jurors would give me one
[17] moment. We'll speak to you very briefly.
[18] (Whereupon, a discussion was held off the record, not
[19]         reported.)
[20]         **THE COURT**: Ladies and gentlemen, as
[21] you can see it's 12:45. And if you're wondering
[22] what the conference was about, it was whether or
[23] not I should start my instructions on the law.
[24] Having observed that you gave these two attorneys
[25] your complete attention and given that it's

Page 49

[1]
[2] important that you give me your complete
[3] attention, I think we should take lunch now and
[4] I'll charge you after lunch and that is
[5] re-enforced by the fact that your lunches are
[6] here.
[7] So if we can take lunch for until
[8] 1:30 and when you come back I'll give you the
[9] instructions on the law and case will be yours for
[10] deliberations.
[11] THE COURT CRIER: Everyone remain
[12] seated while the jury exits the courtroom.
[13] (Jury departs the courtroom at 12:45 p.m.)
[14] THE COURT: We are back on the
[15] record in the Commonwealth versus John In
[16] CP-51-CR-0004829-2007. Both counsel having closed
[17] the Court is prepared to charge.
[18] As soon as the jurors are ready,
[19] we'll bring them out.
[20] THE COURT CRIER: Please remain
[21] seated while the jurors enter the courtroom.
[22] (Jury enters the courtroom at 2:05 p.m.)
[23] THE COURT: Good afternoon, you may
[24] be seated.
[25] Mr. McNeal, would you make the

Page 50

[1]
[2] appropriate announcement, please?
[3] THE COURT CRIER: Anyone wishing to
[4] leave the courtroom, should do so no. No one will
[5] be able to leave or enter the courtroom while the
[6] Judge is charging the jury.
[7] THE COURT: Ladies and gentlemen,
[8] the first order of business is I must advise you
[9] you must leave your notes in place. You can
[10] collect them at the conclusion of my instructions
[11] and take them with you into the deliberation room.
[12] Jurors, now that all of the evidence
[13] has been presented and the attorneys for both
[14] sides have made their closing arguments, it
[15] becomes my duty to instruct you in the law which
[16] you must on your oath accept and apply to the
[17] facts as you determine the facts to be in reaching
[18] your verdict.
[19] Now, in doing so, in instructing you
[20] on the law, I will be reading from a written
[21] charge as almost all Judges do to make certain
[22] that what I am telling you is in accordance with
[23] the laws of the Commonwealth of Pennsylvania and
[24] is both standard and uniform. I advise you of
[25] this that I will be reading because there is a

Page 51

[1]
[2] tendency not to pay close attention to anyone who
[3] is reading to you. However, because it's most
[4] important that instructions I now impart to you be
[5] accurate and in accordance with the law of this
[6] Commonwealth, I will be reading. I give you this
[7] warning and nevertheless ask you to pay close
[8] attention. If you understand that what I am about
[9] to say to you for perhaps the next 45 minutes will
[10] provide you with the tools you'll need to make
[11] your decisions in the case, then you'll understand
[12] the importance of what I have to say and the
[13] necessity for you to pay close attention.
[14] As I have said, members of the jury,
[15] you must apply only the law in which I instruct
[16] you. You may not apply any other law which you
[17] know or think you know. If you jurors wish
[18] instructions on the law in addition to the
[19] instructions I am giving you presently or if you
[20] wish me to clarify an instructions later, then you
[21] may through your foreperson send a written request
[22] and I will accommodate you.
[23] As I mentioned at the outset and
[24] have mentioned since we commenced this trial, it
[25] is my responsibility as the presiding Judge to

Page 52

[1]
[2] decide questions of law and you must accept and
[3] follow my rulings and instructions on matters of
[4] law. However, I am not the judge of the facts in
[5] this case, so it is not for me to decide what the
[6] facts are concerning the charges against the
[7] defendant. You, ladies and gentlemen, are the
[8] only judges of the facts, so it is your
[9] responsibility to weigh the evidence and based on
[10] that evidence and the logical inferences which
[11] flow from that evidence to determine what the
[12] facts are, apply the rules of law that I impart to
[13] you presently to those facts, and then to decide
[14] whether the defendant has or has not been proven
[15] guilty beyond a reasonable doubt of the charges
[16] lodged against him.
[17] Now, in determining what the facts
[18] are, you are not to -- strike that. In
[19] determining the facts, you are to consider only
[20] the evidence which has been presented in this
[21] courtroom and the logical inferences which have
[22] derived from that evidence. You are not to rely
[23] upon supposition or guess on any matters which are
[24] not in evidence. You should not regard as true
[25] any evidence which you find to be incredible even

Page 53

[1]
[2]    if it is uncontradicted.  Your determination of
[3]    the facts should not be based on sympathy for or
[4]    prejudice against the defendant or the
[5]    complainants.  Nor on which attorney made the
[6]    better speech nor on which attorney you like
[7]    better.
[8]         Now, ladies and gentlemen, in these
[9]    instructions I may, but if I do so at all, it will
[10]   be to a very limited extent.  I may refer to some
[11]   particular evidence in the case, I certainly don't
[12]   propose to all of the evidence, but I leave that
[13]   to your recollection.  For as I said, and it bears
[14]   repeating, it is your recollection and yours alone
[15]   which must govern.  So you are not bound by my
[16]   recollection nor by the recollections of these
[17]   attorneys as articulated in their arguments nor
[18]   are you to conclude that any evidence which I call
[19]   to your attention or which the attorneys have
[20]   already called to your attention is the only
[21]   evidence which is to be considered.
[22]        Again, it is your responsibility, as
[23]   factfinders to consider all of the evidence that
[24]   you believe material in deliberating upon your
[25]   verdicts in this case.

