# First Judicial District of Pennsylvania

*51CR00048292007*
*John In*

_____

*Trial (Jury) Volume 1*
*September 12, 2008*



_____

*First Judicial District of Pennsylvania*
*100 South Broad Street, Second Floor*
*Philadelphia, PA 19110*
*(215) 683-8000   FAX:(215) 683-8005*

*Original File COMVIN^9-12-08.txt, 70 Pages*
*CRS Catalog ID: 16010923*

## Page 1

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

-----

COMMONWEALTH              :
                          :
       vs.                : C.P.# 51-CR-0004829-2007
                          :
JOHN IN                   :

-----

Room 801, Criminal Justice Center
Philadelphia, Pennsylvania

-----

Friday, September 12, 2008

-----

**BEFORE**: THE HONORABLE SANDY L.V. BYRD, J.

-----

JURY TRIAL
TESTIMONY OF
POLICE OFFICER FELICIA BATTLES

-----

## Page 2

**APPEARANCES**:

LAUREN BARALDI, ESQUIRE
Assistant District Attorney
For the Commonwealth

RICHARD GIULIANI, ESQUIRE
Attorney for the Defendant

## Page 3

INDEX
COMMONWEALTH'S EVIDENCE

| WITNESS | DR. | CR. | RDR. | RCR. |
|---|---|---|---|---|
| (Previously presented.) | | | | |

EXHIBITS

| NO. | DESCRIPTION | FOR IDENT. | IN EVD. |
|---|---|---|---|
| (Previously presented.) | | | |

DEFENDANT'S EVIDENCE

| WITNESS | DR. | CR. | RDR. | RCR. |
|---|---|---|---|---|
| POLICE OFFICER FELICIA BATTLES | 7 | 34 | 50 | |

EXHIBITS

| NO. | DESCRIPTION | FOR IDENT. | IN EVD. |
|---|---|---|---|
| D-5 | 9-1-1 transmissions | 8 | |
| D-6 | 9-1-1 transcript | 13 | |
| D-7 | Statement | 30 | |

## Page 4

- - -

(The Court, Commonwealth's attorney, Defense attorney, and defendant present in the courtroom.)

- - -

**MR. GIULIANI**: With the Court's permission, we are going to be playing the tape during her testimony, the transmission and such. We are only playing a portion of it.

**THE COURT**: Have you worked that out?

**MR. GIULIANI**: We have.

**THE COURT**: You are going to just request leave to reopen and we'll bring the jury out. I'll ask the question I have and you can move in the exhibit in front of the jury and rest.

Can we make sure we have the right name for the acquittal, the other one said nothing was requested of her. I want to make sure we get the right one.

**MR. GIULIANI**: The complainants would be Christina Khem and Furtari Yun.

**THE COURT**: I want to make sure

Page 5

[1] the ruling was on the correct one. Was that
[2] Dina?
[3] **MR. GIULIANI**: Yes.
[4] **MS. BARALDI**: Yes, Your Honor.
[5] **THE COURT**: All right.
[6] Mr. In is here with his
[7] attorney, Mr. Giuliani and Ms. Baraldi for the
[8] Commonwealth.
[9] Ms. Baraldi?
[10] **MS. BARALDI**: Yes, Your Honor.
[11] I would ask to reopen.
[12] **THE COURT**: Very well. Let's
[13] have the jury brought out.
[14] **THE COURT CRIER**: Please remain
[15] seated while the jury enters the courtroom.
[16] - - -
[17] (Jury enters the courtroom at
[18] 10:26 a.m.)
[19] - - -
[20] (Whereupon, previously sworn
[21] witness enters the courtroom and is seated.)
[22] - - -
[23] **THE COURT**: Good morning.
[24] You may be seated.

Page 6

[1] Mr. Levin, would you expect to
[2] find DNA on a surface if the handler wore
[3] latex gloves?
[4] **THE WITNESS**: No, I would not.
[5] **THE COURT**: Any question based
[6] on my question?
[7] **MR. GIULIANI**: No, Your Honor.
[8] **MS. BARALDI**: No, Your Honor.
[9] **THE COURT**: Thank you, sir. You
[10] may be excused.
[11] - - -
[12] (Witness excused.)
[13] - - -
[14] **THE COURT**: You may continue.
[15] **MS. BARALDI**: At this time the
[16] Commonwealth would ask to move into evidence
[17] all exhibits which has been previously marked
[18] C-1 through C-29.
[19] **THE COURT**: Any objection?
[20] **MR. GIULIANI**: No, Your Honor.
[21] **THE COURT**: They would be
[22] received.
[23] **MS. BARALDI**: At this time the
[24] Commonwealth rests.

Page 7

[1] **THE COURT**: The Commonwealth
[2] having rested, Mr. Giuliani?
[3] **MR. GIULIANI**: Thank you, sir.
[4] The Defense would call Police Officer Felicia
[5] Battles.
[6] **THE COURT CRIER**: Please state
[7] your name, spell your last name, badge number
[8] and assignment for the record.
[9] **THE WITNESS**: My name is Officer
[10] Battles, B-A-T-T-L-E-S, first name,
[11] F-E-L-I-C-I-A, Badge No. 7047, 4th District.
[12] POLICE OFFICER FELICIA BATTLES,
[13] after having been first duly sworn, was
[14] examined and testified as follows:
[15] **THE COURT**: Sir, you may
[16] proceed.
[17] **MR. Giuliani**: Thank you, Your
[18] Honor.
[19] - - -
[20] DIRECT EXAMINATION
[21] - - -
[22] **BY MR. Giuliani**:
[23] **Q.** Good morning, Officer Battles.
[24] **A.** Good morning.

Page 8

[1] **Q.** On March 7th, 2007, were you a
[2] Philadelphia Police Officer?
[3] **A.** Yes.
[4] **Q.** Where were you assigned?
[5] **A.** I was assigned to RPC-46, radio patrol
[6] car 46, covering the 4th District.
[7] **Q.** And do you remember the shift you were
[8] working on that particular day?
[9] A. 12:00 to 8:00 shift.
[10] Q. Midnight to 8:00 in the morning?
[11] A. Midnight to 8:00 in the morning.
[12] **Q.** You at some point received a radio call
[13] while on patrol that morning?
[14] **A.** That's correct.
[15] **MR. GIULIANI**: With the Court's
[16] permission I ask that this be marked as
[17] Defense Exhibit 5.
[18] **THE COURT**: It may be marked.
[19] - - -
[20] (9-1-1 transmissions marked
[21] Defense Exhibit 5 for identification.)
[22] - - -
[23] **MR. GIULIANI**: Your Honor, there
[24] has been a stipulation by and between myself

Page 9

[1] and Ms. Baraldi, that these are the 9-1-1
[2] transmissions that were made in the early
[3] morning hours of March 7th, 2007.  These radio
[4] transmissions were made in the ordinary course
[5] of police business, and the transmissions as
[6] heard on the CD are authentic and accurate.
[7]     **THE COURT**: So stipulated?
[8]     **MS. BARALDI**: Yes, Your Honor.
[9]     **MR. GIULIANI**: With the Court's
[10] permission, may I approach?
[11]     **THE COURT**: You may.
[12] **BY MR. Giuliani**:
[13]   **Q.**   Officer Battles, you will see there's a
[14] compact disk player.  Prior to your testimony
[15] this morning, have you had the opportunity to
[16] listen to some of these transmissions?
[17]   **A.**   Yes, I have.
[18]   **Q.**   And as you have listened to them did you
[19] recognized your voice on some of them?
[20]   **A.**   Yes.
[21]   **Q.**   You went to the location at 720 Mifflin
[22] Street, right?
[23]   **A.**   Yes.
[24]   **Q.**   And I want to jump ahead.  There are two

