IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN IN,                                :       CIVIL ACTION
                                        :
            Petitioner,                 :
                                        :
      v.                                :
                                        :       NO. 21-608
MARK CAPOZZA, et al.,                   :
                                        :
            Respondents.                :


## REPORT AND RECOMMENDATION

**MARILYN HEFFLEY, U.S.M.J.**                          **February 28, 2022**

         This is a counseled petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254

by John In ("In" or "Petitioner"), a prisoner incarcerated at the State Correctional Institution

Fayette in La Belle, Pennsylvania.  For the reasons that follow, I recommend that the petition be

granted.

## I.      FACTUAL AND PROCEDURAL HISTORY

         On September 15, 2008, after a jury trial in the Philadelphia County Court of Common

Pleas, In was convicted of conspiracy, burglary, two counts of robbery, possession of an

instrument of crime, and violating Sections 6106 and 6108 of the Uniform Firearms Act.  See

Commonwealth v. In, No. 2858 EDA 2017, 2019 WL 1785335, at *3 (Pa. Super. Ct. Apr. 23,

2019) [hereinafter "PCRA Super. Ct. Op."].  Pursuant to In's motion to sever the charge of

violating Section 6105 of the Uniform Firearms Act, the trial court conducted a separate bench

trial and found him guilty of that charge.  Id.  On December 19, 2008, the trial court sentenced In

to an aggregate term of 25 to 50 years' imprisonment, followed by 10 years' probation.  Id.

         The Pennsylvania Superior Court summarized the facts underlying In's conviction as

follows:

> On March 7, 2007, three men entered Vuthary Yun's ["Yun"] house, and one of the men pointed a gun at his head. The man with the gun pushed Yun into the basement and demanded money and jewelry. Yun's daughter, Dina Khem ["Dina"], who was in her bedroom in the basement, called 911 when she heard a man's voice yelling at her father. A few minutes later, when Dina heard police upstairs, she exited her room and walked to the basement steps, where she observed her father and [In] at the top of the steps. When Dina attempted to speak to her father, [In] turned to face her, pointed the gun at her, and told her to "shut the fuck up." Dina testified that she observed [In] for approximately two minutes before returning to her room. While Yun was being held in the basement, co-conspirators Jerry Jean [("Jean")] and Dyshon Marable [("Marable")] were on the second floor, robbing Dina's younger sister, Christina Khem ["Christina"], of her jewelry.
>
> When Officer Roger Birch arrived outside of the victims' home, he observed [In] kneeling beside a white Nissan Altima. [In] entered the vehicle and sped eastbound. Officer Birch pursued him in his patrol car for approximately one block before [In] crashed the Altima into a house. [In] exited the vehicle and fled on foot before being apprehended by police. Police later took Dina to the patrol car in which [In] was being held, and Dina identified him as the gunman who held her father in the basement.
>
> Officer Kevin Cannon observed co-conspirator Jean hiding between two parked cars near the white Nissan Altima. Police arrested Jean shortly thereafter and found pieces of a latex glove in his sweatshirt. Co-conspirator Marable was later found hiding in a closet on the second floor of the victims' home.
>
> Police recovered a 0.9 mm semi-automatic handgun from the driver's side of the white Nissan Altima. Latex gloves and three traffic tickets listing the name Jerry Jean were also recovered from the vehicle. Another handgun and a latex glove were found in a shed in the victims' backyard [where Jean had hidden after fleeing the victims' house]. Later, Yun discovered that sixty dollars had been taken from his wallet.

Id. at *1 (quoting Commonwealth v. In, No. 3021 EDA 2013, 2016 WL 6247993, at *1 (Pa. Super. Ct. Oct. 26, 2016) (footnote omitted)). In appealed his conviction, but the Pennsylvania Superior Court affirmed his judgment of sentence on July 23, 2010. Id. at *3. In filed a petition for allowance of appeal, which the Pennsylvania Supreme Court denied on January 5, 2011. Commonwealth v. In, 12 A.3d 370 (Pa. 2011).