Page 54

[1]
[2]         Jurors, a fundamental principle of
[3]    our system of criminal law is that a defendant is
[4]    presumed to be innocent.  So the mere fact that
[5]    John In was arrested and is charged with crimes is
[6]    not evidence of guilt.  Furthermore, a defendant
[7]    is presumed to remain innocent throughout the
[8]    trial unless and until you conclude based upon a
[9]    careful and impartial consideration of the
[10]   evidence that the Commonwealth has proven him
[11]   guilty beyond a reasonable doubt to the charges
[12]   made against him.
[13]        It is not the defendant's burden to
[14]   prove that he is not guilty.  Instead, it is the
[15]   Commonwealth that always has the burden of proving
[16]   each and every element of the crimes charged and
[17]   that defendant is guilty of those crimes beyond a
[18]   reasonable doubt.  So a person accused of a crime
[19]   is not required to present evidence or prove
[20]   anything in his own defense.
[21]        If the evidence presented fails to
[22]   meet the Commonwealth's burden, then your verdict
[23]   must be not guilty.  On the other hand, if the
[24]   evidence does prove beyond a reasonable doubt that
[25]   the defendant is guilty of the crimes charged,

Page 55

[1]
[2]    then your verdict should be guilty.  Although the
[3]    Commonwealth has the burden of proving that the
[4]    defendant is guilty, this does not mean that the
[5]    Commonwealth must prove its case beyond all
[6]    reasonable doubt or to a mathematical certainty
[7]    nor must the Commonwealth demonstrate the complete
[8]    impossibility of innocence.
[9]         A reasonable doubt is a doubt that
[10]   would cause a reasonably careful and sensible
[11]   person to pause, hesitate, or refrain from acting
[12]   upon a matter of highest importance in his or her
[13]   own affairs or to his or her own interests.  A
[14]   reasonable doubt must fairly arise out of the
[15]   evidence that was presented or out of the lack of
[16]   evidence presented with respect to some elements
[17]   of each of the crimes charged.
[18]        A reasonable doubt must be a real
[19]   doubt.  It may not be an imagined one nor may it
[20]   be a doubt manufactured to avoid carrying out an
[21]   unpleasant duty.  So, jurors, to summarize, you
[22]   must not find the defendant guilty based upon a
[23]   mere suspicion of guilt.  The Commonwealth has the
[24]   burden of proving the defendant guilty beyond a
[25]   reasonable doubt.

Page 56

[1]
[2]         If the Commonwealth has met that
[3]    burden then the defendant is no longer presumed to
[4]    be innocent, and you should find him guilty.  On
[5]    the other hand, if the Commonwealth has not met
[6]    its burden, then you must find him not guilty.
[7]         You must consider and weigh the
[8]    testimony of each witness and give it such weight
[9]    as in your judgment it is fairly entitled to
[10]   receive.  The matter of the credibility of a
[11]   witness, that is whether his or her testimony is
[12]   believable and accurate in whole or in part is
[13]   solely for your determination.  So as judging of
[14]   the fact you are the sole judges of the
[15]   credibility of the witnesses and their testimony.
[16]   This means you must judge the truthfulness and
[17]   accuracy of each witness's testimony and decide
[18]   whether to believe all or part or none of that
[19]   testimony.  The following are some of the factors
[20]   that you may and should consider when judging
[21]   credible and deciding whether or not to believe
[22]   testimony.
[23]        **They include the following**:  Was the
[24]   witness able to see, hear, or know the things
[25]   about which he or she testified?  How well could

[1]
[2] the witness remember and describe the things about
[3] which he or she testified? Was the ability of the
[4] witness to see, hear, know, remember, or describe
[5] those things affected by youth, old age, or any
[6] physical, mental, or intellectual deficiency? Did
[7] the witness testify in a convincing manner? How
[8] did he or she look, act, or speak while
[9] testifying? Was his or her testimony certain or
[10] uncertain, confused or clear, self-contradictory
[11] or straight-forward, evasive or straight-forward?
[12] Did the witness have an interest in the outcome of
[13] the case, a bias, a prejudice, or motive that
[14] might affect his or her testimony? How well does
[15] the testimony of the witness square with the other
[16] evidence in the case including the testimony of
[17] other witnesses? Was it contradicted or supported
[18] by the other testimony and evidence? Did the
[19] testimony make sense?
[20]         If you believe some part of the
[21] testimony of a witness to be inaccurate consider
[22] whether the inaccuracy cast doubt on the rest of
[23] his or her testimony. This may depend on whether
[24] he or she has been inaccurate in an important
[25] matter or a minor detail and on any possible

[1]
[2] explanation therefore. For example, did the
[3] witness make an honest mistake or forget or did he
[4] or she deliberately falsify.
[5]         Now, while you are judging the
[6] credibility of each witness, you are likely to be
[7] judging the credibility of other witnesses or
[8] evidence in the case. If there is a real
[9] irreconcilable conflict, it's up to you to decide
[10] which, if any, conflicting evidence or testimony
[11] to believe. As so, you the jurors are responsible
[12] to give the testimony of each witness and all the
[13] evidence whatever credibility and weight you think
[14] it deserves.
[15]         If you conclude that one of the
[16] witnesses testified falsely and did so
[17] intentionally about any facts that's necessary to
[18] your decisions in this case, then for that reason
[19] alone you may, if you wish, disregard everything
[20] that the witness said. However, you are not
[21] required to disregard everything that the witness
[22] said for this reason. It is entirely possible
[23] that a witness testified falsely and intentionally
[24] so in one respect, but truthfully about everything
[25] else. If you find that to be the situation, you