Page 10

[1] young women who testified here the other day
[2] and you were present, correct?
[3]   **A.**   Yes.
[4]   **Q.**   You've gotten to know those two young
[5] ladies?
[6]   **A.**   Yes.
[7]   **Q.**   Tell the members of the jury who are
[8] they?
[9]   **A.**   I don't know their names, per se.
[10]   **Q.**   Okay.
[11] But you recognize them as the two young
[12] ladies in that house that morning?
[13]   **A.**   Yes, two of them.
[14]     **MR. GIULIANI**: Your Honor, may I
[15] approach again?
[16]     **THE COURT**: Yes.
[17] **BY MR. GIULIANI**:
[18]   **Q.**   Officer, I am going to play this first
[19] tape and make sure it's loud enough.
[20]     - - -
[21]     (Audio recording played.)
[22]     - - -
[23] **BY MR. Giuliani**:
[24]   **Q.**   Now, have you heard that transmission

Page 11

[1] before, Officer Battles?
[2]   **A.**   Not that part, not that I can remember.
[3]   **Q.**   Now, you learned that two of the young
[4] ladies in the house are named Christina Khem
[5] and Dina Khem, you know that today?
[6]   **A.**   Yes.
[7]   **Q.**   As you are out there, you don't receive
[8] that call, you are not hearing the call made
[9] from the person inside of the house?
[10]   **A.**   No.
[11]   **Q.**   Who are you in transmission with or
[12] contact with?
[13]   **A.**   Police radio.
[14]   **Q.**   I am going to play the next one,
[15] Officer, and see if you recognize this.
[16]     - - -
[17]     (Audio recording played.)
[18]     - - -
[19] **BY MR. GIULIANI**:
[20]   **Q.**   Now, you heard that transmission,
[21] correct?
[22]   **A.**   Yes.
[23]   **Q.**   There was a voice on there that said
[24] 4-6?

Page 12

[1]   **A.**   Yes.
[2]   **Q.**   Who is that voice?
[3]   **A.**   My voice.
[4]   **Q.**   Okay.
[5] Now, you identified yourself as 4-6,
[6] tell the members of the jury why that is?
[7]   **A.**   I was working assigned as 4-6 car.
[8]   **Q.**   That's the number of your police
[9] cruiser?
[10]   **A.**   That's correct.
[11]   **Q.**   So it's fair to say it's police
[12] procedure you don't identify yourself by name
[13] or badge number, you usually identify yourself
[14] by car?
[15]   **A.**   Exactly.
[16]   **Q.**   Did you also hear the other two numbers
[17] 4-3?
[18]   **A.**   Yes.
[19]   **Q.**   Do you know who 4-3 is?
[20]   **A.**   Officer Robinson.
[21]   **Q.**   And how about 4-8?
[22]   **A.**   Officer Nolan.
[23]     **MR. GIULIANI**: Your Honor, may
[24] this be marked as Defense Exhibit 6, please?

Page 13

[1]            THE COURT: Yes.
[2]            - - -
[3]            (Transcript marked Defense
[4]     Exhibit 6 for identification.)
[5]            - - -
[6]   BY MR. GIULIANI:
[7]     Q.   Officer Battles, what I am showing you
[8]   is marked D-6, it's a transcript of those
[9]   tapes or conversations we are about to hear.
[10]  You just heard two separate ones, would you
[11]  agree with me?
[12]    A.   Yes.
[13]    Q.   Now, the one that began, which you were
[14]  on identifying yourself as 4-6, starting at
[15]  Page 1 going to Page 2. Again, what time did
[16]  that transmission go out to you in your patrol
[17]  car?
[18]    A.   Approximately 5:15, 5:20.
[19]    Q.   Why don't you look at D-6, it tells you
[20]  the exact times.
[21]    A.   5:14 a.m.
[22]            MR. GIULIANI: May I approach?
[23]            THE COURT: Yes.
[24]  BY MR. GIULIANI:

Page 14

[1]     Q.   Let me show you the bottom transcript
[2]   right here and flip over to Page 2. Do you
[3]   see the transcript of where you responded?
[4]     A.   At the top.
[5]     Q.   Yes, ma'am.
[6]     A.   Yes.
[7]     Q.   And that transmission that we just heard
[8]   starts at 5:15:22 a.m., right?
[9]     A.   Okay.
[10]    Q.   Now, I am going to play the next one in
[11]  line, tell the members of the jury the next
[12]  set of transmissions, what time it begins?
[13]    A.   5:22:27.
[14]    Q.   So seven minutes after the first
[15]  transmission where you are told there's a
[16]  robbery in progress and you respond and
[17]  Officer Robinson responds and Nolan responds
[18]  is the next set, right?
[19]    A.   Okay.
[20]            MR. GIULIANI: Court's
[21]  indulgence, please.
[22]            THE COURT: Yes.
[23]            - - -
[24]            (Short pause.)

Page 15

[1]            - - -
[2]            MR. GIULIANI: There's been a
[3]   stipulation by and between counsel as follows:
[4]            There are going to be
[5]   transmissions, officers identify themselves on
[6]   these transmissions by numbers. The names and
[7]   corresponding numbers for those officers on
[8]   this tape are on the board and counsel agreed
[9]   they are who they are.
[10]           With counsel's permission, I
[11]  would like to open it so the jury can see.
[12]           THE COURT: So stipulated?
[13]           MS. BARALDI: Yes.
[14]           MR. GIULIANI: Thank you.
[15]           - - -
[16]           (Audio recording played.)
[17]           - - -
[18]  BY MR. Giuliani:
[19]    Q.   I am going to stop it right there,
[20]  Officer. Would you agree with me these
[21]  transmissions the jury just heard happened
[22]  after you and your fellow officers went into
[23]  the house of 720 Mifflin?
[24]    A.   Yes.

Page 16

[1]     Q.   Okay.
[2]          And that's seven minutes after you first
[3]   got the call, correct?
[4]     A.   From here, yes.
[5]     Q.   Okay.
[6]          Now, the jury just heard someone say,
[7]   "4-6, be advised I discharged." Did you hear
[8]   that?
[9]     A.   Yes.
[10]    Q.   And do you see that on the transcript in
[11]  front of you?
[12]    A.   Yes.
[13]    Q.   Who is 4-6?
[14]    A.   Mine.
[15]    Q.   And you are telling the radio that you
[16]  fired the weapon?
[17]    A.   That's correct.
[18]    Q.   Let's continue.
[19]           - - -
[20]           (Audio recording played.)
[21]           - - -
[22]  BY MR. GIULIANI:
[23]    Q.   Okay.
[24]         That was you just on there?

Page 17

[1]   A.   That's correct.
[2]   Q.   Let's stop here for a second. Tell the
[3]   members of the jury what happened when you
[4]   went in that house?
[5]   A.   From what point?
[6]   Q.   When you first entered with Officer
[7]   Nolan and Robinson, what did you see?
[8]   A.   When we went in the house, when we first
[9]   entered into the house?
[10]  Q.   Yes, ma'am.
[11]  A.   Okay. I saw a female sitting on the
[12]  couch and I asked her who's in the house.
[13]  Q.   Could you tell the members of the jury
[14]  is this an older person or younger person?
[15]  A.   A younger person.
[16]  Q.   Could you tell their race?
[17]  A.   Asian, yes.
[18]  Q.   Go ahead.
[19]  A.   I'm sorry. And I thought I saw another
[20]  child sitting or laying I'm not sure on the
[21]  couch. Officer Nolan ran up the steps. First
[22]  I asked what happened? Who is in the house?
[23]  Who's in the house? They were sitting there
[24]  with a blank stare and it appeared like

Page 18

[1]   something was wrong. And I said: Police, is
[2]   anybody upstairs? Anybody in the basement?
[3]        And we heard a noise coming from
[4]   upstairs, "I'm alright." And it didn't appear
[5]   to be an Asian male and I advised my partners
[6]   it sounds like a black person, something
[7]   doesn't sound right.
[8]        So as we entered into the house we heard
[9]   noise. Officer Nolan ran upstairs and Officer
[10]  Robinson ran towards the back. At which point
[11]  I was stuck because I didn't know which way to
[12]  run because the radio call came out the
[13]  person's in the basement. So my mind told me
[14]  to run towards Robinson. I heard glass
[15]  breaking upstairs so I ran towards the
[16]  backyard with Officer Robinson. And then it
[17]  appeared that a male came out of the basement,
[18]  but I'm not sure at this point which way he
[19]  came from because everything happened so fast.
[20]  Q.   Let's talk about that.
[21]  A.   Okay.
[22]  Q.   You know that Nolan went upstairs?
[23]  A.   That's correct, we heard glass breaking.
[24]  Q.   Okay.