On July 15, 2011, In filed a pro se petition under Pennsylvania's Post Conviction Relief

Act ("PCRA"), 42 Pa. Cons. Stat. Ann. §§ 9541-9546. PCRA Super. Ct. Op. at *3 The PCRA court appointed counsel, who filed an amended PCRA petition on October 4, 2012, arguing that In's trial counsel was ineffective for: (1) failing to object to the Commonwealth's presentation of Marable as a witness at trial when the Commonwealth knew that Marable would not testify; (2) stipulating to Marable's guilty plea arising out of the home invasion robbery; (3) failing to object to the detectives' testimony that Marable gave a post-arrest statement; and (4) failing to object to the Commonwealth's remarks during its closing argument. Id. On September 6, 2013, the PCRA court issued a notice of its intent to dismiss the petition pursuant to Pennsylvania Rule of Criminal Procedure 907. PCRA Super. Ct. Op. at *3. On October 11, 2013, the PCRA court dismissed In's petition without a hearing. Id. In filed a timely appeal with the Superior Court. Id. The Superior Court vacated the PCRA court's order and remanded the matter for an evidentiary hearing. Id. Upon remand, the PCRA court conducted an evidentiary hearing on July 7, 2017, during which In called his trial counsel as a witness. Id. at *4. On August 18, 2017, the PCRA court once again denied In's PCRA petition. Id.

In filed a timely notice of appeal, arguing that his trial counsel was ineffective for failing to object to Marable being called as a witness at trial. Id. The Superior Court affirmed the dismissal of In's PCRA petition on April 23, 2019. Id. at *10. The Pennsylvania Supreme Court denied In's petition for allowance of appeal on May 27, 2020. Commonwealth v. In, 234 A.3d 406 (Pa. 2020).

On February 9, 2021, In filed the present counseled petition for a writ of habeas corpus in this Court. Pet. (Doc. No. 1). In his petition, In argued that his trial counsel was ineffective for: (1) failing to request DNA testing that would have exonerated him and demonstrated his actual innocence; (2) failing to object to the prosecutor's prejudicial reference to God; and (3) allowing

the Commonwealth to utilize Marable's guilty plea and statement in any manner.  Id.  In his subsequently filed Brief in Support of his Petition for Writ of Habeas Corpus, In only addressed his claim that trial counsel was ineffective in failing to request DNA testing, noting that while he raised several claims in his habeas petition, the Conviction Integrity Unit of the Philadelphia District Attorney's Office ("CIU") indicated that it would concede relief based on that claim. See Pet'r's Br. (Doc. No. 19), at 1 n.1.

On January 14, 2022, the Commonwealth filed its answer to In's petition for a writ of habeas corpus, in which it concedes that In is entitled to habeas relief.  See Resp. (Doc. No. 24). The Commonwealth states that, through its CIU, it conducted an independent investigation into In's claims.  Id. at 1.  Specifically, the Commonwealth claims that "new DNA evidence suggests that an unidentified individual played the role in the robbery that had been, until now, attributed to In" and that "[t]he CIU's review has led it to conclude that In's trial counsel was ineffective for failing to request and test that exculpatory DNA evidence."  Id. at 1-2.  For the reasons set forth below, In's petition for a writ of habeas corpus should be granted.

## II.    APPLICABLE LEGAL STANDARDS

### A.    Standard for Issuance of a Writ of Habeas Corpus

Congress, by its enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), significantly limited the federal courts' power to grant a writ of habeas corpus. Where the claims presented in a federal habeas petition were adjudicated on the merits in the state courts, a federal court shall not grant habeas relief unless the adjudication:

1. Resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

2. Resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

The United States Supreme Court has made clear that a writ may issue under the "contrary to" clause of § 2254(d)(1) only "if the state court applies a rule different from the governing law set forth in [United States Supreme Court] cases, or if [the state court] decides a case differently than [the United States Supreme Court has] done on a set of materially indistinguishable facts." Bell v. Cone, 535 U.S. 685, 694 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). A writ may issue under the "unreasonable application" clause only where there has been a correct identification of a legal principle from the Supreme Court, but the state court "unreasonably applies it to the facts of the particular case." Id. (citing Williams, 529 U.S. at 407-08). This requires a petitioner to demonstrate that the state court's analysis was "objectively unreasonable." Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

State court factual determinations are also given considerable deference under the AEDPA. Palmer v. Hendricks, 592 F.3d 386, 391-92 (3d Cir. 2010) (quoting Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004)). A petitioner must establish that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