[1]
[2] may accept that part of his or her testimony which
[3] you find to be truthful and which you believe and
[4] you may reject that part which you find to be
[5] false and not worthy of belief.
[6]         If you find there were conflicts in
[7] the testimony, you jurors have a duty of deciding
[8] which testimony to believe. But you should first
[9] try to reconcile, that is, fit together any
[10] conflicts in the testimony if you can fairly do
[11] so. Discrepancies in and conflicts between
[12] testimony of different witnesses may or may not
[13] cause you to disbelieve some or all of their
[14] testimony. But you should remember that two or
[15] more persons witnessing an incident may see or
[16] hear it happen differently. Also, it is not
[17] uncommon for a witness to be innocently mistaken
[18] in his or her recollection of how something
[19] happened.
[20]         If you cannot reconcile a conflict
[21] in the testimony, it is up to you to decide which
[22] testimony, if any, to believe and which to reject
[23] as not true or inaccurate. Again, in making this
[24] decision consider whether the conflict involves a
[25] matter of importance to the decision in this case

[1]
[2] or merely unimportant detail or whether the
[3] conflict is brought about by an innocent mistake
[4] or an intentional falsehood. You should also keep
[5] in mind, jurors, the other factors that go into
[6] deciding whether or not to believe a particular
[7] witness.
[8]         In deciding which conflicting
[9] testimony to believe, you should not necessarily
[10] be swayed by the number of witnesses on either
[11] side. You should consider whether the witnesses
[12] appeared to be biased or unbiased, whether they
[13] are interested or disinterested persons, and you
[14] should consider all other factors which go to the
[15] reliability of their testimony. The important
[16] thing is the quality of the testimony of each
[17] witness. You should also consider extent to which
[18] conflicting testimony is supported by other
[19] evidence in the case.
[20]         Now, ladies and gentlemen, evidence
[21] may be of two different types in a criminal case.
[22] On the one hand there is direct evidence, which is
[23] testimony by a witness from his or her own
[24] personal knowledge, such as something he or she
[25] saw or heard himself or herself. The other type

Page 61

[1]
[2] is circumstantial evidence, which is testimony
[3] about facts which point to existence of other
[4] facts which are in question.
[5]     The example use to illustrate
[6] circumstantial evidence goes as follows:  Suppose
[7] you retire on a winter night and the streets are
[8] clear.  When you awoke snow was on the street and
[9] on the sidewalks, and you saw footsteps in the
[10] snow.  You would properly conclude that snow had
[11] fallen during the night, although you didn't see
[12] it snow, and that someone walked in the snow,
[13] although you saw no one walking in the snow.
[14] That, ladies and gentlemen, is an example of
[15] circumstantial evidence whether or not
[16] circumstantial evidence is proof of the other
[17] facts in question depends in part on the
[18] application of common sense and human experience.
[19]     In deciding whether or not to accept
[20] circumstantial evidence as proof of the facts in
[21] question, you must be satisfied, first, that the
[22] testimony of the witness who is presenting this
[23] circumstantial evidence is truthful and accurate.
[24]     And second, that the existence of
[25] the facts the witness testifies to leads to the

Page 62

[1]
[2] conclusion that facts in question also happened.
[3]     Now, jurors, you recall that when I
[4] gave you preliminary instructions on the law, I
[5] told you that statements made by the attorneys did
[6] not constitute evidence and, therefore, was not
[7] binding on you.  Thereafter, during the course of
[8] this trial, I brought to your attention an
[9] exception to this rule.  I remind you that a
[10] stipulation is one such exception.  There were
[11] stipulations in this case on both sides from the
[12] Commonwealth and from the defense.
[13]     The law is when the Commonwealth and
[14] the defense stipulate, that is when they agree
[15] that a certain fact or facts are true, their
[16] stipulations are evidence of those facts and you
[17] jurors should regard stipulated or agreed upon
[18] facts as proven.
[19]     I permitted Benjamin Levin to
[20] testify as an expert witness.  An expert is a
[21] person who has special knowledge or skill in some
[22] science, art, profession, occupation, or subject
[23] that the witness acquired by training, education,
[24] or experience.  And because an expert has this
[25] special, that is out of the ordinary knowledge or

Page 63

[1]
[2] skill, he may be able to supply you jurors with
[3] specialized information, explanations, and
[4] opinions that will assist you in deciding the
[5] case.
[6]     Regular witnesses are bound by two
[7] limitations that do not apply to an expert.
[8] First, regular witnesses generally can testify
[9] only about things that they personally perceived.
[10] Things that they saw or heard themselves.  And
[11] second, regular witnesses are not allowed to
[12] express opinions that require special knowledge
[13] and skill.  Now by contrast, an expert is allowed
[14] to express an opinion or matter that is within the
[15] area of the expertise.
[16]     Furthermore, while an expert may
[17] base an opinion on things personally perceived, he
[18] may also base an opinion on factual information
[19] learned from other sources.  If an expert bases an
[20] opinion on things not personally perceived, he can
[21] describe the information on which he relies and
[22] identify its source when explaining his opinion.
[23]     Now, jurors, you must remember that
[24] you are the sole judges of the credibility and
[25] weight of all of the testimony.  The fact that I

Page 64

[1]
[2] permitted a witness as an expert and the lawyers
[3] referred to the witness as an expert and agreed
[4] the witness had special knowledge or skill does
[5] not mean his testimony or opinions are right.
[6] When you are determining the credibility and
[7] weight of an expert's testimony and opinions
[8] consider all of the factors I described earlier
[9] that are relevant when evaluating the testimony of
[10] any witness.  You should also consider all other
[11] things bearing on credibility and weight including
[12] the training, education, and experience, and
[13] ability of the expert.  The factual information on
[14] which he based an opinion, the source and
[15] reliability of that information, and the
[16] reasonableness of any explanation he gave to
[17] support his opinion or opinions.
[18]     There was evidence including the
[19] testimony of Officer Birch that tended to show
[20] that the defendant John In fled from the police.
[21] The credibility and weight and affect of that
[22] evidence is for you to decide.  Generally speaking
[23] when a crime has been committed and a person
[24] thinks he is or may be accused of committing that
[25] crime he flees such flight is a circumstance