Page 19

[1]        And then you said you and Robinson went
[2]   towards the back of the house?
[3]   A.   That's correct.
[4]   Q.   To get to the back of the house, is
[5]   there a kitchen you had to run through?
[6]   A.   Yes.
[7]   Q.   Okay.
[8]        And you noticed there was a basement
[9]   door?
[10]  A.   No, we didn't notice the basement door
[11]  at that time. I didn't know where the
[12]  basement was at that time. All I know is my
[13]  partner was running towards the back and he
[14]  went through what appeared to be the backyard
[15]  at this point because I'm right behind him.
[16]  Q.   Tell the members of the jury about this
[17]  male that came out of the basement area. I
[18]  want to make sure we get this correct.
[19]  A.   At that point I thought he came out of
[20]  the basement, I'm not sure which way he came.
[21]  Q.   Can you describe this male that you saw?
[22]  A.   Well, at this point he was tall, about 6
[23]  foot. He looked like he wore -- he had a
[24]  white handkerchief, like a bandana, tied

Page 20

[1]   around his neck with the point coming here.
[2]   He had white latex gloves on.
[3]        He was medium brown skin and he had a
[4]   green hoody on. I thought it was at that
[5]   point I didn't know what color at that point,
[6]   it was green, orange, red. I was just so
[7]   worried about the officer's safety that's in
[8]   the backyard. But all I know is he ran past
[9]   me, and he ran past the officer. Where he
[10]  came from I thought it could have been the
[11]  basement, I wasn't sure at this point.
[12]  Q.   Where did he run to?
[13]  A.   He ran -- when we got -- Officer
[14]  Robinson got out in the backyard first. When
[15]  you look to your left and you look to your
[16]  right, there's an alley, there's a window.
[17]  When you come out of the backyard, you look to
[18]  your left there's like a little alleyway and
[19]  the house and it's a window, he ran that way.
[20]       We heard a window break from upstairs.
[21]  So when you turn to your left there's a shed
[22]  and it's like an old cement outhouse. And
[23]  there's a metal fence that goes way up say
[24]  about 12 feet or less. And Officer Robinson

Page 21

[1] was standing in my peripheral vision towards
[2] the right of me. So I would do like this and
[3] his gun was drawn and we heard noise coming
[4] from the shed. So we were hollering with our
[5] guns drawn, come out with your hands up; come
[6] out of the shed. So we assumed that he was in
[7] the shed because there was nowhere else to run
[8] and there's no way he could have jumped that
[9] fence that quick.
[10]    Q.   Okay.
[11]       And the person that went to the shed is
[12] that the male that ran past you?
[13]    A.   Yes.
[14]    Q.   And you think he cam came out of the
[15] basement?
[16]    A.   I think he did, I wasn't sure.
[17]    Q.   Fair enough. Let's continue with this
[18] transmission.
[19]       - - -
[20]       (Audio recording played.)
[21]       - - -
[22] BY MR. GIULIANI:
[23]    Q.   Officer, let me stop the tape right
[24] there. Do you recognize the voice who is on

Page 22

[1] that transmission right there? If you know,
[2] if you don't know.
[3]    A.   Not really.
[4]       - - -
[5]       (Audio recording played.)
[6]       - - -
[7] BY MR. GIULIANI:
[8]    Q.   Let me pause it again right there.
[9] Officer Battles, did you hear a voice say:
[10] 4-6, be advised, they all have guns.
[11]    A.   Yes.
[12]    Q.   Is that your voice?
[13]    A.   Yes.
[14]    Q.   Tell the members of the jury what
[15] information did you have that all three males
[16] inside the house had guns?
[17]    A.   One of the children in the house said
[18] they all three had guns.
[19]    Q.   Let's continue.
[20]       - - -
[21]       (Audio recording played.)
[22]       - - -
[23] BY MR. GIULIANI:
[24]    Q.   Officer Battles, did you hear that last

Page 23

[1] transmission?
[2]    A.   Yes.
[3]    Q.   That was you?
[4]    A.   That's correct.
[5]    Q.   Do you remember making that
[6] transmission?
[7]    A.   Yes, I do.
[8]    Q.   Where were you when you were making that
[9] transmission, still in the home?
[10]    A.   Still in the home with the children
[11] because I didn't want to leave them knowing we
[12] didn't locate the third male.
[13]    Q.   Now, at that point in time where were
[14] Officers Nolan and Robinson?
[15]    A.   I have no idea. I was in the house with
[16] the children by myself.
[17]    Q.   They were no longer in the home?
[18]    A.   Not at that point, no.
[19]    Q.   And is it fair to say until other backup
[20] officers arrived and entered the home you
[21] stayed inside of the home?
[22]    A.   That's correct.
[23]    Q.   Okay.
[24]       Let's continue.

Page 24

[1]       - - -
[2]       (Audio recording played.)
[3]       - - -
[4] BY MR. GIULIANI:
[5]    Q.   Did you hear that transmission: 4-6, be
[6] advised, two black, white.
[7]    A.   That's correct.
[8]    Q.   That was you?
[9]    A.   I made that statement.
[10]    Q.   Where did you get that information from?
[11]    A.   From the children in the house.
[12]    Q.   Okay.
[13]    A.   At this time it was three girls and one
[14] male child.
[15]    Q.   Okay.
[16]       And just so the jury is clear, you saw
[17] one of these males inside of the house and
[18] that's the person you shot at?
[19]    A.   That's correct.
[20]    Q.   You didn't see either of the other two?
[21]    A.   No.
[22]    Q.   Let's continue.
[23]       - - -
[24]       (Audio recording played.)

Page 25

- - -
BY MR. GIULIANI:
Q. Again, that was you.
A. That's correct.
Q. One had light-colored jeans and a navy blue zip-up sweats?
A. That's correct.
Q. And you're getting information from people inside of the home?
A. Exactly.
Q. Not just inside of the house, but outside of the house in the street there was chaos, there was a lot of activity.
    MS. BARALDI: I object. It calls for speculation.
    MR. GIULIANI: I'll rephrase.
BY MR. GIULIANI:
Q. This happened quickly.
A. Yes.
Q. The whole event happened quickly and fast?
A. Yes.
Q. And you're getting information from people inside of the home?