**B.     Exhaustion and Procedural Default**

"[A] federal habeas court may not grant a petition for a writ of habeas corpus . . . unless the petitioner has first exhausted the remedies available in the state courts." Lambert v. United States, 134 F.3d 506, 513 (3d Cir. 1997) (citing 28 U.S.C. § 2254(b)(1)(A); Toulson v. Beyer, 987 F.2d 984, 986-87 (3d Cir. 1993)). The exhaustion requirement mandates that the claim "have been 'fairly presented' to the state courts." Bronshtein v. Horn, 404 F.3d 700, 725 (3d Cir. 2005) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971)). Fair presentation requires that a

petitioner have pursued his or her claim "through one 'complete round of the State's established appellate review process.'" Woodford v. Ngo, 548 U.S. 81, 92 (2006) (quoting O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999)). The procedural default barrier, in the context of habeas corpus, also precludes federal courts from reviewing a state petitioner's habeas claims if the state court decision is based on a violation of state procedural law "that is independent of the federal question and [is] adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991). "[I]f [a] petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his [or her] claims in order to meet the exhaustion requirement would now find the claims procedurally barred. . . . there is a procedural default for [the] purposes of federal habeas." Id. at 735 n.1 (citing Harris v. Reed, 489 U.S. 255, 269-70 (1989); Teague v. Lane, 489 U.S. 288, 297-98 (1989)); see also McCandless v. Vaughn, 172 F.3d 255, 260 (3d Cir. 1999).

To survive procedural default in the federal courts, a petitioner must either "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750.

### C. Ineffective Assistance of Counsel

In Strickland v. Washington, 466 U.S. 668 (1984), the United States Supreme Court set forth the standard for claims of ineffective assistance of counsel in violation of the Sixth Amendment. Counsel is presumed to have acted effectively unless the petitioner demonstrates both that "counsel's representation fell below an objective standard of reasonableness" and that there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 686-88, 693-94.

To satisfy the reasonable performance prong of the analysis, a petitioner must "show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland, 466 U.S. at 687). In evaluating counsel's performance, the reviewing court "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance" and that there are "countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Id. at 104, 106 (quoting Strickland, 466 U.S. at 689). The reviewing court must "'reconstruct the circumstances of counsel's challenged conduct' and 'evaluate the conduct from counsel's perspective at the time.'" Id. at 107 (quoting Strickland, 466 U.S. at 689). "[I]t is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." Id. at 111.

To satisfy the prejudice prong of the analysis, a petitioner must demonstrate that counsel's errors were "so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." Id. at 104 (quoting Strickland, 466 U.S. at 687). Thus, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland, 466 U.S. at 694). This determination must be made in light of "the totality of the evidence before the judge or jury." Strickland, 466 U.S. at 695.

### III.  In Is Entitled to Habeas Relief on His Claim that His Trial Counsel Was Ineffective for Failing to Request DNA Testing

In argues that his trial counsel was ineffective for failing to request DNA testing, the results of which would have created a reasonable probability of In's acquittal. Pet'r's Br. at 8-

24. The Commonwealth concedes that In is entitled to habeas relief on this claim. Resp. at 13-22. The undersigned agrees with the parties' position that In's claim that his trial counsel's failure to request DNA testing violates his Sixth Amendment right to effective assistance of counsel and entitles him to habeas relief.

### A.  Exhaustion and Procedural Default

As an initial matter, In failed to raise the claim that his trial counsel was ineffective for failing to request DNA testing in the state court. Accordingly, his claim is procedurally defaulted. Coleman, 501 U.S. at 729; McCandless, 172 F.3d at 260. In argues, and the Commonwealth agrees, that In is entitled to overcome that procedural default pursuant to Martinez v. Ryan, 566 U.S. 1, 9 (2012), because of his first post-conviction counsel's subsequent ineffectiveness. Pet'r's Br. at 25-29; Resp. at 11.

In its Response, however, the Commonwealth has affirmatively waived exhaustion and procedural default as defenses to this claim. Resp. at 11 ("Although the Commonwealth believes that In is entitled to overcome th[e] procedural default because of his first post-conviction counsel's subsequent ineffectiveness, the Commonwealth instead chooses to knowingly and intentionally waive In's procedural default." (internal citations omitted)); see 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement."). This waiver is valid even when lack of exhaustion would otherwise have barred the petitioner's claim. Sharrieff v. Cathel, 574 F.3d 225, 229 (3d Cir. 2009). Accordingly, In is not precluded from relief based on any alleged procedural default of his claim.