Page 65

[1]
[2] tending to show the person is conscious of guilt.
[3] Such flight does not necessarily show
[4] consciousness of guilt in every case. A person
[5] may flee for some other motive or may do so even
[6] though innocent. Whether the evidence of flight
[7] in this case should be looked at as tending to
[8] prove guilt depends on the facts and circumstances
[9] in this case and especially on the motive that may
[10] have prompted the flight. You may find the
[11] defendant guilty solely on the basis of evidence
[12] of flight.
[13]     Jurors, it is entirely up to the
[14] defendant in every criminal law trial whether or
[15] not to testify. A defendant has an absolute right
[16] founded on the Constitution to remain silent. You
[17] must not draw any inference of guilt or any other
[18] inference adverse to the defendant from the fact
[19] that he did not testify in this case.
[20]     Now, ladies and gentlemen, the
[21] defendant John In is on trial before you having
[22] been charged with the following offenses: He has
[23] been charged with burglary; robbery, two counts;
[24] possessing an instrument of crime, violation
[25] Section of 6106 and 6108 of the Uniform Firearms

Page 66

[1]
[2] Act, and criminal conspiracy. To each of these
[3] offenses the defendant has pled not guilty and
[4] elected to be tried by you, ladies and gentlemen.
[5] I have already instructed you concerning the
[6] manner in which you are to consider the evidence
[7] and the general rules of law concerning the same.
[8] I must now instruct you on the specific charges
[9] made against the defendant. I shall charge on
[10] each of those offenses in turn, starting first
[11] with burglary.
[12]     The defendant John In has been
[13] charged with burglary. To find the defendant
[14] guilty of this offense, you must find that the
[15] following elements have been proven beyond a
[16] reasonable doubt.
[17]     First, that the defendant entered a
[18] particular location, to wit, 720 Mifflin Street,
[19] Philadelphia, Pennsylvania.
[20]     Second, that that location, that
[21] place, was an occupied structure. An occupied
[22] structure is any building or structure or place
[23] adapted for overnight accommodations of persons
[24] which is actually occupied at the time of the
[25] incident.

Page 67

[1]
[2]     Third, that the defendant entered
[3] that location, 720 Mifflin Street, with the intent
[4] to commit a crime inside. Herein, the
[5] Commonwealth alleges robbery.
[6]     Fourth, that the location, 720
[7] Mifflin Street, was not open to the public at the
[8] time.
[9]     And fifth, that the defendant did
[10] not have permission or lawful authority to enter
[11] that location.
[12]     If after considering all of the
[13] evidence you find that the Commonwealth has proven
[14] the elements just stated beyond a reasonable
[15] doubt, then you should find him guilty of this
[16] offense. Otherwise, you must find him not guilty
[17] of burglary.
[18]     The defendant has been charged with
[19] robbery, two counts. The complainants are Vuthay
[20] Yun and Christina Khem. I shall now define
[21] robbery.
[22]     The defendant, John In, has been
[23] charged with robbery. To find the defendant
[24] guilty of this offense, you must find that the
[25] following two elements have been proven beyond a

Page 68

[1]
[2] reasonable doubt.
[3]     First, that the defendant threatened
[4] the complainant or complainants Vuthay Yun and/or
[5] Christina Khem with serious bodily injury or
[6] intentionally put the complainant or complainants
[7] Vuthay Yun and Christina Khem in danger of
[8] immediate serious bodily injury. And second, the
[9] defendant did so during course of committing
[10] theft.
[11]     During the course of committing
[12] theft means that you can find the defendant guilty
[13] if you find beyond a reasonable doubt that he did
[14] these things either while actually committing
[15] theft, attempting to commit a theft, or while
[16] fleeing after committing or attempting to commit.
[17] A theft, of course, means taking unlawful control
[18] of or exercising unlawful control over someone
[19] else's property intending not to return that
[20] property to that person.
[21]     Serious bodily injury is defined in
[22] the law as a bodily injury that creates a series
[23] of risk of death or causes serious permanent
[24] disfigurement or protracted loss or impairment of
[25] any bodily member or organ. This means an injury

Page 69

[1]
[2] that causes a substantial risk that the
[3] complainant would die or sustain an injury that
[4] permanently and seriously disfigures the
[5] complainant or that causes a long-term loss or
[6] limitation on the use of any part of the human
[7] body.
[8]         After considering all of the
[9] evidence, you find that the Commonwealth has
[10] proven the elements just stated beyond a
[11] reasonable doubt, then you should find the
[12] defendant guilty of robbery. Otherwise, you must
[13] find him not guilty of this offense.
[14]         It bears repeating that there are
[15] two complainants and you must return a verdict on
[16] each robbery count. The robbery count where the
[17] complainant is Vuthay Yun, the robbery count in
[18] which the complainant is Christina Khem. The
[19] definition of robbery applies to both
[20] complainants.
[21]         The next offense is possessing an
[22] instrument of crime.
[23]         In order to find the defendant
[24] guilty of possessing a criminal instrument as
[25] charged in this case, you must be satisfied that

Page 70

[1]
[2] the following elements have been proven beyond a
[3] reasonable doubt.
[4]         First, that the defendant possessed
[5] a certain item, that is a handgun. For a person
[6] to possess an item he must have the power to
[7] control and the intent to control that item.
[8]         And second, that the item was an
[9] instrument of crime. An instrument of crime is
[10] anything specially made for criminal use or
[11] anything specially adapted for criminal use or
[12] anything that is used for criminal purposes and
[13] possessed by the defendant at the time of the
[14] alleged offense under circumstances not manifestly
[15] appropriate for lawful uses it may have.
[16]         That a thing could somehow
[17] facilitate the possible commission of a crime is
[18] not enough. To be an instrument of crime, a thing
[19] must be something the defendant would need to use
[20] in the commission of the underlying offense or
[21] offenses.
[22]         And third, that the defendant
[23] possessed that item, to wit, a handgun with intent
[24] to employ it criminally. That is with intent to
[25] attempt or to commit a crime with it. The