Page 26

A. Only from the two females at this point.
Q. Okay.
   They are obviously excited about what happened?
A. Yes.
Q. Okay.
   Did you ever see a man named Vuthary Yun?
A. That would be the father, yes.
Q. And where did you see him?
A. Maybe in the timing about maybe a good three minutes, four minutes, I'm not sure.
Q. You said --
A. I'm not sure because I wasn't timing anything at the time.
Q. You say a good three or four minutes after what? After you entered? After the discharge? After the officers left the house?
A. Oh no, you are talking about after I entered, after the officers left the house.
Q. I am asking you.
A. When the officers returned back to the house I would say a good maybe five, I'm not sure. I really can't put the minutes or

Page 27

seconds, I really can't. Not at this time anyway.
Q. Let me ask you this: Did you eventually or at any point in time go into the basement?
A. We never made it into the basement, not at all.
Q. Did you see the father come out of the basement?
A. Yes.
Q. You did?
A. Yes.
Q. When he came out of the basement was he by himself?
A. The second -- yes.
Q. Did you notice anything strange about him?
A. Yes, he had a cord like a long shoestring. And it was wrapped from around his ankles all the way up to his knees. And it was like a bright pumpkin red or orange, like the color of pumpkin. It was wrapped around his legs, his arms were bounded and there was something in his mouth.
Q. Now, you were getting information from

Page 28

the two girls at this point, right?
A. At this point it wasn't the two girls that I seen, it was the child, the baby female.
Q. Okay.
A. Is the information I got this from.
Q. Okay.
   Let's continue.
    - - -
    (Audio recording played.)
    - - -
BY MR. GIULIANI:
Q. Officer Battles, that's you, right?
A. Yes.
Q. And that's your badge number?
A. Yes.
Q. Let's talk about this briefly. Are there special procedures that occur when a Philadelphia police officer discharges his or her weapon?
A. Yes.
Q. Tell the members of the jury what they are?
A. We are not to make a statement to anyone

Page 29

[1] and we have to wait until a supervisor comes
[2] on location. And we pass our weapon to the
[3] supervisor and at that point we make the
[4] statement to the supervisor. How many times
[5] it was discharged and about where did you
[6] discharge.
[7] **Q.** Okay.
[8] And you did that in this case?
[9] **A.** That's correct.
[10] **Q.** Who is the supervisor that came to
[11] location?
[12] **A.** Sergeant Woods.
[13] **Q.** And did you give him your firearm?
[14] **A.** Yes, I did.
[15] **Q.** Let's continue.
[16] - - -
[17] (Audio recording played.)
[18] - - -
[19] **BY MR. GIULIANI**:
[20] **Q.** Officer Battles, did you at any point in
[21] time make a statement afterwards that day
[22] about what happened? After what we heard on
[23] the tape about the discharge of the weapon.
[24] **A.** Only to my sergeant.

Page 30

[1] **Q.** Okay.
[2] **MR. Giuliani**: Your Honor, I'd
[3] ask that this be marked as D-7, please.
[4] - - -
[5] (Statement marked Defense
[6] Exhibit 7 for identification.)
[7] - - -
[8] **BY MR. GIULIANI**:
[9] **Q.** Officer Battles, I am showing you what's
[10] been marked Defense Exhibit 7. Take a look at
[11] that and let me know when you had a chance to
[12] look at it and know what it is.
[13] **A.** Yes, I know what this is.
[14] **Q.** You've seen that before, right, Officer?
[15] **A.** Yes.
[16] **Q.** Tell the members of the jury what D-7
[17] is?
[18] **A.** D-7 is the statement I made to Internal
[19] Affairs in August, 8/24/07.
[20] **Q.** Now, before the jury gets the wrong
[21] idea, isn't it a fact because of the discharge
[22] of the weapon you're required to make a
[23] statement?
[24] **A.** That's correct.

Page 31

[1] **Q.** No indication you did anything wrong,
[2] but you have to talk to them.
[3] **A.** Yes.
[4] **Q.** It's part of your duties as a police
[5] officer. Would you go to Page 2, please.
[6] **A.** Okay.
[7] **Q.** And do you see the question there:
[8] "Tell me all that you know about this
[9] incident."
[10] Do you see that?
[11] **A.** Yes.
[12] **Q.** I want you to go down to paragraph two
[13] and begin reading there.
[14] **A.** "I was continuously yelling 'police' and
[15] asking if everything was okay. It sound like
[16] a black male's voice shouted down from
[17] upstairs that everything was okay. I looked
[18] back and I told the other officers that the
[19] voice didn't sound like an Asian individual,
[20] that it sounded like a black male.
[21] "At that point an Asian female came
[22] running downstairs at a high rate of speed
[23] stating 'there are two males upstairs, they
[24] got guns.' At the same time another Asian

Page 32

[1] female came running from the kitchen area and
[2] she said that there was a male downstairs in
[3] the basement. And she said they all got guns;
[4] my father's down in the basement. Then I
[5] asked who else was there? And she said that
[6] the male with the gun was still down there.
[7] She said there were three black males and they
[8] all had guns. Officer Nolan heard a noise and
[9] he ran upstairs."
[10] **Q.** Let me stop you right there. You're
[11] telling the IAD officer on that date and time
[12] that when you came in an Asian female came
[13] running from the kitchen area.
[14] **A.** That's exactly what I said.
[15] **Q.** That's different from the young Asian
[16] female who came downstairs, correct?
[17] **A.** Different.
[18] **Q.** And this Asian female specifically told
[19] you that there was a male downstairs in the
[20] basement with a gun?
[21] **A.** Yes, that's what I believe she said.
[22] **Q.** And her father was down there, too?
[23] **A.** That's correct.
[24] **Q.** Please continue to the next paragraph.

Page 33

[1] The bottom paragraph on Page 2.
[2] **A.** "We see this male come out from the area
[3] where the Asian female came from, the kitchen
[4] area. There was a black male about 6'4",
[5] husky build, 290 pounds wearing an orange
[6] hoody. And he had a white handkerchief over
[7] his face and latex gloves on his hands. He
[8] runs out of the back door and I was going
[9] towards the back door. Officer Robinson runs
[10] out of the back door and then I ran out after
[11] Robinson. We didn't see the male at first the
[12] light" -- wait a minute.
[13] "We didn't see the male at first. The
[14] light was dim there when we ran out of the
[15] back door. Robinson was to my right about 5
[16] feet away, there was a shed to the left in the
[17] yard. We knew that he had to be in the shed
[18] because there didn't seem to be a way to get
[19] out of the yard."
[20] **Q.** Let me stop you there, Officer. You
[21] were telling the Internal Affairs investigator
[22] what you remember to the best of your
[23] knowledge?
[24] **A.** Five months later, yes.

Page 34

[1] **Q.** And you'll agree with me in your
[2] statement you tell them that the male that
[3] ends up in the backyard, who you eventually
[4] discharged your weapon on, came out of the
[5] kitchen area?
[6] **A.** At that point I believed he came from
[7] the kitchen area.
[8] **Q.** Fair enough.
[9] **A.** I wasn't sure. I told them I wasn't
[10] sure.
[11] **Q.** Okay.
[12] **A.** Because it happened so fast.
[13] **Q.** Fair enough, Officer.
[14] **MR. GIULIANI**: That's all I
[15] have. Thank you very much.
[16] **MS. BARALDI**: May I?
[17] **THE COURT**: Yes.
[18] **MS. BARALDI**: Thank you.
[19] - - -
[20] CROSS-EXAMINATION
[21] - - -
[22] **BY MS. BARALDI**:
[23] **Q.** Good morning, Officer.
[24] **A.** Good morning.

Page 35

[1] **Q.** Officer Battles, prior to March 7th,
[2] 2007, how long had you been a police officer?
[3] **A.** Seven years and a few months.
[4] **Q.** In that seven years, had you ever
[5] discharged your weapon?
[6] **A.** Never.
[7] **Q.** Is this the first time you've ever
[8] discharged it?
[9] **A.** Yes.
[10] **Q.** Is this the only time to date you've
[11] discharged your weapon; is that fair to say?
[12] **A.** Yes, ma'am.
[13] **Q.** You receive a radio call and I'll quote
[14] **here**: "Somebody breaking in. There's no
[15] flash."
[16] **A.** Yes.
[17] **Q.** And we know that because we heard it on
[18] the radio tape?
[19] **A.** Yes.
[20] **Q.** So you don't have any other information
[21] other than somebody breaking in; is that
[22] correct?
[23] **A.** Yes.
[24] **Q.** So when you arrive on location, you

Page 36

[1] arrive on location with Officer Robinson and
[2] Nolan, correct?
[3] **A.** Yes.
[4] **Q.** You actually go in first, not the two
[5] guys, correct?
[6] **A.** Yes.
[7] **Q.** So they send you in first?
[8] **A.** They are right behind me.
[9] **Q.** You walk in and see an Asian child
[10] sitting on the couch?
[11] **A.** Yes.
[12] **Q.** This is not the two girls that have been
[13] here to testify, this is a younger child?
[14] **A.** That's correct.
[15] **Q.** You walk in and you say "Police."
[16] **A.** Yes.
[17] **Q.** You hear something coming from upstairs,
[18] you recognize that voice as not the voice of
[19] an Asian man.
[20] **A.** That's correct.
[21] **Q.** As a result of that, Officer Nolan goes
[22] running upstairs or Christina Khem comes
[23] running downstairs first?
[24] **A.** Christina Khem coming running downstairs