## B.     Factual Background of Claim

### 1.     Evidence of the Crime Presented at Trial

On March 7, 2007, three men committed a home invasion robbery at the residence at 720 West Mifflin Street, Philadelphia. Transcript of Record at 101, Commonwealth v. In, No. CP-51-CR-0004829-2007 (Pa. Ct. Com. Pl. Phila. Cnty. Sept. 10, 2008) [hereinafter "Sept. 10 Tr."]. Yun lived at this residence along with his three daughters, Christina, Angela, and Dina, and one son, Keith. Id. at 74-75. Three men entered Yun's house and accosted him while he was doing the dishes. Id. at 101-02. Two of the men – Jean and Marable – went upstairs to a second-floor bedroom occupied by Christina, where they held her at gunpoint. Id. at 75-80. The third perpetrator – who was described by Yun as the tallest of the three – took Yun at gunpoint from the kitchen on the ground floor down to the basement where he tied him up. Id. at 100-04. Yun's daughter Dina, who was sleeping in a bedroom in the basement, heard the commotion and called the police from inside her bedroom. Id. at 124. When Dina later heard police arrive, she left her bedroom and walked over to the steps that led to the ground floor. Id. at 124-25. She saw her father and the third perpetrator with a gun standing near the top of the steps. Id. at 125-26. She spoke to her father, and the perpetrator pointed a gun at her and told her to "shut the fuck up." Id. at 126-27. She then went back to her bedroom. Id. at 127.

After the police arrived, Officers Robert Robinson and Felicia Battles went to the rear alley to apprehend Jean, who had jumped out of the upstairs window. Transcript of Record at 31-35, 48, Commonwealth v. In, No. CP-51-CR-0004829-2007 (Pa. Ct. Com. Pl. Phila. Cnty. Sept. 11, 2008) [hereinafter "Sept. 11 Tr."]. Marable was later found by police in an upstairs bedroom closet where he had stayed hidden for over an hour. Id. at 160. While the police were in the rear apprehending Jean, the third perpetrator exited the basement and ran through the front

vestibule, out of the house. Sept. 10 Tr. at 82-84. Christina had come downstairs when the police arrived and was standing by the front door when the man ran right past her. Id. at 84. She testified that in order to get out of the house, the man had to run through the vestibule. Id. When the man ran past her, she heard him yell, "oh shit." Id. at 82-83.

Whereas the circumstances surrounding Jean's and Marable's arrests were never disputed, the Commonwealth acknowledges that the evidence introduced at trial surrounding In's apprehension and arrest was conflicting. Resp. at 6. According to the evidence admitted at trial, while officers were occupied pursuing Jean, a tall individual wearing "dark clothing" ran past two of Yun's daughters and towards the front door, pausing only briefly to exclaim, "oh shit, what's happening," before exiting the house. Sept. 10 Tr. at 81-83. Shortly afterward, when Officer Cannon got out of his car to apprehend Jean, he observed a white Nissan Altima parked nearby with its headlights on. Sept. 11 Tr. at 80-81. Then, the Nissan Altima reversed and sped off eastbound on Mifflin Street. Id. Although officers in the area were not yet aware that anyone other than Jean had fled the Mifflin Street house, they believed that the speeding Nissan Altima was likely tied to the home invasion. Id. at 89. Officers pursued the Nissan Altima, but conflicting accounts of that pursuit by the officers involved make it difficult to determine exactly how the chase unfolded. See Resp. at 7.

At trial, Officer Birch testified that he first saw In kneeling behind the white Nissan Altima at roughly the time Officer Cannon spotted Jean crouched nearby. Sept. 11 Tr. at 96, 99. He then testified that he saw In jump into the Nissan Altima through its passenger-side door and begin driving eastbound on Mifflin Street. Id. at 96. Officer Birch followed in his cruiser until the Nissan Altima crashed into a house on the 500 block of Mifflin Street after making a sudden turn, likely because a second police cruiser was approaching from the opposite direction. Id.

According to Officer Birch's trial testimony, In then jumped out of the disabled Nissan Altima and fled.  Id. at 96-97, 101.  Officer Birch left his cruiser at the location of the crash and pursued In on foot.  Id. at 96, 101.

This account is contradicted by Officer Birch's own accounts of the events as memorialized in police investigative records.  First, according to a memorandum that Officer Birch prepared a few hours after In's arrest, In was already sitting in the Nissan Altima's driver's seat when Birch first arrived on scene.  Id. at 105.  Second, in an interview he gave to police detectives after the incident, Officer Birch explained that when he first spotted In, In was not interacting with the Nissan Altima at all.  Rather, he was running northbound on Sixth Street while the Nissan Altima was parked at 7th and Mifflin.  Id. at 109.  Moreover, transcripts from Officer Birch's contemporaneous police radio transmissions and testimony given by Officer Seaborn also contradict the testimony that Officer Birch gave at trial.  According to Officer Birch's trial testimony, he witnessed the crash on the 500 block of Mifflin Street and left his cruiser at that location while he pursued In on foot.  Id. at 96-97.  But Officer Birch's radio transmissions show that after In was arrested, Officer Birch asked for other officers to retrieve his vehicle from the 700 block of Mifflin Street.  App'x to Pet'r's Br. at 20.  Officer Seabron's trial testimony corroborated Officer Birch's radio call.  Officer Seaborn testified at trial that he arrived at the crash site after the driver had fled, parked his cruiser directly behind the crashed Nissan Altima, and secured the area.  Sept. 11 Tr. at 117-18, 121.  During the course of these events, Officer Seabron did not see Officer Birch's car anywhere on the 500 block of Mifflin Street.  See id. at 122.