Page 71

[1]
[2] Commonwealth has charged here that the crime the
[3] defendant intended to commit with the instrument
[4] alleged was burglary and/or robbery.
[5]         If after considering all of the
[6] evidence you find the Commonwealth has proven the
[7] elements just stated beyond a reasonable doubt,
[8] then you should find the defendant guilty of
[9] possessing an instrument of crime. Otherwise, you
[10] must find him not guilty of this offense.
[11]         The defendant is charged with
[12] violating Section 6108 of the Uniform Firearms
[13] Act, to wit, carrying firearms on a public street
[14] or public property of Philadelphia.
[15]         In order to find him guilty of
[16] violating Section 6108 of the Uniform Firearms
[17] Act, you must be satisfied that the following
[18] elements have been proven beyond a reasonable
[19] doubt.
[20]         First, that the defendant carried a
[21] firearm on the public streets or public property.
[22]         And second, that the defendant did
[23] not have a license for carrying a firearm.
[24]         And third, that the firearm was in
[25] operating condition.

Page 72

[1]
[2]         For purposes of this offense a
[3] firearm is any pistol or revolver with a barrel
[4] length less than 12 inches.
[5]         If after considering all of the
[6] evidence you find the Commonwealth has proven the
[7] evidence elements just stated beyond a reasonable
[8] doubt, then you should find the defendant guilty
[9] of violating Section 6108 of the Uniform Firearms
[10] Act, carrying a firearm on the public streets or
[11] property in Philadelphia. Otherwise, you must
[12] find him not guilty of this offense.
[13]         The defendant has also been charged
[14] with violation of Section 6106 of the Uniform
[15] Firearms Act, carrying a firearm without a
[16] license. To find the defendant guilty of this
[17] offense, you must find that each of the following
[18] elements have been proven beyond a reasonable
[19] doubt.
[20]         First, that the defendant carried a
[21] firearm either in a vehicle or concealed on/or
[22] about his person. A firearm is any pistol or
[23] revolver with a barrel less than 15 inches or a
[24] pistol or revolver with an overall length of less
[25] than 26 inches. To be a firearm the specific

[1]
[2] object charged must be either be operable, that is
[3] -- strike that.
[4]     To be a firearm the specific object
[5] charge must be operable, that is capable of firing
[6] a projectile.
[7]     And second, at that the defendant
[8] was not in his place of abode, that is his home or
[9] fixed place of business.
[10]     And third, that the defendant did
[11] not have a valid and lawfully issued license for
[12] carrying a firearm.
[13]     If after considering all of the
[14] evidence you find that the Commonwealth has proven
[15] the elements just stated beyond a reasonable
[16] doubt, then you should find the defendant guilty
[17] of violating Section 6106 of the Uniform Firearms
[18] Act, carrying a firearm without a license.
[19] Otherwise, you must find him not guilty of this
[20] offense.
[21]     Finally, the defendant has been
[22] charged with criminal conspiracy. John In is
[23] charged with conspiracy to commit robbery and/or
[24] burglary. I have already defined both robbery and
[25] burglary for you.

[1]
[2]     In Pennsylvania joining in a
[3] conspiracy or creating a conspiracy is itself a
[4] crime, even if the crime the people are planning
[5] is not carried out, the members of a conspiracy
[6] are still responsible for the distinct crime of
[7] conspiracy.
[8]     In general terms, a conspiracy is an
[9] agreement between two or more persons to commit a
[10] crime or crimes. A conspiracy exists once two
[11] conditions are met. There is an agreement and one
[12] of the members then commits some act to help
[13] achieve the goal of the conspiracy.
[14]     I shall now explain these elements
[15] in detail.
[16]     The first element of a conspiracy is
[17] an agreement. It can be stated in words or
[18] unspoken, but acknowledged, but it must be an
[19] agreement in the sense that two or more persons
[20] have come to an understanding that they agree to
[21] act together to commit a crime or crimes. Their
[22] agreement does not have to cover the details of
[23] how the crimes will be committed nor does it call
[24] for all of them to participate in actually
[25] committing the crime or crimes. They can agree

[1]
[2] that one of them will do the job. What is
[3] necessary is that the parties do agree. In other
[4] words, do come to a firm, common understanding
[5] that a crime or crimes will be committed.
[6]     Although the agreement itself is the
[7] essence of the conspiracy, a defendant cannot be
[8] convicted of conspiracy unless he or a fellow
[9] conspirator does something more, does an overt act
[10] in furtherance of the conspiracy. The overt act
[11] is an act by any member of the conspiracy that
[12] would serve to further the goals of the
[13] conspiracy. The overt act can be criminal or
[14] non-criminal in itself as long as it is designed
[15] to put the conspiratorial agreement into effect.
[16]     This is to show that the parties
[17] have a firm agreement and are not just thinking or
[18] talking about committing a crime or crimes. The
[19] overt act shows the conspiracy has reached the
[20] action stage. If a conspirator actually commits
[21] or attempts to commit the agreed upon crime or
[22] crimes that obviously would be an overt act in
[23] furtherance of the conspiracy. But a small act or
[24] a step that is much more preliminary and a lot
[25] less significant can satisfy the overt act

[1]
[2] requirement.
[3]     The Commonwealth may prove a
[4] conspiracy by direct evidence or circumstantial
[5] evidence. People who conspire often do so
[6] secretly and cover up afterwards. In many
[7] conspiracies circumstantial evidence is the best
[8] or only evidence on the question of whether there
[9] was an agreement, that is a common understanding
[10] and whether the conspirator shared the intent to
[11] promote or facilitate committing the object crime
[12] or crimes.
[13]     Thus, you may, if you think it
[14] proper, infer that there was a conspiracy from the
[15] relationship, conduct, and acts of the defendant
[16] and his alleged co-conspirators and the
[17] circumstances surrounding their activities.
[18]     However, the evidence of this must
[19] support your conclusion beyond a reasonable
[20] doubt. A defendant cannot be convicted merely
[21] because he was present with others or even because
[22] he knew what the others or what the other had
[23] planned or were doing. There must be proof of an
[24] agreement between the defendant and another person
[25] or persons to form or to continue a conspiracy.