Page 37

[1] first.
[2] **Q.** **She says**: "Help me, help me."
[3] **A.** That's correct.
[4] **Q.** Officer Nolan goes upstairs?
[5] **A.** Yes.
[6] **Q.** Officer Robinson takes off to the back?
[7] **A.** That's correct.
[8] **Q.** You make a split second decision you're
[9] going with Robinson.
[10] **A.** Yes.
[11] **Q.** Reason being no one is going upstairs,
[12] the only way they came get out is out of the
[13] window; fair to say?
[14] **A.** Yes.
[15] **Q.** At this point you don't know anything
[16] about the basement?
[17] **A.** No.
[18] **Q.** Because the radio call you received at
[19] this point is just somebody breaking in,
[20] that's all radio told you. And we know that
[21] because we listened to the tape. Okay?
[22] **A.** Okay.
[23] **Q.** So is it fair to say the only thing you
[24] know at this point is somebody breaking in,

Page 38

[1] there's no flash, female complainant,
[2] someone's in the house, she's in the basement.
[3] **A.** That's correct.
[4] **Q.** That's all you know.
[5] **A.** That's correct, yeah.
[6] **Q.** So you are not looking for a basement
[7] door and following your partner out back?
[8] **A.** Yes.
[9] **Q.** At some point in time Robinson goes
[10] through and in this house behind the living
[11] room is a kitchen; is that fair to say?
[12] **A.** That's correct.
[13] **Q.** And when you walk in the couch is facing
[14] the front door?
[15] **A.** Yes.
[16] **Q.** So when you walk in that's how you see
[17] the Asian female sitting right there, the
[18] little girl?
[19] **A.** Yes.
[20] **Q.** If I told you her name, would that help?
[21] **A.** Maybe.
[22] **Q.** Angela?
[23] **A.** (No audible response.)
[24] **Q.** We'll go by the youngest Asian daughter.

Page 39

[1] **A.** Yes.
[2] **Q.** The stairs are to your left, no one goes
[3] running up the steps, you are headed towards
[4] the back?
[5] **A.** Right.
[6] **Q.** Now, in the kitchen there's a door to
[7] your right, fair to say, to get out of that
[8] back alleyway?
[9] **A.** That's correct.
[10] **Q.** Robinson's in front of you?
[11] **A.** That's correct.
[12] **Q.** In your mind do you see Robinson opening
[13] that door?
[14] **A.** Yes.
[15] **Q.** Okay.
[16] At this point you haven't seen any other
[17] people in this house, but that Asian female,
[18] other than police, that second?
[19] **A.** At that second.
[20] **Q.** Okay.
[21] Robinson goes out the back, right,
[22] you're right behind him?
[23] **A.** That's correct.
[24] **Q.** Now, you get out in the back and then

Page 40

[1] you realize you hear something in the shed;
[2] fair to say?
[3] **A.** Yes.
[4] **Q.** Okay.
[5] Do you see anybody running past Robinson
[6] outside in the alley?
[7] **A.** Yes.
[8] **Q.** So the first time you see anyone that's
[9] not the Asian female or not one of your
[10] brother's in blue is outside in that alley; is
[11] that fair to say?
[12] **A.** Yes.
[13] **Q.** So you don't see anybody inside of the
[14] house, did you?
[15] **A.** It happened so fast, no. Not really,
[16] no.
[17] **Q.** As we are going through it now, though,
[18] you realize you are following Robinson out and
[19] the first person you see is already outside?
[20] **A.** That's correct, because there's a big
[21] window.
[22] **Q.** There's a kitchen window?
[23] **A.** Yes.
[24] **Q.** So you see him through that window and

Page 41

[1] he's actually already outside?
[2] **A.** Yes.
[3] **Q.** And the only place he could have come
[4] from is where?
[5] **A.** When you turn to your right there's --
[6] like, picture this being my right. From here
[7] -- from that line that wood line right there.
[8] **Q.** Right here?
[9] **A.** Yes. If that's my right, the wood line
[10] would be the house and it would be a window.
[11] **Q.** Okay.
[12] So when I'm walking out the back door --
[13] **A.** Like, the second floor window.
[14] **Q.** You are following Robinson out, that
[15] window is to the right in the kitchen. It has
[16] the bars on it that the ladies and gentlemen
[17] already seen.
[18] **A.** Right.
[19] **Q.** If looking to your right, that's the
[20] house right there, correct?
[21] **A.** Right.
[22] **Q.** The only place he could have come from
[23] is that second story window; is that fair to
[24] say?

Page 42

[1] **A.** That's fair to say.
[2] **Q.** So you could have seen him through that
[3] window still while inside of the house?
[4] **A.** Right.
[5] **Q.** But you couldn't have seen him inside
[6] the house?
[7] **A.** No. Thinking about it, no.
[8] **Q.** And it's clear in your head you remember
[9] that white handkerchief.
[10] **A.** I surely do. It jumped at me
[11] distinctively.
[12] **Q.** So you are following him into the yard?
[13] **A.** Right.
[14] **Q.** By the time you go outside you don't see
[15] him in the yard; fair to say?
[16] **A.** Yes.
[17] **Q.** You hear noises coming from the shed,
[18] correct?
[19] **A.** Yes.
[20] **Q.** When he's in the shed how long are you
[21] standing in the backyard with your gun drawn
[22] with Officer Robinson?
[23] **A.** Twenty seconds or less.
[24] **Q.** And the whole time you're screaming

Page 43

[1] "Police"?
[2] **A.** Yes.
[3] **Q.** And you don't know what he's got in his
[4] hands?
[5] **A.** I don't know.
[6] **Q.** Now, this is all taking place between
[7] the radio call at 5:15 and the next time we
[8] hear from you, you already discharged that's
[9] not until 5:22?
[10] **A.** That's correct.
[11] **Q.** That's a seven-minute period of time.
[12] **A.** That's correct.
[13] **Q.** So there's a point in time when you and
[14] Robinson are outside?
[15] **A.** Correct.
[16] **Q.** And no one is on the second floor?
[17] **A.** Yes.
[18] **Q.** There's no police on the first floor of
[19] the house?
[20] **A.** No. And I'm worried about Nolan
[21] upstairs.
[22] **Q.** So you are out back and in about 20
[23] seconds you're screaming for this guy to get
[24] out of the shed.

Page 44

[1] **A.** That's correct.
[2] **Q.** He gets out of the shed. What happens
[3] right that second? What do you see?
[4] **A.** When he comes out of the shed we are
[5] hollering at him, get on the ground, get on
[6] the ground. He steps one foot out and he
[7] hesitates and you can't see his right arm, but
[8] you can see his left arm. Let's see. He's
[9] facing me. So you could see one arm come out
[10] and we are hollering, come out, get on the
[11] ground. And at that split point he turns and
[12] it seems like he's going to comply, but at
[13] that split point he turns and grabs the arm
[14] rail and he reaches his other foot out. As
[15] he's getting ready to pull out it seems like I
[16] see something silver, that's when I discharge.
[17] But at the same point he jumps over the rail,
[18] jumps over and over.
[19] **Q.** Okay.
[20] **A.** And that's what happens after. You
[21] know, at the same point I'm discharging. I
[22] don't know if he's coming out with something
[23] on me or my partner.
[24] **Q.** And you find out later he's not struck?