Although the reasons for, and the circumstances surrounding, In's flight from police are uncertain, there is no dispute that In attempted to flee from or evade the police shortly after the

crime was committed. See Resp. at 8. When apprehended, In was arrested by Sergeant Steven

Woods and put in the back of a car alongside Jean. Sept. 10 Tr. at 91-92. Christina and Dina

were both taken to the car to identify the men. Id. at 92. Christina was able to identify Jean

based on a sweatshirt that he had been wearing, but could not identify In. Id. at 92-93. Dina did

not recognize Jean, but identified In as the man she encountered in her basement. Id. at 130.

Yun, however, did not identify In. Id. at 107.

Both Marable and Jean pleaded guilty. See Docket at 4, Commonwealth v. Marable, No.

CP-51-CR-0004827-2007 (Pa. Ct. Com. Pl. Phila. Cnty.); Docket at 4, Commonwealth v. Jean,

No. CP-51-CR-0004828-2007 (Pa. Ct. Com. Pl. Phila. Cnty.). In maintained that he was not

involved in the crime and was not the third perpetrator. See App'x to Pet'r's Br. at 22.

## 2.      Physical Evidence Collected

Five pieces of evidence were recovered at the scene that were tested for DNA: three

pieces of latex gloves and two guns, one found in the white Nissan Altima that the

Commonwealth alleged was driven by the third perpetrator fleeing the scene and one found in an

area where Jean had been observed behind the residence. Sept. 11 Tr. at 12-13, 32-37, 145, 168-

76; App'x to Pet'r's Br. at 1-2. One latex glove was found in a back alleyway near where Jean

attempted to flee. Sept. 11 Tr. at 24, 146-47. Another scrap of latex glove was recovered from

the highway at the 600 block of Mifflin Street. Id. at 147. A third latex glove piece was

recovered from the Mifflin Street house's front vestibule. Id. at 24, 147.

These five items were swabbed for DNA, which was then compared to DNA from Jean

and In that had been obtained via buccal swab. Resp. at 9. Both Jean and In were excluded as

contributors to the DNA samples collected from the two guns. Sept. 11 Tr. at 175-76. The scrap

of latex glove found in the alley behind the Mifflin Street house yielded a DNA sample that

matched Jean, but not In.  Id. at 170.  The scrap of latex glove found on the highway on the 600

block of Mifflin Street did not conclusively match Jean, but Jean could not be excluded as a

possible contributor.  Id. at 172.  In, however, was excluded as a possible contributor.  Id.

Finally, both Jean and In were excluded as contributors to the scrap of latex glove found in the

home's front vestibule.  Id. at 175.  Thus, In's DNA was excluded from every DNA sample from

the evidence collected.  App'x to Pet'r's Br. at 1-2.  Marable's DNA was not tested prior to trial,

and accordingly none of the DNA swabs were tested against Marable's DNA.  Transcript of

Record at 47, Commonwealth v. In, No. CP-51-CR-0004829-2007 (Pa. Ct. Com. Pl. Phila. Cnty.

Sept. 12, 2008) [hereinafter "Sept. 12 Tr."].

### 3.   The Commonwealth's Trial Theory

The Commonwealth's theory at trial was that In was the third perpetrator who took Yun

hostage at gunpoint and led him to the basement, where he tied Yun up.  Id. at 40-45.  When

police arrived, In fled out the front door and headed to a white Nissan Altima, where he stowed

his gun.  Id.  He then sped off when police approached the car but, not long after, he crashed the

car and tried to flee on foot, only to be caught by the police.  Id.  The Commonwealth relied

heavily at trial on Dina's identification of In shortly after the incident and that In lived in the

same general neighborhood (on the other side of town) as Jean.  Resp. at 3.  However, as the

Commonwealth acknowledges, the prosecution struggled to account for DNA evidence

introduced at trial – specifically, the DNA from the piece of latex glove recovered from the front

vestibule to which In had been excluded as a contributor.  See id.  The prosecution argued that

the latex glove piece found in the front vestibule belonged to Marable.  Id.; Sept. 12 Tr. at 46-47.