Page 77

[1]
[2] To be proved guilty of being a conspirator, the
[3] defendant must have intended to act jointly with
[4] the other person or persons charged, and must have
[5] intended that the crime or crimes allege to be a
[6] goal of the conspiracy would be committed.
[7]      The Commonwealth alleged that the
[8] defendant John In conspired with certain other
[9] persons, to wit, Jerry Jean and Dyshon Marable.
[10] The Commonwealth alleges that the crimes of
[11] robbery and/or burglary was the object of the
[12] conspiracy. I have, as I said before, already
[13] defined those offenses.
[14]      The Commonwealth alleges that the
[15] following was an overt act, to wit, the defendant
[16] and/or his co-conspirator took property of another
[17] person.
[18]      Before any defendant can be
[19] convicted, the 12 jurors must agree on the same
[20] person or persons whom the defendant allegedly
[21] conspired with the same object crime or crimes and
[22] the same overt act.
[23]      In order to find defendant guilty of
[24] conspiracy to commit robbery and/or burglary, you
[25] must be satisfied that the following three

Page 78

[1]
[2] elements have been proven beyond a reasonable
[3] doubt.
[4]      First, that the defendant agreed
[5] with the other person or persons that one or more
[6] of them would engage in conduct for planning and
[7] commission of the crime or crimes charged,
[8] burglary and/or robbery.
[9]      And second, that the defendant
[10] and/or the other persons or persons intended to
[11] promote or facilitate the commission of that crime
[12] or those crimes. In other words, they share the
[13] intention to bring about that crime or those
[14] crimes or to make it easier to commit that crime
[15] or those crimes, robbery and/or burglary.
[16]      And third, that the defendant or the
[17] other person or persons did the fact that is
[18] alleged to have been an overt act and did it in
[19] furtherance of the conspiracy.
[20]      As a general rule, if one of the
[21] conspirators agreed to commit a crime and after
[22] that one of the conspirators does any act to carry
[23] out or advance their agreement, then he has done
[24] an overt act in furtherance of their conspiracy.
[25] The other conspirators do not have to participate

Page 79

[1]
[2] in the act or even know about it. In a sense they
[3] are partners and like partners they are
[4] responsible for each other's actions.
[5]      I charge you that a conspiracy can
[6] have as its objective one crime or many crimes.
[7] But it is your task to determine what objective
[8] has been proved beyond a reasonable doubt.
[9]      Now, jurors, I must instruct you on
[10] the concept of liability for conduct of another
[11] person or persons. There are two basic ways that
[12] one defendant may be criminally responsible for
[13] conduct committed by another person or persons.
[14] These two ways may apply even if the defendant in
[15] question was not present at the time and place
[16] when the particular act or occurred.
[17]      The first way is for the defendant
[18] to be a member of the conspiracy. I have already
[19] defined for you what a conspiracy is and how one
[20] is proved. As applied to this case, if it is
[21] proved beyond a reasonable doubt that the
[22] defendant was indeed a member of a conspiracy, he
[23] may be held responsible for the act or acts of
[24] another person or persons if each of the following
[25] elements is proved beyond a reasonable doubt.

Page 80

[1]
[2]      First, that the other person or
[3] persons committed a specific act that was also a
[4] member of the same conspiracy -- strike that.
[5]      First, that the other person who
[6] committed a specific act was also a member of the
[7] same conspiracy.
[8]      And second, that the crime or crimes
[9] in question was or were committed while the
[10] conspiracy was in existence.
[11]      And third, that the crime or crimes
[12] in question was or were committed to further the
[13] goals of the conspiracy.
[14]      There is a second and separate way
[15] that one defendant can be proved liable for the
[16] conduct of another person or persons. That is
[17] when the defendant is an accomplice of the person
[18] who actually commits the crime or crimes at
[19] issue.
[20]      Now, jurors, there is a basic
[21] difference between being an accomplice and being a
[22] conspirator. In a conspiracy people agree to act
[23] jointly. To be an accomplice a person does not
[24] have to agree to help someone, a person is an
[25] accomplice if he on his own acts to have the other

Page 81

[1]
[2] person or persons commit a crime or crimes.
[3]          More specifically, the defendant is
[4] an accomplice of another person for particular
[5] crime or crimes if the following two elements are
[6] proven beyond the reasonable doubt.
[7]          One, that the defendant had the
[8] intent of promoting or facilitating the commission
[9] of that crime or those crimes.
[10]          And two, that the defendant either
[11] solicits, commands, encourages, or request the
[12] other person or persons to commit that crime or
[13] those crimes or aids, agrees to aid, or attempts
[14] to aid the other person or persons in planning or
[15] committing that crime or those crimes.
[16]          It is important to understand that a
[17] person is not an accomplice merely because he is
[18] present when a crime is committed or simply knows
[19] that a crime is being committed.  Accomplice
[20] liability must be assessed separately for each
[21] crime charged.  If two of the crimes are committed
[22] and the defendant is charged for accomplice for
[23] each of those crimes he may not be found liable as
[24] to each individual crime that the defendant had
[25] the intent of promoting the specific crime, and