Page 45

[1] **A.** Yes.
[2] **Q.** You discharge once and put the gun down,
[3] right?
[4] **A.** Yes.
[5] **Q.** And he goes eastbound down the alley?
[6] **A.** Yes.
[7] **Q.** And because you discharged then, police
[8] procedure you stay on the scene?
[9] **A.** Right.
[10] **Q.** Now at this point, if you can recall, he
[11] goes over the fence, where's Nolan? Nolan was
[12] in the backyard with you?
[13] **A.** Right now, I don't remember that.
[14] **Q.** Fair enough.
[15] All of a sudden then Robinson -- when do
[16] you first remember meeting back up with Nolan
[17] or do you see Nolan again?
[18] **A.** When we meet back up with Nolan is when
[19] Robinson runs back in the house. I stopped
[20] and turned around and started following
[21] Robinson. Then I see Nolan downstairs and
[22] then they started to run out the back door.
[23] Because Robinson said he ran out the back, he
[24] ran over the alley, he's going over radio. So

Page 46

[1] now they are running out the back door
[2] together, and I look back and I see the two
[3] girls there. And I'm starting to run out with
[4] them and then I stopped, because I got right
[5] towards the front door and I was getting ready
[6] to run and I said, ain't nobody here with the
[7] children. So I backed up and went in the
[8] house because I remembered there was a third
[9] male and we never -- we didn't see where he
[10] was, you know what I mean, where he came from.
[11] **Q.** That third male could have been in the
[12] closet the whole time, so it was a good thing
[13] you did.
[14] **A.** He could be somewhere in the house so I
[15] stayed there with them.
[16] **Q.** So at this point Mr. Yun, you realize,
[17] because you remember the two girls there is
[18] not out of the basement yet?
[19] **A.** Right.
[20] **Q.** In your mind's eye. And when we are
[21] talking about the two girls, we are talking
[22] about the girl that runs down the steps we
[23] know is Christina yelling help me, help me,
[24] and the little girl on the couch.

Page 47

[1] **A.** Exactly.
[2] **Q.** Because in your statement you said some
[3] girl came running out of the basement area and
[4] said to you that there's -- and I'm turning to
[5] Page 2 of your statement.
[6] "At the same time" -- paragraph 2. "At
[7] the same time another Asian female came
[8] running from the kitchen. She said there was
[9] a male downstairs in the basement. They all
[10] got guns, my father is down in the basement."
[11] **A.** That's correct.
[12] **Q.** Okay.
[13] Is the Asian female that said that to
[14] you the little girl on the couch?
[15] **A.** No.
[16] **Q.** The girl Dina from the basement, is it
[17] the older daughter that says that to you?
[18] Think back.
[19] **A.** The older daughter. She was the older
[20] daughter because the one next to the oldest
[21] was the one that was upstairs if I can vaguely
[22] recall. I am almost sure about it.
[23] **Q.** But at this point you're there with
[24] Christina already?

Page 48

[1] **A.** Right.
[2] **Q.** And with the little girl on the couch?
[3] **A.** Right.
[4] **Q.** When you first see Dina come up from the
[5] basement?
[6] **A.** Right.
[7] **Q.** So it's after the discharge that you
[8] first see Dina come up from the basement?
[9] **A.** That's correct.
[10] **Q.** And her father follows her up later on?
[11] **A.** Yes.
[12] **Q.** Now, if I could turn your attention to
[13] the transcripts of the radio call that I am
[14] not going to play for everybody because
[15] everybody has heard it already.
[16] You give a description -- turning to
[17] Page 5, for the record, of the radio call.
[18] About 10 lines down it says, "4-6" which is
[19] you, correct?
[20] **A.** Yes.
[21] **Q.** "Be advised one had light-colored jeans
[22] and navy blue zipped up sweats."
[23] Now, the only man you had seen was the
[24] man you discharged at Jerry Jean and he's

[1] wearing a green sweatshirt, correct?
[2] **A.** That's correct.
[3] **Q.** Who gives you that information?
[4] **A.** The younger daughter. The little girl
[5] on the couch.
[6] **Q.** The little girl on the couch, she tells
[7] you about the navy blue zip-up sweat shirt?
[8] **A.** Yes, I can remember. Because when I
[9] usually ask anybody about a hoody, you have
[10] two types of hoodies, you have one that you
[11] can zip-up and you can put your hands in and
[12] one that zip-up that -- you know, like, no
[13] zipper at all, you know what I mean.
[14] So I asked her, listen, make sure, is
[15] there anything distinctive about the hoody?
[16] She said it zips up. I said what about the
[17] jeans was it light color or navy blue or dark.
[18] She said it's like light blue, like acid wash
[19] that's exactly her words. I went over the air
[20] I said be advised he has a navy blue hoody on,
[21] it zips up, so this way they know what type of
[22] hoody it was, and a pair of light blue jeans.
[23] **Q.** And that information came from the
[24] little girl on the couch?

[1] **A.** That's exactly right.
[2] **MS. BARALDI**: I don't have any
[3] further questions.
[4] **THE COURT**: Any redirect?
[5] **MR. GIULIANI**: Briefly.
[6] - - -
[7] REDIRECT EXAMINATION
[8] - - -
[9] **BY MR. GIULIANI**:
[10] **Q.** Officer Battles, I want to touch on
[11] something you said. I had never discharged
[12] your weapon before that day?
[13] **A.** No.
[14] **Q.** It was a very scary situation.
[15] **A.** Yes, it was.
[16] **Q.** Do you agree with me, your description
[17] to Internal Affairs is different, five months
[18] later is different than what you just
[19] testified today?
[20] **A.** That's correct.
[21] **Q.** And that's part of the fact that it
[22] happened that fast and that is frightening
[23] even to you are a trained police officer?
[24] **A.** That's correct.

[1] **Q.** Okay.
[2] **MR. GIULIANI**: That's all I
[3] have. Thank you very much.
[4] **THE COURT**: Any redirect?
[5] **MS. BARALDI**: No, Your Honor.
[6] **THE COURT**: Officer, you may
[7] step down.
[8] - - -
[9] (Witness excused.)
[10] - - -
[11] **THE COURT**: May I see counsel
[12] for a moment?
[13] Perhaps we should give the jury
[14] a short recess and I'll see you here in open
[15] court.
[16] **MS. BARALDI**: Okay.
[17] **THE COURT CRIER**: Please remain
[18] seated while the jury exits the courtroom.
[19] - - -
[20] (Jury departs the courtroom at
[21] 11:20 a.m.)
[22] - - -
[23] **THE COURT**: Let the record
[24] reflect the jurors have exited the courtroom.

[1] Mr. Giuliani, who is your next
[2] witness?
[3] **MR. GIULIANI**: I intend to not
[4] call any further witnesses. I will colloquy
[5] my client about his Constitutional rights. I
[6] intend to move into evidence my exhibits and I
[7] am going to rest.
[8] **THE COURT**: Very well.
[9] Will you have any rebuttal,
[10] Ms. Baraldi?
[11] **MS. BARALDI**: No, Your Honor.
[12] **THE COURT**: Okay. Give me one
[13] second. All right.
[14] Let the record reflect the
[15] jurors have all left the courtroom.
[16] Mr. Giuliani, I am going to
[17] restate what I heard you say, that is that you
[18] intend to mark and move your exhibits and
[19] rest, correct, sir?
[20] **MR. GIULIANI**: It is, Your
[21] Honor.
[22] **THE COURT**: And I heard you say
[23] that your client will not be testifying.
[24] **MR. GIULIANI**: That's correct.