The prosecution claimed, however, that because Marable pleaded guilty before Jean and In were

swabbed for DNA, the Commonwealth had no ability to obtain Marable's DNA.  Sept. 12 Tr. at

47. According to the Commonwealth, "[t]he prosecution used this logic to assure the jury that it could be true both that In's DNA had not been found on a scrap of glove that Marable dropped, and that In was one of the three men who broke into the Mifflin Street house." Resp. at 4.

### 4. Trial Counsel's Trial Theory

At trial, In's counsel argued to the jury that In's exclusion as a contributor to the DNA on the latex glove piece found in the front vestibule exonerated In. Sept. 12 Tr. at 24-25. Specifically, he argued that the third perpetrator from the basement ran out of the house through the front vestibule. Id. Thus, the glove piece was likely dropped by this third perpetrator. Id. He argued that Jean could not have dropped the latex scrap because, in addition to never having returned to that floor after the police arrived, he was excluded as a contributor to any DNA on the glove. Id. at 24. Nor could Marable have dropped it, because he was hiding in a second-floor closet and did not return to the first floor until well after the police secured the house. Id. Furthermore, In's counsel contended that he could not have dropped it because he was also excluded by DNA testing. Id. at 25. Consequently, trial counsel argued that this evidence necessarily suggested that someone other than those three men had been part of the robbery and that In was not the third participant. Id. However, because Marable's DNA had never been tested, trial counsel could not conclusively refute the theory put forth by the prosecution that the latex fragment from the front vestibule belonged to Marable.

### 5. Habeas Investigation

Prior to trial, In requested that trial counsel seek a comparison of the glove piece from the vestibule with Marable's DNA. App'x to Pet'r's Br. at 22. Trial counsel never did so. During the habeas investigation, however, Marable agreed to provide In's habeas counsel with a buccal swab so that a DNA analysis could be performed. See id. at 3-5. On February 25, 2020,

Marable was swabbed, and his sample was sent to DNA Diagnostics Center in Fairfield, Ohio. Id. On February 28, 2020, DNA Diagnostics Center issued its report revealing Marable's profile. Id. at 6-7.

Habeas counsel engaged expert Arthur W. Young of Guardian Forensic Sciences in Abington, Pennsylvania, to conduct an analysis of Marable's DNA profile with the DNA evidence and other profiles in the case. Id. at 8-15. Young concluded that Marable was excluded as a contributor to the DNA from the glove piece in the front vestibule. Id. at 17. In addition, Young found a number of common alleles between the glove piece in the vestibule and the firearm in the Nissan Altima that the Commonwealth argued was driven by the third perpetrator fleeing the scene. Id. at 18. In, however, was excluded as a contributor to the DNA profiles on both the firearm and the glove piece. Id. at 17-18.

Likewise, the CIU accepted In's case for review and undertook and independent investigation into the evidence. Resp. at 9. The CIU obtained a voluntary buccal swab from Marable and then requested the Office of Forensic Services ("OFS") at the Philadelphia Police Department to compare the buccal swab with the DNA reports prepared in anticipation of In's original trial. Resp. Ex. A. After analyzing Marable's reference sample, OFS concluded that Marable was excluded as a contributor to the DNA recovered from the scrap of latex glove originally found in the Mifflin Street house's entryway vestibule. Id. The OFS DNA analyst also concluded that there were enough alleles in common between the latex scrap and the firearm recovered from the crashed Nissan Altima that it was possible the DNA obtained from both items was deposited by the same individual. Id.

In addition to the DNA testing, the CIU also interviewed In's trial attorney in an effort to understand why trial counsel did not pursue DNA testing at the time of trial given In's pre-trial

claim of innocence and the possibility that testing would disprove the Commonwealth's theory of the crime.  Resp. at 10.  During the interview, trial counsel informed CIU that he remembered the case well and that he had no strategic basis for failing to investigate and/or pursue DNA testing to determine whether Marable was in fact the source of the DNA obtained from the latex scrap found in the home's vestibule.  Id.