Page 82

[1]
[2] then either solicited, commanded, encouraged, or
[3] requested the other person or persons to commit
[4] that crime or those crimes or aided, agreed to aid
[5] or attempted to aid the other person in planning
[6] or committing that crime or those crimes.
[7]          In other words, you must decide
[8] whether the prosecution has proved beyond a
[9] reasonable doubt that the defendant was an
[10] accomplice to each crime, the first crime, the
[11] second crime, et cetera.
[12]          Ladies and gentlemen, that concludes
[13] the instructions, the definitions of the crimes
[14] charged against the defendant.  I must now advise
[15] you as to the standards by which you must be
[16] guided as you deliberate on your verdicts.
[17]          In order to return a verdict each
[18] juror must agree.  Your verdict must be unanimous,
[19] a majority vote is not permissible.  You as jurors
[20] have a duty to consult with one another and to
[21] deliberate with a view to reaching a unanimous
[22] agreement if it can be done without violence to
[23] individual judgment.  That is to say that each
[24] juror must decide the case for himself or herself,
[25] but only after an impartial consideration of the

Page 83

[1]
[2] evidence with his or her fellow jurors.
[3]          In the course of such deliberations
[4] a juror should not hesitate to re-examine his or
[5] her own views and to change his or her own opinion
[6] if convinced it is erroneous.  But no juror should
[7] surrender his or her honest convictions as to the
[8] weight or affect of the evidence or as to the
[9] guilt or innocence of the defendant solely because
[10] of the opinion of his or her fellow jurors or for
[11] the mere purpose of returning a unanimous verdict.
[12]          In deliberating on your verdict, you
[13] must not be influenced by anything outside of the
[14] evidence presented in this case and the law as
[15] given by this Judge.  Now, ladies and gentlemen,
[16] the instructions and the law have essentially been
[17] completed.  I need only to meet briefly with the
[18] attorneys and, thereafter, I shall return and
[19] submit the case to you for your deliberations.
[20]          Please bear with us one more time.
[21]     (The following occurred in the anteroom:)
[22]          THE COURT:  I am in the anteroom
[23] with the attorneys, Ms. Baraldi and Mr. Giuliani.
[24] As I said to the jurors, I concluded the
[25] instructions and this is your opportunity to bring

Page 84

[1]
[2] to my attention any requests for corrections or
[3] make any objections, request for clarifying
[4] instructions, or additional instructions.
[5]          MR. GIULIANI:  I have none.
[6]          MS. BARALDI:  I don't have any.
[7]          THE COURT:  Okay.  So we'll submit
[8] the case.  How long do you expect we should keep
[9] them today?
[10]          MR. GIULIANI:  I have no
[11] limitations, as long as you want.
[12]          MS. BARALDI:  I have to leave by
[13] 5:00.
[14]     (The following occurred in open court:)
[15]          THE COURT:  Ladies and gentlemen,
[16] when you retire to deliberate on your verdict, you
[17] will select one of your members as a foreperson,
[18] foreman or forelady.  And that person will have
[19] the responsibility of leading you in your
[20] discussions and he or she will also have the duty
[21] of announcing your verdict in open court.  Please
[22] keep in mind that the foreperson has only one vote
[23] the same as the rest of you.
[24]          Now, when you go out to deliberate
[25] you will take with you this verdict sheet.  And

[1]
[2] you will see it is the case of Commonwealth versus
[3] John In. And what is important on this verdict
[4] sheet is what appears under the word "charge" in
[5] the left hand column and what you will write under
[6] the word "verdict" in the right hand column.
[7]       So you will deliberate on the crime,
[8] burglary, 720 Mifflin Street, write in your
[9] verdict, guilty or not guilty. You will
[10] deliberate on the charge of robbery Vuthay Yun,
[11] and write in your verdict, guilty or not guilty.
[12] You will deliberate on your charge of complainant
[13] Christina Khem, and write in your verdict, guilty
[14] or not guilty. You will deliberate on the charge
[15] of possession an instrument of crime, and write in
[16] your verdict, guilty or not guilty. You will
[17] deliberate on violation of Section 6108, carrying
[18] a firearm in public in Philadelphia, and write in
[19] your verdict, guilty or not guilty. You will
[20] deliberate on the charge of violating Section 6106
[21] Uniform Firearms Act, write in your verdict,
[22] guilty or not guilty. And finally deliberate on
[23] the charge of criminal conspiracy.
[24]       Now, you will see on this verdict
[25] sheet there's a special section for the crime of

[1]
[2] conspiracy. If you find the Commonwealth has
[3] proven the defendant guilty beyond a reasonable
[4] doubt of criminal conspiracy, you will be asked to
[5] mark the crime or crimes that you find proved
[6] beyond a reasonable doubt to be the objective of
[7] conspiracy. So there is an interrogatory that
[8] says answer only if your verdict on conspiracy is
[9] guilty. What crime or crimes do you find to be
[10] the objective of the conspiracy; burglary, yes, or
[11] no; robbery, yes or no.
[12]       In order for this verdict to be
[13] valid the foreperson must sign the sheet, affix
[14] his or her juror number, and date the sheet, that
[15] is after completing it, obviously.
[16]       Now, that does, in fact, conclude my
[17] instructions in the law. I have but one final
[18] thing to say and then the matter will be yours for
[19] deliberation. And that final thing is this if
[20] each of you, and this is a suggestion, treat his
[21] or her fellow jurors with the same courtesy and
[22] respect in your everyday lives, it will make your
[23] deliberative process easier, more meaningful, and
[24] will facilitate the resolution of this matter.
[25]       I will now send you out to

[1]
[2] deliberate, but first, I must ask Jurors No. 13
[3] and 14 to collect their belongings from the jury
[4] room and take a seat in the first row of the
[5] courtroom.
[6]       The final question to counsel,
[7] Ms. Baraldi, Mr. Giuliani, do either of you have
[8] any objection to the jurors retiring to deliberate
[9] at this time?
[10]       MR. GIULIANI: Absolutely not, Your
[11] Honor.
[12]       MS. BARALDI: No, Your Honor.
[13]       THE COURT: Then Jurors No. 1
[14] through and including 12, you may retire to
[15] commence your deliberations and, of course, you
[16] may take your note pads.
[17]       Thank you.
[18] (Juror commence deliberation at 3 o'clock p.m.)
[19]       THE COURT: Let the record reflect
[20] that the jurors have all left the room. And I
[21] will acknowledge that both attorneys conducted
[22] themselves like professionals and I observed that
[23] they were both well-prepared and executed
[24] themselves well. Thank you both for a case well
[25] tried.