Page 53

[1] **THE COURT**: Let's have Mr. In
[2] sworn in.
[3] **THE COURT CRIER**: Please state
[4] for the record your name and spell your name
[5] for the record.
[6] **THE DEFENDANT**: John In, I-N.
[7] - - -
[8] JOHN IN, after having been first
[9] duly sworn, was examined and testified as
[10] **follows**:
[11] - - -
[12] **THE COURT**: You may be seated,
[13] Counsel. Can we take up another matter that
[14] will last up about five minutes?
[15] - - -
[16] (Short recess in the matter of
[17] Commonwealth v. John In.)
[18] - - -
[19] **THE COURT**: We'll reconvene in
[20] Commonwealth v. John In.
[21] Mr. In, you have been sworn.
[22] Tell me your full name, state your age and
[23] give me your date of birth.
[24] **THE DEFENDANT**: John In, I-N,

Page 54

[1] 8/5/83.
[2] **THE COURT**: How old are you?
[3] **THE DEFENDANT**: Twenty-five.
[4] **THE COURT**: What's the highest
[5] grade you completed in school, sir?
[6] **THE DEFENDANT**: Graduated high
[7] school.
[8] **THE COURT**: So you read, write,
[9] and understand English, correct?
[10] **THE DEFENDANT**: Yes.
[11] **THE COURT**: Where did you
[12] graduate high school?
[13] **THE DEFENDANT**: Olney High.
[14] **THE COURT**: Have you been
[15] diagnosed with and treated for mental illness
[16] or disease?
[17] **THE DEFENDANT**: No.
[18] **THE COURT**: Are you under the
[19] influence of drugs, alcohol, or medication?
[20] **THE DEFENDANT**: No.
[21] **THE COURT**: You heard your
[22] attorney, Mr. Giuliani, tell me that you have
[23] decided not to testify in this case; is that
[24] correct?

Page 55

[1] **THE DEFENDANT**: Yes, Your Honor.
[2] **THE COURT**: Do you understand
[3] that you are the defendant in this case and
[4] for that reason you have rights?
[5] **THE DEFENDANT**: Right.
[6] **THE COURT**: You've seen that
[7] play out. You are presumed to be innocent.
[8] The Commonwealth is obliged to prove you
[9] guilty beyond a reasonable doubt. Your
[10] attorney has confronted the witnesses and you
[11] have observed that the Constitutional rights
[12] that are yours have been protected. Agreed?
[13] **THE DEFENDANT**: Yes.
[14] **THE COURT**: Now, we are at the
[15] juncture where the Commonwealth has rested and
[16] there's been a witness called for defense.
[17] And I must advise you as to what your options
[18] are. I do this knowing full well that you
[19] have already had this discussion with
[20] Mr. Giuliani and he has spoken to you in his
[21] role as counsel. I am simply making a record.
[22] Do you understand that?
[23] **THE DEFENDANT**: Yes.
[24] **THE COURT**: Every defendant in a

Page 56

[1] criminal trial has an absolute right to
[2] testify, he or she has a right to call
[3] witnesses if the defendant elects to do so.
[4] Do you understand?
[5] **THE DEFENDANT**: Yes.
[6] **THE COURT**: On the other hand,
[7] every defendant in a criminal case has a
[8] Constitutional right against self-
[9] incrimination, you have a right of silence at
[10] trial. Do you understand?
[11] **THE DEFENDANT**: Yes.
[12] **THE COURT**: You have no
[13] obligation to testify and/or call witnesses
[14] for that matter. Do you understand that?
[15] **THE DEFENDANT**: Yes.
[16] **THE COURT**: However, whether or
[17] not you testify is a decision that you must
[18] make. It is entirely up to you, it is not a
[19] decision that Mr. Giuliani can make. Do you
[20] understand that?
[21] **THE DEFENDANT**: Yes.
[22] **THE COURT**: Now, do you
[23] understand what your rights are?
[24] **THE DEFENDANT**: Yes.

Page 57

[1] **THE COURT**: Do you understand
[2] what your options are?
[3] **THE DEFENDANT**: Yes.
[4] **THE COURT**: Do you understand
[5] that you can testify if you want to?
[6] **THE DEFENDANT**: Yes.
[7] **THE COURT**: Do you understand
[8] that if you do not wish to testify you can
[9] simply advise me that you do not wish to
[10] testify and that decision will be honored?
[11] **THE DEFENDANT**: Yes.
[12] **THE COURT**: Is that clear to
[13] you?
[14] **THE DEFENDANT**: Yes.
[15] **THE COURT**: Now, have you
[16] thought about this?
[17] **THE DEFENDANT**: Yes, I do not
[18] wish to testify.
[19] **THE COURT**: Having thought about
[20] this have you made a decision?
[21] **THE DEFENDANT**: Yes.
[22] **THE COURT**: What is your
[23] decision?
[24] **THE DEFENDANT**: I do not wish to

Page 58

[1] testify.
[2] **THE COURT**: Is that your
[3] decision?
[4] **THE DEFENDANT**: Yes.
[5] **THE COURT**: Is your decision
[6] made of your own free will?
[7] **THE DEFENDANT**: Yes.
[8] **THE COURT**: Did you discuss this
[9] with your attorney?
[10] **THE DEFENDANT**: Yes.
[11] **THE COURT**: Are you satisfied
[12] with his services?
[13] **THE DEFENDANT**: Yes.
[14] **THE COURT**: Do you understand
[15] not withstanding all of that that it is not
[16] his decision, it's your decision?
[17] **THE DEFENDANT**: Yes.
[18] **THE COURT**: Is the decision not
[19] to testify yours?
[20] **THE DEFENDANT**: Yes.
[21] **THE COURT**: Did you make it of
[22] your own free will?
[23] **THE DEFENDANT**: Yes.
[24] **THE COURT**: Did anybody threaten

Page 59

[1] you or force you not to testify?
[2] **THE DEFENDANT**: No.
[3] **THE COURT**: You are doing this
[4] of your own free will?
[5] **THE DEFENDANT**: Yes.
[6] **THE COURT**: Mr. Giuliani, there
[7] is an instruction, 3.10(a) that reads as
[8] **follows**:
[9] "It is entirely up to the
[10] defendant in every criminal trial whether or
[11] not to testify. He has an absolute right
[12] founded on the Constitution to remain silent.
[13] You must not draw any inference of guilt or
[14] any inference adverse to the defendant from
[15] the fact that he did not testify."
[16] Does your client wish me to give
[17] that instruction?
[18] **MR. GIULIANI**: Yes, Your Honor.
[19] **THE COURT**: Would you discuss it
[20] with him again so that I can note that a
[21] discussion took place?
[22] **MR. Giuliani**: Thank you, Your
[23] Honor.
[24] **THE COURT**: Mr. In, did you hear

Page 60

[1] me read the instruction?
[2] **THE DEFENDANT**: Yes.
[3] **THE COURT**: Did you hear your
[4] attorney say he wished me to give that
[5] instruction on your behalf?
[6] **THE DEFENDANT**: Yes.
[7] **THE COURT**: Once again there are
[8] cases in the literature where defendant's
[9] later on appeal that say I did not want that
[10] instruction. So it's been my practice to ask
[11] the defendant if he wants me to give that
[12] instruction.
[13] **THE DEFENDANT**: Yes.
[14] **THE COURT**: Did you discuss this
[15] with your attorney?
[16] **THE DEFENDANT**: Yes.
[17] **THE COURT**: I don't want to know
[18] what the two of you discussed, I want to know
[19] what decision you made.
[20] **THE DEFENDANT**: Yes, I want the
[21] instruction.
[22] **THE COURT**: Did anyone promise
[23] you anything, or threaten you, or force you to
[24] make this decision?