### C. Trial Counsel Was Ineffective for Failing to Secure and Present an Analysis of Marable's DNA at Trial

#### 1. Trial Counsel's Performance Was Deficient

The Commonwealth concedes that In's trial counsel was ineffective for failing to secure and present an analysis of Marable's DNA.  Id. at 13.  Pursuant to Strickland, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  466 U.S. at 691.  Trial counsel was deficient when he unreasonably failed to investigate whether Marable could be linked to the vestibule glove fragment through DNA testing.  Trial counsel argued to the jury that his client could not have been one of the three intruders because an analysis of the DNA found on the latex scrap recovered from the front vestibule excluded In and Jean as contributors.  Sept. 12 Tr. at 24.  Trial counsel maintained that Marable was likewise excluded because he never returned to the house's first floor after the police arrived.  Id.  Thus, the latex glove piece must have come from an unknown third perpetrator.  Id.  But the defense did not do anything to prove that the scrap of glove had not been dropped when Marable first arrived at the Mifflin Street house or that the DNA on that scrap of glove was not Marable's.  Absent a DNA comparison between Marable and the glove piece, however, the prosecutor was able to argue to the jury that there was no unknown third perpetrator, but rather Marable was the man who dropped the glove piece.  Id. at 47.

Moreover, trial counsel had reason to know that the latex scrap could be tested against

Marable's DNA.  Trial counsel was aware that a useable DNA profile had been obtained from the scrap and that Marable was in custody following a guilty plea for the robbery.  Id. at 24-25; App'x to Pet'r's Br. at 24.  Nevertheless, he failed to even request a sample of Marable's DNA from either the Commonwealth or Marable himself – a request that likely would have been granted.  See Commonwealth v. Brison, 618 A.3d 420, 425 (Pa. Super. Ct. 1992) (finding that the trial court erred when it failed to perform the potentially exculpatory DNA tests that an indigent defendant requested); see also 44 Pa. Cons. Stat. Ann. § 2316 (requiring Marable to provide DNA to the state following conviction and sentence).

Nor is there any indication that trial counsel's failure to investigate DNA testing was attributable to any tactical considerations or strategic judgment.  Pet'r's Br. at 1; App'x to Pet'r's Br. at 24.  In a declaration dated October 7, 2021, and during a subsequent interview with the CIU, trial counsel stated that he had "no reasonable strategic rationale for not seeking to obtain Marable's DNA profile."  App'x to Pet'r's Br. at 24; Resp. at 15.  Moreover, trial counsel acknowledged that "had the jury known [that Marable's DNA had been excluded from the glove in the vestibule], it would have had no basis to convict [] In."  App'x to Pet'r's Br. at 24.  Trial counsel's failure to obtain and present any analysis of Marable's DNA allowed the jury to speculate that Marable dropped the latex scrap found in the Mifflin Street house's front vestibule.  Further investigation into the facts surrounding In's case would have foreclosed that inference.

## 2. Trial Counsel's Deficient Performance Prejudiced In

The Commonwealth likewise concedes that there is a reasonable probability that, but for trial counsel's deficient performance, the results of In's trial would have been different.  Resp. at 17.  The newly-discovered DNA evidence undermines the Commonwealth's theory of the case

and the evidence presented against In at trial was far from unassailable.

Much of In's defense was premised on the implication that the latex fragment found in the front vestibule had been dropped by the true co-conspirator. Sept. 12 Tr. at 24-25. Evidence that someone other than Marable dropped the scrap of latex in the front vestibule would suggest that, although the identity of the third intruder was unknown, it was not In. The uncontroverted facts at trial established that the same man who held Yun hostage in the basement had to be the intruder who fled past Christina through the house's front door, because there was no testimony suggesting that either Jean or Marable returned to the first floor of the house after police arrived. Based on these facts, In's trial counsel argued that the man in the basement was the only intruder who had the opportunity to drop the scrap of latex glove in the front vestibule, and that because In was excluded on the DNA sample of that glove, he was similarly excluded as a participant in the robbery. Id. at 23-24. The defense's theory required jurors to agree that the scrap of latex glove was, in fact, dropped by the man who held Yun hostage in the basement. Although it was uncontested that Marable never returned to the first floor after police arrived, he did spend time on the first floor immediately after entering the house. Sept. 10 Tr. at 102. A juror, therefore, could have easily found that Marable dropped the glove fragment before he went upstairs. Moreover, attributing the latex scrap to Marable, although it required speculation from the jury, was the only way to reconcile Dina's eyewitness identification of In with the DNA evidence presented at trial.