[1]
[2]       MR. GIULIANI: Thank you, Your
[3] Honor.
[4]       MS. BARALDI: Thank you, Your Honor.
[5]       THE COURT: All right. Now I know
[6] there are certain people who would like for the
[7] jury to deliberate until midnight, but I think
[8] that given that we have at least three people with
[9] child care responsibilities, we will recess at
[10] either 4:30 or 5:00. And obviously if there is no
[11] verdict by that time, we will reassemble here on
[12] Monday to conclude.
[13]       Any objection?
[14]       MR. GIULIANI: No, Your Honor.
[15]       MS. BARALDI: No, Your Honor.
[16]       THE COURT: It has been a long day.
[17] Mr. Smith, Ms. Laura Vitz, I nearly forgot you
[18] were not spectators. I want to say a word of
[19] thanks. You heard me thank the attorneys for
[20] being diligent. I should like to also thank the
[21] two of you for, first of all, agreeing to serve.
[22] You obviously will not be deliberating on the
[23] verdict but it's important that you understand
[24] that your service is appreciated.
[25]       And I want to say a word of thanks

Page 89

[1]
[2] for that and to tell you that when you go back and
[3] speak to your friends and neighbors, please tell
[4] them when they are called down don't attempt to
[5] manufacture excuses why they can't serve. When
[6] you think about it, who better to serve than you
[7] and you. So for that reason, I say thank you and
[8] you are excused. Enjoy your weekend.
[9]        (Alternate jurors excused.)
[10]        **THE COURT CRIER**: Please remain
[11] seated while the jury enters the courtroom.
[12]        (Jury enters the courtroom at 4:20 a.m.)
[13]        **THE COURT**: Good afternoon, ladies
[14] and gentlemen. Would you please be seated?
[15]        **THE JURY**: (Jury complies.)
[16]        **THE COURT**: Would the foreperson
[17] please rise and identify yourself?
[18]        **THE FOREPERSON**: By name?
[19]        **THE COURT**: Seat number.
[20]        **THE FOREPERSON**: Juror No. 4.
[21]        **THE COURT**: Mr. Foreman, does the
[22] jury have a question or questions?
[23]        **THE FOREPERSON**: Yes, sir.
[24]        **THE COURT**: Read them exactly as
[25] they appear on your written form.

Page 90

[1]
[2]        **THE FOREPERSON**: First question is,
[3] "Can we see the transcript from the radio call
[4] from March 7th, 2007?"
[5]        **THE COURT**: Yes, sir.
[6]        **THE FOREPERSON**: All of them?
[7]        **THE COURT**: Yes.
[8]        **THE FOREPERSON**: Can we see the
[9] exhibit that shows 720 Mifflin, 524 Mifflin, 7th
[10] Street, and 6th Street? This is the rectangular
[11] map."
[12]        Question No. 3, "Were there any
[13] fingerprints taken from the door or steering wheel
[14] of the Altima.
[15]        Question No. 4, "Did Mr. Yun testify
[16] at Mr. Jeans' trial presuming there was a trial?"
[17]        Question No. 5, "Can we have a
[18] written copy of the law related to the definition
[19] of robbery?"
[20]        Question No. 6, "Can we see the
[21] exhibit that shows the aerial view of Jerry Jean
[22] and John In's neighborhood?"
[23]        Question No. 7, "Can we see the
[24] pictures taking by CSU of the white Altima."
[25]        Question No. 8, "Can we see a copy

Page 91

[1]
[2] of Officer Birch's statement from March 7th,
[3] 2007?"
[4]        Question No. 9, "Can we see the last
[5] copy of Officer Birch's statement from March 20th,
[6] 2007?"
[7]        **THE COURT**: Thank you, Mr. Foreman.
[8]        Ladies and gentlemen, the first
[9] thing I should say to you is there is no time
[10] limit for your deliberation. You have as much
[11] time as you need. Having said that and being
[12] aware that it's now onto 4:30, it is this Court's
[13] position that I should address your questions on
[14] Monday at 9 o'clock. So that after I answer the
[15] questions, my answer will be fresh in your mind
[16] and you can resume your deliberations at that
[17] time. So with your permission, we will recess the
[18] case today.
[19]        With this admission, remember you
[20] are a deliberating jury, but you may only
[21] deliberate when the 12 of you are together in the
[22] jury room. You may not discuss the case with
[23] anyone over the weekend, don't let anyone discuss
[24] it with you. You cannot call each other and
[25] discuss the case. You should have no discussion

Page 92

[1]
[2] of the case. Keep an open mind. Report here at 9
[3] o'clock on Monday morning. I will address each of
[4] your nine questions and you can then resume your
[5] deliberations. If I might say to you, have a good
[6] weekend and I'll see you back on Monday.
[7]        **THE COURT CRIER**: Everyone remain
[8] seated while the jury exits the courtroom.
[9]        (Jury departs the courtroom at 4:25 p.m.)
[10]        (Court adjourned.)
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 93

[1]
[2]       I hereby certify that the proceedings and
[3] evidence are contained fully and accurately in the notes
[4] taken by me on the trial of the above case, and this copy
[5] is a correct transcript of the same.
[6]
[7]
[8]
[9]
[10]          _____
[11]              Samanda Rios
[12]              Court Reporter
[13]
[14]
[15]
[16]
[17]          (The foregoing certification of this
[18] transcript does not apply to any reproduction of the same
[19] by any means unless under the direct control and/or
[20] supervision of the certifying reporter.)
[21]
[22]
[23]
[24]
Court Reporting System (Generated 2018/07/10 22:16:38)