[1] **THE DEFENDANT**: No.
[2] **THE COURT**: Is it your decision?
[3] **THE DEFENDANT**: Yes.
[4] **THE COURT**: Is it made of your
[5] own free will?
[6] **THE DEFENDANT**: Yes.
[7] **THE COURT**: Did you discuss it
[8] with your attorney?
[9] **THE DEFENDANT**: Yes.
[10] **THE COURT**: Are you satisfied
[11] with his services?
[12] **THE DEFENDANT**: Yes.
[13] **THE COURT**: Nevertheless, this
[14] is your decision?
[15] **THE DEFENDANT**: Yes.
[16] **THE COURT**: John In's decision?
[17] **THE DEFENDANT**: Yes.
[18] **THE COURT**: I'll give the
[19] instruction. Which brings us to the last part
[20] of this which is the formal charging
[21] conference.
[22] So the Court hereby convenes a
[23] formal charging conference.
[24] The Court makes the following

[1] finding:
[2] The Court finds the defendant
[3] has knowingly, intelligently, and voluntarily
[4] exercised his right of silence and determined
[5] that he will not be testifying.
[6] What points of charge, if any,
[7] are you requesting, Mr. Giuliani?
[8] **MR. GIULIANI**: Your Honor, I
[9] don't believe there are any other specific
[10] points for charge that are necessary or unique
[11] to this particular case, but for the no
[12] adverse inference which we already discussed.
[13] **THE COURT**: And the
[14] Commonwealth?
[15] **MS. BARALDI**: Your Honor, I
[16] don't have any additional points for charge.
[17] **THE COURT**: Both of you on
[18] yesterday, off the record, said that you would
[19] be satisfied with the standard instructions.
[20] Mr. Giuliani said, in fact, he wanted to be
[21] sure I charge false in one, false in all. And
[22] I'm going to tell you that constitutes
[23] standard instructions.
[24] I charge the jury on what a

[1] stipulation is. I charge the jury on expert
[2] witnesses. I give consciousness of guilt,
[3] flight. And the defendant's failure to
[4] testify.
[5] Are those among the "standard
[6] instructions?"
[7] **MS. BARALDI**: Yes, Your Honor.
[8] **MR. GIULIANI**: Yes, Your Honor.
[9] **THE COURT**: Are there any
[10] requests?
[11] **MS. BARALDI**: No, Your Honor.
[12] **THE COURT**: Let me give you the
[13] verdict sheet to look at and tell me if you
[14] have any objection. Give one to each of the
[15] attorneys.
[16] That is merely a proposed
[17] verdict sheet. I submit it to you for
[18] corrections or objections. If you have
[19] concerns about it, mark it up and I will
[20] obviously make every effort to have the
[21] verdict sheet reflect your request.
[22] **MR. GIULIANI**: I believe it's
[23] acceptable, Your Honor.
[24] **THE COURT**: I told the two of

[1] you earlier that I don't have a great faculty
[2] for names. Mr. Giuliani was successful on his
[3] motion of acquittal on one of the three
[4] robberies, I want to make sure we have the
[5] right name remaining.
[6] **MS. BARALDI**: You do.
[7] **MR. GIULIANI**: You do, Your
[8] Honor.
[9] **THE COURT**: Now, if you look
[10] at --
[11] **MS. BARALDI**: Mr. Yun's name is
[12] spelled incorrectly. It should be Y-U-N, it
[13] is spelled H-U-N on the verdict sheet.
[14] **THE COURT**: Okay. See if
[15] there's anything else.
[16] Counsel, what are you alleging
[17] to be the objective of the conspiracy, robbery
[18] and/or burglary?
[19] **MS. BARALDI**: Yes, both robbery
[20] and/or burglary.
[21] **THE COURT**: And the overt act
[22] that doesn't go on the sheet, but that's part
[23] of it.
[24] **MS. BARALDI**: The unlawful.

Page 65

[1] **THE COURT**: Do you have the
[2] bills there?
[3] **MS. BARALDI**: I do.
[4] **THE COURT**: I think at some
[5] point -- I mean, it can be any number of.
[6] Took another's property; is that sufficient?
[7] **MS. BARALDI**: Yes.
[8] **THE COURT**: Mr. Giuliani and
[9] Ms. Baraldi, do you agree that where there are
[10] multiple alleged criminal objectives the jury
[11] has to determine which one, all, or none,
[12] which is why I have the interrogatory? Any
[13] objection to that?
[14] **MR. GIULIANI**: No, Your Honor.
[15] **MS. BARALDI**: No, Your Honor.
[16] **THE COURT**: I am going to get
[17] the sheet corrected and will you guys be ready
[18] to make your closings?
[19] **MS. BARALDI**: Yes.
[20] **MR. GIULIANI**: Yes.
[21] **THE COURT CRIER**: Please remain
[22] seated while the ladies and gentlemen enter
[23] the courtroom.
[24] 　　　　　　　- - -

Page 66

[1] (Jury enters the courtroom at
[2] 11:52 a.m.)
[3] 　　　　　　　- - -
[4] **THE COURT**: Thank you, ladies
[5] and gentlemen. You may be seated.
[6] Mr. Giuliani, you may continue,
[7] sir.
[8] **MR. GIULIANI**: At this point in
[9] time, the Defense would move for admission of
[10] Defense Exhibits 1 through 7, and Defense
[11] would rest.
[12] **THE COURT**: Any objection?
[13] **MS. BARALDI**: None, Your Honor.
[14] **THE COURT**: Exhibits will be
[15] received. The Defense rests.
[16] Is the evidence closed, Counsel,
[17] for both sides?
[18] **MS. BARALDI**: Yes, Your Honor.
[19] **MR. GIULIANI**: Yes, Your Honor.
[20] **THE COURT**: Very well.
[21] Ladies and gentlemen of the
[22] jury, the first order of business is for you
[23] to put your note pads and pens away. If you
[24] would place them under your seat on this

Page 67

[1] occasion.
[2] Members of the jury, now that
[3] you have heard all of the evidence which is to
[4] be presented in this case the next step is for
[5] the attorneys to make their closing arguments.
[6] Now, even though these arguments do not
[7] constitute evidence, you should consider them
[8] carefully.
[9] In their arguments the attorneys
[10] for both sides will call to your attention the
[11] evidence to which they consider material and
[12] they will ask you to draw certain inferences
[13] from that evidence. You must keep in mind,
[14] however, that you are not bound by the
[15] attorneys recollection of the evidence. It is
[16] your recollection of the evidence and yours
[17] alone which must guide you in your
[18] deliberations.
[19] So if there is a discrepancy
[20] between the attorney's recollection of the
[21] evidence and your own you are obviously bound
[22] by your recollection of the evidence. Nor are
[23] you limited in your consideration of the
[24] evidence to that which is mentioned by the
[25] attorneys. You must, as jurors, consider all

Page 68

[1] of the evidence which you deem material to the
[2] issues involved in this case.
[3] Now to the extent that the
[4] inferences which the attorneys ask you to draw
[5] are supported by the evidence, and appeal to
[6] your reason and judgment you may obviously
[7] consider them in your deliberations.
[8] Jurors, the attorneys may call
[9] to your attention certain principles of law in
[10] the course of their arguments. Please
[11] remember you are not bound by any principle of
[12] law mentioned by any attorney. You must on
[13] your oath both accept and apply only the law
[14] in which I instruct you. And you must apply
[15] that law to the facts as you determine the
[16] facts to be in reaching your verdict.
[17] Now, ladies and gentlemen, under
[18] the rules promulgated by the Supreme Court of
[19] Pennsylvania, Mr. Giuliani, the attorney for
[20] the defendant, Mr. In, will address you first
[21] Followed thereafter by Ms. Baraldi, the
[22] attorney for the Commonwealth. After which I
[23] shall instruct you on the law which you must
[24] accept and apply to the facts as you determine
[25] the facts to be in reaching your verdict.

[1]     Mr. Giuliani, are you ready to
[2] address the jury?
[3]     **MR. GIULIANI**: I am, Your Honor.
[4]     - - -
[5]     (Closing arguments to jury given
[6] by counsel.)
[7]     - - -
[8]     (Jury instructions given by the
[9] Court.)
[10]     - - -

[2]     I hereby certify that the proceedings and
[3] evidence are contained fully and accurately in the notes
[4] taken by me on the trial of the above case, and this copy
[5] is a correct transcript of the same.

[10]     _____
[11]     Samanda Rios
[12]     Court Reporter

[17]     (The foregoing certification of this
[18] transcript does not apply to any reproduction of the same
[19] by any means unless under the direct control and/or
[20] supervision of the certifying reporter.)

# Lawyer's Notes