Dina's identification, however, was itself problematic. As the Commonwealth acknowledges, see Resp. at 19-20, the identification process was incredibly suggestive, taking place while In and his co-defendant were sitting in the back of a police car. Sept. 10 Tr. at 129-30; see also United States v. Brownlee, 454 F.3d 131, 138 (3d Cir. 2006). Dina's identification

was undermined by the fact that neither Christina, who viewed the perpetrator passing by her in the front vestibule, or Yun could identify In as the perpetrator. Sept. 10 Tr. at 92-94, 107-08. Yun also testified that the third perpetrator from the basement was the tallest of the three, as he had seen them all standing together. Id. at 112. Jean, however, was 6'4", whereas In was 5'9". Sept. 11 Tr. at 54; Transcript of Record at 42, Commonwealth v. In., No. CP-51-CR-0004829-2007 (Pa. Ct. Com. Pl. Phila. Cnty. July 17, 2017). In was also excluded as a contributor from every DNA profile from the evidence collected from the scene. App'x to Pet'r's Br. at 1-2. A DNA analysis that excluded Marable from being the glove's wearer would have substantially decreased the possibility that jurors would convict In. The possibility that Marable dropped the latex scrap when he first entered the house would have been eliminated, discouraging jurors from accepting the explanation for the latex scrap that also fit with Dina's identification.

Furthermore, evidence presented at trial of In's alleged flight was inconsistent, as discussed supra in Section III.B.1. Officer Birch testified that when he arrived on the scene, he saw a man whom he identified as In "kneeled down" behind a white Nissan Altima in the 600 block of Mifflin Street, near the corner of 7th and Mifflin. Sept. 11 Tr. at 96. According to Officer Birch's trial testimony, In then jumped through the passenger side of the car, put it in reverse, and drove eastbound until crashing into a house at the 500 block of Mifflin. Id. Officer Birch testified that he then saw In take off running. Id. Officer Birch, however, was the only officer to place In anywhere near the Nissan Altima and his testimony was undermined by the fact that, while a gun was found in the car, DNA testing excluded In from being a contributor, even though he was gloveless when he was arrested. Id. at 175. Moreover, multiple discrepancies existed between Officer Birch's trial testimony and his prior statements, including what he relayed over the police radio, and the testimony of Officers Cannon and Seaborn. See

id. at 80-81, 96-97, 99, 100, 102-05, 108-111, 122; App'x to Pet'r's Br. at 20. The jury submitted nine questions during their deliberations, and at least six of them were related in some way to the Nissan Altima and Officer Birch's testimony regarding In's alleged flight. Sept. 12 Tr. at 89-91. This suggests that the jury struggled with what to make of Officer Birch's conflicting statements, and that any additional exculpatory evidence may have led to a different outcome.

Finally, DNA testing also revealed similarities between the DNA found on the latex glove piece from the front vestibule and that found on the gun taken from the crashed Nissan Altima, making it possible that the two items were handled by the same individual. Resp. at 21. Because all three defendants were excluded from the DNA profile found on the latex fragment, the individual who handled both the glove and the gun could not have been Jean, Marable, or In. By tying the gun recovered from the Nissan Altima to the individual who held Yun at gunpoint via DNA, even if not definitively, the defense would have been able to buttress the argument that it made during its closing – that In could not have held someone at gunpoint while wearing crumbling latex gloves and not leave any DNA on the gun. Sept. 12 Tr. at 32.

In light of this evidence supporting an unidentified third intruder, the defense could have plausibly argued that In simply had the misfortune of being in the wrong place at the wrong time. He happened to be near the Nissan Altima when the driver fled from police, and he began running as well. His flight could be explained by In's prior encounter with police as a juvenile and an adult.[1] Officer Birch saw him running up the sidewalk near Jean and the Nissan Altima,

---

[1]     In's juvenile charges resulted in adjudications, while the adult charges were generally withdrawn or In was found not guilty. Resp. at 22 n.8. In had adult convictions for Knowing and Intentional Possession of a Controlled Substance and Escape that predate his arrest in connection with this incident. Id.

and when the Nissan Altima's driver was nowhere to be found, Officer Birch pointed to In as the driver. DNA evidence demonstrating that the piece of latex glove did not belong to either In, Jean, or Marable, but rather some unidentified individual, would have created a reasonable likelihood of a different result.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, I recommend that In's habeas petition be granted. Accordingly, I make the following:

<u>**RECOMMENDATION**</u>

AND NOW, this 28th day of February, 2022, IT IS RESPECTFULLY RECOMMENDED that the Petitioner's petition for a writ of habeas corpus be GRANTED as to Petitioner's claim that he received ineffective assistance of counsel in violation of the Sixth Amendment of the United States Constitution for trial counsel's failure to request DNA testing and that Petitioner's conviction and sentence be VACATED. The parties may file objections to this Report and Recommendation. <u>See</u> Local Civ. Rule 72.1. Failure to file timely objections may constitute a waiver of any appellate rights.

*/s/ Marilyn Heffley*
MARILYN HEFFLEY
UNITED STATES MAGISTRATE JUDGE